UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

MIRROR TRADING INTERNATIONAL                    Chapter 15
(PTY) LTD,
                                                Case No.:

        Debtor in a Foreign Proceeding.
_____/

**VERIFIED MOTION FOR ORDER OF RECOGNITION OF FOREIGN MAIN
PROCEEDING PURSUANT TO §§ 1515 AND 1517 AND REQUEST FOR HEARING**

Chavonnes Badenhorst St Clair Cooper (the "Liquidator"), as one of the duly appointed

liquidators of the bankruptcy estate of Mirror Trading International (PTY) Ltd (the "Debtor")

moves this Court for entry of an Order recognizing the Debtor's involuntary liquidation proceeding

(the "South African Proceeding") under the control or supervision of the High Court of South

Africa, Western Cape Division, Cape Town, Republic of South Africa (the "South African Court")

as a foreign main proceeding under 11 U.S.C. § 1517,[1] granting related relief pursuant to §§ 1520

and 1521, and granting any additional relief which may be available under the Bankruptcy Code.

The Liquidator further requests a hearing on the initial petition (ECF No. 1) (the "Petition") and

this Verified Motion no earlier than (21) days after the date the Court issues its notice of hearing

but, in any event, "at the earliest possible time" thereafter.  See Fed. R. Bankr. P. 2002(q); §

1517(c).

---

[1]    All statutory references shall be to Title 11 U.S.C. § 101 *et seq*. (the "Bankruptcy Code"),
unless otherwise specified.

1

## PRELIMINARY STATEMENT, JURISDICTION, & VENUE

1.      The Liquidator files the Petition and this Verified Motion under § 1504 to seek recognition of the South African Proceeding as a "foreign main proceeding," as defined in § 1502(4).

2.      The Petition and the Verified Motion are supported by the Declaration under penalty of perjury of the Liquidator (the "Declaration") attached as **Exhibit "1"**. The Declaration itself contains exhibits referred to and incorporated herein. The Declaration also provides a summary of the South African Proceeding and the conversion of the Debtor's estate from a provisional liquidation to a final liquidation under the South African Court's supervision. See Ex. 1 ¶¶ 6-28.

3.      A true and correct certified copy of the Order dated December 28, 2020 placing the Debtor into a provisional liquidation (the "Provisional Liquidation Order") is attached as **Exhibit "1-A"**.[2] A true and correct certified copy of the Order dated June 30, 2021 placing the Debtor into a final liquidation (the "Final Liquidation Order") is attached as **Exhibit "1-B"**. A true and correct certified copy of the Certificate of Appointment of Liquidator dated November 11, 2021 (the "Certificate of Appointment of Liquidator") appointing the Liquidator and other five individuals[3] as the Debtor's joint liquidators (the "Joint Liquidators") is attached as **Exhibit "1-C"**. The Liquidator took office as the liquidator of the Debtor's estate in the South African Proceeding pursuant to the Certificate of Appointment of Liquidator and has acted in that capacity continuously since accepting the appointment on November 11, 2021. See Ex. 1 ¶ 4. Further, the

---

[2]    Exhibit 1-A indicates the document attached to the Declaration as Exhibit A.

[3]    Chavonnes Badenhorst St Clair Cooper; Jacolien Frieda Barnard; Deidre Basson; Herman Bester; Christopher James Roos; and Adriaan Willem van Rooyen.

six Joint Liquidators have appointed the Liquidator to represent the Joint Liquidators in court, commence actions, employ counsel and more, all in South Africa or in any other country, through the Power of Attorney for Appointment of Agent to Commence or Defend Proceedings in the Republic of South Africa and/or Any Other Foreign Country (the "Power of Attorney") accepted by myself on October 14, 2022. The Power of Attorney is attached as **Exhibit "1-F"**. See Ex. 1 ¶¶ 34-35; Ex. 1-F.

4.        As required by Fed. R. Bankr. P. 1007(a)(4), a Statement of Corporate Ownership, in conformity with Fed. R. Bankr. P. 7007.1 is attached as **Exhibit "2"**.

5.        South Africa is the center of main interests of the Debtor. Among other considerations, the Debtor is a South African company that conducted its business from the Republic of South Africa, and the location of the Debtor's last principal place of business and registered address are Stellenbosch, Western Cape, Republic of South Africa. See Ex. 1 ¶¶ 6-7. The Liquidator is unaware of any evidence that the Debtor conducted the administration of its affairs other than from the Republic of South Africa or that it had any establishment or place of business outside of the Republic of South Africa. Ex. 1 ¶ 22.

6.        This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334 and §§ 109 and 1501 of the Bankruptcy Code.

7.        This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

8.        Venue is proper in this district under 28 U.S.C. § 1410. The Liquidator has retained Sequor Law, P.A. ("Sequor Law") in this district, and Sequor Law holds in its trust account in this District on behalf of and for the benefit of the Debtor, to which funds Sequor Law has no rights of setoff, charging lien, or similar right.  Ex. 1 ¶ 30.

3

## BACKGROUND AND BASIS FOR RECOGNITION

9.      The Declaration sets forth in detail the background and basis for recognition and it is incorporated by reference as if fully set forth here.  See Ex. 1.

10.     The Liquidator has satisfied each of the requirements for recognition of the South African Proceeding under Chapter 15 of the Bankruptcy Code, as follows:

(a)     The Liquidator qualifies as a "foreign representative" as defined in 11 U.S.C. §101(24) because he is an individual authorized in the South African Proceeding to administer the liquidation of the Debtor's assets and affairs and to act as a representative of the South African Proceeding.  See Ex. 1-C.

(b)     The South African Proceeding is a "foreign main proceeding" as defined in 11 U.S.C. § 101(23) and 1502(4) because it is (i) pending in South Africa, which is the Debtor's center of main interests; and (ii) a collective judicial proceeding under a law relating to insolvency or adjustment of debt in which proceeding the Debtor's assets and affairs are subject to the supervision of the South African Court for the purpose of liquidation.  See Ex. 1 ¶¶ 27, 32-33; Ex. 1-A; Ex. 1-B.

(c)     The Debtor meets the requirements of a "debtor" as defined in sections 109(a), if applicable, and 1502 because the Debtor is the subject of a foreign proceeding and has assets in the United States, including property of the Debtor in trust with Sequor Law.  See Ex. 1 ¶ 30.

(d)     This Verified Motion is accompanied by the Orders of the South African Court dated December 28, 2020 placing the Debtor into a provisional liquidation (Ex. 1-A) and dated June 30, 2021 placing the Debtor into a final liquidation (Ex. 1-B).

SEQUOR LAW, P.A.

(e)     Additionally, the Declaration contains the list of all foreign proceedings, persons, or entities that must be identified pursuant to 11 U.S.C. § 1515 and Fed. R. Bankr. P. 1007.  See Ex. 1 ¶ 38; Ex. 2, ¶ 4.

## RELIEF REQUESTED

11.     The Liquidator seeks an Order pursuant to §§ 105(a), 1507, 1517, 1520, and 1521 of the Bankruptcy Code, substantially in the form of the Proposed Order, attached as **Exhibit "3"** hereto, granting the following relief:

(a) Recognizing the South African Proceeding as a foreign main proceeding and the Liquidator as the duly authorized foreign representative of the Debtor;

(b) Granting the relief allowable as of right upon recognition of a foreign main proceeding under § 1520 of the Bankruptcy Code;

(c) Granting all necessary and appropriate relief under § 1521 of the Bankruptcy Code, including:

(1) staying the commencement or continuation of any action or proceeding without the consent of the Liquidator concerning rights, obligations, or liabilities of the Debtor and the Debtor's bankruptcy estate to the extent not stayed under § 1520(a) of the Bankruptcy Code;

(2) staying execution against the Debtor to the extent not stayed under § 1520(a);

(3) suspending the right to transfer or otherwise dispose of any assets of the Debtor to the extent this right has not been suspended under § 1520(a);

(4) providing for the examination of witnesses, the taking of evidence, and the delivery of information concerning the assets, affairs, rights, obligations, or liabilities of the Debtor or the Debtor's estate under § 1521(a)(4), the Federal

5

Rules of Bankruptcy Procedure including Fed. R. Bankr. P. 2004, and Local Rule 2004-1;

(5) entrusting the administration or realization of all of the Debtor's assets within the territorial jurisdiction of the United States to the Liquidator;

(6) entrusting the distribution of all or part of the Debtor's assets located within the United States to the Liquidator and finding that the interests of the creditors of the Debtor are sufficiently protected thereby;

(7) requiring that other than a counterclaim to a suit brought by the Liquidator, no person or entity may commence suit against the Liquidator in any court, including this Court, in the United States without first obtaining leave of this Court;

(8) otherwise granting comity to and giving full force and effect to the orders and documents attached to this Motion; and

(9) granting the Liquidator such other and further relief as this Court may deem just and proper.

## **CONCLUSION**

WHEREFORE, the Liquidator respectfully requests that this Court enter an Order substantially in the form of the Proposed Order attached hereto as **Exhibit "3"** and grant such other relief as may be just and proper.

Dated: February 9, 2023                    Respectfully submitted,

6

**SEQUOR LAW, P.A.**
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

By:  */s/ Gregory S. Grossman*
Gregory S. Grossman, FBN 896667
ggrossman@sequorlaw.com


**REDMOND LAW FIRM, LLC**
Christopher J. Redmond
Kansas Bar No. 7307
13220 Metcalf, Suite 310
Overland Park, Kansas 66213
Tel:  (913) 379-1100
Christopher.Redmond@christopherredmond
lawfirm.com

*"Pro Hac Vice Application Forthcoming"*

*EXHIBIT "1"*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                      Case No.:

MIRROR TRADING INTERNATIONAL                                Chapter 15
(PTY) LTD,

     Debtor in a Foreign Proceeding.
_____/

### DECLARATION OF THE FOREIGN REPRESENTATIVE IN SUPPORT OF CHAPTER 15 PETITION FOR RECOGNITION OF A FOREIGN MAIN PROCEEDING

     I, CHAVONNES BADENHORST ST CLAIR COOPER (the "Liquidator"), a court-appointed joint liquidator and the foreign representative for the bankruptcy estate of MIRROR TRADING INTERNATIONAL (PTY) LTD (the "Debtor") hereby declare under penalty of perjury under the laws of the United States as follows:

     1.    I am over the age of 18 and, if called upon, could competently testify as to all matters set forth in this statement based upon my own personal knowledge, except for those portions specified as being otherwise. Where matters are based on information supplied to me, those matters are true to the best of my information, knowledge, and belief and I clearly identify the source of that knowledge.

     2.    I am a native English speaker.

     3.    I am a South African insolvency practitioner at CK Trust (Pty) Ltd, and I currently am a liquidator of the Debtor. The Debtor was placed into an involuntary provisional liquidation in the Republic of South Africa by order dated December 29, 2020 (the "Provisional Liquidation Order") by the High Court of South Africa, Western Cape Division, Cape Town, Republic of South Africa (the "South African Court"). A true and correct certified copy of the Provisional Liquidation

1

Order is attached hereto as **Exhibit "A"**. The Debtor was placed into an involuntary final liquidation in the Republic of South Africa by order dated June 30, 2021 (the "Final Liquidation Order") by the South African Court. A true and correct certified copy of the Final Liquidation Order is attached hereto as **Exhibit "B"**. The Debtor's insolvency proceeding pending before the South African Court is hereinafter referred to as the "South African Proceeding."

4.    I was appointed as one of the Debtor's joint liquidators, as evidenced in the Certificate of Appointment of Liquidator dated November 11, 2021 (the "Certificate of Appointment of Liquidator"), appointing myself and other five individuals as the Debtor's joint liquidators[1] (the "Joint Liquidators"). A true and correct certified copy of the Certificate of Appointment of Liquidator is attached hereto as **Exhibit "C"**. I have acted in the capacity as Liquidator in the South African Proceeding continuously since accepting the appointment on November 11, 2021.

5.    I am advised that within the meaning of Chapter 15 of the U.S. Bankruptcy Code: (i) I am the "foreign representative" of the Debtor; (ii) the Debtor's center of their main interests has, at all times relevant, been in the Republic of South Africa; and (iii) the South African Proceeding is a "Foreign Main Proceeding."

### Factual Background

6.    The Debtor was registered and incorporated in the Republic of South Africa in April 2019. The location of the Debtor's last principal place of business and registered address are Stellenbosch, Western Cape, Republic of South Africa.

7.    The Debtor purportedly was a fund manager trading in cryptocurrency, particularly

---

[1] Chavonnes Badenhorst St Clair Cooper; Jacolien Frieda Barnard; Deidre Basson; Herman Bester; Christopher James Roos; and Adriaan Willem van Rooyen.

Bitcoin. Its sole director and chief executive officer, Mr. Cornelius Johannes Steynberg ("Steynberg"), purportedly the only person with full control over the funds invested through it by its investors/creditors, is strongly suspected of being the mastermind behind what appears to be a Ponzi-type investment scheme utilizing the Debtor as the vehicle. Steynberg was assisted by the Debtor's so-called senior management team, which included Mrs. Nerina Steynberg, Mr. Clynton Hugh Marks, Mrs. Cheri Marks, Mr. Charlie Ward, Ms. Monica Coetzee, Ms. Liz Malton, Mr. Leonard Gray, Ms. Romana Samuels and others.

8.      The Debtor operated by soliciting members of the public to invest their funds in the form of Bitcoin on online derivative trading platforms through the Debtor, on the promise of unrealistically high returns, i.e. up to 10% per month.

9.      The Debtor directed investors to transfer the investors' Bitcoin to one of the Debtor's e-wallets. Then, the Debtor purportedly transferred the Bitcoin to the Debtor's pool account with derivative trading platforms.

10.     The Debtor provided "trading statements" to the investors showing profitable trades on behalf of the pool of investments in this account. However, it was later verified that such "trading statements" did not reflect any investment made through the pool account, but were in fact statements from a simulated demo account that never made any actual investments. The Debtor failed to disclose that the "trading statements" did not reflect the investments in the pool account or any investments made by the investors whatsoever.

11.     The Debtor's business model made use of a referral structure in terms of which existing investors received referral bonuses, over and above their exorbitant returns on investment, for the recruitment of new members to "invest" their Bitcoin through the Debtor.

12.     From available information, it appears that more than 3500 Bitcoin were paid to

approximately 180 individuals as so-called referral bonuses. At the current value of one Bitcoin (approximately USD $17,000), this equates to more than USD $59 million. Most of the members of the Debtor's senior management team benefited from those payments.

13.     After suspicion arose that the business of the Debtor was being conducted in contravention of South African statutory provisions regulating local and foreign investment schemes, the South African Financial Sector Conduct Authority ("FSCA"), as the statutorily created financial sector regulatory body established under section 56 of the Financial Sector Regulation Act, 9 of 2017, initiated investigations into the Debtor's business activities. The FSCA obtained Mr. Steynberg's testimony in July 2020 as part of the investigations.

14.     The FSCA issued a press release on December 17, 2020[2] stating, among other things, that:

a.      The Debtor was conducting business which required a financial service provider license, for which the Debtor had not applied;

b.      The FSCA found evidence contradicting the Debtor's alleged returns on investment of 10% per month when it had suffered a capital loss of approximately 30% in a certain period;

c.      The FSCA found evidence contradicting the Debtor's alleged use of a "bot" trading;

d.      The FSCA found evidence contradicting the Debtor's statements regarding the derivative trading platforms the Debtor utilized, the transfer of funds between platforms, and the volume of trading in a much lower rate than the one informed; and

e.      The FSCA found evidence that the new derivative trading platform

---

[2] The December 17, 2020 FSCA press release is attached to Exhibit E below as annex "HB5".

4

the Debtor informed it was using was not a legitimate platform but, instead, linked to Mr. Steynberg himself.

15.     Investigations conducted so far indicate that the Debtor might have utilized the funds invested to cover the Debtor's operational costs, the returns on investment, and the referral bonuses of its investors. Investigations further indicate that the online broker which the Debtor used and instructed its investors to use (Trade300) was a fictitious entity created by Mr. Steynberg to further the fraudulent scheme. All of the indicators suggest that the Debtor was used as the vehicle for what appears to be a massive Ponzi scheme.

16.     The Debtor is supposed to hold at least 23,000 Bitcoin, being the number of Bitcoin it apparently owes to its investors. At the current value of one Bitcoin (approximately USD $17,000), this equates to USD $391 million.

17.     The Commodity Futures Trading Commission ("CFTC") has filed a lawsuit against the Debtor and Mr. Steynberg (case no. 1:22-cv-635) in the United States District Court for the Western District of Texas claiming the violation of the Commodity Exchange Act and different CFTC Regulations. The CFTC's action seeks an order requiring Debtor, Mr. Steynberg and their successors, among other things, (i) to disgorge all benefits received directly or indirectly related to the acts and practices that constitute violations of the Commodity Exchange Act and CFTC Regulations, (ii) to give restitution to every person or entity who sustained losses proximately caused by Debtor's and Mr. Steynberg's violations; (iii) to rescind all contracts and agreements entered into between them and any of the participants whose funds were received by Debtor or Mr. Steynberg as result of the acts and practices that constitute violations; (iv) to pay a civil monetary penalty for each violation of the Commodity Exchange Act and CFTC Regulations; and (v) to make an accounting to the Court of all of their assets and liabilities, together with all funds

they received from and paid to participants and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least December 2017 to the date of such accounting. A true and correct copy of the CFTC action is attached hereto as **Exhibit "D"**.

18.     The CFTC alleges in their complaint that between May 2018 and March 2021, Mr. Steynberg accepted, individually and as the principal and agent of the Debtor, at least 29,421 Bitcoin, with a value of over USD $1.7 billion at the end of that period, from at least 23,000 investors from the United States and many others from other countries, to participate in the commodity pool investment through the Debtor. See Ex. D, ¶ 1. The CFTC further states that (i) of the 29,421 Bitcoin investors transferred to the Debtor's E-Wallets, which were controlled by Steynberg, for the purposes of trading in the Debtor's pool, the Debtor and Steynberg only deposited 1,846.72 Bitcoin into the Debtor's pool account; (ii) the entity Trade300 that the Debtor claimed to use to trade the investors Bitcoin did not exist; (iii) the Debtor failed to deposit into pool accounts 27,574 Bitcoin that the investors had transferred to the Debtor for the purposes of trading; (iv) the Debtor and Steyberg failed to maintain the pool assets separately from Steynberg's own funds, thus comingling funds of the pool and Steynberg's personal funds; (v) the Debtor misappropriated the 27,574 Bitcoin received from its investors and provided "Bitcoin to certain participants as sham 'profits' and 'bonus' payments in the nature of a 'Ponzi' scheme; and (vi) "Steynberg, individually and as an agent of [the Debtor], misappropriated [investors'] Bitcoin for his personal use" Id. ¶ 7, 40-43.

19.     Investigations have indicated that investors from over 78 countries were potentially defrauded in the Debtor's scheme.

20.     The Joint Liquidators are currently conducting investigations about the Debtor's assets, debts, affairs, the missing funds and cryptocurrency, and more.

21.     Mr. Steynberg is a citizen of the Republic of South Africa and his last known residence is in Stellenbosch, Western Cape, South Africa. He is a fugitive from South African law enforcement. Steynberg has been recently detained in Brazil on an INTERPOL arrest warrant.

22.     I am unaware of any evidence that the Debtor conducted the administration of its affairs other than from the Republic of South Africa or that it had any establishment or place of business outside of the Republic of South Africa.

23.     More details about the Debtor's factual background are described in CFTC's Complaint (Ex. D) and in the affidavit made by Herman Bester, one of the Debtor's Joint Liquidators, on January 21, 2021 and filed in the South African Proceeding in support of an application for an order extending the powers of the Joint Liquidators in the then provisional liquidation of the Debtor. A true and correct copy of the Joint Liquidator Herman Bester's affidavit is attached hereto as **Exhibit "E"**.

### The South African Proceeding

24.     On December 29, 2020, the South African Court entered the Provisional Liquidation Order placing the Debtor into an involuntary provisional liquidation in the Republic of South Africa. See Ex. A.

25.     On June 30, 2021, the South African Court entered the Final Liquidation Order placing the Debtor into an involuntary final liquidation in the Republic of South Africa. See Ex. B.

26.     On November 11, 2021, the South African Court issued the Certificate of Appointment of Liquidator appointing myself and the other five Joint Liquidators as the liquidators

7

of the Debtors. See Exhibit C.

27.     The South African Proceeding is currently pending, and I have been continuously acting in the capacity as Liquidator of the Debtor in the South African Proceeding since accepting the appointment.

28.     The Joint Liquidators are implementing the liquidation of the Debtor, performing the activities of liquidators, and making the decisions related to the liquidation of the Debtor all in the Republic of South Africa.

## Debtor Have a Domicile, Place of Business or Property in the United States

29.     I seek recognition of the South African Proceeding in furtherance of a worldwide pursuit of assets with which to satisfy unpaid claims as well as to investigate, identify, and marshal assets of the Debtor in the United States, which assets include, but are not limited to, claims and causes of action belonging to the Debtor. The Debtor's known connections to specific US assets shall be identified by subsequent motions.

30.     I have retained Sequor Law, P.A. ("Sequor Law"). Sequor Law holds in its trust account in this District monies of the Debtor, to which funds Sequor Law has no rights of setoff, charging lien, or similar right.

## Liquidator in a Foreign Proceeding of the Debtor

31.     As the Liquidator, I am authorized in the South African Proceeding to administer the liquidation of the Debtor's assets and affairs and to act as a representative of the South African Proceeding.

32.     As the term is defined in 11 U.S.C. § 101(23), the South African Proceeding is a "foreign proceeding" because it is a collective judicial proceeding under a law relating to insolvency or adjustment of debt in which proceeding the Debtor's assets and affairs are subject

to the control or supervision of the South African Court for the purpose of the Debtor's liquidation.

33.     The South African Proceeding is governed by The Republic of South Africa's Companies Act, 61 of 1973, a law relating to insolvency or adjustment of debt.

34.     The South African Court appointed myself and the other five Joint Liquidators as the joint liquidators of the Debtor. See Ex. C. The Joint Liquidators have granted myself power of attorney to represent the Joint Liquidators in court, commence actions, and more, all in South Africa or in any other country, through the Power of Attorney for Appointment of Agent to Commence or Defend Proceedings in the Republic of South Africa and/or Any Other Foreign Country (the "Power of Attorney") accepted by myself on October 14, 2022. A true and correct copy of the Power of Attorney is attached as **Exhibit "F"**.

35.     Specifically, the six Joint Liquidators, through the Power of Attorney, appointed myself "to be [the Joint Liquidator's] lawful agent in [their] names by means of an attorney to do any or all of the following acts and things." See Ex. F, p. 2. Some of such acts and things are:

      a.     "To appear and represent the Joint Liquidators in any court and before all judicial or other officers whosoever as the [Liquidator] shall consider advisable, whether the court is situated in the Republic of South Africa or any other foreign country." Id. at p. 3.

      b.     "To make any demand or claim and to commence and conduct any action or other proceedings in any court or tribunal for the recovery of any debt, sum of money, right, title, interest, property or matter whatsoever now due and payable or in any way belonging to the insolvent estate of [the Debtor], by any means or on any account whatsoever, and to prosecute, discontinue, compromise, terminate or abandon such action or proceedings as the [Liquidator] shall see fit, whether the action commences in the

9

Republic of South Africa or any other foreign country." Id.

        c.     "To sign all documents necessary in connection with any such action or proceedings, whether in the Republic of South Africa or any other foreign country." Id. at p. 4.

        d.     "When necessary, to employ and pay attorneys and counsel to conduct any such action or proceedings, whether in the Republic of South Africa or any other foreign country." Id.

        e.     "Generally for affecting the purposes aforesaid, to do and cause to be done whatsoever shall be requisite as fully and effectually for all intents and purposes as the Joint Liquidators might or could do if personally present and acting herein." Id.

36.     My address in the capacity of Liquidator is:

> Chavonnes Badenhorst St Clair Cooper
> CK Trust (Pty) Ltd
> Unit 1, Sir Benjamin Promenade, Oxford Street,
> Durbanville, Western Cape, Republic of South Africa

37.     For purposes of this proceeding, my firm requests that any correspondence be sent, in addition to the address provided above, to:

> Attn:  Gregory S. Grossman and Raul Torrao
> Sequor Law, P.A.
> 1111 Brickell Avenue, Suite 1250
> Miami, Florida 33131

> and

> Attn: Christopher J. Redmond
> Redmond Law Firm, LLC
> 13220 Metcalf, Suite 310
> Overland Park, Kansas 66213

### Parties to any U.S. Litigation in Which the Debtor are a Party

38.     I am aware that the CFTC has filed an action against the Debtor and Mr. Steynberg, Case No. 1:22-cv-635, in the United States District Court for the Western District of Texas. See

Ex. D.

39.     I am not aware of any other litigation pending in the United States in which the Debtor is a party.

**Entities Against Whom Provisional Relief is Being Sought Under § 1519 of the Code**

40.     I am not seeking provisional relief under § 1519 of the Bankruptcy Code.

**Statement Identifying Foreign Proceedings With Respect to the Debtor**

41.     The Joint Liquidators have obtained an order in the High Court of South Africa, Western Cape Division, Republic of South Africa on 15 December 2022, under case number 21118/2022, for the issuance of a Letter of Request to be presented to the Canadian Superior Courts to enable the Joint Liquidators to apply for recognition of the South African Proceeding in Canada. The services of Stikeman Elliot LLP, 4300 Bankers Hall West, 888 – 3rd Street, S.W, Calgary, AB Canada T2P 5C5, have been retained in the Recognition Application. A true and correct copy of the Court Order and issued Letter of Request is attached as **Exhibit "G"**

42.     The Joint Liquidators are also proceeding on similar grounds in the High Court of South Africa, Western Cape Division, for the recognition in the foreign jurisdictions of Switzerland, Belgium, Australia, United Kingdom and Namibia. At the time of this declaration, no court orders for these foreign jurisdictions are available yet.

43.     The Joint Liquidators are also in the process of investigating the financial viability of pursuing claims in the foreign jurisdictions of Argentina, Austria, Bangladesh, Bosnia an Hertzegovina, Botswana, Bulgaria, China, Colombia, Estonia, Finland, Germany, Hong Kong, India, Iraq, Ireland, Israel, Italy, Malaysia, Mexico, New Zealand, Nigeria, Norway, Philippines, Poland, Portugal, Puerto Rico, Singapore, Slovakia, Spain, Sweden, Thailand and The United Arab Emirates.



44.    Other than the above Foreign Proceedings referenced herein, the Liquidator is not aware of any other foreign proceedings, as defined in 11 U.S.C. § 101(23), with respect to the Debtor.

I, Chavonnes Badenhorst St Clair Cooper, declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. §1746, that I am one of the court-appointed joint liquidators for Mirror Trading International (PTY) Ltd and that, in such capacity, I have the authority to make this Statement; that I have read the foregoing Statement; and that the facts and matters alleged and contained herein are true and correct to the best of my knowledge and belief, based upon my own personal knowledge of the facts involved and upon my review of the available documents pertaining to Mirror Trading International (PTY) Ltd.

Executed in _Bloemfontein_ . the Republic of South Africa on 31 January, 2023

_____

CHAVONNES BADENHORST ST CLAIR COOPER for and on behalf of the Debtor — as Liquidator in the South African Proceeding

_Signature Page to Declaration of Foreign Representative in Support of Chapter 15 Petition for Recognition of Foreign Proceeding_

# EXHIBIT

# "1-A"

29 – 12 – 2020

IN THE HIGH COURT OF SOUTH AFRICA
(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO: 19201/2020

BEFORE THE HONOURABLE MR JUSTICE ROGERS
AT CAPE TOWN: ON TUESDAY, 29 DECEMBER 2020

In the matter between:

ANTON FRED MELCHIOR LEE                                Applicant

and

MIRROR TRADING INTERNATIONAL (PTY) LIMITED          First Respondent
T/A MTI
(REGISTRATION NUMBER: 2019/205570/07)
Registered office at: 43 Plein Street
              Unit 1
              First Floor
              Stellenbosch
              Western Cape

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)           Second Respondent
              Private Bag X9922, Cape Town 8000

2020 -12- 2 8
DRAFT ORDER
WCD 010

Having read the documents filed of record and having heard Counsel for the
Applicant, it is hereby ordered that:

1.   The First Respondent is hereby placed under provisional liquidation in the hands of the Master of the High Court, Cape Town.

2.   A rule *nisi* is hereby issued calling upon all persons interested to show cause, if any, on Monday, 1 March 2023 at 10h00, or as soon thereafter as the application may be heard, why a final order should not be granted in the following terms: 

   2.1   That the First Respondent be placed under Final Liquidation; and

   2.2   That the costs of this application shall be costs in the Liquidation.

3.   A copy of this provisional order is to be served as follows:

   3.1   On the Respondent at its principal place of business at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape;

   3.2   On the employees of the First Respondent, if any, at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape; *and at 341 Beyers Naude Drive, Randburg, Gauteng.*

   3.3   By one publication in each of the *Sunday Times* and *Rapport* newspapers respectively; and

   3.4   On the South African Revenue Service, Cape Town at 22 Hans Strijdom Avenue, Cape Town.

2

4.  The Registrar of this Honourable Court shall transmit a copy of this provisional order to the Sheriff of the province in which the registered office of the First Respondent is situated and to the Sheriff of every province in which it appears the First Respondent owns businesses.

5.  The Sheriff of this Honourable Court shall attach all property that appears to belong to the First Respondent and transmit to the Master an inventory of all property attached by him or her in terms of section 19 of the Insolvency Act 24 of 1936.

BY ORDER OF THE COURT

COURT REGISTRAR

VEZI & DEBEER INC: YASIN ALLI (REF: YALLI) Yasin@vezidebeer.co.za
3ᴿᴰ FLOOR, EQUITY HOUSE, 107 ST GEORGES MALL, CAPE TOWN, TEL: (012) 361 2746
HC BOX: 763

3

# EXHIBIT "1-B"

Final Liquidation

IN THE HIGH COURT OF SOUTH AFRICA
WESTERN CAPE DIVISION, CAPE TOWN

Case No: 19201/2020

BEFORE THE HONOURABLE ACTING JUSTICE DE WET
CAPE TOWN: WEDNESDAY, 30 JUNE 2021

In the matter between:

ANTON FRED MELCHIOR LEE                                                     Applicant

and                                            2021 -06- 3 0

MIRROR TRADING INTERNATIONAL (PTY) LTD t/a MTI      First Respondent
(Registration Number: 2019/205570/07)
Registered Office at        43 Plein Street, Unit 1
                            1st Floor, Stellenbosch
                            Western Cape

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)      Second Respondent
CLYNTON HUGH MARKS                                       Third Respondent

and

ADRIAAN WILLEM VAN ROOYEN N.O.          First Proposed Intervening Party
HERMAN BESTER N.O.                       Second Proposed Intervening Party
CHRISTOPHER JAMES ROOS N.O.             Third Proposed Intervening Party
JACOLIEN FRIEDA BARNARD N.O.            Fourth Proposed Intervening Party
DEIDRE BASSON N.O.                        Fifth Proposed Intervening Party

ORDER

2

Having heard Counsel for Applicant, First and Third Respondents as well as First to Fifth Proposed Intervening Parties;

IT IS ORDERED THAT:

1.    The application for the reconsideration of the provisional order in terms of Rule 6(12)(c) is dismissed;

2.    The *rule nisi* granted on 29 December 2020, is made absolute and First Respondent is placed under Final Liquidation;

3.    The costs of this application, are costs in the administration of First Respondent;

4.    The costs occasioned by the intervention of Third Respondent, as taxed on an attorney and client scale, be paid by Third Respondent;

5.    The application for intervention by First to Fifth Proposed Intervening Parties as well as their counter application is postponed in terms of an order issued separately from this order for sake of convenience.

BY ORDER OF THE COURT

2021 -06- 3 0

COURT REGISTRAR

763  Coombe Commercial
     c/o Vezi & De Beer Inc
     CAPE TOWN

# EXHIBIT "1-C"



REPUBLIC OF SOUTH AFRICA

SERTIFIKAAT VAN AANSTELLING VAN LIKWIDATEUR

[Maatskappywet, No 61 van 1973 (soos gewysig)]

CERTIFICATE OF APPOINTMENT OF LIQUIDATOR

[Companies Act, No 61 of 1973 (as amended)]

NO:    C000906/2020

Hierby word gesertifiseer dat:
This is to certify that:

| | | |
|---|---|---|
| 1. | BARNARD, JACOLIEN FRIEDA | ID. 8210030014085 |
| 2. | BASSON, DEIDRE | ID. 7009290090087 |
| 3. | BESTER, HERMAN | ID. 7009235139080 |
| 4. | COOPER, CHAVONNES BADENHORST ST CLAIR | ID. 6905045153081 |
| 5. | ROOS, CHRISTOPHER JAMES | ID. 8409215014080 |
| 6. | VAN ROOYEN , ADRIAAN WILLEM | ID. 6911185280080 |
| 7. | XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | ID. XXXXXXXXXXXXXXXXXXXX |

aangestel is as Likwidateur met die magte soos uiteengesit in Artikel 386(1) van Wet No 61 van 1973
saamgelees met item 9 van Skedule 5 van Wet 71 van 2008 van die Maatskappy bekend as:

appointed as Liquidator with the powers as set out in Section 386(1) of Act 61 of 1973 read together with item
9 of Schedule 5 of Act 71 of 2008 of the Company known as:

MIRROR TRADING INTERNATIONAL (PTY) LIMITED T/A MTI   2019/205570/07

wat onder Likwidasie geplaas is
which has been placed under Liquidation     30-6-2021

van die Hoë Hof van Suid-Afrika,                                                              Afdeling
by Order of the High Court of South Africa,    WESTERN CAPE HIGH COURT (CAPE TOWN)    Division

Geteken te                                                        op
Signed at    CAPE TOWN                                         on    11 NOVE...

THE WESTERN CAPE HIGH COURT
CAPE TOWN
2021 -11- 11
INSOLVENT ESTATES 2
WES KAAP HOË HOF
DATE STAMP

DOJCD\HBOUWER
MEESTER VAN DIE HOË HOF VAN SUID-AFRIKA
MASTER OF THE HIGH COURT OF SOUTH AFRICA

URN: S9B2020INS000906

# EXHIBIT

# "1-D"

Timothy J. Mulreany (Maryland Bar No. 8812160123)
Danielle E. Karst (D.C. Bar No. 481881)
**COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:   (202) 418-6158 (Karst)
Telephone:   (202) 418-5306 (Mulreany)
Facsimile:   (202) 418-5523
tmulreany@cftc.gov
dkarst@cftc.gov

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | **Case No. 1:22-cv-635** |
| **Plaintiff,** | **COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, DISGORGEMENT AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |
| v. | |
| **MIRROR TRADING INTERNATIONAL PROPRIETARY LIMITED, and CORNELIUS JOHANNES STEYNBERG** | |
| **Defendants.** | |

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by

and through its attorneys, alleges as follows:

### I.    SUMMARY

1.      From at least May 18, 2018 through at least March 30, 2021 (the "Relevant

Period"), Cornelius Johannes Steynberg ("Steynberg"), individually and as the controlling person

of Mirror Trading International Proprietary Limited ("MTI"), engaged in an international

fraudulent multilevel marketing ("MLM") scheme, using the websites

*www.mirrortradinginternational.au.za, www.mtimembers.com,* and *www.mymticlub.com,* in

addition to social media, to solicit Bitcoin from members of the public for participation in a

commodity pool operated by MTI ("commodity pool" or "Pool"). The commodity pool was

controlled by Defendants MTI and Stenberg (collectively, "Defendants") and purportedly traded off-exchange, retail foreign currency ("forex") on a leveraged, margined and/or financed basis with participants who were not eligible contract participants ("ECPs") through a proprietary "bot" or software program. During the Relevant Period, Steynberg, individually and as the principal and agent of MTI, accepted at least 29,421 Bitcoin—with a value of over $1,733,838,372 at the end of the Relevant Period—from at least 23,000 individuals from the United States, and even more throughout the world, to participate in the commodity pool without being registered as a Commodity Pool Operator as required. Upon information and belief, most if not all of these participants were non-ECPs. Defendants misappropriated, either directly or indirectly, all of the Bitcoin they accepted from pool participants.

2.     In furtherance of the fraudulent scheme, Steynberg, individually and as the agent of MTI, made fraudulent omissions of material facts in solicitations to actual and prospective pool participants, including but not limited to failing to disclose that: (a) Defendants misappropriated pool funds; (b) there was no trading "bot" successfully trading on behalf of participants; (c) no profitable trading in forex or anything else took place on behalf of participants; (d) "account statements" provided to participants were actually simulated trades from "demo" accounts created via the MetaTrader 4 ("MT4") electronic trading platform; (e) purported "returns" paid to some participants were in fact the principal deposits of other participants; and (f) the online broker Trade300, where Defendants purportedly traded participants' Bitcoin, was a fictitious entity created by Steynberg to further the fraudulent scheme.

3.     In furtherance of the fraudulent scheme, Steynberg, individually and as the agent of MTI, made fraudulent misrepresentations of material facts in website and social media

2

solicitations, which he controlled, to actual and prospective pool participants, including but not limited to his claims that: (a) Defendants' trading "bot" achieved "profits" of 10% per month; (b) Defendants traded participants' Bitcoin in a pooled account, first at FXChoice, Ltd. ("FXChoice") and later at the fictitious entity Trade300; (c) MTI's trading "system is a sustainable business model and one that can provide you with the residual income you have always desired"; and (d) the MTI Pool had never had a losing trading day except for one day. All of these representations were false.

4.    In the only pooled account Defendants held, at FX Choice, a broker located in Belize, and which they falsely claimed was trading profitably, Defendants only deposited 1,846 Bitcoin and lost 566.6 Bitcoin trading unprofitably. Defendants never traded profitably, never earned any profits trading, and misappropriated essentially all of the at least 29,421 Bitcoin they accepted from participants.

5.    In early 2021, MTI was the subject of bankruptcy proceedings in the Republic of South Africa. By April 2021, the South African Financial Sector Conduct Authority ("FSCA") was working with South African bankruptcy liquidators, as MTI had been placed into liquidation. Shortly thereafter, it was learned that FXChoice had frozen Defendants' Pool account (account No.**4850, referred to hereinafter as "FXChoice Pool account" or "Pool account"), eight months earlier, on or about August 7, 2020, for suspected fraud. At the time FXChoice froze the Pool account, it held only 1,280 Bitcoin, with a value of approximately $56.3 million. These frozen participant Bitcoin were ultimately transferred by FXChoice to South African liquidators.

6.    Of the 29,421 Bitcoin participants sent to Defendants' E-Wallets, controlled by Steynberg, for trading in the MTI pool during the Relevant Period, Defendants deposited only

3

1,846.72 into the Pool account. Defendants' claims that it traded participants' Bitcoin at a pooled account at Trade300 were false; no such entity exists. Therefore, Defendants failed to deposit 27,574 Bitcoin from participants into the Pool account at FXChoice. Defendants' limited trading in the FXChoice Pool account resulted in overall losses, and Defendants misappropriated the remaining 27,574 Bitcoin sent by participants to Defendants for trading, including by failing to use all of the funds for trading and by providing Bitcoin to certain participants as sham "profits" and "bonus" payments in the nature of a "Ponzi" scheme.

7.     MTI acted at all times during the Relevant Period as a commodity pool operator ("CPO") without being registered with the CFTC, as required by the Commodity Exchange Act ("Act"). Throughout the Relevant Period, Steynberg acted as an associated person ("AP") of CPO MTI without being registered with the CFTC, as required by the Act.

8.     By this conduct, and the conduct further described herein, Defendants have engaged, are engaging and/or are about to engage in acts and practices in violation of Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)-(C), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B), and Commission Regulations ("Regulation(s)") 4.20(a)(1), (b), (c), 5.2(b)(1)-(3), and 5.3(a)(2)(i), (ii), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(1)-(3), 5.3(a)(2)(i), (ii) (2021).

9.     The acts and omissions described herein have all been done by Steynberg in the scope of his employment or office at MTI during the Relevant Period. Therefore, MTI is liable for all acts and omissions described herein by Steynberg, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

10.     Steynberg is a controlling person of MTI and did not act in good faith or knowingly induced MTI's violations of the Act and Regulations described herein during the

Relevant Period. Therefore, Steynberg is liable for MTI's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

11.     Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the Regulations. In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other and further relief as the Court deems necessary and appropriate.

12.     Unless restrained and enjoined by this Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

## II.     JURISDICTION AND VENUE

13.     This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts possess jurisdiction to hear actions brought by the CFTC for injunctive relief or to enforce compliance with the Act whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder, and Section 2(c)(2)(c) of the Act, 7 U.S.C. § 2(c)(2)(c), provides the CFTC with jurisdiction over the forex solicitations and transactions at issue in this action.

14.     Venue lies properly with this Court pursuant to 7 U.S.C. § 13a-1(e) because
Defendants resided and/or transacted business in this District, and certain transactions, acts,
practices, and courses of business alleged in this Complaint occurred, are occurring, or are about
to occur in this District.

### III.     THE PARTIES

15.     Plaintiff **Commodity Futures Trading Commission** is an independent federal
regulatory agency charged by Congress with the administration and enforcement of the Act,
7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2021).

16.     Defendant **Cornelius Johannes Steynberg** is a citizen of the Republic of South
Africa. Steynberg's last known residence is in Stellenbosch, Western Cape South Africa.
Currently, he is a fugitive from South African law enforcement but was recently detained in the
Federative Republic of Brazil ("Brazil") on an INTERPOL arrest warrant. Throughout the
Relevant Period, Steynberg held himself out as the Shareholder, Director and CEO of MTI.
Steynberg has never been registered with the CFTC in any capacity.

17.     Defendant **Mirror Trading International Proprietary Limited** is a company
organized and operated pursuant to the laws of the Republic of South Africa, with a principal
place of business in Stellenbosch, Western Cape South Africa. MTI has never been registered
with the CFTC in any capacity.

### IV.     STATUTORY BACKGROUND

18.     Section 2(c)(2)(C)(i)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I), in relevant part,
applies to any agreement, contract, or transaction in, or in connection with, forex that is offered
to, or entered into with, a person that is not an ECP "on a leveraged or margined basis, or

6



financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," subject to certain exceptions not applicable here.

19.     An ECP is defined by Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10,000,000, or $5,000,000 and who enters into the agreement, contract or transaction to manage the risk associated with an asset owned or a liability incurred, or reasonably likely to be owned or incurred, by the individual.

20.     For the purposes of trading forex, a CPO is defined in Section 1a(11) of the Act, 7 U.S.C. § 1a(11), in relevant part, as: "The term 'commodity pool operator' means any person—engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—agreement, contract, or transaction described in section 2(c)(2)(C)(i) or section 2(c)(2)(D)(i)."

## V.     FACTS

**A.     The Fraudulent Scheme**

**1.     The Initial Scheme**

21.     Steynberg founded MTI in the Republic of South Africa in April 2019. Throughout the Relevant Period, Defendants, by and through Steynberg, accepted at least 29,421 Bitcoin with a value of not less than $1,733,838,372 at the end of the Relevant Period from at least 23,000 participants from the United States and throughout the world to participate in the unregistered commodity pool. Most if not all of these participants were non-ECPs based upon

information and belief. Defendants, through Steynberg, knowingly and falsely represented to actual and prospective pool participants that Defendants operated a pooled forex account, using an experienced trader to produce consistent, high rates of return. Steynberg held himself out as the founder and CEO of MTI.

22.     Throughout the Relevant Period, Defendants solicited actual and prospective participants through social media such as Facebook, Instagram, and YouTube. Defendants also solicited through in-person meetings, word-of-mouth, instant messaging services such as Telegram, podcasts, and websites operated by Steynberg, including *www.mirrortradinginternational.au.za, www.mtimembers.com, www.mymticlub.com*, and *www.mymticlub.com* (collectively, the "websites"). Defendants accepted Bitcoin from at least 23,000 participants located in the United States, with 1,341 known participants located in the State of Texas. Defendants also relied heavily upon MLM marketers to tout MTI, and paid both participation and referral bonuses to MLM touters from non-existent "profits."

**2.     Defendants' Solicitations to Participants**

23.     Steynberg, individually and as the agent of MTI, claimed in social media solicitations to actual and prospective participants that "the objective of Mirror Trading International is to grow your Bitcoin." Steynberg, individually and as the agent of MTI, represented that MTI had a "sustainable business model trading forex using Advanced Intelligence Software with Bitcoin as the base currency," and "[T]he profitability of Mirror Trading International comes solely from the trading activities. Your full investment goes into the trading account."

24.     Defendants targeted their solicitations to non-ECPs with limited trading experience, claiming participants could earn "passive income" by funding their investment with

8

"as little as $100" and "no trading experience required." The only requirements to become a participant, pursuant to Defendants' social media, were that a prospective participant was at least 18 years of age and had Bitcoin to fund participation in the Pool. The minimum participation amount was $100, or a fraction of a Bitcoin.

25.    Steynberg, individually and as the agent of MTI, represented through social media that there were "no membership fees, no subscriptions, no packages, no costs & no deductions." Steynberg, individually and as the agent of MTI, claimed MTI's trading "bot" achieved "profits" of 10% per month, and that the MTI Pool had never had a losing trading day except for one day. Steynberg, individually and as the agent of MTI, represented to actual and prospective participants via social media that: "The system is fully automated and you will receive your daily [pool participant] statement detailing the profits or loss from the trades for the day. These statements will be in your back office from Tuesdays to Saturdays."

26.    Defendants provided each pool participant access to what Defendants referred to as a "back office," which was an online statement each participant could access using their login credentials to view how much profit their Bitcoin investment purportedly earned in the Pool account. Defendants advised participants that: "Your daily trade profits are automatically compounded in the trading pool." Steynberg, individually and as the agent of MTI, also represented to participants that they could withdraw their funds, in full or in part, at any time, and that participants' Bitcoin would be sent to their Bitcoin wallet within 48 hours of a withdrawal request.

27.    In order to rapidly increase the number of participants, and concurrently increase the amount of Bitcoin sent from participants to the Pool, Defendants utilized an MLM marketing scheme described as an "affiliate program" for those wishing "to refer friends and family." The

"affiliate program" had three basic levels: the direct referral bonus; the "weekly binary profit-sharing pool;" and, the "leadership bonus." A participant qualified for the referral bonus by referring new participants to the Pool. The "weekly binary profit-sharing pool" was modeled on a standard MLM program, with "left and right legs" of new participants associated with a single MLM marketer. In order to be "binary qualified," an MLM marketer had to reach certain Bitcoin investment "levels," with each level requiring a greater amount of Bitcoin investment. The higher the "level," the more one purportedly earned. Finally, MLM marketers in the "weekly binary profit-sharing pool" could also qualify for the "Part One (P1) and Part Two (P2) Leadership Pools." In order to qualify for the P1 and P2 Pools which "automatically reward[ed] with P1 & P2 bonuses," one had to "help as many people in your team become Binary Qualified."

28.    The "affiliate program" promised substantial "first and second level" MLM "bonus payments" as well as "referral bonuses" to MLM participants. Steynberg, individually and as the agent of MTI, represented via social media that of each day's "daily trading profits," participants would share 40%, with "binary affiliate program" participants sharing an additional 20% and "affiliate program P1/P2 pool" participants sharing an additional 5%. Finally, the purported "trader" would take 25% of the "daily trading profits," and MTI would take the remaining 10%. Defendants failed to explain how the 10% "direct referral bonus" would be available to be paid after the "daily trading profits" were divided as described above.

29.    Steynberg testified under oath before the FSCA on July 20, 2020, that at the time of MTI's formation in April 2019, MTI purportedly entered into a profit-sharing agreement with a trader named "Quinton," who was to conduct all trading on behalf of all members. Steynberg testified that "Quinton" purportedly used an FXChoice multi-account manager ("MAM"

account) "linked" to each participant's individual account to control the trading in all participants' accounts. Steynberg opened and controlled the MAM account in MTI's name at FXChoice.

30.    Steynberg testified under oath before the FSCA that from April 2019 to July 2019, participants initially had their own accounts that were "linked" to MT4, and MT4 traded the accounts automatically. Steynberg testified that in July 2019, due to heavy trading losses, all participants had their purported individual accounts closed and all Bitcoin transferred to a single pooled account controlled by Defendants. Specifically, Steynberg testified:

> No our members do not have access to Meta Trader, when we just started in April last. I had it set up that every single member had his own account with the Brokerage themselves on a mam account. And then we, we actual (sic) back then had physical human traders and they good profit (sic) for April, May and in June they lost about 80 percent. So I got rid of them and got the software working for us... the only way not for people to steal our trades was to bring everything into a global pool which MTI has now and we do out (sic) trading you know, on that pool account.

31.    Following the heavy losses stained in the April to July 2019 time period, Defendants sent a notice to each participant stating in relevant part:

> Over the last couple of weeks, MTI had issues with the traders, which resulted in losses for ourselves and the members. We have a solution to recover all member's funds. Those willing to take the journey with us over the next few weeks will be happily surprised with the trading system that we managed to put together for our members. . . . At the moment, it is not possible to deploy the trading system on all FXChoice accounts due to licensing restrictions. We are, however, allowed to use the system in a pooled account environment. To switch to the pooled account, please follow the steps below.

### 3.    The MTI Pooled Account at FXChoice

32.    Defendants opened a single commodity pool account in the name of MTI at FXChoice, account No.**4850, in August 2019. Defendants falsely represented to actual and prospective participants that MTI operated a commodity pool that traded forex agreements,

contracts or transactions, on a leveraged, margined or financed basis, and that the only assets

they accepted for investment in the Pool account was Bitcoin. Specifically, Defendants claimed

to be trading foreign currency pairs in the Pool account on a leveraged or margined basis,

initially at FXChoice, and later purportedly at Trade300. Pool participants registered via

Defendants' websites, where they were advised that Defendants only accepted Bitcoin to secure

their participation in the Pool. Defendants directed participants to transfer their Bitcoin to one of

the MTI E-Wallets, which were controlled by Steynberg. Defendants then purportedly

transferred the Bitcoin to the MTI Pool account at FXChoice, and later, to an MTI Pool account

purportedly at Trade300.

33.    Throughout the Relevant Period, Steynberg was in sole control of the MTI E-

Wallets receiving participants' funds and controlled the movement of Bitcoin from the MTI E-

Wallets to FXChoice accounts and elsewhere.

34.    Beginning on or about August 2019, Steynberg, individually and as the agent of

MTI, represented to actual and prospective participants that MTI used a high frequency artificial

intelligence trading "bot," together with a "head trader" and a "trading team," that purportedly

traded the Pool's account at FXChoice, earning large profits. These representations were false.

FXChoice records show that the Pool account traded using only a small fraction of participants'

Bitcoin, that this limited trading was at an overall loss, and that Steynberg made many of the

trades via a mobile device.

35.    After Defendants created the purported FXChoice Pool account, they provided

"trading statements" showing profitable trades on behalf of the Pool in this account. In fact,

these "trading statements" were not associated with any actual pooled accounts, but were in fact

statements from a simulated "demo" account that never actually traded forex, Bitcoin or anything

12

else. Defendants failed to disclose to participants that all of Defendants' representations to

participants regarding trading, profitability and/or the existence of a commodity pool account

were false. Defendants further failed to disclose to participants that all of the purported "trading

statements" were false and created by Defendants.

### 4.    The Final Phase of the Scheme

36.    On or about June 8, 2020, FXChoice began receiving complaints from MTI

participants that the trades shown in MTI's trading reports provided to participants did not

correlate with the live trades purportedly made in MTI's Pool account. FXChoice conducted a

compliance review of the MTI Pool account and determined that the "account statements"

provided to participants were actually simulated trades from "demo" accounts created by

Steynberg, individually and as the agent of MTI, via the MT4 application. FXChoice further

determined that Defendants deleted any of the "demo" accounts' "losing" trades in the "account

statements" and presented only "winning trades," thereby giving the false impression to

participants that Defendants' trading "bot" was profitably trading. Finally, FXChoice

determined that a number of trades in MTI's FX Choice Pool account were manually placed via

a mobile device.

37.    As a result of its compliance investigation, on June 10, 2020, FXChoice blocked

all transactions in MTI's Pool account pending a compliance review. On July 13, 2020,

Steynberg, individually and as the agent of MTI, unsuccessfully attempted to withdraw 280

Bitcoin from the blocked Pool account. FXChoice refused Defendants' withdrawal request and

informed Defendants that they were required to provide audited financial statements for MTI.

As a result of Defendants' failure to provide FXChoice with the requested audited financial

statements, on August 7, 2020, FXChoice marked the Pool account No.**4850 as "fraud" and



froze the 1,280 Bitcoin remaining in the account.

38.     Subsequently, Steynberg, individually and as the agent of MTI, represented to participants that MTI would transfer all of the Pool's trading accounts from FXChoice to a purported online broker identified as Trade300. Steynberg, individually and as the agent of MTI, represented to participants that Trade300 was another online forex trading platform, and that MTI continued to earn large profits while trading through Trade300. Steynberg testified before the FSCA that MTI's Pool account at Trade300 averaged trading profits of 10% per day, and that the MTI Pool account never experienced a negative profit trading day. Upon information and belief, Trade300 is a fictious trade broker created by Steynberg to further the fraudulent scheme.

**B.     Defendants' Misappropriation and Commingling of Participants' Funds**

39.     Steynberg, individually and as the agent of MTI, misappropriated pool participants' funds by soliciting funds for trading on behalf of the Pool and then depositing and holding participants' funds in E-Wallets controlled by Steynberg instead of segregating the funds in a pool account and using the funds to trade on behalf of the Pool's participants.

40.     Throughout the Relevant Period, participants sent 29,421 Bitcoin to Defendants' E-Wallets as instructed. However, Defendants deposited only 1,846.72 of participants' 29,421 Bitcoin into the FXChoice Pool account. Defendants never deposited the remaining 27,574 Bitcoin into the FXChoice Pool account or any account at Trade300, and failed to use those funds for any trading on behalf of participants. Instead, Steynberg, individually and as the agent of MTI, misappropriated participants' Bitcoin for his personal use.

41.     Defendants also misappropriated some of participants' funds by providing Bitcoin to certain participants as purported trading "profits" or "bonuses" in order to create the illusion that the Pool was trading and trading profitably.

14



42.    At no time did Defendants create, or MTI operate, the Pool as an entity cognizable as a legal entity separate from the pool operator, MTI.  As a result, at no time were any assets, in this case Bitcoin, from pool participants received in the Pool's name because a separate legal entity in the name of the pool was never created.  Instead, all Bitcoin were sent directly from participants to E-Wallets owned and controlled by Defendants.

43.    During the Relevant Period, Defendants, by and through Steynberg, failed to maintain pool assets separately from Steynberg's own funds.  Steynberg, individually and as the agent of MTI, commingled pool participants' assets with personal funds of Steynberg.  As described above, pool participants deposited Bitcoin into E-Wallet(s) controlled by Steynberg.  Defendants held these assets in Steynberg's personal E-Wallets instead of segregating them in a pool account.

**C.    Defendants' Material Omissions and Misrepresentations of Material Facts**

44.    In furtherance of the fraudulent scheme, Defendants knowingly made material omissions of fact in solicitations and other communications with actual and prospective pool participants, including by failing to disclose that:

a.    Defendants misappropriated pool participants' funds by soliciting funds for trading and then retaining participants' funds in Steynberg's personal E-Wallets instead of segregating the funds in a pool account and using the funds to trade on behalf of the Pool;

b.    There was no trading "bot" successfully trading on behalf of participants;

c.    No profitable trading in forex, or anything else, took place on behalf of pool participants;

15



d.    "Account statements" provided to participants were actually simulated trades from "demo" accounts created via the MT4 application;

e.    The broker Trade300 did not exist and was created by Steynberg to further the fraudulent scheme; and,

f.    Purported "returns" paid to some pool participants were in fact the principal deposits of other participants and were not generated by profitable trading.

45.    Similarly, during the Relevant Period, Defendants, by and through Steynberg, misrepresented, among other things, that:

a.    Pool participants' Bitcoin would be pooled and used to trade forex contracts on participants' behalf;

b.    Profits were achieved through trading; and

c.    Trading "profits" were distributed to participants.

46.    These representations were false because Defendants deposited only a small portion of participants' Bitcoin into the FXChoice Pool account for a limited time period. The FXChoice Pool account never traded profitably, there was no Trade300 account, and there were no profits to distribute to participants.

**D.    Defendants' Failure to Register**

47.    During the Relevant Period, MTI acted in a capacity as a CPO by soliciting, accepting, and receiving funds, securities, or property, in this case Bitcoin, from the public while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of, among other things, trading in forex, without being registered with the CFTC as a CPO.

48.    Throughout the Relevant Period, Steynberg acted in a capacity as an AP of MTI

16

by, in his capacity as a partner, officer, employee, consultant or agent of the CPO MTI, soliciting or supervising the solicitation of funds for participation in the Pool, without being registered with the CFTC as an AP of a CPO.

49.     On or about July 27, 2020, the Texas State Securities Board ("TSSB") issued a Cease and Desist Order against Steynberg and MTI, among others, finding their solicitations were materially misleading, and that they were operating a fraudulent MLM scheme involving digital assets and forex, which had defrauded Texas residents. The TSSB ordered Steynberg and MTI to immediately cease and desist all operations in the State of Texas. Despite the issuance of this Order, upon information and belief Defendants continued to unlawfully solicit residents in Texas.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT ONE (ALL DEFENDANTS)
**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C), and Regulation § 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2021) (Fraud in Connection with Forex)**

50.     The allegations set forth in the preceding paragraphs are re-alleged and incorporated herein by reference.

51.     7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

[F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, [. . .] that is made, or to be made, for or on behalf of, or with, any other person other than on or subject to the rules of a designated contract market – (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or] (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for, in the case of paragraph (2), with the other person.



52.     Pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv), 7 U.S.C. § 6b applies to the forex agreements, contracts, or transactions offered by Defendants "as if" they were contracts of sale of a commodity for future delivery. Further, Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), makes the forex agreements, contracts, or transactions here "subject to" 7 U.S.C. § 6b. Finally, Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), makes clear the CFTC has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of forex transactions described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i).

53.     17 C.F.R. § 5.2(b)(1)-(3) makes it unlawful for any person, by use of the mails or by any instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; (2) willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

54.     As described herein, Steynberg cheated or defrauded, or attempted to cheat or defraud, and willfully deceived, or attempted to deceive, other persons in connection with Defendants' offering of, or entering into, off-exchange leveraged or margined forex transactions with non-ECPs, by, among other things: (i) fraudulently soliciting participants and prospective participants by making material misrepresentations and omissions about, among other things, MTI's trading abilities and profits; (ii) misappropriating participants' funds; and (iii) posting false account statements of participants' profits from demo trading, all in violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

55.     The foregoing acts, omissions, and failures by Steynberg occurred within the



scope of his employment, agency, or office with MTI during the Relevant Period. Therefore,

MTI is liable for Steynberg's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-

(3), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17

C.F.R. § 1.2 (2021).

56.    Steynberg held and exercised direct and indirect control over MTI and either did

not act in good faith or knowingly induced MTI's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and

17 C.F.R. § 5.2(b)(1)-(3) during the Relevant Period.  As a controlling person of MTI, Steynberg

is liable for MTI's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3)

pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

57.    Each misrepresentation, omission of material fact, false statement, and

misappropriation, including but not limited to those specifically alleged herein, is alleged as a

separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

### COUNT TWO (ALL DEFENDANTS)
### Violations of Section 4o(1)(A)-(B) of the Act, 7 U.S.C. § 6o(1)(A)-(B)
### (Fraud by a CPO; Fraud by an AP of a CPO)

58.    The allegations set forth in the preceding paragraphs are re-alleged and

incorporated herein by reference.

59.    Throughout the Relevant Period, MTI acted and continues to act as a CPO, as

defined by Section 1a(11) of the Act, 7 U.S.C. § 1a(11), by soliciting, accepting, or receiving

funds or property (in the form of Bitcoin) from the public while engaged in a business that is of

the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of

trading in off-exchange, leveraged or margined forex transactions.

60.    For the purposes of retail forex transactions, a CPO is defined in 17 C.F.R.

§ 5.1(d)(1) (2021) as "any person who operates or solicits funds, securities, or property for a

19



pooled investment vehicle that is not an eligible contract participant as defined in section 1a(18) of the Act, and who engages in retail forex transactions." MTI was not an ECP as defined in section 1a(18) of the Act, 7 U.S.C. § 1a(18).

61.     An AP of a CPO is defined by Regulation 1.3, 17 C.F.R. § 1.3 (2021), as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged.  Throughout the Relevant Period, Steynberg acted as an AP of CPO MTI by soliciting funds or property (in the form of Bitcoin) for participation in the Pool and/or supervised other persons so engaged.

62.     Further, pursuant to 17 C.F.R. § 5.1(d)(2) (2021), any person associated with a CPO "as a partner, officer, employee, consultant or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) [t]he solicitation of funds, securities, or property for a participation in a pooled vehicle; or (ii) [t]he supervision of any person or persons so engaged" is an AP of a retail forex CPO.

63.     Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), "[a]greements, contracts, or transactions" in retail forex and accounts or pooled investment vehicles "shall be subject to . . . section[ ] 4o [7 U.S.C. § 6o]," except in circumstances not relevant here.

64.     7 U.S.C. § 6o(1)(A)-(B) prohibits CPOs and APs of CPOs, whether registered with the CFTC or not, from using the mails or any means or instrumentality of interstate commerce, directly or indirectly, from employing devices, schemes or artifices to defraud any



actual or prospective participant, or engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon any actual or prospective participant.

65.     As alleged herein, Defendants employed a device, scheme, or artifice to defraud actual and prospective participants or engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon any actual or prospective participant, including without limitation, fraudulent solicitations to actual and prospective participants that contained misrepresentations and omissions of material facts, and misappropriation of participants' funds, all in violation of 7 U.S.C. § 6o(1)(A)-(B).

66.     The foregoing acts, omissions, and failures by Steynberg occurred within the scope of his employment, agency, or office with MTI during the Relevant Period. Therefore, MTI is liable for Steynberg's violations of 7 U.S.C. § 6o(1)(A)-(B) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

67.     Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 7 U.S.C. § 6o(1)(A)-(B) during the Relevant Period. As a controlling person of MTI, Steynberg is liable for MTI's violations of 7 U.S.C. § 6o(1)(A)-(B), pursuant to 7 U.S.C. § 13c(b).

68.     Each act of fraudulent solicitation, misappropriation and false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6o(1)(A)-(B).

<div align="center">

**COUNT THREE (ALL DEFENDANTS)**
**Violations of Regulation 4.20(a)(1), (b), and (c), 17 C.F.R. § 4.20(a)(1), (b), (c) (2021)**
**(Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds**
**in the Pool's Name, and Commingling of Pool Funds)**

</div>

69.     The allegations set forth in the preceding paragraphs are re-alleged and



incorporated herein by reference.

70.     17 C.F.R. § 4.20(a)(1) requires a CPO to operate their commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

71.     During the Relevant Period, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(a)(1) by failing to operate the commodity pool as a legal entity separate from itself.

72.     17 C.F.R. § 4.20(b) provides: "All funds, securities or other property received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest or as an assessment (whether voluntary or involuntary) on an interest in a pool that it operates or that it intends to operate must be received in the pool's name."

73.     During the Relevant Period, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(b) by receiving funds from existing or prospective pool participants for the purchase of an interest in the Pool without receiving the same in the Pool's name.

74.     17 C.F.R. § 4.20(c) provides, "[n]o commodity pool operator may commingle the property of any pool that it operates or that it intends to operate with the property of any other person."

75.     During the Relevant Period, MTI, while acting as a CPO, violated 17 C.F.R. § 4.20(c) by commingling pool funds with the personal funds of Steynberg.

76.     Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) during the Relevant Period.  As a controlling person of MTI, Steynberg is liable for MTI's violations of 17 C.F.R. § 4.20(a)(1), (b), and (c) pursuant to 7 U.S.C. § 13c(b).

77.     Each act of failing to operate the Pool as a separate legal entity, failing to receive

22

funds in the Pool's name, and commingling of pool funds, including but not limited to those

specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R.

§ 4.20(a)(1), (b), and (c).

### COUNT FOUR (ALL DEFENDANTS)
**Violations of Sections 2(c)(2)(C)(iii)(I)(cc), 4m(1), and 4k(2) of the Act, 7
U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), 6k(2), and Regulations 5.3(a)(2)(i) and (ii), 17
C.F.R. §§ 5.3(a)(2)(i), (ii) (2021)
(Failure to Register as a CPO; Failure to Register as an AP of a CPO)**

78.    The allegations set forth in the preceding paragraphs are re-alleged and

incorporated herein by reference.

79.    7 U.S.C. § 6m(1) makes it unlawful for any CPO, unless registered with the

CFTC, to make use of the mails or any means or instrumentality of interstate commerce in

connection with its business as a CPO.  Similarly, 17 C.F.R. § 5.3(a)(2)(i) requires anyone acting

as a CPO for a pooled investment vehicle that engages in retail forex transactions to register as a

CPO.

80.    Subject to certain exceptions not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc)

states in part, that:

> A person, unless registered in such capacity as the Commission by rule,
> regulation, or order shall determine and a member of a futures association
> registered under section 17, shall not . . .
> . . . .
>
> (cc) operate or solicit funds, securities, or property for any pooled investment
> vehicle that is not an eligible contract participant in connection with [applicable
> retail forex agreements, contracts, or transactions].

81.    Except in circumstances not relevant here, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) and 17

C.F.R. § 5.3(a)(2)(i) require those that meet the definition of a retail forex CPO under 17 C.F.R.

§ 5.1(d)(1) to register as a CPO with the CFTC.

23



82.     During the Relevant Period, MTI acted as a CPO by engaging in a business that

was in the nature of a commodity pool, investment trust, syndicate, or similar enterprise, and in

connection therewith, solicited, accepted, or received from others, funds, securities, or property,

either directly or otherwise, for the purpose of trading in off-exchange leveraged, margined or

financed forex transactions while failing to register with the CFTC as a CPO in violation of 7

U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1), and 17 C.F.R. § 5.3(a)(2)(i).  During the Relevant Period,

MTI was not exempt from registration as a CPO.

83.     7 U.S.C. § 6k(2) makes it unlawful for any person to be associated with a CPO as

an officer or agent (or any person occupying a similar status or performing similar functions), in

any capacity that involves the solicitation of funds, securities, or property for participation in a

commodity pool, unless such person is registered with the CFTC as an AP of a CPO.  Similarly,

17 C.F.R. § 5.3(a)(2)(ii) requires anyone acting as an AP of a CPO for a pooled investment

vehicle that engages in retail forex transactions to register as an AP.

84.     Except in certain circumstances not relevant here, 7 U.S.C.

§§ 2(c)(2)(C)(iii)(I)(cc) and 17 C.F.R. § 5.3(a)(2)(ii) require those that meet the definition of an

AP of a retail forex CPO under 17 C.F.R. § 5.1(d)(2) to register as an AP of a CPO with the

CFTC.

85.     Throughout the Relevant Period, Steynberg was associated with CPO MTI as an

officer or agent in a capacity that involved the solicitation of funds, securities, or property for

participation in a commodity pool, while failing to register with the CFTC as an AP of the CPO

MTI in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

Throughout the Relevant Period, Steynberg was not exempt from the requirement to register as

an AP of a CPO.

24



86.     The foregoing acts, omissions, and failures by Steynberg occurred within the scope of his employment, agency, or office with MTI during the Relevant Period.  Therefore, MTI is liable for Steynberg's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii), pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

87.     Steynberg held and exercised direct and indirect control over MTI and either did not act in good faith or knowingly induced MTI's violations of 7 U.S.C. § 6m(1) during the Relevant Period.  As a controlling person of MTI, Steynberg is liable for MTI's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i), pursuant to 7 U.S.C. § 13c(b).

88.     Each instance during the Relevant Period in which MTI acted as an unregistered CPO, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

89.     Each instance during the Relevant Period in which Steynberg acted as an AP of MTI, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6k(2) and 17 C.F.R. § 5.3(a)(2)(ii).

## VII.    RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.     Find that Defendants violated Sections 2(c)(2)(C)(iii)(I)(cc), 4b(a)(2)(A)-(C), 4k(2), 4m(1), and 4o(1)(A)-(B) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B), and Regulations 4.20(a)(1), (b), and (c), 5.2(b)(1)-(3), 5.3(a)(2)(i) and (ii), 17 C.F.R. §§ 4.20(a)(1), (b), (c), 5.2(b)(1)-(3), 5.3(a)(2)(i), (ii) (2021);

B.     Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants and any other person or entity in active concert with them, from engaging in conduct



in violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6b(a)(2)(A)-(C), 6k(2), 6m(1), 6o(1)(A)-(B), and 17 C.F.R. §§ 4.20(a)(1), (b), (c). 5.2(b)(1)-(3), 5.3(a)(2)(i), (ii) (2021);

      C.    Enter an order of permanent injunction prohibiting Defendants and any other person or entity in active concert with them from, directly or indirectly:

      1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

      2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of Defendants or for accounts in which Defendants have a direct or indirect interest;

      3)   Having any commodity interests traded on Defendants' behalf;

      4)   Controlling or directing the trading for, or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

      5)   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

      6)   Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and

      7)   Acting as a principal (as that term is defined in Regulation 3.1, 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person

registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9);

D.     Enter an order requiring Defendants, as well as any successors thereof, to disgorge, pursuant to such procedures as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.     Enter an order requiring Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedures as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations described herein, including pre-judgment and post-judgment interest;

F.     Enter an order directing Defendants, as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any of the participants whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

G.     Enter an order directing Defendants, as well as any successors thereof, to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* 17 C.F.R. § 143.8 (2021), or subsequent annually adjusted amounts, for each violation of the Act and Regulations, as described herein;



H.    Enter an order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to participants and other persons in connection with commodity interests and all disbursements for any purpose whatsoever of funds received from commodity interests, including salaries, commissions, interest, fees, loans, and other disbursement of money or property of any kind from at least December 2017 to the date of such accounting;

I.    Enter an order requiring Defendants, and any successors thereof, to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

J.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated:  June 30, 2022

Respectfully submitted,

By: /s/ Timothy J. Mulreany
Timothy J. Mulreany
(Maryland Bar No. 8812160123)
Danielle E. Karst (D.C. Bar No. 481881)
COMMODITY FUTURES TRADING
COMMISSION
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone:  (202) 418-5306 (Mulreany)
Facsimile:  (202) 418-5523



# EXHIBIT

# "1-E"

HC 87

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO.: 935/2021

In the urgent application of:

HERMAN BESTER N.O.                                                      First Applicant

ADRIAAN WILLEM VAN ROOYEN N.O.                                  Second Applicant

CHRISTOPHER JAMES ROOS N.O.                                       Third Applicant

JACOLIEN FRIEDA BARNARD N.O.                                      Fourth Applicant

DEIDRE BASSON N.O.                                                      Fifth Applicant

*(In their capacities as the duly appointed joint provisional liquidators of*

*Mirror Trading International (Pty) Ltd (in provisional liquidation))*

*(for an order extending the powers of the Applicants in terms of Section*
*386(5) and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973*
*Companies Act") read with Item 9 of Schedule 5 of the Companies Act, 71 of*
*2008 (as amended) ("the 2008 Companies Act") and for the convening of a*
*Commission of Enquiry in terms of the provisions of Section 417 and 418 of*
*the 1973 Companies Act and the appointment of a Commissioner in terms*
*of Section 418 of the 1973 Companies Act read with Item 9 of Schedule 5 of*
*the 2008 Companies Act)*

---

## NOTICE OF MOTION: EX PARTE APPLICATION

---

The stamp on the page reads: OFFICE OF THE CHIEF JUSTICE / PRIVATE BAG X9020 / CAPE TOWN 8000 / 2021 -01- 2 1 / GENERAL OFFICE / WESTERN CAPE HIGH COURT

2

**BE PLEASED TO TAKE NOTICE THAT** an ex parte application, in camera will be made on behalf of the above applicants to this court on **FRIDAY, 22 JANUARY 2021** at 10h00 or as soon thereafter as counsel for the applicants may be heard for an order in the following terms:

1.    That this application may be heard in camera, as a matter of urgency in terms of Rule 6(12) of the Uniform Rules and that any non-compliance with the Rules with regards to service and time frames be condoned.

2.    Authorising the applicants to bring this application in terms of the provisions of section 386(5) and 387(3) of the Companies Act, 61 of 1973, as amended ("the 1973 Companies Act") read with item 9 of Schedule 5 to the Companies Act 71 of 2008, as amended ("the 2008 Companies Act").

3.    Authorising the applicants in terms of section 386(5) and 387(3) of the 1973 Companies Act read with section 386(4) to:

    3.1    institute or defend actions or other legal proceedings in terms of section 386(4)(a);

    3.2    Obtain legal advice on any question of law affecting the administration of Mirror Trading International (Pty) Ltd ("MTI") and to engage the services of attorneys and counsel in connection with any matter arising out of or relating to MTI;



3

3.3    Agree with such attorneys and counsel on the tariff or scale of fees
to be charged by and paid to such attorneys and/or counsel for the
rendering of services to MTI and to conclude written agreements
with the attorneys and/or counsel in the form contemplated in and
by section 73(2) of the Insolvency Act, 24 of 1936 read with
section 339 of the 1973 Companies Act;

3.4    Pay the attorneys and/or counsel the agreed costs and the
disbursements incurred by the attorneys and counsel out of the
funds of MTI as costs in the administration of MTI as and when such
services are rendered and disbursements are made;

3.5    Agree to any reasonable offer of composition made to MTI by any
debtor and to accept payment of any part of a debt due to MTI in
settlement thereof or to grant an extension of time for the payment
of any such debt in terms of section 386(4)(b);

3.6    Open an on-line cryptocurrency trading account in the name of,
alternatively on behalf of MTI and to receive cryptocurrency to be
recovered on behalf of MTI, in such account;

3.7    Sell any movable property of MTI, including any Bitcoin or other
form of cryptocurrency, by public auction, public tender, private
treaty or relevant platform, as the case may be, and to give delivery
thereof in terms of section 386(4)(h);



4

3.8     Engage the services of bookkeepers, accountants, auditors,
        forensic accountants, forensic digital experts, investigators, key staff
        or any other person for any purpose for which they may be required
        in relation to the affairs of MTI and to treat the costs so incurred as
        costs in the administration in terms of section 386(4)(f).

4.      Ratifying and confirming all such actions already taken by the applicants
        as fall under section 386(4)(a) of the 1973 Companies Act, including the
        engagement by the applicants of attorneys and counsel to bring this
        application.

5.      That a commission of enquiry into the affairs of MTI be held in terms of the
        provisions of section 417 read with section 418 of the 1973 Companies Act
        read with Item 9, Schedule 5 of the 2008 Companies Act ("the enquiry").

6.      That Mr Adriaan Serfontein Hurter, Mr Lambertus Von Wielligh Bester,
        retired Judge Eberhard Bertelsmann and, conditional upon his acceptance
        of this appointment pursuant to the granting of this order, retired Judge
        Hans-Joachim Fabricius, be appointed as commissioners in terms of
        section 418(1)(a) of the 1973 Companies Act and that they be authorised
        to fix the time(s) and place(s) for the holding of the enquiry as they in their
        sole direction deem fit.



6

7       That the Master of the High Court, Cape Town be authorised to appoint
        commissioners in addition to the court appointed commissioners, upon the
        Applicants' duly motivated request to do so ("the additional appointed
        commissioners").

8.      That the enquiry be referred to the court appointed commissioners and, if
        applicable, to the additional appointed commissioners and to the duly
        designated magistrate in any one of the following magistrate courts:

        (i)     Magistrate Court, Stellenbosch;

        (ii)    Magistrate Court, Cullinan;

        (iii)   Magistrate Court, Durban.

        ("the designated magistrates")

9.      That the applicants be authorised to proceed with the whole or any part of
        the enquiry before any one of the court appointed commissioners and/or
        the additional appointed commissioners and or any of the designated
        magistrates (collectively referred to as "the commissioners").

10.     That the commissioners be authorised and empowered to summon or
        cause to be summoned before them any person to be examined at the
        enquiry by counsel or any attorney on behalf of the applicants or by any



6

other competent party as is provided for in section 418(1)(c) of the 1973 Companies Act. Such persons may include, but are not limited to:

**NAME** | **CAPACITY**
--- | ---
1. Cornelius Johannes Steynberg | Director of MTI
2. Nerina Steynberg | Second in command of MTI
3. Coenie Rademan | Past Director of MTI
4. Clynton Hugh Marks | Head of Referral Program and Members of MTI
5. Cheri Marks | Head of Communications and Marketing of MTI
6. Liz Malton | Management Team member and Training and Presenting Team member of MTI
7. Charles Ward | COO of MTI
8. Monica Coetzee | Head of Corporate Services and Training and Presenting Team member of MTI
9. Romana Samuels | Head of Member Support of MTI and staff member at MTI's Stellenbosch office
10. Vincent Ward | Head of International Expansion of MTI
11. Leonard Gray | Head of Legal of MTI
12. Jaco Eckley | Management Team member and staff member at MTI's Stellenbosch office
13. Tom Fraser | Management Team member of



7

MTI

| 14. | Gerald Lassen | Member of MTI and Manager of MTI's Strand office |

15.    Duly authorised representative(s) of FXChoice

| 16. | A certain Ms Camila | Senior Account Manager of Trade300 |

17.    Duly authorised representatives of Standard Bank (being the bank of MTI)

18.    Duly authorised representatives of ABSA, FNB and Standard Bank (being the banks of Steynberg)

19.    Duly authorised representative(s) of any other bank in respect of bank statements of any party that may be identified as being relevant for purpose of investigation the affairs of MTI

20.    Individuals already identified, and still to be identified, who received referral commission in the form of bonus and who made "profits" on their purported investments with MTI

11.    That the commissioners be authorised and empowered to summons further persons before them who, as a result of the evidence led before them or representations made to them, appear to them to be capable of giving information concerning their knowledge of or dealings and associations with the business, trade, property and affairs of MTI.

12.    That all persons summoned before the commissioners may be examined concerning the trade, dealings, affairs and property of MTI.

13.    That all persons summoned by the commissioner be ordered to produce at the enquiry inter alia all books, record and documents, whether in printed



8

form or sorted in digital form (including documents stored through the utilisation of computer hardware or software), in their possession, custody, power or under their control or in possession, custody, power or under control of the firm, company, or any entity by which they are employed or which they represent in respect of all maters concerning the trade, dealings, affairs or property of MTI.

14.   That the signature of the relevant commissioner or the Master of the Western Cape High Court, Cape Town on the summons (subpoenas) to be issued, shall be sufficient for the validity thereof.

15.   That the record of this application and all proceedings before the commissioners shall be kept private and confidential and shall not be disclosed without the prior leave of the court or the relevant commissioner having been obtained.

16.   That the applicants and commissioners are authorised and empowered to conduct any part of the enquiry, as identified by the applicants, via an appropriate virtual platform in a format to be determined by the relevant commissioner.

17.   That the commissioner(s) be directed and instructed to report to the Master of the High Court, Cape Town, in respect of the following, although not limited thereto:



9

(i)     The identity of the witnesses who gave evidence before the commissioner(s);

(ii)    Which assets and/or monies were discovered, if any, through the inquiry and which advantage was derived to the creditors of MTI as a result thereof; and

(iii)   Whether any unlawful acts, transgressions and/or any other irregularities were discovered by means of the evidence before the commissioners(s) and whether such matters should be referred to the relevant authority for consideration.

18.     That the costs and expenses of this application and the enquiry on an attorney own client scale, be costs in the administration of MTI.

19.     That the applicants be granted such further and/or alternative relief as the court may deem necessary.

TAKE FURTHER NOTICE THAT the applicants have appointed the offices of **MOSTERT & BOSMAN ATTORNEYS**, Fourth Floor, Madison Square, c/o Carl Cronje Drive & Tygerfalls Boulevard, Tygerfalls, Bellville, with servicing address at **VEZI DE BEER INC**, Third Floor, Equity House, 107 St George's Mall, **CAPE TOWN** as the address at which it will accept notice and service of all documents and process in these proceedings.

TAKE NOTICE FURTHER THAT the affidavits of **HERMAN BESTER, ADRIAAN WILLEM VAN ROOYEN, CHRISTOPHER JAMES ROOS, JACOLIEN FRIEDA**

10

BARNARD and DEIDRE BASSON annexed hereto will be used in support of this application.

KINDLY ENROLL THE MATTER FOR HEARING ACCORDINGLY.

DATED AT BELLVILLE ON THIS __21st__ DAY OF JANUARY 2021.

MOSTERT & BOSMAN

PER: PIERRE DU TOIT

*Attorney for Applicants*

Fourth Floor, Madison Square

c/o Carl Cronje & Tygerfalls Boulevard

Tygervalley, BELLVILLE

(Ref: PDT/AE/WI7098)

Servicing Address:

VEZI DE BEER INC

Third Floor, Equity House

107 St George's Mall

Gardens, CAPE TOWN

TO:   THE REGISTRAR

High Court

CAPE TOWN

OFFICE OF THE CHIEF JUSTICE
PRIVATE BAG X9020
CAPE TOWN 8000

2021 -01- 21

GENERAL OFFICE
WESTERN CAPE HIGH COURT

BY HAND

11

AND

TO:   THE MASTER OF THE HIGH COURT

      CAPE TOWN                                              BY HAND

HC 97

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO.: _____

In the urgent application of:

| | |
|---|---|
| **HERMAN BESTER N.O.** | First Applicant |
| **ADRIAAN WILLEM VAN ROOYEN N.O.** | Second Applicant |
| **CHRISTOPHER JAMES ROOS N.O.** | Third Applicant |
| **JACOLIEN FRIEDA BARNARD N.O.** | Fourth Applicant |
| **DEIDRE BASSON N.O.** | Fifth Applicant |

*(In their capacities as the duly appointed joint provisional liquidators of*

*Mirror Trading International (Pty) Ltd (in provisional liquidation))*

(for an order extending the powers of the Applicants in terms of Section 386(5) and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973 Companies Act") read with Item 9 of Schedule 5 of the Companies Act, 71 of 2008 (as amended) ("the 2008 Companies Act") and for the convening of a Commission of Enquiry in terms of the provisions of Section 417 and 418 of the 1973 Companies Act and the appointment of a Commissioner in terms of Section 418 of the 1973 Companies Act read with item 9 of Schedule 5 of the 2008 Companies Act)

---

**FOUNDING AFFIDAVIT**

---



2

I, the undersigned,

## HERMAN BESTER

do hereby make oath and state that:

1.    I am an adult male insolvency and business rescue practitioner practicing at Tygerberg Trustees (Pty) Ltd, with business address at First Floor, Cascade Terraces, Waterfront Road, Tyger Waterfront, Bellville, Western Cape.

2.    I take appointments as a trustee of insolvent estates and as a liquidator of companies and close corporations and as a senior business practitioner.

3.    The facts deposed to herein fall within my personal knowledge and belief, save where the context indicates the contrary, and are furthermore true and correct.

4.    Where I rely on:

    4.1    Information conveyed to me by others, appearing from documents under my control or communicated to me by third parties, I verily believe such information to be true and correct;



3

4.2   Submissions of a legal nature, I do so on the advice of the
applicants' legal representatives, which advice I accept and verily
believe to be correct;

4.3   Hearsay evidence, I verily believe same to be true and correct and
respectfully request that same be admitted in terms of the provisions
of section 3 of the Law of Evidence Amendment Act, 45 of 1988.

## The Applicants

5.   I am the first applicant in this matter, cited in my capacity as
joint provisional liquidator of Mirror Trading International (Pty) Ltd
(in provisional liquidation) ("MTI"). In confirmation hereof, a copy of the
certificate of appointment of the joint provisional liquidators of MTI, issued
by the Master of the Western Cape High Court ("the Master") on 20
January 2021, is annexed hereto as "HB1".

6.   The second applicant is ADRIAAN WILLEM VAN ROOYEN N.O, cited in
his capacity as joint provisional liquidator of MTI, who practises as an
insolvency practitioner at Full Swing Trading - 726 CC t/a Investrust, with
business address at 73 Bond Street, Clydesdale, Pretoria.

7.   The third application is CHRISTOPHER JAMES ROOS N.O., cited in his
capacity as joint provisional liquidator of MTI, who practises as an



insolvency practitioner at Sebenza Trust, Unit A2, 43 Estcourt Avenue, Wierda Park, Centurion.

8.    The fourth applicant is JACOLIEN FRIEDA BARNARD N.O., cited in her capacity as joint provisional liquidator of MTI, who practises as an insolvency practitioner at Tewelelopele Trust, with business address at 310 Soutpansberg Road, Rietondale, Pretoria.

9.    The fifth applicant is DEIDRE BASSON N.O., cited in her capacity as joint provisional liquidator of MTI, who practises as an insolvency practitioner at Tshwane Trust Co (Pty) Ltd, with business address at 1207 Cobham Road, Queenswood, Pretoria.

10.    I am duly authorised by the second to fifth applicants to depose to this affidavit and to bring this application on behalf the applicants and MTI. In confirmation hereof, confirmatory affidavits deposed to by the second to fourth applicants are annexed hereto. The fifth applicant is currently not available to sign a confirmatory affidavit. However, she has provided Mr Johannes Zacharas Human Müller with a written power of attorney to act on her behalf. In this regard I refer to the confirmatory affidavit of Mr Müller annexed hereto.

11.    I hereinafter refer to the first to fifth applicants collectively as "we", or the "applicants", alternatively "provisional liquidators".





5

## Purpose of this application

12.   This is an urgent *ex parte* application in which the provisional liquidators seek the relief described below.

13.   First, we seek, in terms of the provisions of section 386(5) and 387(3) read with section 386(4) of the 1973 Companies Act, read further with item 9 of Schedule 5 of the 2008 Companies Act, the extension of our powers as provisional liquidators and in particular, authorisation to *inter alia*:

  13.1   Bring this application;

  13.2   Bring or defend any action or other legal proceeding, to obtain legal advice on any question of law affecting the administration of MTI and to engage the services of attorneys and counsel in connection with any matter arising out of or relating to MTI;

  13.3   Agree to any reasonable offer of composition made to MTI by any debtor and to accept payment of any part of a debt due to MTI in settlement thereof or to grant an extension of time for the payment of any such debt;

  13.4   Compromise or admit any claim or demand against the company, including an unliquidated claim;











8

Information available clearly indicates that MTI is currently unable to pay its debts as envisaged in section 417(1) of the 1973 Companies Act.

Background

20.     MTI was registered and incorporated in April 2019 purportedly in order to conduct the business of a fund manager trading in crypto currency, particularly Bitcoin. Its sole director and chief executive officer, Mr Cornelius Johannes Steynberg ("Steynberg"), purportedly the only person with full control over the funds invested through it by its investors/creditors is strongly suspected of being the mastermind behind what appears to be a ponzi-type investment scheme utilising MTI as the vehicle.  Steynberg was assisted by MTI's so-called senior management team, which included Mrs Nerina Steynberg, Mr Clynton Hugh Marks, Mrs Cheri Marks, Mr Charlie Ward, Ms Monica Coetzee, Ms Liz Maiton, Mr Leonard Gray, Ms Romana Samuels and others.

21.     MTI operated by soliciting members of the public to invest their funds in the form of Bitcoin on online derivative trading platforms through MTI, on the promise of unrealistically high returns, i.e. up to 10% per month.  MTI's business model made use of a referral structure in terms of which existing investors received referral bonuses, over and above their exorbitant returns on investment, for the recruitment of new members to "invest" their Bitcoin through MTI.



8

From available information, it appears that more than 3500 Bitcoin were
paid to approximately 180 individuals as so-called referral bonuses. At the
current value of one Bitcoin (approximately R534 000.00), this equates to
more than R1.8 billion. Most of the members of MTI's senior management
team benefitted from these payments.

22.    After suspicion arose of the business of MTI being conducted in
        contravention of South African statutory provisions regulating local and
        foreign investment schemes, the South African Financial Sector Conduct
        Authority ("FSCA"), being the statutorily created financial sector regulatory
        body established in terms of section 56 of the Financial Sector Regulation
        Act, 9 of 2017 ("the FSR Act"), initiated investigations into MTI's business
        activities.

23.    On 18 August 2020, the FSCA issued a press release, a copy of which is
        annexed hereto as "HB3", in which it expressed the following concerns in
        relation to the business of MTI:

        23.1    The business model of MTI required of it to be in possession of a
                Financial Service Provider Licence ("FSP licence") in terms of
                section 111 of the FSR Act, which it was not;

        23.2    MTI claimed to have in excess of R2.9 billion (at the conversion
                rates at the time) in investor/creditor funds in trading accounts but



Content:

Okay, final:


11

from the multi account manager account and instead pool their Bitcoin into a single member trading account managed by a bot, being an automated program used to facilitate high frequency trading on the trading platform, together with a head trader and trading team. The FSCA's investigations revealed that this too was a fallacy, as dealt with hereinunder.

26. On 28 October 2020, the FSCA issued a second press release, a copy of which is annexed hereto as "HB4", in which it informed the public of its on-going investigations into the affairs of MTI and issued a warning to exercise extreme caution when "investing" with any person or organisation not registered as a Financial Service Provider.

27. On 17 December 2020, the FSCA issued a final press release, a copy of which is annexed hereto as "HB5", in which it advised that its investigations were nearing completion, from which investigations it could confirm that:

27.1    MTI was conducting business which required of it to be in possession of a financial service provider licence, for which it had not applied;

27.2    It had found evidence contradicting MTI's claim to have funds in trading accounts of a substantial value, as the total value of frozen Bitcoin invested through FXChoice, was negligible;



12

27.3    It had found evidence contradicting MTI's alleged returns on investment in that from 29 January 2020 until 3 June 2020, MTI had in fact suffered a capital loss on investment of approximately 30%, as opposed to its alleged returns of up to 10% per month;

27.4    It had found evidence contradicting MTI's alleged utilisation of bot trading;

27.5    After being informed by the FSCA that it was conducting an illegal unregistered financial services business, MTI claimed to have:

27.5.1    Changed its business to that of a fund manager trading in derivative instruments based on crypto currency (still Bitcoin);

27.5.2    Accordingly changed its online derivative trading platform from FXChoice to 'Trade300' (still utilising a bot);

27.5.3    Transferred all its investors' funds to 'Trade300';

27.6    It had found evidence to believe that Trade300 was not a legitimate derivative trading platform but instead linked to Steynberg himself;

27.7    It had found that the alleged transfer of investor funds from FXChoice to the so-called Trade300 had not occurred during the



13

period alleged by Steynberg, despite MTI providing it with purported proof of the transfer in this regard;

27.8    It had found no evidence of any significant store of funds on any trading platform and that most of the crypto currency balances were held in the name and under the control of Steynberg personally, which funds did not equate to that which MTI claimed to have in investor funds in trading accounts;

27.9    It believed that MTI and its senior management were conducting an illegal operation, were misleading investors/creditors and were contravening several laws.

28.    On 22 December 2020, the management of MTI released a statement to its investors/creditors, a copy of which is annexed hereto as "HB6", in which it outrightly distanced itself from the illegal operation of MTI and particularly from Steynberg by expressing the following:

28.1    Steynberg had not been truthful with the management, leaders or members of MTI;

28.2    After communications with Trade300, which had been sparse and unforthcoming, it believed that Trade300 was potentially owned and operated by Steynberg;



14

28.3    On 2 December 2020, Steynberg travelled to Sao Paulo, Brazil
        and on 13 December 2020 he informed management that his
        wife, Nerina Steynberg, would run "the system" in his absence;

28.4    On 15 December 2020, Steynberg could no longer be reached
        nor located and his wife refrained from reporting him as a missing
        person but instead intimated that he did not want to be found;

28.5    Investors' requests for the withdrawal of their investments through
        MTI had not been honoured, for no valid reason;

28.6    MTI's Nedbank account, to which only Steynberg and his wife
        had full access, had been suspended and the account and logins
        had been changed;

28.7    Steynberg's wife informed management that Steynberg had
        booked a return flight and that his return date was 22 December
        2020.

29.  It is unclear at this stage whether the content of the above statement is
     authentic or fabricated with the intention to further mislead MTI's investors/
     creditors with a view to dissolving the scheme, particularly in view of the
     fact that members of the management of MTI are suspected of having
     been involved in previous failed "get-rich-quick" schemes comparable to





that of MTI. This is nonetheless an issue which urgently needs to be investigated by the applicants.

30. In addition to the above:

30.1 The Texas State Securities Board has issued an emergency order in terms of which MTI and Steynberg were to immediately cease and desist from offering for sale any security, acting as a securities dealer or agent and engaging in any fraud in connection with the offer for sale of any security in Texas. A copy of this order is annexed hereto as "HB7";

30.2 The Canadian *Autorité Des Marchés Financiers*, an independent administrative authority which regulates the French financial market, has placed MTI on its warning list of websites and companies that solicit investors illegally. A copy of the relevant extract from this warning list is annexed hereto as "HB8";

30.3 From the website of RAG and from the nominations for the appointment of provisional liquidations, it appears that tens of thousands of investors are foreign citizens of more than 140 other countries.

16

31. The above is an indication of the magnitude of the scheme and the existence of its international presence, which supports the necessity for the granting of the relief sought by the applicants in this application.

32. From the above, at this stage it appears as though:

32.1 MTI received and accepted funds in the form of Bitcoin from members of the public without being registered to do so in terms of the FSR Act, nor the Banks Act, 94 of 1990 ("the Banks Act");

32.2 MTI utilised the funds invested through it by its investors/creditors to cover its operational costs and the returns on investment and the referral bonuses of its investors/creditors;

32.3 MTI accordingly utilised the invested funds in contravention of the investment mandates provided to it by its investors/creditors.

33. From our pre-liminary enquiries, it appears that MTI is supposed to hold 23 000 Bitcoin, being the number of Bitcoin which it owes to its investors. The value of one Bitcoin at today's US Dollar/Rand exchange rate equates to R534 940.00. The value of 23 000 Bitcoin is therefore approximately R12.3 billion. To date the FSCA has been unable to trace Bitcoin of a material value in the name of MTI.



17

34.    The above strongly suggests that MTI was utilised as the vehicle for what appears to be a massive unlawful ponzi-type scheme.

35.    The applicants accordingly urgently need to take action by *inter alia* appointing attorneys, digital experts, and auditors to assist them in unravelling the scheme, establishing the flow of the funds and recovering and safeguarding assets for and on behalf of MTI and its investors/creditors in South Africa and in any foreign jurisdiction that may be identified.

## Extension of powers

36.    This Honourable Court is furthermore requested to ratify and confirm the actions already performed by the provisional liquidators insofar as they fall under the powers sought by the liquidators as described below.

37.    By virtue of this application, the liquidators seek the powers set out in section 386(5) and 387(3) of the 1973 Companies Act, as well as the further powers set out in section 386(4) of the 1973 Companies Act.

38.    Given the magnitude of the scheme conducted through MTI, it is not possible to foresee and therefore precisely describe what actions may be required of the applicants in the foreseeable future.



18

39.    At this stage, a short description of each of the powers sought by the
       provisional liquidators and a brief explanation as to why they are or may be
       necessary in the winding-up of MTI are set out below.

## The power to bring or defend any action or other legal proceedings (section 386(4)(a))

40.    Firstly, it has been necessary to appoint attorneys and counsel to assist
       with this application.

41.    Secondly, it is clear at this stage that substantial funds placed by the
       investors/creditors of MTI under its control have been utilised for purposes
       other than for which such transfers were made and it is strongly suspected
       that such funds have been misappropriated by MTI, and ultimately
       Steynberg, Clynton Hugh Marks and Cheri Marks ("the Marks"), to cover
       *inter alia* its operational costs, returns on investment and referral bonuses.
       It is unclear for what other purposes the funds have been used and this
       accordingly urgently needs to be investigated by the applicants with the
       assistance of forensic accountants and forensic digital experts.

42.    From the evidence, it is clear that investigations need to be initiated into
       the affairs of MTI immediately in order to protect the interests of the
       thousands of investors/creditors who have placed their funds into MTI by:




19

42.1    Preventing further dissipation of such funds/assets and preventing the destruction of information relating to the whereabouts of the funds/assets and any and all assets belonging to MTI;

42.2    Initiating the required legal steps and/or actions and/or proceedings required to recover and reclaim funds from third parties not entitled thereto in South Africa and in any foreign jurisdiction that may be identified.

43.     The liquidators accordingly seek the power:

43.1    To institute or defend actions or other legal proceedings;

43.2    To obtain legal advice on any question of law affecting the administration of MTI and to engage the services of attorneys and counsel in connection with any matter arising out of all in relation to the winding-up of MTI;

43.3    To agree with such attorneys and counsel on the tariff or scale of fees to be charged and paid to such attorneys and/or counsel for the rendering of services to MTI; to conclude written agreements with the attorneys and/or counsel in the form contemplated in section 73(2) of the Insolvency Act as read with section 339 of the 1973 Companies Act;





20

43.4  To pay the attorneys and/or counsel the agreed costs and/or disbursements made by the attorneys and counsel out of the funds of MTI as costs in the administration of MTI as and when such services are rendered and the disbursements are made, and that the actions of the liquidators to date hereof in respect of the engagement of the services of attorneys and counsel (particularly with regard to this application) be approved, ratified and confirmed;

43.5  To engage the services of bookkeepers, accountants, auditors, forensic digital experts, investigators, key staff or any other person or entity for any purpose for which it maybe required in the investigations of the business and affairs of MTI and its participation in the unlawful scheme of MTI, and to treat the costs so incurred as costs in the administration of the winding-up of MTI.

**The power to compromise or settle debts due to MTI (section 386(4)(b))**

44.    In view of the magnitude of MTI's estate and the anticipated claims in relation thereto, it is imperative that the appointed liquidators be granted the power to agree to any reasonable offer of compromise or settlement made to the estate, to accept any payment of any part of a debt due to the estate or to grant an extension of time for the payment of any such debt.

45.    The above powers are necessary to prevent costly and protracted litigation which will only serve to hamper the estate and its creditors, and are



21

therefore necessary to facilitate the expeditious and efficient winding-up of the estate by the liquidators.

## The power to sell property (section 386(4)(h))

46.    In view of the extent of the anticipated costs in connection with the investigation into and the winding-up of the estate of MTI, the applicants seek the power, insofar as they are able to recover assets that belong to the estate of MTI, to sell such assets where necessary for the purpose of advancing the winding-up process.

47.    As it appears that most of the assets that may initially be recovered will be in the form of Bitcoin or other forms of cryptocurrency, it is imperative that the applicants have the power to sell the cryptocurrency when the market value is favourable in order to preserve the value of the assets recovered. This will be done with the assistance and advice of the appropriate experts in respect of cryptocurrency trading.  Although Bitcoin has recently shown exponential growth, its value is notoriously volatile.  The applicants should therefore be in a position to take advantage of favourable market conditions on short notice, if so advice by the suitable experts.

## The opening of an on-line cryptocurrency trading account (Section 386(5))

48.    As explained above, it is foreseen that most of the assets that will initially be recovered on behalf of MTI, will be in the form of Bitcoin or other forms



22

of cryptocurrency. In order to be able to receive the cryptocurrency on behalf of MTI, the applicants will require the power to open an appropriate on-line cryptocurrency trading account in the name of MTI, alternatively in the name of any one of the applicants on behalf of MTI, as cryptocurrency can only be transferred from one cryptocurrency wallet/ cryptocurrency account into another cryptocurrency wallet/account. It is therefore not possible to recover and receive cryptocurrency on behalf of MTI, without opening a cryptocurrency trading account on behalf of MTI.

## Commission of Enquiry

49.    In view of the facts set out hereinabove, the applicants submit that an enquiry into the trade, dealings, affairs and/or property of MTI urgently needs to be convened and held in order to collate the necessary data and information not currently in the possession of the applicants in order to enable them ascertain the existence and whereabouts of funds and/or assets as quickly and efficiently as possible.

50.    In short, an enquiry is necessary to *inter alia* urgently:

    50.1   Ascertain the reasons why MTI was established and why the funds of its investors/creditors were placed under its control;

    50.2   Establish the flow of the funds of MTI's investors/creditors and in particular, the recipients of such funds, in order to determine and

23

appraise the potential claims by the applicants against such recipients for the safe guarding and recovery thereof;

50.3 Investigate whether Steynberg, as sole director and CEO of MTI, and the other senior staff of MTI have contravened the provisions of the Companies Act or have committed offences.

51. Further to the above, the applicants submit that an enquiry under sections 417 and 418 of the 1973 Companies Act will be most suitable under the circumstances, as opposed to any other enquiry under the 1973 Companies Act, for the following reasons:

51.1 The enquiry can be convened and held within a matter of days once the applicants' powers have been extended and the court's authority to do so has been obtained. The applicants submit that the circumstances undoubtedly call for such urgency;

51.2 The above will enable the applicants to carry out their primary duties of ascertaining and recovering the assets of the estate during the initial period after the granting of the order of provisional winding-up, which will in turn serve to reduce the risk of further dissipation of such assets prior to recovery thereof. This is of particular importance in view of the ease and immediacy with which cryptocurrency can be transferred and dissipated;



24

51.3   The enquiry will be conducted in a private and confidential manner as envisaged by the provisions of section 417(7) read with section 418 of the 1973 Companies Act, which will ensure the protection of the integrity of the data and information obtained at this early stage of the winding-up process, which information is likely to be of a highly sensitive nature and which could be misused:

51.3.1   By the witnesses to prepare for the enquiry by fabricating a common version based on the testimony of previous witnesses;

51.3.2   By the relevant parties behind the operation of the scheme to frustrate the applicants' attempts to locate and recover the assets of MTI.

**Witnesses at enquiry**

52.   The necessary information will be obtained by way of the interrogation of *inter alia* the following persons:

52.1   Steynberg, as sole director, CEO and 50% shareholder of MTI;

52.2   Nerina Steynberg, as purported second in command of MTI;

52.3   Coenie Rademan, as director of MTI during the period 30 April 2019 to 15 May 2020;



52.4  Clynton Hugh Marks, as Head of Referral Program and Members and 50% shareholder of MTI;

52.5  Cheri Marks, as founding member and Head of Communications and Marketing of MTI;

52.6  Liz Malton, as founding member, Management Team member as well as Training and Presenting Team member of MTI;

52.7  Charles Ward, as COO of MTI;

52.8  Monica Coetzee, as Head of Corporate Services as well as Training and Presenting Team member of MTI;

52.9  Romana Samuels, as Head of Member Support of MTI and staff member at MTI's Stellenbosch office;

52.10 Vincent Ward, as purported Head of International Expansion of MTI;

52.11 Leonard Gray, as Head of Legal of MTI;

52.12 Jaco Eckley, as Management Team member and staff member at MTI's Stellenbosch office;

52.13 Tom Fraser, as Management Team member of MTI;

26

52.14 Gerald Lassen, as member of MTI and Manager of MTI's Strand office;

52.15 Duly authorised representative(s) of FXChoice;

52.16 A certain Ms Camila as purported Senior Account Manager of Trade300;

52.17 Duly authorised representatives of Standard Bank (being the bank of MTI);

52.18 Duly authorised representatives of ABSA, FNB and Standard Bank (being the banks of Steynberg);

52.19 Duly authorised representative(s) of any other bank in respect of bank statements of any party that may be identified as being relevant for purpose of investigation the affairs of MTI.

52.20 Individuals already identified, and still to be identified, who received referral commission in the form of bonus and who made "profits" on their purported investments with MTI;



27

52.21 Any and all other parties to be identified as parties who have relevant information pertaining to the affairs of MTI in their possession or under their control;

## Appointment of commissioners

53. Due to the magnitude of the scheme, the high number of witnesses that need to be interrogated in order for the applicants to obtain sufficient information pertaining to the whereabouts of billions of Rands worth of Bitcoin syphoned off and the urgency with which this needs to be accomplished, the applicants submit that it will be appropriate and prudent for the court to appoint more than one commissioner who is not also a magistrate.

54. The applicants propose that Mr Adriaan Serfontein Hurter ("Mr Hurter"), Mr Lambertus Von Wielligh Bester and retired Judges Eberhard Bertelsmann and Hans-Joachim Fabricus (the appointment of last mentioned being conditional upon his acceptance of the appointment, as explained below) be appointed as commissioners in terms of section 418(1)(a) of the 1973 Companies Act.

55. Mr Hurter has been a practicing attorney for the past 45 years, during which period he has been involved in litigation relating to insolvency law matters, including ponzi-type schemes.    He also has appropriate




28

experience acting as an appointed commissioner in numerous other matters. A copy of Mr Hurter's resumé is annexed hereto as "HB9".

56. Mr Bester has been an insolvency practitioner since 1983. He has fulfilled numerous leadership roles within the insolvency industry for many years and has an impeccable professional record. A copy of Mr Bester's resumé is annexed hereto as "HB10".

57. Retired Judge Bertelsmann has been a Judge of the High Court of South Africa since 2000 and has retired in 2016. A copy of retired Judge Bertelsmanns' resumé is annexed hereto as "HB11".

58. Retired Judge Hans-Joachim Fabricius has been a judge of the High Court of South Africa since 26 July 2010 and has retired on 29 February 2020. He, until recently was appointed as an acting judge in the High Court of South Africa, Gauteng Division, Pretoria. Due to the urgency of this matter, we have unfortunately been unable to communicate with Judge Fabricius regarding his resumé and willingness to accept the appointment as commissioner in this matter. His experience as a judge is well-known and I respectfully submit that it is in any event not necessary to provide any additional confirmation of his experience and suitability to act as a commissioner.

59. Messrs Hurter, Bester and Judges Bertelsmann and Fabricius are accordingly suitably qualified persons to be appointed as the



29

commissioners of the enquiry in the estate of MTI and, except for Judge Fabricius, have accepted their appointment as such, should the court so order. In this regard, copies of their signed consents are annexed hereto as "HB12", "HB13" and "HB14". As explained above, the applicants have been unable to make timeous contact with Judge Fabricius in order to obtain his consent to be appointed. The applicants therefore pray for an order that his appointment be conditional upon him accepting same pursuant to the granting of the order.

60.   In the event that difficulties are experienced with the progress of the enquiry due to a defaulting or recalcitrant witness whilst the enquiry is conducted before a commissioner who is not also a magistrate, it may be necessary to proceed with the enquiry before a magistrate, as a magistrate has the authority to issue a warrant of arrest in respect of a recalcitrant witness, whilst a commissioner who is not also a magistrate does not have this power.

61.   The applicants therefore respectfully submit it will be appropriate and prudent for this court to also authorise the referral of any parts of the enquiry, as may be determined by the applicants in due course, to be conducted before a magistrate in a specific magistrate court. The applicants respectfully submit that this will be most effective, from a practical and cost point of view, and in the best interest of MTI and its creditors.



30

62.    The applicants have at this stage identified a number of magistrate court jurisdictions where it may be necessary and/or most practical based on the area where some of the most important witnesses reside and where some of the affairs of MTI were conducted.  These magistrate court districts and the reasons for their relevance, can be summarised as follows:

62.1    Magistrate Court, Stellenbosch – where MTI has one of its principal places of business and its registered office;

62.2    Magistrate Court, Cullinan – were MTI had a satellite office;

62.3    Magistrate Court, Durban – were MTI had a satellite office and where the Marks reside;

**Costs of application and enquiry**

63.    The applicants submit that this application as well as the enquiry will be to the benefit of the investors/creditors of MTI as the proceeds of any assets and/or funds recovered as a result of the information obtained at the enquiry will be distributed amongst the creditors in order of preference.

64.    In the premises, we submit that the costs of this application as well as the costs occasioned by the convening and holding of the enquiry, including the costs of the venue, the attorneys and counsel representing the applicants, the transcription services and all other related and/or costs incidental to the enquiry be costs in the administration of the estate of MTI.



31

## Urgency

65.   The applicants are obliged by statute to urgently take control over and recover any and all assets of the estate of MTI, and thereby the expeditious winding-up of MTI to the benefit of its investors/creditors.

66.   As set out hereinabove, there are numerous issues which call for the applicants' urgent and immediate attention and action, particularly the recovery of the billions of funds misappropriated by MTI and/or Steynberg and/or the Marks from the funds placed under MTI's control. Moreover, this urgency is amplified by the fact that Steynberg is most probably in a position to dissipate the remaining cryptocurrency, which can be done with relative ease and immediacy without the knowledge of the applicants.

67.   The second meeting of creditors, at which meeting resolutions are usually adopted granting the liquidators the powers sought in this application, will not be held in the foreseeable future and may take approximately six to twelve months to convene. This aforesaid delay will be prolonged by the effects of the Covid-19 pandemic and the national lockdown regulations.

68.   The above delay will undoubtedly cause the estate of MTI and its investors/creditors irreparable harm. For this reason, the applicants are



32

obliged to bring this application on an urgent basis in order to preserve the interests of the thousands of investors/creditors.

## Conclusion

69. The applicants accordingly humbly request that this court grant an order in terms of the notice of motion to which this affidavit is attached.

**HERMAN BESTER**

Sworn to and signed in my presence at ___Tygervalley___ on this 21 day of ___January___ 2021 by the deponent who declared that he:

(a) knows and understands the contents of this affidavit;

(b) has no objection to the taking of the prescribed oath;

(c) considers the oath to be binding on his conscience;

and uttered the words: "I swear that the contents of this affidavit are true, so help me God."

**COMMISSIONER OF OATHS**

FERIAL ISMAIL
Commissioner of Oaths
Practising Attorney (RSA)
Tel: +27 (0)21 817 0720 or 082 299 1832   Fax: 086 602 4850
Madison Square, 5th Floor, 4 Howick Close
TYGERFALLS, corner of Carl Cronje Drive & Bill Bezuidenhout
TYGERVALLEY, 7530
DOCEX 159 CAPE TOWN
P.O. BOX 3617 TYGERVALLEY 7536
ferial@fi-attorneys.co.za



**"HB1"**



**REPUBLIC OF SOUTH AFRICA**

**SERTIFIKAAT VAN AANSTELLING VAN VOORLOPIGE LIKWIDATEUR**

[Maatskappywet, No 61 van 1973 (soos gewysig)]

**CERTIFICATE OF APPOINTMENT OF PROVISIONAL LIQUIDATOR**

[Companies Act, No 61 of 1973 (as amended)]

**NO: C000906/2020**

Hierby word gesertifiseer dat:
This is to certify that:

1. VAN ROOYEN , ADRIAAN WILLEM     ID. 6911185280080
2. BESTER, HERMAN     ID. 7009235139080
3. BARNARD, JACOLIEN FRIEDA     ID. 8210030014085
4. BASSON, DEIDRE     ID. 7008290090087
5. ROOS, CHRISTOPHER JAMES     ID. 8409215014080
6. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX     ID. XXXXXXXXXXXXXXXXXXXX
7. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX     ID. XXXXXXXXXXXXXXXXXXXX

aangestel is as Voorlopige Likwidateur met die magte soos uiteengesit in Artikel 386(1) van Wet No 61 van 1973 saamgelees met item 9 van Skedule 5 van Wet 71 van 2008 van die Maatskappy bekend as:

appointed as Provisional Liquidator with the powers as set out in Section 386(1) of Act 61 of 1973 read together with item 9 of Schedule 5 of Act 71 of 2008 of the Company known as:

**MIRROR TRADING INTERNATIONAL (PTY) LIMITED T/A MTI   2019/205570/07**

wat onder Voorlopige Likwidasie geplaas is
which has been placed under Provisional Liquidation  29-12-2020

van die Hoë Hof van Suid-Afrika,        Afdeling
by Order of the High Court of South Africa,   WESTERN CAPE HIGH COURT (CAPE TOWN)   Division

Geteken te        op
Signed at   CAPE TOWN        on   20 JANUARY 2021

DOJCDIHBOUWER
MEESTER VAN DIE HOË HOF VAN SUID-AFRIKA
MASTER OF THE HIGH COURT OF SOUTH AFRICA

URN: 6992020INS000906




"HB2"

29-12-2020

IN THE HIGH COURT OF SOUTH AFRICA
(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO: 19201/2020

BEFORE THE HONOURABLE MR JUSTICE ROGERS
AT CAPE TOWN: ON TUESDAY, 29 DECEMBER 2020

In the matter between:

ANTON FRED MELCHIOR LEE                                    Applicant

and

MIRROR TRADING INTERNATIONAL (PTY) LIMITED       First Respondent
T/A MTI
(REGISTRATION NUMBER: 2019/205570/07)
Registered office at: 43 Plain Street
                        Unit 1
                        First Floor
                        Stellenbosch
                        Western Cape

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)            Second Respondent
Private Bag X9000, Cape Town 8000

2020-12-28
DRAFT ORDER
WCD-010

Having read the documents filed of record and having heard Counsel for the
Applicant, it is hereby ordered that:



1. The First Respondent is hereby placed under provisional liquidation in the hands of the Master of the High Court, Cape Town.

2. A rule *nisi* is hereby issued calling upon all persons interested to show cause, if any, on Monday, 1 March 2021 at 10h00, or as soon thereafter as the application may be heard, why a final order should not be granted in the following terms: 

   2.1 That the First Respondent be placed under Final Liquidation; and

   2.2 That the costs of this application shall be costs in the Liquidation.

3. A copy of this provisional order is to be served as follows:

   3.1 On the Respondent at its principal place of business at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape;

   3.2 On the employees of the First Respondent, if any, at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape; *and at 341 Belfem Naude Drive, Randburg, Gauteng.*

   3.3 By one publication in each of the *Sunday Times* and *Rapport* newspapers respectively; and

   3.4 On the South African Revenue Service, Cape Town at 22 Hans Strijdom Avenue, Cape Town.

2



4.  The Registrar of this Honourable Court shall transmit a copy of this provisional order to the Sheriff of the province in which the registered office of the First Respondent is situated and to the Sheriff of every province in which it appears the First Respondent owns businesses.

5.  The Sheriff of this Honourable Court shall attach all property that appears to belong to the First Respondent and transmit to the Master an inventory of all property attached by him or her in terms of section 19 of the Insolvency Act 24 of 1936.

BY ORDER OF THE COURT

Private Bag X9020, Cape Town 8000

2020 -12- 2 8

WCD-010

COURT REGISTRAR

*VEZI & DEBEER INC: YASIN ALLI (REF: YALLI) Yasin@vezidebeer.co.za*
*3ʳᵈ FLOOR, EQUITY HOUSE, 107 ST GEORGES MALL, CAPE TOWN, TEL: (012) 361 2746*
*HC BOX: 763*

3



"HB3"

26.

AFML 2



**FSCA Press Release**                                                  18 August 2020

**Mirror Trading International**

The FSCA is investigating the activities of Mirror Trading International. The FSCA is of the view that the current business model of Mirror Trading International requires it to be in possession of a financial service provider licence. MTI has informed us that they accept clients' funds in the form of Bitcoin, pool the funds into one trading account on a forex derivative trading platform, and conduct high frequency trading through the utilisation of a Bot. If this is being done as described, then this amounts to financial services, hence the licence requirement.

However, the FSCA has a much greater concern about the activities of the company. MTI claims to have more than R2.9 billion (at current conversion rates) in clients' funds in trading accounts, but we have not been able to conclusively confirm that the funds exist.

Moreover, the returns on the investments claimed by MTI seem far-fetched and unrealistic. According to MTI its Bot-trading is able to generate consistent profits of an average of 10% per month. The FSCA warns the public that MTI is not licensed to conduct the proclaimed business that they are conducting and that they are aware of the need for a FSP licence. The FSCA also draws attention to the fact that FX Choice, the previous platform broker for MTI seems to have made public statements that gainsay the version of MTI in terms of trading volumes and Bot trading.  FX Choice has blocked the account of MTI due to compliance concerns. We are in the process of obtaining confirmation from FX Choice of the correctness of the statements attributed to them.



**Transitional Management Committee**
DP Tshidi (Commissioner)  CD de Silva  JA Boyd  SM du Toit  LF Kubayo  K Gibson  CB Motlobelo  P Magam



The investigation is ongoing, and MTI has partially co-operated with the FSCA. We are reviewing the information as it becomes available and will involve the South African Police Service if the discrepancies are confirmed. MTI has undertaken to inform all of its clients of the investigation and to provide the opportunity to all its clients to withdraw their assets that are with MTI. We recommend that clients request refunds into their own accounts as soon as possible.

**ENDS**

Enquiries:                    Brandon Topham
                              Email address: brandon.topham@fsca.co.za
                              Telephone: 012 367 7856



Transitional Management Committee:

DP Tshidi (Commissioner)    CD de Silva    JA Boyd    MW du Toit    LP Kekana    K Gibson    OS Makhubela    F Mogase



**FSCA**

Financial Sector
Conduct Authority

"HB4"

P.O. Box 35655
Menlo Park
0102

Tel. +27 12 428 8000
Toll free. 0800 20 3722
Fax. +27 12 346 6941
Email. info@fsca.co.za
Website. www.fsca.co.za

**FSCA Press Release**                                **28 October 2020**

### FSCA conducts search operations at premises of Mirror Trading International

On 26 October 2020, the Financial Conduct Authority (FSCA) executed three search and
seizure warrants, which were issued by three separate high courts in Limpopo, Kwazulu-
Natal and Western Cape, on application by the FSCA, at the home of the Chief Executive
Officer of Mirror Trading International (MTI), Mr. Johan Steynberg, the home of the
Marketing Director of MTI, Mrs. Cheri Marks, and the MTI offices in Stellenbosch.

The FSCA does not conduct criminal investigations. Our investigations are carried out in
terms of the Financial Sector Regulations Act, 9 of 2017, which is aimed at protecting the
South African investing public and to ensure a secure financial sector. Investigations may
lead to referrals of evidence to other authorities or to the South African Police Service
(SAPS).

Following the execution of the warrants against MTI, the next step is for the FSCA
investigators to examine the evidence and compare it with other information obtained. On
conclusion of the investigation, the FSCA will make decisions which may include taking
regulatory or administrative action where necessary, and or referring the evidence
obtained to other bodies.

The regulator strongly refutes allegations that the FSCA lied to the Courts. While
demonstrations have been made by MTI to FSCA investigators, with the view to convince
them that live trading was taking place and that bitcoin balances existed, the FSCA has
not been able to independently confirm the accuracy of the demonstrations. The FSCA
has also received contradictory information about these trades. Obtaining independent
evidence to support certain statements made to the investigators (including existence of
the trading and balance of investor funds), is part of the reason why applications were
made to the Courts to allow the investigators to gather further evidence.

MTI previously indicated that they were trading in foreign exchange, and that they now
trade in Crypto assets. The information at the disposal of the investigation team indicates
that both these trading operations were and are implemented by means of derivative
financial instruments. The FSCA has jurisdiction over all derivative instruments regardless
of what asset or commodity forms the basis for the trades. The Authority therefore, rejects
the statement that it does not have jurisdiction to investigate the matter.



**Transitional Management Committee:**
DP Tshidi (Commissioner)    CD da Silva    JA Boyd    MM du Toit    LP Kekana    K Gibson    OB Makhubela    P Mogase

The FSCA's investigation will continue without fear, favour or prejudice and the regulator and its investigators are not threatened or deterred by unfounded defamatory remarks. Our earlier warning to the public to exercise extreme caution when "investing" with any person or organisation not registered as a Financial Service Provider or in terms of a properly executed Prospectus registered with the CIPC or registered as a financial institution with the Prudential Authority, remains in place.

**ENDS**

Enquiries:                          **Financial Sector Conduct Authority**

Email address: FSCACommunications@fsca.co.za

Telephone: 0800 203 722

2



"HB5"

28

AFML 3



**Financial Sector
Conduct Authority**

**FSCA Press Release**                                    **17 December 2020**

**The FSCA's investigation on Mirror Trading International nears completion**

The Financial Sector Conduct Authority (FSCA) has previously warned the public against
trading with MTI (Mirror Trading International (Pty) Limited) and makes this information
available, because it believes it is in the public interest to warn financial customers and to
protect the public.

The FSCA now reports that its investigation into this entity is near completion as MTI is not
licensed to conduct financial services and has not applied for such a licence. The Authority
believes that MTI and its senior management are conducting an illegal operation,
misleading clients and have contravened several laws.

Mr Cornelius Johannes Steynberg, CEO of MTI has actively assisted in the operations by
Mr Clynton Hugh Marks and Mrs Cheri Marks ("Marks").

**The evidence and statements of MTI, Steynberg and Marks**

MTI first started trading in April 2019. Members of the public were invited to register on the
MTI website (www.mirrortradinginternational.co.za and www.mymticlub.com) and move
their Bitcoin from their Bitcoin wallet to MTI Bitcoin wallets. Steynberg was in full control of
these MTI Bitcoin wallets. From the MTI Bitcoin wallet, the Bitcoin were transferred to MTI's
forex platform "broker of choice" by the name of FXChoice Ltd ("FXChoice").

Steynberg testified under oath, that from April 2019 to July 2019, member trading accounts
were linked to a professional trader appointed by MTI through a multi account manager
arrangement linked to Meta Trader 4. Trading was conducted in derivative instruments
based on forex pairs.

Transitional Management Committee:
DB Mahlaba (Chairperson)    TP Tshidi    JA Boyd    MM du Toit    LF Kekana    K Gibson



21

However, according to Steynberg MTI experienced substantial losses (of up to 80%), and as a result, MTI requested its members to delink their respective FXChoice accounts from the multi account manager account and move their bitcoin to a pooled account.

As a result, from August 2019 Steynberg claimed that MTI employed a bot (high frequency artificial intelligence trading) together with a head trader and trading team to make all its trading decisions, with great success. The Authority found evidence contradicting this assertion.

During October 2020, after the FSCA informed MTI that it was an conducting illegal unregistered financial services business, MTI claimed that it changed its trading activities to trade in derivative instruments based on crypto currency (Bitcoin), so that it no longer fell within the jurisdiction of the FSCA, and that it no longer required an FSP licence (financial services provider licence). This is also incorrect as the submissions received from Steynberg revealed that the crypto was alleged to be traded in the form of a derivative product, which would have required registration with the FSCA as well. We have found no evidence that any crypto trading is being conducted as communicated with members of MTI.

MTI, Steynberg, and Cheri Marks claim that the trading activities of MTI were from FXChoice to Trade300, transferring all the clients' crypto assets from FXChoice to Trade300.

According to Steynberg, Trade300 is another on-line trading platform. At Trade300 MTI experienced the same extraordinary profits utilising the bot – but at this stage trading in crypto derivatives.

Steynberg stated under oath and repeatedly in the press that the bot trading averaged a return of 10% per month, and that MTI has never had a negative profit trading day, but for one exception. Marks also repeatedly confirmed the trading successes on social media.

**The evidence uncovered by the investigation**

The FSCA obtained evidence from FXChoice, a Belize registered on-line trading platform, that is in complete contradiction with the claims of Steynberg and Marks. According to FXChoice they received queries from clients of MTI and in the process the clients provided FXChoice with trading statements. The source of the trading statements was MTI. These trading statements were based on demo trading accounts and not actual trades. As a result, FXChoice froze the balance of the crypto assets linked to MTI on the FXChoice platform.

However, the total frozen crypto assets on FXChoice is a negligible amount, taking into account the total assets that MTI claimed it invested on behalf of its clients. FXChoice confirmed that MTI put in 1846.72 Bitcoin from 29 January 2020 until 3 June 2020 and made a loss of 566.55 Bitcoin, an approximate capital loss of 30%. 

The FSCA attempted to track down Trade300 to obtain a statement and trading details from it, to verify the version of MTI. MTI did not provide any useful details that assisted the FSCA.

The FSCA followed all possible links on the internet to establish whether Trade300 existed. It could only find one reference to Trade300; i.e. the website of Trade300. However, the website was and still is "under maintenance", and the only reference linked to the website is the name of "Joe Steyn", a known alias of Steynberg.

The FSCA obtained search and seizure warrants and executed them at the homes of Steynberg and Marks, and the offices of MTI. On the desktop computer of Steynberg the investigation team found evidence relating to Trade300. It would therefore appear that Trade 300 is linked to Steynberg.

As a further effort to verify the evidence of MTI, Steynberg and Marks, the FSCA requested information from MTI about the transfer of clients' assets from FXChoice to Trade300. MTI, in support of its assertion purported to provide proof of the transfer in the form of Bitcoin wallets, stating that MTI transferred 16 444 Bitcoin from FXChoice to Trade300 in 4 instalments on 21 July 2020; 22 July 2020 and 24 July 2020 respectively.





31

The FSCA found that no withdrawal of bitcoin by MTI from FXChoice occurred in July 2020. The last withdrawal of bitcoin by MTI from FXChoice was conducted in August 2019. Further, FX Choice confirmed that none of the eight sending wallets are related to FX Choice and that FX Choice had neither received deposits from nor sent any payments to any of the eight bitcoin wallets.

The transfers were made from wallets with transaction activities which bear no resemblance to the purported activities of MTI.

We have found no evidence of any significant store of Crypto assets on any trading platform and that most crypto balances appear in the name and under control of Steynberg. The amount of such balances is well below the advertised balance on the MTI trading platform as being due to investors of MTI.

In the last few days, we received complaints that investors were unable to redeem their investments.

The investigation is on-going, and a criminal case has been opened by the FSCA with the South African Police Services.

**ENDS**

Enquiries:    **Financial Sector Conduct Authority**
Email address: fscacommunications@fsca.co.za
Telephone: 0800 203 722



Transitional Management Committee:
DG Marchussi (Coordinator)   DP Tshidi   JA Boyd   MM du Toit   LP Kokane   K Gibson



"HB6"

AFuK 5⁵⁰

AFML 1

MTI Critical Statement                                                      22/12/2020

Apologies to all members for the lack of communication – MTI Management and leaders have not responded to this terrible situation before now as we had to wait for the facts to be verified before we could release any information.

The main points:

Johann is alive.

Johann is in Brazil as far as we know.

Johann has not been truthful with management, leaders or members.

We as management and leaders do not know if our bitcoin is safe.

Management has contacted the server team; they are co-operating fully.

Management has been in contact with the broker, trade300, but now believe this company is potentially owned and operated by Johann Steynberg. Communication with the broker has been sparse and unforthcoming.

The whole management team is co-operating with law enforcement and will continue to do so until this matter is resolved.

Nerine Steynberg (Johann's wife) is yet to file a missing persons' report.

"The last time we heard from Johann was Tuesday, 15 December 2020, at 01:51am."


Detailed report from the Management and Leaders' Team:

Following the search and seizure warrants executed by the FSCA on the 26ᵗʰ of October 2020, things started unravelling quickly at MTI, it was becoming very difficult to handle te amount of work created for each department. Each department was expanded, with more training staff being brought in. Support employed 22 more support staff and we insisted that Johann get help in the technical department as it was clear he and Nerine were not coping. The system kept crashing and Johann told us that we had had numerous hacking attempts by a Russian syndicate. He sent us the details of these, some demanding extremely high ransoms.

On the day of the raid an independent contractor to MTI, a crypto expert was contacted, and asked to contact Camila (The senior account manager) at trade300 (MTI's unregulated broker) and tell her that our accounts may be compromised as a result of the raid and she must wait to hear from Johann before allowing any access to the broker account of MTI, which the contractor did immediately.

The contractor had trade300 contact details as we had asked him to help Johann to cryptographically prove MTI's bitcoin balance to the FSCA and the public. Johann however did not supply the necessary details to him to complete this process.

Johann told us that when the FSCA took all the electronic devices, a security protocol was put in place with the broker to avoid all our member bitcoin being stolen, this included a limitation of withdrawals. This was communicated to all members on managements' insistence.

A week after the raid, Johann requested that Clynton Marks give him BTC to pay members that had made withdrawals as the limitation on withdrawals with the broker was still a hinderance. Johann agreed to put

51

In 400btc as well. Clynton then agreed and paid over 400btc of his own outside of MTI to Johann on the 1st, 11th and 13th of November 2020. Management has no proof that Johann did contribute the amount he stated. Clynton Marks had full confidence that he would get his Bitcoin back.

Johann said Nerina Steynerg also allegedly gave 200btc for this process.

Johann frantically processed withdrawals and management insisted on this being the highest priority knowing full well Cheri Marks had promised this to members on Johann's instruction.

On the 30th of November Johann received an email from an anonymous source. (email attached)

MTI CEO Urgent Plea

[illegible]

52

They do not have any evidence but will stop at nothing to make sure MTI stop operating.
It has been said that the only way to kill this snake is to cut off its head. Sir, this is the plan for MTI as things stand now. Our source confirmed that within the next week or maybe two, they will make a very public statement with the arrest and incarceration of you, CEO and [illegible] of MTI.
The only way to ensure MTI go out of business is to remove you from this equation regardless of the facts.

Our group has spent many hours doing our own due diligence on MTI and found it to be a phenomenal gift to society. Thank you.
The fact is, that you, sir, are stepping on the toes of major financial institutions in South Africa and abroad.

Cryptocurrency is not just a number.

It is a well known fact that the major players in the current financial system are 17, 18 and 33 degree masons which will do anything possible to see the downfall of MTI. [illegible] That you pose a major threat to their ecosystem.

It is hereby our very humble plea that you temporarily remove yourself from the borders of South Africa. Our team are working diligently to expose the [illegible] and [illegible] placed by the players involved against you and MTI. In the meantime we need you to be safe.

With your current status, it would be nearly impossible for you to get a [illegible] especially with the [illegible]. The good news is, is that there are [illegible] countries that do not require a Visa to enter. We are sure you will be able to figure it out and keep the information limited to only those close to you.

When you do decide to go, and we sincerely hope you do so, it would be very important to have as little contact as possible [illegible] as they are monitoring [illegible]. [illegible] only communicate via secure [illegible]. [illegible], Telegram, [illegible].

Thank you again for everything you do for humanity through MTI. We will continue doing our best to expose the truth. God bless you and your family.

Johann said he needed to secure himself for MTI. Johann said he needed to speak to Nerina Steynberg. We had a management meeting where the management team also advised Johann to remain calm and to stay in SA on the 1st of December 2020.

On the 2nd of December 2020 the team heard from Johann and Nerina Steynberg, this time they were on their way to the airport. Johann assured us all that everything will be ok that he simply needed to secure himself for MTI and put measures in place if ever something did incapacitate him so that Nerina can run the company. He did not disclose where he was going, he openly said that not even Nerina would be told his eventual destination. To date, his wife and daughter and extended family remain in SA.

Johan did send Clynton numerous pictures and messages of his flight to Doha. Apparently from there he went on to Sao Paulo, this was conveyed to Cheri Marks in a telephone conversation at a later stage.

For the weeks between the 3rd of December to the 14th of December Johann and Nerina continued to manage and run MTI's technical department despite the challenges we faced, slow withdrawals, withdrawal reporting problems on the server side, a server that needed upgrades and better protection.



53

On the 12th of December Clynton was very worried that he had not heard anything from Johann. The team later made contact with him and he said he fell asleep and apologised for the scare. All the while we had been in contact with Nerina, but this brought on a need to urgently appoint more technical staff in the know in Johann's department.

On Sunday the 13th of December we had a management meeting and Johann was told by our team that we refused to work with him any longer if he didn't appoint a proper second in charge that could run the system in his absence. He reiterated that Nerina would do this, as she is his 2IC. We said that if anything ever happened to him, Nerina would be in no position to run a company and suggested we appoint an outside contractor to assist. Johann was reluctant but agreed.

Nerina categorically stated that she can run the company and that Johann will not be handing the technical department over to anyone. Johann also told the team about an automated email that would be sent to Nerina and Clynton should he not log in to the server for 12 hours, this was the first time such an email was ever discussed.

On Monday Clynton forced Johann to add and introduce the contractor to the server team and the broker. He was placed on a WhatsApp group with the development team for MTI. Johann said he would do the broker introduction the following day. We were all relieved that Johann had some help and support he could trust.

On Monday night 14/12/2020 Johan let us know via signal (messaging APP) that he was processing the latest withdrawals and that he had received the necessary bitcoin from the broker (1200btc). He paid 500 withdrawals and then asked Nerina to check it to make sure the reporting function was correct, she confirmed it was. He did another batch of 2500 withdrawals. Then he said he was going to dinner and had to finalise the last withdrawals on his return.

At 06:04pm on Monday he confirmed he had concluded 2094 withdrawals.

At 12:27am on Tuesday he confirmed withdrawals were slow due to checking process but that 5200 withdrawals had been done for the day.

The last time we heard from Johann was Tuesday 01:51am.

On Tuesday we had no news further from Johann. We called Nerina and she also had not heard anything. She did not seem worried.

At 2:36pm Clynton received an automated email (attached) from Johann with details on how to run MTI. Details for the server team in India and login details to the server, along with only an email address for the broker. Management was familiar with this email as we had been copied in on communications between the broker and Johann on occasion pertaining to information needed for the FSCA.





54

[illegible]

Cheri Marks immediately called Nerina.

Nerina was calm and said she would go to see Johann's best friend as he was flying to Brazil on that Saturday to join Johann.

When Nerina was asked what the first step should be to find him, she said "Maybe he doesn't want to be found".

Management and Leaders decided to do whatever it took to get members' btc safe and that, that withdrawal list needed to be paid.

Cheri Marks then put together an email with as much supporting documents as management and Nerina could furnish her with and sent it to the server team and the broker emails that Johann contained in the ICDE mail sent to Clynton and Nerina. The server team responded with lots of hesitation as they had been told by Johann categorically to only ever deal with him. They were completely unaware of any corporate structure.

The server development team needed a payment of $45,000 for security invoices outstanding and further bandwidth which our management team paid immediately via PayPal upon receipt of a detailed invoice. They assisted us then and continue to do so. The server team has been most helpful. It has also subsequently come to the management teams' attention that no server upgrade was done as Johann said on the weekend of the 6th of December 2020.

The broker responded as follows;

[illegible]

*"Dear Cheri Marks,*

*Thank you for your letter below.*






55

*I can understand the difficult situation you must experience.*

*I have not heard from Johan since the weekend. Our technical team informed me that the automatic statement upload does not work at the moment. Looks like password changed on your end.*

*I have attach the last statement export the same format we usually upload to your end. Total BTC in trade as of the statement time: 23332.33656638 with the last trading day total profit of 0.1681890221970796*

*Please forward a secure bitcoin wallet address that I submit to our accounts and technical departments for your withdrawals.*

*Sincerely,*
*Camila*
*Trade300*

Thursday 11.22.2020 2:36pm

*Dear Cheri Marks,*

*Here the last trade result.*

*Our technical team cannot upload automatically.*

*BTC in Trade: 23167.58375198*

*Total Profit:0.7758953112433976*

*Attached is the import statement.*

*I will contact the finance department to see why only little btc was released.*

*If your developers need to talk to our technical team they can contact technical@trade300.com*
*I know they have been working with the import functions and have good knowledge of how it works.*

*Sincerely,*
*Camila*
*Trade300*

Thu 11.12.2020 1:05p.t

*Dear Cheri Marks,*

*Here the last trade result.*

*Our technical team cannot upload automatically.*

*BTC in Trade: 22767.71204023*



*Total Profit:1.5951980630651596*

*Attached is the import statement.*

*\*\*\*FINANCE\*\*\**
*Nate, please see latest URGENT request below. This need done today.*

*Sincerely,*
*Camila*
*Trade300*
*Senior Account Manager*

To date of writing this statement the bitcoin requested to honour withdrawals has not been paid out from trade300 and there is no valid reason for this. Over 34 emails have been sent to Trade300 in the last 6days to resolve this matter.

Nerina told us not to tell members about Johann being missing, and that she was sure he would turn up.

On Thursday 17/12 management got the press release from the FSCA.

We immediately contacted the server team and disabled all deposits into MTI, Nerina then confirmed Johann uses the alias Joe Steyn "all the time, for everything".

Nerina was again instructed to open a missing persons case immediately.

From the time of writing this statement she has still not opened a missing persons case.

On Wednesday 16 December we paid a private investigator to find Johann. Nerina was not happy about that. The investigator interviewed Nerina, she refused to be recorded and was not forthcoming with information.

The MTI Nedbank account, to which only Nerina and Johann has full access, has been suspended. Our head of corporate services was locked out of the account and the logins have been changed.

Nerina informed us only today that Johann had booked a return flight and that his return date was the 22nd of December 2020. This was news to us, not once during the last week or after his departure was that ever communicated to us. We are convinced she has control over his funds and the team of management and leaders were promised she could run MTI in Johann's absence.

This is all the information we have up to the time of this statement. Further information will be communicated when we get it.

MTI Management & Leaders



"HB7"

AFM 3



*Texas State Securities Board*

TRAVIS J. ILER
SECURITIES COMMISSIONER

CLINTON HOGAN
DEPUTY SECURITIES COMMISSIONER

MHR P.O. BOX 13167
AUSTIN, TEXAS 78711-3167

E. WALLY KINNEY
CHAIR

MICHAEL HOGARD, JR.
MEMBER

KENNY KONCABA
MEMBER

ROBERT BELT
MEMBER

MELISSA TYROCH
MEMBER

IN THE MATTER OF
MIRROR TRADING INTERNATIONAL PTY LTD;
CORNELIUS JOHANNES "JOHANN" STEYNBERG;
FOREXANDBITCOIN.COM; MICHAEL AARON
CULLISON; STEVE HERCEG AND BRIAN D. KNOTT

Order No. ENF-20-CDO-1811

**Mirror Trading International PTY LTD**
Service by certified mail, return receipt requested, addressed to (1) 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600; and (2) P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

**Cornelius Johannes "Johann" Steynberg**
Service by certified mail, return receipt requested, addressed to (1) 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600; and (2) P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

**ForexandBitcoin.com**
Service by certified mail, return receipt requested, addressed to (1) 9650 South Maryland, Parkway, Suite A5, #445, Las Vegas, Nevada 89183; (2) 122 Coney Island Avenue, Las Vegas, Nevada 89123; (3) 1890 Autumn Gold Avenue, Last Vegas, Nevada 89123; (4) 8493 Moon Dance Cellars Court, Las Vegas, Nevada 89139; (5) 10352 Gwynne Falls South, Las Vegas, Nevada 89123; and (6) 1371 Pedro Street, San Jose, California 95128.

**Michael Aaron Cullison**
Service by certified mail, return receipt requested, addressed to (1) 9650 South Maryland, Parkway, Suite A5, #445, Las Vegas, Nevada 89183; (2) 122 Coney Island Avenue, Las Vegas, Nevada 89123; (3) 1890 Autumn Gold Avenue, Last Vegas, Nevada 89123; (4) 8493 Moon Dance Cellars Court, Las Vegas, Nevada 89139; (5) 1371 Pedro Street, San Jose, California 95128.

**Steve Herceg**
Service by certified mail, return receipt requested, addressed to (1) 2216 West Olive Avenue, #322, Burbank, California 91506; and (2) 182 Kenneth Road, Glendale, California 91201.

Brian D. Knott
Service by certified mail, return receipt requested, addressed to (1) 10408 Long Leaf Place, Las Vegas, Nevada 89134; and (2) and 2209 Latitudes Court, Las Vegas, Nevada 89109.

## EMERGENCY CEASE AND DESIST ORDER

This is your OFFICIAL NOTICE of the issuance by the Securities Commissioner of the State of Texas (the "Securities Commissioner") of an EMERGENCY CEASE AND DESIST ORDER pursuant to Section 23-2 of The Securities Act, Tex. Rev. Civ. Stat. Ann. arts. 581-1-581-45 (the "Securities Act").

The Enforcement Division of the Texas State Securities Board (the "Enforcement Division") has presented evidence sufficient for the Securities Commissioner to find:

## FINDINGS OF FACT

1.  Mirror Trading International PTY LTD ("Respondent Mirror Trading") can be served at 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600, and P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7699.

2.  Cornelius Johannes "Johann" Steynberg ("Respondent Steynberg") is the Founder, Director, and Chief Executive Officer of Respondent Mirror Trading. He can be served at 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600, and P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7699.

3.  ForexandBitcoin.com ("Respondent ForexAndBitcoin") is a multilevel marketer for Respondent Mirror Trading. It can be served at 9850 South Maryland, Parkway, Suite A5, #448, Las Vegas, Nevada 89183; 122 Coney Island Avenue, Las Vegas, Nevada 89123; 1860 Autumn Gold Avenue, Last Vegas, Nevada 89123; 8492 Moon Dance Cellars Court, Las Vegas, Nevada 89139; 10352 Gwynne Falls South, Las Vegas, Nevada 89123; and 1371 Padro Street, San Jose, California 95128.

4.  Michael Aaron Cullison ("Respondent Cullison") is the owner of Respondent ForexAndBitcoin and a multilevel marketer for Respondent Mirror Trading. He can be served at 9850 South Maryland, Parkway, Suite A5, #448, Las Vegas, Nevada 89183; 122 Coney Island Avenue, Las Vegas, Nevada 89123; 1860 Autumn Gold Avenue, Last Vegas, Nevada 89123; 8492 Moon Dance Cellars Court, Las Vegas, Nevada 89139; 10352 Gwynne Falls South, Las Vegas, Nevada 89123; and 1371 Padro Street, San Jose, California 95128.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 2



34

5.    Steve Herceg ("Respondent Herceg") is a multilevel marketer for Respondent Mirror Trading.  He can be served at 2219 West Olive Avenue, #322, Burbank, California 91506, and 182 Kenneth Road, Glendale, California 91201.

6.    Brian D. Knott ("Respondent Knott") is a multilevel marketer for Respondent Mirror Trading.  He can be served at 10409 Long Leaf Plaza, Las Vegas, Nevada 89134, and 2209 Latitudes Court, Las Vegas, Nevada 89106.

### RESPONDENT MIRROR TRADING IS RECRUITING MULTILEVEL MARKETERS TO PERPETRATE AN INTERNATIONAL CRYPTOCURRENCY AND FOREX INVESTMENT SCHEME

7.    Respondent Mirror Trading purports to operate as a private company in The Western Cape, a province of South Africa located off the south-western coast of the country.

8.    Respondent Mirror Trading is perpetrating an international multilevel marketing scheme tied to investments in a cryptocurrency and forex trading pool.

9.    Respondent Mirror Trading is promising to pay lucrative commissions to multilevel marketers for promoting its investments and recruiting other multilevel marketers.

10.   Respondent Mirror Trading is touting the success of its multilevel marketers in recruiting new members.  It claims to have recruited almost 76,000 members from more than 170 countries, including more than 22,500 members since March 1, 2020.

11.   Its multilevel marketers are now illegally soliciting Texans to purchase fraudulent investments in the cryptocurrency and forex trading pool.

### RESPONDENTS FOREXANDBITCOIN, CULLISON, KNOTT AND HERCEG ARE PUBLICLY SOLICITING TEXAS RESIDENTS

12.   Respondents ForexAndBitcoin, Cullison, Knott and Herceg are multilevel marketers for Respondent Mirror Trading.

13.   Respondents ForexAndBitcoin, Cullison, Knott and Herceg are advertising the investments in the cryptocurrency and forex trading pool through forums in craigslist.org for Texas residents.

14.   Respondents ForexAndBitcoin, Cullison, Knott and Herceg are touting the profitability of the investments in the cryptocurrency and forex trading pool, variously claiming as follows:

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 3





A. Investors deposit as little as $100 and make an average of 10% per month;

B. Investors simply need to "[just sit back and watch [their] MONEY grow;"

C. The investments pay "daily trade income," the daily trade income is "automatically compounded" and "compound interest is the 8th Wonder of the World;"

D. The investment "grows your bitcoin compounding daily earning an average of 10% per month;"

E. The investments have more than 200+ days straight with positive gains; and

F. The investments close 600 to 800 trades each day and have not lost a trade in almost a year.

15. In addition to touting the profitability of the investments in the cryptocurrency and forex trading pool, Respondent Herceg is targeting Texans impacted by changes to the economy, in part by encouraging them to put their governmental assistance "stimulus/covid check to work" by purchasing the investments.

16. In addition to touting the profitability of the investments, Respondents ForexAndBitcoin, Cullison, Knoff and Herceg are also touting the profitability of the multilevel marketing program.

THE QUALIFICATIONS AND PRIOR FINANCIAL EXPERIENCE
OF THE MULTILEVEL MARKETERS PROMOTING THE PRODUCT IN TEXAS

17. Although Respondents ForexAndBitcoin, Cullison, Knoff and Herceg are touting the profitability of both the investments in the bitcoin and forex trading pool and the multilevel marketing program, they are not providing investors with information relating to their qualifications and their prior financial experience, including the following information:

A. Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about June 17, 1999, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, California Northern Bankruptcy Court, Case No. 99-54157;

B. Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about August 28, 2006, Respondent Cullison filed a



36

Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 08-12244-bam;

C. Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about September 23, 2011, Respondent Cullison, formerly doing business as Empower. Nutrition Inc., LLC, and doing business as Fusion Nutrition Inc., filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 15-15119-lab;

D. Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about August 4, 2015, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 08-12244-bam;

E. Respondent Knott is not telling potential investors that on or around June 15, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 10-21126-bam;

F. Respondent Knott is not telling potential investors that on or about August 9, 2019, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 19-15134-abl; and

G. Respondent Herzog is not telling potential investors that on or about October 4, 2017, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. 2:17-bk-22205-BR.

RESPONDENT MIRROR TRADING MAINTAINS INTERNET WEBSITES THAT SERVE AS PLATFORMS FOR PURCHASING THE INVESTMENTS IN THE CRYPTOCURRENCY AND FOREX POOL

18. Respondent Mirror Trading maintains internet websites at www.mirrortradinginternational.com (the "MTI Website") and www.mymticlub.com (the "MTI Club Website").

19. The MTI Website and the MTI Club Website advertise the investments in the cryptocurrency and forex trading pool.

20. The MTI Club Website serves as a platform for purchasing the investments in the cryptocurrency and forex trading pool.



37

THE INVESTMENTS IN THE
CRYPTOCURRENCY AND FOREX TRADING POOL

21. Respondent Mirror Trading is issuing investments in a cryptocurrency and forex trading pool whereby it purports to pool cryptocurrencies and somehow use the cryptocurrencies to trade forex for a profit.

22. Respondent Mirror Trading is describing the investments in the cryptocurrency and forex trading pool in greater detail as follows:

A. Potential investors purchase the investments in the cryptocurrency and forex trading pool by registering as members through the MTI Club Website and funding their accounts with bitcoin;

B. Respondent Mirror Trading thereafter verifies the deposit and transfers the bitcoin to a "trading pool" with various "registered and regulated" forex brokers;

C. Respondent Mirror Trading employs advanced "digital software" and "artificial intelligence" to trade the bitcoin on the forex markets through the brokers' platforms;

D. The forex trading generates income, and Respondent Mirror Trading retains a portion of the income to cover costs and pay salaries and commissions; and

E. Respondent Mirror Trading also uses income generated through forex trading to pay returns to investors equal to their a pro rata share of 40 percent of daily trading profits.

23. Respondent Mirror Trading is publishing historical information that purports to show it has earned considerable returns for investors. For example, it claims the average daily profit for investors was 0.5864 percent from September 2019 through April 2020, and it claims investors received compounded returns of 141.76 percent during this eight-month period of time.

24. Respondent Mirror Trading is also publishing current information that purports to reflect it continues to provide lucrative income for investors. For example, it is representing as follows:

A. On June 26, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.1564 percent;

B.    On June 25, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.2598 percent;

C.    On June 24, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.6218 percent;

D.    On June 23, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.5384 percent; and

E.    On June 22, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.1198 percent.

25.    Respondent Mirror Trading is also projecting future returns will continue to generate profits of around 10 percent per month. It projecting these future returns as follows:

A.    An investment of 1 bitcoin, valued at around $9,163.54 at the time of investment, will generate an ending balance of around 3.73112994 bitcoin worth around $34,209.02 at the end of a 12 month term, assuming the price of bitcoin remains constant through the term.

B.    An investment of 1 bitcoin, valued at around $9,139.71 at the time of investment, will generate an ending balance of around 723.10525622 bitcoin worth around $6,608,973.07 at the end of a 60 month term, assuming the price of bitcoin remains constant through the term.

26.    Respondent Mirror Trading also claims the projection of future returns of around 10 percent per month constitutes a "conservative quota" and "in reality the profits may be higher."

## THE MULTI-LEVEL MARKETING SCHEME

27.    Respondent Mirror Trading is recruiting members to participate in a multilevel marketing scheme.

28.    Respondent Mirror Trading is providing multilevel marketers with tools for recruiting new investors. In addition to providing access to information published in a Telegram group and YouTube channel, Respondent Mirror Trading is providing its multilevel marketers with referral links that can be embedded in websites or sent via electronic mail or text message.

29.    Respondent Mirror Trading is promising to pay four streams of commissions to multilevel marketers.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 7

39

30.    Respondent Mirror Trading refers to the four streams of commissions as direct once-off referral bonuses, weekly profit-sharing bonuses, P1 leadership bonuses and P2 leadership bonuses. It describes them as follows:

A.    The direct once-off referral bonuses generally refer to the payment of commissions equal to 10 percent of the principal deposited by recruited investors.

B.    The weekly profit-sharing bonuses are predicated on recruiting new investors. An agent generally qualifies for weekly profit-sharing bonuses when he or she recruits at least two new members. He or she may then share in a pool of 20 percent of the weekly gross profits derived from trading, with the maximum payout capped at $75,000.

C.    The P1 leadership bonus is predicated on recruiting new investors and earning shares in a pool. An agent generally earns shares in this pool when he or she refers at least two members with accounts valued at least at $200. Respondent Mirror Trading pays P1 leadership bonuses to the agent based, at least in part, on the number of shares earned by the agent.

D.    The P2 leadership bonus is also predicated on recruiting new investors and earning shares in a pool. An agent generally earns shares in this pool when he or she refers at least two members with accounts valued at least at $200 and at least one such member refers at least two members with accounts valued at least at $200. Respondent Mirror Trading pays P2 leadership bonuses to the agent based, at least in part, on the number of shares earned by the agent.

31.    Respondent Mirror Trading also purports to prohibit illegal activity among membership, requires all members to adhere to all laws and accepted business practices within the countries they transact business and prohibits members from engaging in fraudulent commercial practices.

## THE DISCLAIMERS

32.    Respondent Mirror Trading is disclaiming any and all liability associated with its sale of investments in the cryptocurrency and forex trading pool. It also requires investors to agree to the following provisions:

A.    Investors must agree "[n]either MTI nor its business partners is responsible for any loss or damage of whatever nature;" and

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 8



L,0

B.   Investors must agree "MTI will not and cannot be held liable for any losses of whatsoever nature due to unfulfilled promises to prospective members or third parties by any other existing members."

## REGISTRATION VIOLATIONS

33.   Respondents Mirror Trading, ForexAndBitcoin, Steynberg, Cullison, Knott and Herceg (collectively the "Respondents") have not been registered with the Securities Commissioner as dealers or agents at any time material hereto.

34.   The investments in the cryptocurrency and forex trading pool have not been registered by qualification, notification or coordination and no permit has been granted for their sale in Texas at any time material hereto.

## FRAUD AND THE CONCEALMENT OF MATERIAL BUSINESS INFORMATION

35.   In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose Respondent Steynberg's business repute, qualifications and experience, and this information constitutes a material fact.

## FRAUD AND THE DIGITAL SOFTWARE AND ARTIFICIAL INTELLIGENCE

36.   In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose material facts relating to the administration of the "digital software" and "artificial intelligence" used to trade forex, including the following material facts:

A.   The identity of the programmers and developers of the "digital software" and "artificial intelligence," including the identity of the party that coded the software, as well as its business repute, qualifications and experience;

B.   The identity of the servicers of the "digital software" and "artificial intelligence," including the identity of the party responsible for maintaining and updating the software, as well as its business repute, qualifications and experience;

C.   The costs associated with the "digital software" and "artificial intelligence," including any ongoing costs for licensing the software, maintaining the software and updating the software; and

D.   The security of the "digital software" and "artificial intelligence," including the security of internet connections used to access the software, the use of

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 9



41

security systems to prevent or deter cyberattacks, and the use of encryption to prevent unauthorized access by third-parties.

37.  In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose material facts relating to the implementation of the "digital software" and "artificial intelligence" used to trade forex, including the following material facts:

A.  The strategy or strategies used to buy and sell forex for a profit;

B.  Information relating to defects, glitches, bugs or malfunctions, including information explaining these events may negatively impact the ability to trade forex for a profit; and

C.  The strategies or procedures for overcoming hardware and software failures, power outages or network disconnections.

## FRAUD AND THE "REGISTERED AND REGULATED" FOREX BROKERS

38.  In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts about the forex brokers:

A.  The identity of the forex brokers, as well as the address of their principal places of business and their business repute, qualifications and experience of the forex brokers;

B.  Any information that reflects or relates to their registration and regulation by a government agency; and

C.  Any information that reflects the scope of their authority to trade forex, their procedures for trading forex, or their role in receiving, maintaining and using cryptocurrencies.

## FRAUD AND THE SAFEGUARDING OF BITCOIN

39.  In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts relating to the safeguarding and protecting of bitcoin, including the following material facts:

A.  The type of wallet or software it uses to receive, access and transfer bitcoin, including information that reflects whether Respondent Mirror Trading is

42

using a custodial wallet that affords access to a custodian or other party with the authority of a non-custodial wallet that is not affiliated with a custodian or other party;

B. The connectivity of the wallet or software it uses to receive, access and transfer bitcoin, including information that reflects whether Respondent Mirror Trading is using a "hot" wallet such as a mobile or desktop wallet or a "cold" wallet that is typically not connected to the internet;

C. The procedures or protocols for securing access to the wallet or software it uses to receive, access and transfer bitcoin, including its policies for safeguarding private keys and any other means of authentication and access of the wallets or software;

D. The security of the wallet or software it uses to receive, access and transfer bitcoin, including the security of internet connections used to access the wallet, the use of security systems to prevent or deter cyberattacks, and the use of encryption to prevent unauthorized access by third-parties; and

E. The risk that attackers may use viruses, malware or other techniques to hack systems or otherwise gain access to bitcoin.

## FRAUD AND THE CONCEALMENT OF
## RISKS ASSOCIATED WITH TRADING FOREX

40. In connection with the offer of the investment in the forex trading pool, Respondents are intentionally failing to disclose the following material facts relating to the risks associated with trading foreign currencies:

A. Fluctuations in a country's interest rates may lead to fluctuations in a currency's value, thereby negatively impacting the ability to close a trade for a profit;

B. Macroeconomic statistics, such as inflation, can have a significant impact on forex markets;

C. Other capital markets, including stocks, bonds, and commodities markets have strong influences on exchange rates between foreign currencies;

D. International trade numbers, such as trade deficits and surpluses, play a vital role in forex markets;




43

E.    Fluctuations in the foreign exchange rate between the time of placing a trade and the time of closing a trade may negatively impact the price of forex;

F.    Leveraging transactions on margin, once called, may lead to substantial losses in excess of initial investments; and

G.    Political news can be important for forex traders, and unexpected news can negatively impact forex trading.

### FRAUD AND THE CONCEALMENT OF THE RISKS ASSOCIATED WITH BITCOIN AND BITCOIN POOLS

41.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg and intentionally failing to disclose the following material facts relating to the risks associated with bitcoin and bitcoin pools:

A.    Governments may adopt legislation or regulation that may negatively impact the use, transfer, exchange or price of bitcoin;

B.    A system or technical failure, or deficient source code, may negatively impact the ability to exchange cryptocurrencies for fiat currencies, as well as the price of cryptocurrencies;

C.    A hacking incident or malicious attack may negatively impact the price of cryptocurrencies;

D.    Bitcoin competes with other cryptocurrencies, and this competition may negatively impact the price of bitcoins; and

E.    Investors will need to monetize their bitcoin, and cryptocurrency exchanges or other parties may charge considerable fees when exchanging bitcoin for fiat currency.

### DECEPTION AND THE MULTILEVEL MARKETING PROGRAM

42.    As described herein, Respondent Mirror Trading is recruiting multilevel marketers to offer the investments in the bitcoin and forex trading pool and promising to pay four tiers of commissions for selling the product.

43.    As described herein, Respondent Mirror Trading also purports to prohibit illegal activity among membership, requires all members to adhere to all laws and

44

accepted business practices within the countries they transact business and prohibits members from engaging in fraudulent commercial practices.

44.  These statements are materially misleading or otherwise likely to deceive the public because:

  A.  Any party offering securities in Texas must generally be registered as a dealer or agent with the Securities Commissioner; and

  B.  Parties may generally only offer securities in Texas when the securities are registered or permitted for sale.

### DECEPTION AND THE DISCLAIMER OF LIABILITY

45.  As described herein, Respondent Mirror Trading is disclaiming any and all liability associated with its sale of investments in the cryptocurrency and forex trading pool. It also requires investors to agree to the following provisions:

  A.  Investors must agree "[n]either MTI nor its business partners is responsible for any loss or damage of whatever nature;" and

  B.  Investors must agree "MTI will not and cannot be held liable for any losses of whatsoever nature due to unfulfilled promises to prospective members or third parties by any other existing members."

46.  These statements are materially misleading or otherwise likely to deceive the public because:

  A.  The Securities Act provides Texans with important rights, including potential civil causes of action against Respondent Mirror Trading; and

  B.  As a matter of law, Respondent Mirror Trading may not escape potential liability by requiring members to disclaim these important rights.

### DECEIT AND OFFERS BY MULTILEVEL MARKETERS IN TEXAS

47.  As described herein, Respondents ForexAndBitcoin, Cullison, Knott and Herceg are offering the investments in the cryptocurrency and forex trading pool to Texans, variously representing as follows:

  A.  Investors deposit as little as $100 and make an average of 10% per month;

  B.  Investors simply need to "[j]ust sit back and watch [their] MONEY grow;"

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 13

45

C. The investment pays "daily trade income," the daily trade income is "automatically compounded" and "compound interest is the 8th Wonder of the World;"

D. The investment "grows your bitcoin compounding daily earning an average of 10% per month;"

E. The investments have more than 200+ days straight with positive gains; and

F. The investment closes 600 to 800 trades each day and has not lost a trade in almost a year.

48. These statements are materially misleading or otherwise likely to deceive the public because they tout the profitability of investing in the cryptocurrency and forex trading pool but do not disclose the following information:

A. The business repute, qualifications or experience of Respondent Mirror Trading and Steynberg;

B. The information relating to the administration of the "digital software" and "artificial intelligence" used to trade forex described herein;

C. The information relating to the implementation of the "digital software" and "artificial intelligence" used to trade forex described herein;

D. The information about the forex brokers described herein;

E. The information relating to the safeguarding and protecting of bitcoin described herein;

F. The information about the forex brokers described herein;

G. The information relating to the risks associated with bitcoin and bitcoin pools described herein;

H. The information relating to the registration of multilevel marketers who offer Texans the investments in the cryptocurrency and forex trading pool described herein;

I. The information relating to the registration of cryptocurrency and forex trading pools offered or sold to Texans described herein; and

Emergency Cease and Desist Order Mirror Trading International PTY LTD et al. Page 14

46

J.     The information relating to the disclaimer of liability as described herein.

49.    These statements are also materially misleading or otherwise likely to deceive the
public because Respondents ForexAndBitcoin, Culleson, Knott and Herceg are
touting the safety and profitability of investing in the cryptocurrency and forex
trading pool and participating in the multilevel marketing program, but they are not
disclosing their qualifications and their prior financial experience, including the
following information:

A.     Respondents ForexAndBitcoin and Culleson are not telling potential
investors that on or about June 17, 1999, Respondent Culleson filed a
Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy
Court, California Northern Bankruptcy Court, Case No. 99-54197;

B.     Respondents ForexAndBitcoin and Culleson are not telling potential
investors on or about August 28, 2008, Respondent Culleson filed a
Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy
Court, District of Nevada, Case No. 08-12244-bam;

C.     Respondents ForexAndBitcoin and Culleson are not telling potential
investors on or about September 23, 2011, Respondent Culleson filed a
Voluntary Petition for Chapter 13 Bankruptcy in the United States
Bankruptcy Court, District of Nevada, Case No. 11-25076-lab;

D.     Respondents ForexAndBitcoin and Culleson are not telling potential
investors on or about September 4, 2015, Respondent Culleson, formerly
doing business as Empower Nutrition Inc., LLC, and doing business as
Fusion Nutrition Inc., filed a Voluntary Petition for Chapter 7 Bankruptcy in
the United States Bankruptcy Court, District of Nevada, Case No. 15-15113-
lab;

E.     Respondent Knott is not telling potential investors that on or around June
15, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the
United States Bankruptcy Court, District of Nevada, Case No. 10-21128-
bam;

F.     Respondent Knott is not telling potential investors that on or about August
9, 2019, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United
States Bankruptcy Court, District of Nevada, Case No. 19-16134-abt; and

G.     Respondent Herceg is not telling potential investors that on or about
October 4, 2017, he filed a Voluntary Petition for Chapter 7 Bankruptcy in

47

the United States Bankruptcy Court for the Central District of California, Case No. 2:17-bk-22208-BR.

## CONCLUSIONS OF LAW

1. The investments in the cryptocurrency and forex trading pool are "securities" as that term is defined in Section 4.A of the Securities Act.

2. Respondents are violating Section 7 of the Securities Act by offering securities for sale in Texas at a time when the securities are not registered with or permitted by the Securities Commissioner.

3. Respondents are violating Section 12 of the Securities Act by offering securities for sale in Texas without being registered pursuant to the provisions of Section 12 of the Securities Act.

4. Respondents Mirror Trading and Steynberg are engaging in fraud in connection with the offer for sale of securities.

5. Respondents are making an offer containing statements that are materially misleading or otherwise likely to deceive the public.

6. Respondents' conduct, acts, and practices threaten immediate and irreparable harm.

7. The foregoing violations constitute bases for the issuance of an Emergency Cease and Desist Order pursuant to Section 23-2 of the Securities Act.

## ORDER

1. It is therefore ORDERED that Respondents immediately CEASE AND DESIST from offering for sale any security in Texas until the security is registered with the Securities Commissioner or is offered for sale pursuant to an exemption from registration under the Texas Securities Act.

2. It is further ORDERED that Respondents immediately CEASE AND DESIST from acting as a securities dealer or agent in Texas until they are registered with the Securities Commissioner or is acting pursuant to an exemption from registration under the Texas Securities Act.

3. It is further ORDERED that Respondents Mirror Trading and Steynberg immediately CEASE AND DESIST from engaging in any fraud in connection with the offer for sale of any security in Texas.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 18

48.

4.   It is further ORDERED that Respondents immediately CEASE AND DESIST from
     offering securities in Texas through an offer containing a statement that is
     materially misleading or otherwise likely to deceive the public.

## NOTICE

Pursuant to Section 23-2 of the Securities Act, you may request a hearing before
the 31st day after the date you were served with this Order.  The request for a hearing
must be in writing, directed to the Securities Commissioner, and state the grounds for the
request to set aside or modify the Order.  Failure to request a hearing will result in the
Order becoming final and non-appealable.

You are advised under Section 29.D of the Securities Act that any knowing
violation of an order issued by the Securities Commissioner under the authority of Section
23-2 of the Securities Act is a criminal offense punishable by a fine of not more than
$10,000, or imprisonment in the penitentiary for two to ten years, or by both such fine and
imprisonment.

SIGNED AND ENTERED by the Securities Commissioner this 7th day of July,
2020.

_____
TRAVIS J. ILES
Securities Commissioner

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 17

"HB8"



**AUTORITÉ**
**DES MARCHÉS**
**FINANCIERS**

General public    Fraud prevention    Illegal on-line trading platforms
    Warning list of websites and companies that solicit investors illegally

# Warning list of websites and companies that solicit investors illegally

> ## This list is not exhaustive
>
> It contains only the names of websites that we have received complaints about. Some fraudulent websites are not included in this list either because they have not yet been brought to our attention or their names have been modified. Stay informed!

## Complet list of the active platforms in Québec today

| NOM D'ENTREPRISE | AUTRE NOM D'AFFAIRE | SITE WEB |
|---|---|---|
| 1st Trade options | | www.1sttradeoptions.com |
| AAAFx | | www.aaafx.com |






| HQ Broker | Capazone Invest Ltd. | www.hqbroker.com |
|---|---|---|
| ICC Intercertus Capital Ltd, ICC Intercertus Capital (Cayman) Limited et Fiscus Capital Seychelles Limited | | everfx.com |
| iforex group | Formula Investments House Ltd | www.iforex.com |
| Impero Solutions Limited | | impero.solutions |
| International Capital Markets PTY Ltd | | ICMarkets.com |
| IQ Option | Best Binary Options Brokers | wwwbulkforex.com |
| Libertex International Company Limited | | libertex.org |
| Markets.com Global | Playtech PLC | www.markets.com |
| Mirror Trading International | | mymtclub.com |
| My Beverly Dreams LLC/ My Beverly Dreams Inc. | | beverlydream.net |

"HB9"

## CURRICILIUM VITAE

of

## ADRIAAN SERFONTEIN HURTER

### ID: 490930 5071 084

For purpose of using showing his proficiency in Insolvency Law

**Degrees obtained:**

BA 1971 (Stellenbosch)

LLB 1973 (Stellenbosch)

**Professional career:**

Admitted as attorney December 1975

Admitted with right of appearance in the High Court 1995

Still practicing as attorney under the name and style of A S HURTER ATTORNEYS

**Experience insolvency and liquidations:**

1980's – special advisor to the Nel Commission into the affairs of Master Bond

1990's – appointed as commissioner for the rogatory Commission in respect of Club Mykonos (could not attend due to illness)



1990's – involved in investigations and actions against Saambou in respect of overcharging of interest and ultimately responsible for the demise of Saambou.

1980's – involved with the demise of Stellenbosch District Bank on behalf of various farmers being members of that Bank

2008 – BFS Group application for his liquidation and involved in interrogation of directors

2009 – Spitskop Ponzi scheme: involved in interrogation of directors and other stake holders and bringing of various court applications including declaring it a Ponzi scheme

2013 – involved in the interrogation of Grand Select in liquidation

2014 – 2016 – involved in interrogations in respect of Requad Construction (two years)

2016-2017- involved in interrogations of Nkathi Construction (two years)

2019 – involved in declaring Muffin Line a Ponzi scheme

2019 – present – involved in interrogations of Nthwese Investment Consortium (Pty) Ltd in liquidation, involving with claim with SARS of some R20,000,000.00



Since 2010 I have sat on various tribunals as well as commissioner in terms of interrogations in terms of Section 417 and 418.

General:

1998 – 2012

Commissioner of Small Claims Court and chairman of the advisory group of the Small Claims Court

2004 – 2010

Member of control body of Durbanville Primary School and Stellenberg High School

Thus dated and signed at Onrus this 14th day of January 2021.

_____

A S Hurter



"HB10"

## RESUMÉ OF RELEVANT EDUCATION, EXPERIENCE AND PROFESSIONAL AFFILIATIONS

### LAMBERTUS VON WIELLIGH BESTER

L von W Bester holds a Bachelor of Law Degree and he has been actively engaged in in Insolvency Practice since 1983 after having served as Legal Advisor to a financial institution for a number of years. He is currently employed by Cape Trustees (Pty) Ltd in Cape Town. He has during his years of practice been appointed Liquidator/Trustee of some of the largest corporate liquidations and insolvencies in the Country and has conducted numerous Enquiries on behalf of Liquidators and Trustees.

He has been a member of the Association of Insolvency Practitioners of Southern Africa (AIPSA), now SARIPA, since 1987 and for many years held the position of Chairman of the National Council and has also served on the Western Cape Regional Council as the Chairperson for a number of years, as well as on various committees established by the Department of Justice and Constitutional Development (Master's Office). He was a member of the Business Unit of the Department of Justice and Constitutional Development (Master Office) and the Joint Chairperson of the Masters' Offices Monitoring Committees.

He was a founding member of the Insolvency Practitioners Society of South Africa ("IPSSA") and served as its Co-Chairperson for a number of years. In addition to the aforegoing, he was involved in the establishment of the National Diploma in Insolvency Law and Practice, which diploma is now presented by the Universities of Pretoria and Johannesburg, under the auspices of SARIPA. He has presented lectures and seminars to officials of Financial Institutions as well as to students that have enrolled for the aforementioned Diploma in Insolvency Law and Practice. He has also been actively involved in the drafting and promotion of legislation for the Licensing and Statutory Regulation of Insolvency Practitioners and served as a member of the Government appointed Reference Group on the Regulatory Framework for the Corporate Rescue and Liquidation Industries in South Africa.

He served as a Director of the International Board of the International Insolvency Organisation (INSOL), the membership whereof consists of more than 40 Corporate Rescue Restructuring and Insolvency Organisations. He co-chaired the INSOL Annual Regional Conference held in Cape Town and has also been involved in the annual Conferences of SARIPA since its inception, co-chairing the initial Conferences from 2009 to 2013.

He has been appointed by the High Court as Commissioner in several matters, to chair and oversee Commissions of Enquiry in compliance with the provisions of Sections 417 and 418 of the Companies Act, as well as Receiver pursuant to divorce proceedings.

"HB11"

# CURRICULUM VITAE OF
# JUDGE EBERHARD BERTELSMANN



1964: Matric Afrikaanse Hoer Seunskool, Pretoria

1965: Military service Bloemfontein

1966 – 1968: BA (Law) University Stellenbosch

1969 – 1971: Junior Lecturer Faculty of Law University of South Africa

1971: Ll B University of South Africa

1972: Public Prosecutor, Magistrate's Court, Pretoria

October 1972 – 2000: Member Pretoria Bar

Senior Counsel (SC) 1988

Member Pretoria Bar Council 1989 – 1999; four terms as Vice-Chairperson, three terms as Chairperson of the Bar

Practice: Extensive exposure to commercial, administrative, constitutional and criminal law disputes. Particular interests: insolvency law and especially insolvency enquiries or interrogations; human rights, child law, restorative justice.

1991 – 1999: Member Executive, General Council of the Bar of South Africa

Involved in the establishment of the Arbitration Foundation of South Africa

2000: Appointed as judge to the High Court, Pretoria; June 2010 – November 2010: acting appointment in the Supreme Court of Appeal, Bloemfontein, South Africa

2014 to August 2016 Judge in the Land Claims Court;

Co-author of three legal text books: Mars on Insolvency 9th and 10th edition; Criminal Procedure in the Magistrates' Courts; Chapter on Constitutional Litigation in Van Loggerenberg Supreme Court Practice

Member of arbitrators' panels AFSA Pretoria and AFSA Johannesburg

Advisor to the Echo Legal Aid Assistance Centre

September 2016 to date: Commissioner in several insolvency enquiries; arbitrator in a range of arbitrations covering construction, contract, property, medical negligence and general commercial disputes, either as single arbitrator or as member of a three-arbitrator panel; panel member in arbitration appeals. The appointments as arbitrator have been made under the aegis of AFSA, the Association of Arbitrators and privately. Appointed as mediator and as expert in dispute resolution in business rescue matters.

1966: I received treatment for dependency on tranquillisers and alcohol in the Elim Clinic, Kempton Park. Since then I have served more than 24 years on the same Clinic's Board of Directors until my retirement in 2016 and have been involved in intercessions and other activities to assist those afflicted by substance dependency to date.



"HB12"

HC 97

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO.: _____

In the urgent application of:

| | |
|---|---|
| HERMAN BESTER N.O. | First Applicant |
| ADRIAAN WILLEM VAN ROOYEN N.O. | Second Applicant |
| CHRISTOPHER JAMES ROOS N.O. | Third Applicant |
| JACOLIEN FRIEDA BARNARD N.O. | Fourth Applicant |
| DEIDRE BASSON N.O. | Fifth Applicant |

*(in their capacities as the duly appointed joint provisional liquidators of*

*Mirror Trading International (Pty) Ltd (in provisional liquidation))*

---

### CONSENT TO ACT AS COMMISSIONER

---

I, the undersigned,

### ADRIAAN SERFONTEIN HURTER

herewith consent to my appointment as Commissioner in terms of Section 418(1)(a) of the Companies Act, 61 of 1973, read with Item 9, Schedule 5 to the Companies Act, 71 of 2008 in the matter of Mirror Trading International (Pty) Ltd (in provisional liquidation).

ADRIAAN SERFONTEIN HURTER

"HB13"

**HC 97**

**IN THE HIGH COURT OF SOUTH AFRICA**

**(WESTERN CAPE DIVISION, CAPE TOWN)**

CASE NO.: _____

In the urgent application of:

| | |
|---|---|
| **HERMAN BESTER N.O.** | First Applicant |
| **ADRIAAN WILLEM VAN ROOYEN N.O.** | Second Applicant |
| **JACOLIEN FRIEDA BARNARD N.O.** | Third Applicant |
| **DEIDRE BASSON N.O.** | Fourth Applicant |

*(in their capacities as the duly appointed joint provisional liquidators of*

*Mirror Trading International (Pty) Ltd (in liquidation))*

---

### CONSENT TO ACT AS COMMISSIONER

---

I, the undersigned,

### LAMBERTUS VON WIELLIGH BESTER

herewith consent to my appointment as Commissioner in terms of Section 418(1)(a) of the Companies Act, 61 of 1973, read with Item 9, Schedule 5 to the Companies Act, 71 of 2008 in the matter of Mirror Trading International (Pty) Ltd (in liquidation).

**LAMBERTUS VON WIELLIGH BESTER**



"HB14"

HC 57

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO. _____

In the urgent application of:

| | |
|---|---|
| HERMAN BESTER N.O. | First Applicant |
| ADRIAAN WILLEM VAN ROOYEN N.O. | Second Applicant |
| CHRISTOPHER JAMES ROOS N.O. | Third Applicant |
| JACOLIEN FRIEDA BARNARD N.O. | Fourth Applicant |
| DEIDRE BASSON N.O. | Fifth Applicant |

*(in their capacities as the duly appointed joint provisional liquidators of*

*Mirror Trading International (Pty) Ltd (in provisional liquidation))*

---

### CONSENT TO ACT AS COMMISSIONER

---

I, the undersigned,

### EBERHARD BERTELSMANN

herewith consent to my appointment as Commissioner in terms of Section 418(1)(a) of the Companies Act, 61 of 1973, read with Item 9, Schedule 5 to the Companies Act, 71 of 2008 in the matter of Mirror Trading International (Pty) Ltd (in provisional liquidation).

_____

EBERHARD BERTELSMANN



HC 97

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO.: _____

In the urgent application of:

HERMAN BESTER N.O.                                            First Applicant

ADRIAAN WILLEM VAN ROOYEN N.O.                    Second Applicant

CHRISTOPHER JAMES ROOS N.O.                          Third Applicant

JACOLIEN FRIEDA BARNARD N.O.                          Fourth Applicant

DEIDRE BASSON N.O.                                             Fifth Applicant

(in their capacities as the duly appointed joint provisional liquidators of

Mirror Trading International (Pty) Ltd (in provisional liquidation))

(for an order extending the powers of the Applicants in terms of Section 386(5)
and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973 Companies
Act") read with Item 9 of Schedule 5 of the Companies Act, 71 of 2008 (as
amended) ("the 2008 Companies Act") and for the convening of a Commission of
Enquiry in terms of the provisions of Section 417 and 418 of the 1973 Companies
Act and the appointment of a Commissioner in terms of Section 418 of the 1973
Companies Act read with Item 9 of Schedule 5 of the 2008 Companies Act)

---

**CONFIRMATORY AFFIDAVIT**



I, the undersigned,

### ADRIAAN WILLEM VAN ROOYEN

do hereby make oath and say that:

1.    I am a major male insolvency practitioner, employed by Full Swing Trading – 725 CC t/a Investrust, 73 Bond Street, Clydesdale, Pretoria.

2.    I depose to this affidavit in my capacity as duly authorized joint provisional liquidator of Mirror Trading International (Pty) Ltd (in provisional liquidation).

3.    The content of this affidavit falls within my personal knowledge, save where the context indicates otherwise, and is to the best of my knowledge and belief true and correct.

4.    I have read the Affidavit of Herman Bester and confirm the correctness thereof insofar as it relates or refer to me.

_____

ADRIAAN WILLEM VAN ROOYEN

I certify that the above signature is the true signature of ADRIAAN WILLEM VAN ROOYEN and that he acknowledged to me:

1.   that he knows and understands the contents of this affidavit.

2.   that he has no objection to taking the prescribed oath.

3.   that he considers the prescribed oath to be binding to his/her conscience.

The deponent thereafter uttered the words: "I swear that the contents of this affidavit are true, so help me God". The deponent signed this affidavit in my presence at ___PRETORIA___ on this __21st__ day of JANUARY 2021.

COMMISSIONER OF OATHS

NICOLENE KRUGER
3 MICHAEL ROAD,
VALHALLA, PRETORIA, 0185
COMMISSIONER OF OATHS
9/1/8/2 GAUTENG

HC 97

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO..

In the urgent application of:

HERMAN BESTER N.O.                                          First Applicant

ADRIAAN WILLEM VAN ROOYEN N.O.                    Second Applicant

CHRISTOPHER JAMES ROOS N.O.                        Third Applicant

JACOLIEN FRIEDA BARNARD N.O.                        Fourth Applicant

DEIDRE BASSON N.O.                                        Fifth Applicant

(in their capacities as the duly appointed joint provisional liquidators of

Mirror Trading International (Pty) Ltd (in provisional liquidation))

(for an order extending the powers of the Applicants in terms of Section 386(5)
and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973 Companies
Act") read with Item 9 of Schedule 5 of the Companies Act, 71 of 2008 (as
amended) ("the 2008 Companies Act") and for the convening of a Commission of
Enquiry in terms of the provisions of Section 417 and 418 of the 1973 Companies
Act and the appointment of a Commissioner in terms of Section 418 of the 1973
Companies Act read with Item 9 of Schedule 5 of the 2008 Companies Act)

## CONFIRMATORY AFFIDAVIT

I, the undersigned,

CHRISTOPHER JAMES ROOS

do hereby make oath and say that:

1. I am a major male insolvency practitioner, employed by Sebenza Trust, Unit 2A, 43 Estcourt Avenue, Wierda Park, Centurion.

2. I depose to this affidavit in my capacity as duly authorized joint provisional liquidator of Mirror Trading International (Pty) Ltd (in provisional liquidation).

3. The content of this affidavit falls within my personal knowledge, save where the context indicates otherwise, and is to the best of my knowledge and belief true and correct.

4. I have read the Affidavit of Herman Bester and confirm the correctness thereof insofar as it relates or refer to me.

CHRISTOPHER JAMES ROOS

I certify that the above signature is the true signature of CHRISTOPHER JAMES ROOS and that he acknowledged to me:

1.    that he knows and understands the contents of this affidavit.

2.    that he has no objection to taking the prescribed oath.

3.    that he considers the prescribed oath to be binding to his/her conscience.

The deponent thereafter uttered the words: "I swear that the contents of this affidavit are true, so help me God". The deponent signed this affidavit in my presence at Pretoria on this 21 day of JANUARY 2021.

COMMISSIONER OF OATHS

JACO CORNE MULDER
COMMISSIONER OF OATHS
PRACTISING ATTORNEY
JACO MULDER ATTORNEYS
877 BOSLOERIE STREET
EAST LYNNE, PRETORIA 0186

HC 97

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO.:

In the urgent application of:

HERMAN BESTER N.O.                                          First Applicant

ADRIAAN WILLEM VAN ROOYEN N.O.                 Second Applicant

CHRISTOPHER JAMES ROOS N.O.                       Third Applicant

JACOLIEN FRIEDA BARNARD N.O.                        Fourth Applicant

DEIDRE BASSON N.O.                                            Fifth Applicant

(in their capacities as the duly appointed joint provisional liquidators of

Mirror Trading International (Pty) Ltd (in provisional liquidation))

(for an order extending the powers of the Applicants in terms of Section 386(5)
and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973 Companies
Act") read with item 9 of Schedule 5 of the Companies Act, 71 of 2008 (as
amended) ("the 2008 Companies Act") and for the convening of a Commission of
Enquiry in terms of the provisions of Section 417 and 418 of the 1973 Companies
Act and the appointment of a Commissioner in terms of Section 418 of the 1973
Companies Act read with item 9 of Schedule 5 of the 2008 Companies Act)

# CONFIRMATORY AFFIDAVIT



I, the undersigned,

JACOLIEN FRIEDA BARNARD

do hereby make oath and say that:

1.   I am a major female insolvency practitioner, employed by Tswelelopele Trust, 310 Soutpansberg Road, Rietondale, Pretoria.

2.   I depose to this affidavit in my capacity as duly authorized joint provisional liquidator of Mirror Trading International (Pty) Ltd (in provisional liquidation).

3.   The content of this affidavit falls within my personal knowledge, save where the context indicates otherwise, and is to the best of my knowledge and belief true and correct.

4.   I have read the Affidavit of Herman Bester and confirm the correctness thereof insofar as it relates or refer to me.

JACOLIEN FRIEDA BARNARD

I certify that the above signature is the true signature of JACOLIEN FRIEDA BARNARD and that he acknowledged to me:



1.   that she knows and understands the contents of this affidavit.

2.   that she has no objection to taking the prescribed oath.

3.   that she considers the prescribed oath to be binding to her conscience.


The deponent thereafter uttered the words: "I swear that the contents of this affidavit are true, so help me God". The deponent signed this affidavit in my presence at Pretoria on this 01 day of JANUARY 2021.

COMMISSIONER OF OATHS

Rozelle Cavanagh
COMMISSIONER OF OATHS
Ex Officio Ref RC495/11
84 Carob Tree, Jozini Street
Moreleta Park, Pretoria 0181



RC 17

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO.

In the urgent application of:

**HERMAN BESTER N.O.**                                          First Applicant

**ADRIAAN WILLEM VAN ROOYEN N.O.**                  Second Applicant

**CHRISTOPHER JAMES ROOS N.O.**                         Third Applicant

**JACOLIEN FROTMA BAKKARD N.O.**                       Fourth Applicant

**DEIDRE BASSON N.O.**                                          Fifth Applicant

(in their capacities as the duly appointed joint provisional liquidators of
Mirror Trading International (Pty) Ltd (in provisional liquidation))

(for an order concerning the winding up of the Applicants in terms of Section 346(1)
and 347(1) of the Companies Act, 61 of 1973 (as amended) ("the 1973 Companies
Act") read with Item 9 of Schedule 5 of the Companies Act, 71 of 2008 (as
amended) ("the 2008 Companies Act") and for the convening of a Commission of
Enquiry in terms of the provisions of Section 417 and 418 of the 1973 Companies
Act and the appointment of a Commissioner in terms of Section 418 of the 1973
Companies Act read with Item 9 of Schedule 5 of the 2008 Companies Act)

---

## CONFIRMATORY AFFIDAVIT

---





GENERAL POWER OF ATTORNEY

I, the undersigned,

## DEIDRE BASSON

do hereby nominate, constitute and appoint JOHANNES ZACHARIAS HUMAN MULLER, with power of substitution to be my lawful attorney and agent in my name, place and stead to act on my behalf with full power of authority in respect of all Insolvent Estate, Deceased Estates, Close Corporations in liquidation, Companies in liquidation, Companies under Judicial Management, Assigned Estates, Affairs, Compromises, or matters under Agricultural Credit Act no 28 of 1966 in which I am at present or may in future be appointed or acting as Provisional Trustee, Joint Trustee, Joint Provisional Trustee, Trustee, Provisional Liquidator, Joint Provisional Liquidator, Liquidator, Joint Liquidator, Joint Provisional Judicial Manager, Provisional Judicial Manager, Judicial Manager or Joint Judicial Manager, Receiver, Executor or Co-Executor, whether Testamentary, Dative or Assumed, agent for Executor(s) or Executrix, Administrator or Co-Administrator (as aforesaid) may be applicable or any other capacity in which I may now be acting or be appointed in future and generally for effecting the purposes aforesaid, to do all acts to be done whatsoever shall be requisite, as fully and effectually, for all intents and purposes, as I might or could do if personally present and acting herein - hereby ratifying, allowing and confirming and promising and agreeing to ratify, allow and confirm all and whatsoever my said Attorney in Appeal shall lawfully do, or cause to be done, by virtue of these presents.

DATED at PRETORIA THIS 14 DAY OF JANUARY 2009.

AS WITNESSES

1.

2.

DEIDRE BASSON



I, the undersigned

## JOHANNES ZACHARIAS DURAND MOLLER

do hereby make oath and say that:

1. I am a senior legal insolvency practitioner, employed by Tshwane Trust Co (Pty) Ltd, 1027 Orchove Road, Queenswood, Pretoria.

2. I depose to this affidavit in my capacity as duly authorised agent on behalf of Deidré Basson, in her capacity as joint provisional liquidator of Mirror Trading International (Pty) Ltd (in provisional liquidation).

3. The content of this affidavit falls within my personal knowledge, save where the context indicates otherwise, and is to the best of my knowledge and belief true and correct.

4. I confirm that Deidré Basson is currently not available to depose to a confirmatory affidavit, as she is travelling in the Kruger National Park and does not have the necessary facilities to attend to the signing of a sworn affidavit, at her disposal.

5. Prior to her departure she provided me with a written general power of attorney, a copy of which is annexed hereto as "JZDM1".





* I confirm that I have discussed the handwriting of the abovementioned application with the applicant and confirm that she has authorised the launching of this application and guaranteed me to accede to this request

7. In the premises, I confirm that I have read the Founding Affidavit deposed to by Hannes Bester and confirm the correctness thereof insofar as it relates to the this application

JOHANNES ZACHARIAS HUMAN MULLER

I certify that the above signature is the one signature of **JOHANNES ZACHARIAS HUMAN MULLER** and that he acknowledged to me:

1. that he knows and understands the contents of this affidavit
2. that he has no objection to taking this prescribed oath
3. that he considers the prescribed oath to be binding to his conscience

The deponent thereafter uttered the words "I swear that the contents of this affidavit are true, so help me God". The deponent signed and affixed in my presence at _____ on this __31__ day of **JANUARY 2021.**

COMMISSIONER OF OATHS

# EXHIBIT "1-F"

## POWER OF ATTORNEY

Appointment of agent to commence or defend proceedings in the
Republic of South Africa and/or any other foreign country.

We, the undersigned:

**JACOLIEN FRIEDA BARNARD N.O**, with Identity Number 821003 0014 085, a
practicing insolvency practitioner at Barn Trustees, with address situated at 310
Soutpansberg Road, Rietondale, Pretoria, Gauteng;

And

**DEIDRE BASSON N.O**, with Identity Number 700929 0090 087, a practicing
insolvency practitioner at Tshwane Trust Co, with address situated at 1207
Cobham Road, Queenswood, Pretoria, Gauteng;

And

**HERMAN BESTER N.O**, with Identity Number 700923 5139 080, a practicing
insolvency practitioner at Tygerberg Trustees, with address situated at First
Floor, Cascade Terraces, Tyger Waterfront, Belville, Western Cape;

And

**CHRISTOPHER JAMES ROOS N.O**, with Identity Number 840921 5014 080, a
practicing insolvency practitioner at Sebenza Trust, with address situated at
Unit 2A, 43 Estcourt Avenue, Wierda Park, Centurion, Gauteng;

And

**ADRIAAN WILLEM VAN ROOYEN N.O**, with Identity Number 691118 52080
080, a practicing insolvency practitioner at Investrust, with address situated at
73 Bond Street, Sunnyside, Pretoria, Gauteng,

And

**CHAVONNES BADENHORST ST CLAIR COOPER N.O**, with Identity Number
690504 5153 081, a practicing insolvency practitioner at CK Trust (Pty) Ltd, with
address situated at Unit 1, Sir Benjamin Promenade, Oxford Street, Durbanville,
Western Cape

In our capacity as the Joint Liquidators of **MIRROR TRADING
INTERNATIONAL (PTY) LIMITED T/A MTI (Reg no: 2019/205570/07) ("MTI")**,
under Certificate of Appointment no C000906/2020,

do hereby nominate, authorise, constitute and appoint:

**CHAVONNES BADENHORST ST CLAIR COOPER N.O**, with Identity Number
690504 5153 081, a practicing insolvency practitioner at CK Trust (Pty) Ltd, with
address situated at Unit 1, Sir Benjamin Promenade, Oxford Street, Durbanville,
Western Cape,

(hereinafter called "the Agent"), with power of substitution to be our lawful agent
in our names by means of an attorney to do any or all of the following acts or
things:

**1. To accept service**
To accept service of any summons, writ or other legal process, whether issued I
the Republic of South Africa and/or any other foreign country.

**2. To represent the Joint Liquidators in court**

To appear and represent the Joint Liquidators in any court and before all judicial or other officers whomsoever as the Agent shall consider advisable, whether the court is situated in the Republic of South Africa or any other foreign country.

**3. To institute action**

To make any demand or claim and to commence and conduct any action or other proceedings in any court or tribunal for the recovery of any debt, sum of money, right, title, interest, property or matter whatsoever now due or payable or in any way belonging to the insolvent estate of MTI, by any means or on any account whatsoever, and to prosecute, discontinue, compromise, terminate or abandon such action or proceedings as the Agent shall see fit, whether the action commences in the Republic of South Africa or any other foreign country.

**4. To defend proceedings and make counterclaims**

To defend any action or proceedings brought against the insolvent estate of MTI or in which the Joint Liquidators may be joined in any court or tribunal (including any counterclaim or claim in reconvention made against the insolvent estate of MTI), or to compromise any such action or proceedings or consent to judgment therein if the Agent shall see fit, and to make any claim in reconvention in such action or proceedings and for such relief as the Agent shall see fit, on behalf of the insolvent estate of MTI, whether the action or proceedings was brought in the Republic of South Africa or any other foreign country.

**5. Appeals**

To note, prosecute, withdraw or abandon any appeal which may be allowed by law against any judgment or order made in favour of the insolvent estate of MTI in any such action or proceedings and to defend any appeal against any such judgment or order made in favour of the insolvent estate of MTI, whether in the Republic of South Africa or any other foreign country.

### 6. To sign documents

To sign all documents necessary in connection with any such action or proceedings, whether in the Republic of South Africa or any other foreign country.

### 7. To employ attorneys

When necessary, to employ and pay attorneys and counsel to conduct any such action or proceedings, whether in the Republic of South Africa or any other foreign country.

### 8. To take other means of recovering debts

To take such other lawful ways and means in order to recover or get in any sum of money or other thing whatsoever which shall by the Agent be understood to be due, owing, belonging or payable to the insolvent estate of MTI by any person whomsoever, whether in the Republic of South Africa or any other foreign country

### 9. To give receipts

To give valid receipts and to do all other acts necessary according to the law of the Republic of South Africa or any other foreign country.

### 10. General

Generally for effecting the purposes aforesaid, to do and cause to be done whatsoever shall be requisite as fully and effectually for all intents and purposes as the Joint Liquidators might or could do if personally present and acting herein.

AND

Ratification

The Joint Liquidators hereby ratify and agree to ratify all and whatsoever the Agent shall lawfully do or cause to be done by virtue of these presents.

AND

Irrevocability

The Joint Liquidators declare that the power hereby created shall be irrevocable for the period of _____ from the date hereof.

SIGNED at _____ Pta _____ on this __21__ day of _September 2022._ 2022.

Witnesses:

1 .............................................

2 .............................................
   (*Signatures of witnesses*)

JACOLIEN FRIEDA
BARNARD N.O

SIGNED at _Pretoria_ on this __29th__ day of _September_ 2022.

Witnesses:

1 .............................................

2 .............................................
   (*Signatures of witnesses*)

DEIDRE BASSON N.O

SIGNED at _Cape Town_ on this _13th_ day of _October_ 2022.

Witnesses:

1 ...............................

2 ...............................
   *(Signatures of witnesses)*

HERMAN BESTER N.O


SIGNED at _Pretoria_ on this _30th_ day of _September_ 2022.

Witnesses:

1 ...............................

2 ...............................
   *(Signatures of witnesses)*

CHRISTOPHER JAMES
ROOS N.O


SIGNED at _Pretoria_ on this _30th_ day of _September_ 2022.

Witnesses:

1 ...._Gerber_....................

2 ...............................
   *(Signatures of witnesses)*

ADRIAAN WILLEM VAN
ROOYEN N.O

SIGNED at _Bloemfontein_ on this _14th_ day of _October_
2022.

Witnesses:

1 ............................................

2 ............................................

(*Signatures of witnesses*)

CHAVONNES BADENHORST
ST CLAIR COOPER N.O

## ACCEPTANCE OF APPOINTMENT AS AGENT TO COMMENCE OR DEFEND PROCEEDINGS IN THE REPUBLIC OF SOUTH AFRICA AND/OR ANY FOREIGN COUNTRY

I, the undersigned

### CHAVONNES BADENHORST ST CLAIR COOPER N.O
(Identity Number: 690504 5153 081)

Do hereby accept the appointment as Agent of the Joint Liquidators in the insolvent estate of **MIRROR TRADING INTERNATIONAL (PTY) LTD T/A MTI (Reg no: 2019/205570/07)**, to commence or defend proceedings in the Republic of South Africa and/or any other foreign country, as per the Power of Attorney signed by the Joint Liquidators.

SIGNED at _Bloemfontein_ on this _19th_ day of _October 2022_ 2022.

Witnesses:

1 .................................................

2 .................................................

*(Signatures of witnesses)*

.................................................
CHAVONNES BADENHORST
ST CLAIR COOPER N.O

# EXHIBIT

# "1-G"

IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

Case No. 21418/2022

Before the honourable Mr Justice Francis

Cape Town, Friday 15 December 2022

*Thursday*

In the *ex parte* application of:

| | |
|---|---|
| HERMAN BESTER N.O | First Applicant |
| ADRIAAN WILLEM VAN ROOYEN N.O | Second Applicant |
| CHRISTOPHER JAMES ROOS N.O | Third Applicant |
| JACOLIEN FRIEDA BARNARD N.O | Fourth Applicant |
| DEIDRE BASSON N.O | Fifth Applicant |
| CHAVONNES BADENHORST ST CLAIR COOPER N.O | Sixth Applicant |

---

DRAFT ORDER

---

HAVING HEARD COUNSEL AND HAVING READ THE PAPERS FILED OF RECORD IT IS ORDERED:

1. That a letter of request be issued in favour of the applicants to any Court of competent jurisdiction in Canada in terms of the draft letter annexed to this order marked annexure "LOR".

2. That the costs of this application shall be costs in the administration of the insolvent estate of Mirror trading International (Pty) Ltd (in liquidation).

BY ORDER OF THE COURT

COURT REGISTRAR

Schabort Potgieter Attorneys Inc.
C/O van der Berg & Associates
2nd Floor, Radio House
Cnr Loop & Longmarket Streets
Cape Town
021 424 7004
tinus@law2licks.co.za

THE HIGH COURT OF SOUTH AFRICA
WESTERN CAPE DIVISION, CAPE TOWN

CASE NO.:

In the **urgent** *ex parte* application of:

| | |
|---|---|
| **HERMAN BESTER N.O.** | First Applicant |
| **ADRIAAN WILLEM VAN ROOYEN N.O.** | Second Applicant |
| **CHRISTOPHER JAMES ROOS N.O** | Third Applicant |
| **JACOLIEN FRIEDA BARNARD N.O** | Fourth Applicant |
| **DEIDRE BASSON N.O.** | Fifth Applicant |
| **CHAVONNES BADENHORST ST CLAIR COOPER N.O** | Sixth Applicant |

(In their capacities as the jointly appointed
liquidators of Mirror Trading International (Pty)
Ltd (in liquidation) (Master's Ref:
C000906/2020)

---

**LETTER OF REQUEST FOR JUDICIAL ASSISTANCE FROM THE COURTS
OF CANADA IN RELATION TO THE WINDING-UP OF MIRROR TRADING
INTERNATIONAL (PTY) LTD (IN LIQUIDATION) (MASTER'S REF.
C000906/2020)**

---

1.      To any Court of competent jurisdiction in Canada;

2.      This constitutes a letter of request by the High Court of South Africa
        (Western Cape Division, Cape Town), directed to any Court of competent
        jurisdiction in Canada;

3.      The purpose of this letter of request is to request any Court of competent
        jurisdiction in Canada to:

- 2 -

3.1    Recognise the liquidation of Mirror Trading International (Pty) Ltd t/a MTI, wound up because it was unable to pay its debts, and that it was just and equitable to do so;

3.2    Recognise the appointment of Adriaan Willem Van Rooyen N.O., Herman Bester N.O., Christopher James Roos N.O, Jacolien Frieda Barnard N.O. Deidre Basson N.O. and Chavonnes Badenhorst St Clair Cooper N.O, as the jointly appointed liquidators concerned with the winding-up of Mirror Trading International (Pty) Ltd t/a MTI, as per their certificate of appointment attached as annexure "A1";

3.3    Recognise the Court order relating to the extension of powers of the jointly appointed liquidators, as well as the institution of an inquiry in terms of the provisions of section 417/418 of the South African Companies Act 61 of 1973 as set out in annexure "A2" hereto, and the adopted resolutions passed at the second creditors' meeting held on 10 December 2021, attached hereto as annexure "A2.1";;

3.4    Recognise the rights, powers and title of the said joint provisional liquidators of Mirror Trading International (Pty) Ltd t/a MTI, as specifically extended in terms of the Court order annexed hereto as annexure "A2" above, and to institute the required legal proceedings in any competent Court in Canada relating to the winding-up of Mirror Trading International (Pty) Ltd t/a as MTI;

3.5    Making such order as any competent Court in Canada may consider just and appropriate in assisting the High Court of South Africa by ensuring the aforesaid in the most effective administration and winding-up of Mirror

- 3 -

Trading International (Pty) Ltd t/a MTI.

4.      This letter of request is granted by the abovementioned Court on application
        made to it by the joint liquidators under the abovementioned case number.
        In the circumstances this letter of request will form an annexure to the
        Court's order in this regard.

5.      **BACKGROUND TO THIS LETTER OF REQUEST**

5.1     The application for the urgent winding-up of Mirror Trading International
        (hereinafter referred to as "MTI") was launched by a Mr Anton Fred Melchior
        Lee (hereinafter referred to as "Lee"), investor/creditor of MTI in the amount
        of US$34,708.77 on 23 December 2020 out of this Court and under case
        number 19201/2020.

5.2     The winding-up application was first heard on 24 December 2020. While the
        application was not opposed by MTI, a postponement was requested on
        behalf of the voluntary group/association comprising a large number of
        investors/creditors of MTI known as the MTI Recovery Action Group
        (hereinafter referred to as "RAG") resulting in the hearing being postponed
        to 29 December 2020.

5.3     After considering the available information, RAG conceded that MTI ought
        to be wound-up and Rogers J of this Court granted an order placing MTI
        under provisional winding-up in the hands of the Master of this Court with a
        return date for the finalisation thereof on 1 March 2021. A copy of this order
        is annexed hereto as annexure "A3".

- 4 -

5.4    MTI was placed under provisional winding-up in terms of section 344 of the Companies Act, 61 of 1973 in that it was unable to pay its debts as described in terms of section 345 of the Companies Act, 61 of 1973 and it further appeared to the Court that it was just and equitable that it be wound-up in the view of the legality of its business model.

5.5    MTI was finally wound up by an order of this court on 30 June 2021, and as per the order granted and attached hereto as annexure "A4".

5.6    According to the winding-up application, and consequent investigations conducted by the jointly appointed liquidators in the insolvent estate of MTI, it has been determined that MTI is both factually and commercially insolvent and has been trading illegally in terms of the provisions of the Companies Act, 61 of 1973.

5.7    MTI was registered and incorporated in April 2019 purportedly in order to conduct the business of a fund manager trading in Crypto currency particularly Bitcoin. The sole director and chief executive, Mr Cornelius Johannes Steynberg (hereinafter referred to as "Steynberg"), purportedly the only person of full control over the funds invested through it by its investors/creditors who is strongly suspected of being the mastermind behind what appears to be a Ponzi-type investment scheme utilising MTI as the vehicle. Steynberg was assisted by MTI's so-called senior management team which included Mrs. Nerina Steynberg, Mr. Clynton Hugh Marks, Mrs Cheri Marks, Mr. Charlie Ward, Ms. Monica Coetzee, Ms. Liz Malton, Mr. Leonard Gray, Mr. Romana Samuels and others.

- 5 -

5.8     MTI operated by soliciting members of the public to invest their funds in the form of Bitcoin on online derivative trading platforms through MTI on the promise of unrealistically high returns, in other words up to 10% per month. MTI's business model made use of a referral structure in terms of which existing investors received referral bonuses over and above their exorbitant returns on investment for the recruitment of new members to invest their Bitcoin through MTI.

5.9     From available information it appears that more than 3500 Bitcoin were paid to approximately 180 individuals as so-called referral bonuses. At the current value of one bitcoin (at approximately R285 985.75), this equates to more than R1 billion. Importantly most members of the MTI senior management team benefited from these payments. These persons also constituted what can be described as the "winners" of the Ponzi-type scheme and at the expense of other investors at the lower end of the scheme termed as the "losers".

5.10    After suspicion arose of the business of MTI being conducted in contravention of South African statutory provisions regulating local and foreign investments schemes, the South African Financial Sector Conduct Authority (hereinafter referred to as the "FSCA") being the statutory created financial sector regulatory body established in terms of section 56 of the Financial Sector Regulation Act, 9 of 2017 initiated investigations into MTI's business activities.

5.11    No less than three press releases were issued by the FSCA, the last of

- 6 -

which was issued on 17 December 2020 and which press releases are annexed hereto as annexure "A5" in terms of which the FSCA advised the general public that *inter alia*:

5.11.1    MTI was conducting business which required of it to be in possession of a financial service provider licence, for which it had not applied;

5.11.2    it had found evidence contradicting MTI's claim to have funds in trading accounts of a substantial value, as the total value of frozen Bitcoin invested through FXChoice was negligible;

5.11.3    it had found evidence contradicting MTI's alleged returns on investments and that from 29 January 2020 until 3 June 2020 MTI had in fact suffered a capital loss on investment of approximately 30% as opposed to its alleged returns of up to 10% per month;

5.11.4    it had found evidence contradicting MTI's alleged utilisation of bot trading;

5.11.5    after being informed by the FSCA that it was conducting an illegal unregistered financial services business, MTI claimed to have:

5.11.5.1      changed its business to that of a fund manager trading in derivative instruments based on Crypto currency (still Bitcoin);

5.11.5.2      accordingly changed its online derivative training platform from FXChoice to "*Trade300*" (still utilising a bot);

5.11.5.3      transferred all its investors' funds to Trade300.

- 7 -

10

5.11.6    it had found evidence to believe that Trade300 was not a legitimate derivative trading platform but instead linked to Steynberg himself;

5.11.7    it had found that the alleged transfer of investor funds from FXChoice to the so-called Trade 300 had not occurred during the period alleged by Steynberg, despite MTI providing it with purported proof of the transfer in this regard;

5.11.8    it had found no evidence of any significant store of funds on any trading platform and that most of the Crypto currency balances were held in the name and under the control of Steynberg personally, which funds did not equate to that which MTI claimed to have in investor funds and in its trading account;

5.11.9    It is believed that MTI and its senior management were conducting an illegal operation, were misleading investors/creditors and were contravening several laws.

5.12    In addition to the above:

5.12.1    the Texas State Securities Board has issued an emergency order in terms of which MTI and Steynberg were to immediately cease and desist from offering for sale any security, acting as a securities dealer or agent and engaging in any fraud in connection with the offer for sale of any security in Texas. A copy of this order is annexed hereto as annexure "A6"

5.13    The Canadian *Autorité Des Marchés Financiers*, an independent administrative authority which regulates the French financial market, has placed MTI on its warning list of websites and companies that solicit investors illegally. A copy of the relevant extract of the warning list is attached hereto as annexure "A7".

5.14    From the website of RAG and from their nominations for the appointment of provisional liquidators it appears that tens of thousands of investors are foreign citizens from more than 140 countries.

5.15    The above is an indication of the magnitude of the scheme and the existence of its international presence which supports the necessity of the issuing of this letter of request.

5.16    From the above it is concluded that:

5.16.1    MTI is a company unable to pay its debts as and when they become due;

5.16.2    the liabilities of MTI by far exceed the assets of MTI;

5.16.3    certain individuals benefited handsomely at the expense of others;

5.16.4    MTI received and accepted funds in the form of Bitcoins from members of the public without being registered to do so in terms of the relevant South African legislation including but not limited to the Financial Service Regulation Act and the Banks Act, 94, 1990;

5.16.5    MTI utilised the funds invested through it by its investors/creditors to



- 9 -

cover its operational costs and the returns on investments and referral
bonusses to its investors and creditors;

5.16.6    MTI accordingly utilised and invested the funds in contravention of the
investment mandate provided to it by its investors/creditors.

5.17    From preliminary investigations it appears that MTI ought to hold a minimum
of 23 000 Bitcoin being the number of Bitcoin it owes to its investors. To
date, the jointly appointed liquidators have only been able to recover
approximately 1300  Bitcoin and to the benefit of the insolvent estate.

## 6.    THE COURT'S REQUESTS IN RELATION TO THE CONDUCTING OF THE EXAMINATION

6.1    An enquiry has been instituted into the affairs of MTI and in terms of the
provisions of section 417 and 418 of the Companies Act, 61 of 1973, a copy
of the order is attached above as annexure "A2".

6.2    The Court accordingly requests for the reasons stated above and so as to
best assist it in the winding-up of MTI that:

6.2.1    an examination of investors who benefited at the expense of others and
who reside within the jurisdiction of Canada be examined in terms of the
provisions of section 417 and 418 of the South African Companies Act,
61 of 1973;

6.2.2    that these investors who unjustly benefited be ordered to attend to be
examined at such time as you shall appoint and at the offices of the joint

- 10 -

13

liquidators' Canadian solicitors, Stikeman Elliott LLP, situated at
4300 Bankers Hall West, 888-3rd Street S.W. Calgary, AB Canada
T2P 5C5, alternatively such place as you shall appoint, alternatively that
such order to attend may be issued by the appointed commissioners
being any of the following:

6.2.2.1    Mr Adriaan Serfontein Hurter;

6.2.2.2    Mr Lambertus Von Wielligh Bester;

6.2.2.3    Retired Justice Eberhardt Bertelsmann;

6.2.2.4    Retired Justice Hans-Joachim Fabricius

6.2.3    appointed as commissioners in terms of section 418(1)(a) of the
Companies Act, 61 of 1973;

6.2.4    that you order that those attending such examination provide to the duly
appointed commissioner(s), and in attendance, all books and records
relating to MTI in their possession;

6.2.5    the examination be presided over and taken by the aforementioned
commissioner(s), alternatively any appropriate judicial officer whom you
shall appoint for this purpose;

6.2.6    the examination shall be private and confidential (or held in private) as
contemplated in section 417(7) of the Companies Act, 61 of 1973;

6.2.7    that the persons who may participate in the examination shall include
Advocate Johann Hershensohn, Advocate Ruan de Leeuw, Mr Jacobus
Hendrik Schabort and Mr Chavonnes Badenhorst St Clair Cooper;

- 11 -

6.2.8    that the examination of all such witnesses examined shall be recorded either by video or in audio and that the records of the examination and copies of any documents produced shall be kept by the commissioner, alternatively Stikeman Elliott, further alternatively any such person you shall appoint.

6.3    A true copy of the current wording of the provisions of section 417 and 418 of the South African Companies Act is attached hereto as annexure "A8".

7.    THE NEED FOR OTHER REQUESTS MENTIONED ABOVE

7.1    In addition to the above requests, the Court requests that you:

recognise the jointly appointed liquidators as the duly appointed liquidators of the company in liquidation for the purposes of the judicial assistance in or pursuant to this letter of request;

7.1.2    if and to the extent necessary, permit the jointly appointed liquidators in their said capacity to seek, obtain and maintain in Canada appropriate relief in relation to claims the company in liquidation has brought or intends to bring against any investors who have benefited at the expense of others and in the unlawful scheme;

7.1.3    make any order that appears to any Court of competent jurisdiction in Canada to be convenient and appropriate in relation to the liquidation of the company in liquidation to assist the High Court of South Africa (Western Cape Division, Cape Town) including where the need for such

- 12 -

order becomes apparent after the date of this letter of request.

7.2    Orders to this effect will assist the jointly appointed liquidators in preserving and recovering the assets of the company in liquidation and otherwise in carrying out their duties in relation to the winding-up, in particular in achieving the most effective administration of the company in liquidation's winding-up for the benefit of its creditors.

8.    **CONCLUSION**

In the circumstances the presiding Judge is kindly and respectfully requested to accept this letter of request and to agree to the requests contained herein and to assist the jointly appointed liquidators to conduct their examination into the affairs of the company in liquidation in the manner stated above and within the jurisdiction of Canada.

DATED AND SIGNED AT CAPE TOWN ON THIS ___ DAY OF _December_ 2022

_____

HIS LORDSHIP MR JUSTICE



REPUBLIC OF SOUTH AFRICA

SERTIFIKAAT VAN AANSTELLING VAN LIKWIDATEUR

[Maatskappywet, No 61 van 1973 (soos gewysig)]

CERTIFICATE OF APPOINTMENT OF LIQUIDATOR

[Companies Act, No 61 of 1973 (as amended)]

NO:    C000906/2020

Hierby word gesertifiseer dat:
This is to certify that:

| | | |
|---|---|---|
| 1. BARNARD, JACOLIEN FRIEDA | ID. | 8210080014085 |
| 2. BASSON, DEIDRE | ID. | 7009290090067 |
| 3. BESTER, HERMAN | ID. | 7009235139080 |
| 4. COOPER, CHAVONNES BADENHORST ST CLAIR | ID. | 6905045153081 |
| 5. ROOS, CHRISTOPHER JAMES | ID. | 8409215014080 |
| 6. VAN ROOYEN , ADRIAAN WILLEM | ID. | 6911185280080 |
| 7. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | ID. | XXXXXXXXXXXXXXXXXXXXXXX |

aangestel is as Likwidateur met die magte soos uiteengesit in Artikel 386(1) van Wet No 61 van 1973 saamgelees met item 9 van Skedule 5 van Wet 71 van 2008 van die Maatskappy bekend as:

appointed as Liquidator with the powers as set out in Section 386(1) of Act 61 of 1973 read together with item 9 of Schedule 5 of Act 71 of 2008 of the Company known as:

MIRROR TRADING INTERNATIONAL (PTY) LIMITED T/A MTI  2019/205570/07

wat onder Likwidasie geplaas is
which has been placed under Liquidation    30-6-2021    

van die Hoë Hof van Suid-Afrika,                                              Afdeling
by Order of the High Court of South Africa,    WESTERN CAPE HIGH COURT (CAPE TOWN)    Division

Geteken te                                op
Signed at    CAPE TOWN                  on    11 NOVEMBER 2021

DOJCD\VBOUWER
MEESTER VAN DIE HOË HOF VAN SUID-AFRIKA
MASTER OF THE HIGH COURT OF SOUTH AFRICA

DATE STAMP

URN: 8B62020INS000906

Extension of Powers

IN THE HIGH COURT OF SOUTH AFRICA

[WESTERN CAPE DIVISION, CAPE TOWN]

Case No. 935/2020

CAPE TOWN, On Friday the 22nd of January 2021

Before his Honourable Justice De Villiers (Acting)

In the ex parte application of :-

HERMAN BESTER N.O.                                          First Applicant

ADRIAAN WILLEM VAN ROOYEN N.O.      WCD-004          Second Applicant

CHRISTOPHER JAMES ROOS N.O.                              Third Applicant

JACOLIEN FRIEDA BARNARD N.O.                            Fourth Applicant

DEIDRE BASSON N.O.                                          Fifth Applicant

(In their capacities as the duly appointed joint provisional liquidators of

Mirror Trading International (Pty) Ltd (in provisional liquidation))

(for an order extending the powers of the Applicants in terms of Section

386(5) and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973

Companies Act") read with Item 9 of Schedule 5 of the Companies Act, 71

of 2008 (as amended) ("the 2008 Companies Act") and for the convening of

a Commission of Enquiry in terms of the provisions of Section 417 and 418

of the 1973 Companies Act and the appointment of a Commissioner in

terms of Section 418 of the 1973 Companies Act read with Item 9 of

Schedule 5 of the 2008 Companies Act)

2

## ORDER

HAVING READ THE PAPERS FILED OF RECORD and having heard counsel for the Applicants an order is made in the following terms:

1. Authorising the applicants to bring this application in terms of the provisions of section 386(5) and 387(3) of the Companies Act, 61 of 1973, as amended ("the 1973 Companies Act") read with Item 9 of Schedule 5 to the Companies Act 71 of 2008, as amended ("the 2008 Companies Act").

2. Authorising the applicants in terms of section 386(5) and 387(3) of the 1973 Companies Act read with section 386(4) to:

   2.1 Institute or defend actions or other legal proceedings in terms of section 386(4)(a);

   2.2 Obtain legal advice on any question of law affecting the administration of Mirror Trading International (Pty) Ltd ("MTI") and to engage the services of attorneys and counsel in connection with any matter arising out of or relating to MTI;

   2.3 Agree with such attorneys and counsel on the tariff or scale of fees to be charged by and paid to such attorneys and/or counsel for the rendering of services to MTI and to conclude written agreements with the attorneys and/or counsel in the form contemplated in and by section 73(2) of the

3

Insolvency Act, 24 of 1936 read with section 339 of the 1973 Companies Act;

2.4    Pay the attorneys and/or counsel the agreed costs and the disbursements incurred by the attorneys and counsel out of the funds of MTI as costs in the administration of MTI as and when such services are rendered and disbursements are made;

2.5    Agree to any reasonable offer of composition made to MTI by any debtor and to accept payment of any part of a debt due to MTI in settlement thereof or to grant an extension of time for the payment of any such debt in terms of section 386(4)(b);

2.6    Open an on-line cryptocurrency trading account in the name of, alternatively on behalf of MTI and to receive cryptocurrency to be recovered on behalf of MTI, in such account;

2.7    Sell any movable property of MTI, including any Bitcoin or other form of cryptocurrency, by public auction, public tender, private treaty or relevant platform, as the case may be, and to give delivery thereof in terms of section 386(4)(h)

2.8    Engage the services of bookkeepers, accountants, auditors, forensic accountants, forensic digital experts, investigators, key staff or any other person for any purpose for which they may be required in relation to the

4

affairs of MTI and to treat the costs so incurred as costs in the administration in terms of section 386(4)(f).

3.  Ratifying and confirming all such actions already taken by the applicants as fall under section 386(4)(a) of the 1973 Companies Act, including the engagement by the applicants of attorneys and counsel to bring this application.

4.  That a commission of enquiry into the affairs of MTI be held in terms of the provisions of section 417 read with section 418 of the 1973 Companies Act read with Item 9, Schedule 5 of the 2008 Companies Act ("the enquiry").

5.  That Mr Adriaan Serfontein Hurter, Mr Lambertus Von Wielligh Bester, retired Judge Eberhard Bertelsmann and, conditional upon his acceptance of this appointment pursuant to the granting of this order, retired Judge Hans-Joachim Fabricius, be appointed as commissioners in terms of section 418(1)(a) of the 1973 Companies Act and that they be authorised to fix the time(s) and place(s) for the holding of the enquiry as they in their sole direction deem fit.

6.  That the Master of the High Court, Cape Town be authorised to appoint commissioners in addition to the court appointed commissioners, upon the Applicants' duly motivated request to do so ("the additional appointed commissioners").

7.  That the enquiry be referred to the court appointed commissioners and, applicable, to the additional appointed commissioners and to the duly designated magistrate in any one of the following magistrate courts:

5

    (i)     Magistrate Court, Stellenbosch;

    (ii)    Magistrate Court, Cullinan;

    (iii)   Magistrate Court, Durban.

        ("the designated magistrates")

8.    That the applicants are authorised to proceed with the whole or any part of the enquiry before any one of the court appointed commissioners and/or the additional appointed commissioners and or any of the designated magistrates (collectively referred to as "the commissioners").

9.    That the commissioners are authorised and empowered to summon or cause to be summoned before them any person to be examined at the enquiry by counsel or any attorney on behalf of the applicants or by any other competent party as is provided for in section 418(1)(c) of the 1973 Companies Act. Such persons may include, but are not limited to:

| NAME | CAPACITY |
|---|---|
| 1.   Cornelius Johannes Steynberg | Director of MTI |
| 2.   Nerina Steynberg | Second in command of MTI |
| 3.   Coenie Rademan | Past Director of MTI |
| 4.   Clynton Hugh Marks | Head of ... |

6

Members of MTI

| 5. | Cheri Marks | Head of Communications and Marketing of MTI |
| 6. | Liz Malton | Management Team member and Training and Presenting Team member of MTI |
| 7. | Charles Ward | COO of MTI |
| 8. | Monica Coetzee | Head of Corporate Services and Training and Presenting Team member of MTI |
| 9. | Romana Samuels | Head of Member Support of MTI and staff member at MTI's Stellenbosch office |
| 10. | Vincent Ward | Head of International Expansion of MTI |
| 11. | Leonard Gray | Head of Legal of MTI |
| 12. | Jaco Eckley | Management Team member and staff member at MTI's Stellenbosch office |
| 13. | Tom Fraser | Management Team member of MTI |
| 14. | Gerald Lassen | Member of MTI and Manager of MTI's Strand office |
| 15. | Duly authorised representative(s) of FXChoice | |
| 16. | A certain Ms Camila | Senior Account Manager of Trade300 |
| 17. | Duly authorised representatives of Standard Bank (being the bank of MTI) | |
| 18. | Duly authorised representatives of ABSA, FNB and Standard Bank | |

23

7

(being the banks of Steynberg)

19.   Duly authorised representative(s) of any other bank in respect of
bank statements of any party that may be identified as being
relevant for purpose of investigation the affairs of MTI

20.   Individuals already identified, and still to be identified, who received
referral commission in the form of bonus and who made "profits" on
their purported investments with MTI

10.  That the commissioners are authorised and empowered to summons further
persons before them who, as a result of the evidence led before them or
representations made to them, appear to them to be capable of giving
information concerning their knowledge of or dealings and associations with the
business, trade, property and affairs of MTI.

11.  That all persons summoned before the commissioners may be examined
concerning the trade, dealings, affairs and property of MTI.

12.  That all persons summoned by the commissioner be ordered to produce at the
enquiry inter alia all books, record and documents, whether in printed form or
sorted in digital form (including documents stored through the utilisation of
computer hardware or software), in their possession, custody, power or under
their control or in possession, custody, power or under control of the firm,
company, or any entity by which they are employed or which they represent in
respect of all matters concerning the trade, dealings, affairs or property of MTI.

2021 -01- 2 2

5

13. That the signature of the relevant commissioner or the Master of the Western Cape High Court, Cape Town on the summons (subpoenas) to be issued, shall be sufficient for the validity thereof.

14. That the record of this application and all proceedings before the commissioners shall be kept private and confidential and shall not be disclosed without the prior leave of the court or the relevant commissioner having been obtained.

15. That the applicants and commissioners are authorised and empowered to conduct any part of the enquiry, as identified by the applicants, via an appropriate virtual platform in a format to be determined by the relevant commissioner.

16. That the commissioner(s) be directed and instructed to report to the Master of the High Court, Cape Town, in respect of the following, although not limited thereto:

   (i)   The identity of the witnesses who gave evidence before the commissioner(s);

   (ii)  Which assets and/or monies were discovered, if any, through the inquiry and which advantage was derived to the creditors of MTI as a result thereof; and

   Whether any unlawful acts, transgressions and/or any other irregularities were discovered by means of the evidence before the commissioners(s)

9

and whether such matters should be referred to the relevant authority for consideration.

17. That the costs and expenses of this application and the enquiry on an attorney own client scale, be costs in the administration of MTI.

18. That the applicants be granted such further and/or alternative relief as the court may deem necessary.



BY THE ORDER OF THE COURT

COURT REGISTRAR

Box 97
Mallatt and Bosmen
Fourth Floor
Madison Square
c/o Carl Cronje & Tygerfalls Boulevard
Bellville
Ref: PDT/AEYW/7098

<u>MIRROR TRADING INTERNATIONAL (PTY) LTD - (IN LIQUIDATION)</u>
<u>MASTER'S REFERENCE NUMBER:  C906/2020</u>

**RESOLUTIONS SUBMITTED AT THE SECOND MEETING OF CREDITORS AND MEMBERS, IN TERMS OF SECTION 402 OF THE COMPANIES ACT, ACT 71 OF 1973, AS AMENDED, TO BE HELD BEFORE THE MASTER OF THE HIGH COURT CAPE TOWN, ON FRIDAY, THE 10TH OF DECEMBER 2021 AT 09H00.**

**RESOLVED:**

1.  That all actions of whatsoever nature heretofore taken by the liquidators and also as set out in the report, to which these Resolutions are attached, be and are hereby confirmed, ratified and approved of.

2.  That the liquidators be and are hereby granted the authority and shall be vested with all the powers mentioned in the Companies Act 61 of 1973, as amended.

3.  That the liquidators be and are hereby authorized to engage the services of Attorneys, Accountants and/or Counsel and/or Recording Agents, as they may deem necessary the purpose of:

    a.  taking any legal opinion that may be considered necessary in the interest of the estate;

    b.  instituting or defending on behalf of the Company any action or other legal proceedings of a civil nature, and subject to the provisions of any law relating to criminal procedure, any criminal proceedings;

    c.  holding enquiries and examinations in terms of Sections 415, 416, 417 and 418 of the Companies Act, 61 of 1973, as amended, or as read in conjunction with the Insolvency Act nr. 24 of 1936, as amended and to appoint attorneys and counsel and also accountants and any other advisers, to act on their behalf in regard to such enquiries and at the cost of the Company to assist them in regard to such enquiries, and particularly to hold an enquiry as envisaged in the report to creditors, to which these resolutions are attached;

    d.  to draw any contracts and sign any documents as may be necessary;

    e.  for any purpose, in doing searches at the Deeds Offices, Registrar of Companies and other registry, as they in his/their sole and absolute discretion may deem necessary, all costs so incurred to be costs in the liquidation;

    f.  for any other purpose whatsoever, as they, in their sole discretion, may deem fit;

    g.  that the liquidators be duly authorized to agree any tariff and/or scale of rates to be used in determination of any legal or other fees, and in their sole discretion to agree the quantum of such fees, which legal fees shall be on an attorney and own client basis;

    h.  all costs incurred to be treated as administration costs of the estate;

4.  That the liquidators be and are hereby authorized and empowered to investigate any apparent voidable and/or undue preference and/or any disposition of property, and to take any steps which they in their absolute discretion may deem necessary, including the institution of legal actions and the employment of attorneys and/or counsel to have these set aside, and to proceed to the final end or determination of any such legal actions or abandon the same at any time as they in their sole discretion may deem fit, all costs so incurred to be costs in the liquidation. The costs referred to herein being subject to the same conditions and/or he same scales as are set out above.

5. That the liquidators be and are hereby authorized to collect any outstanding debts due to the Company in liquidation, and for the purpose thereof, to sell or compound any of these debts for such sum, and on such terms and conditions, as they in their sole discretion may deem fit, or to abandon any claims which they in their sole discretion may deem to be irrecoverable, and to appoint debt collectors in their sole discretion to assist them in the recovery of outstanding debts, and to take all necessary steps on the terms and provisions as they in their sole discretion as liquidators may deem fit, to ensure the maximum debt collections, or to institute Legal Action and/or employ attorneys and/or counsel in connection with the recovery of the debts, and to proceed to the final end or determination of any such legal action instituted or to abandon the same at any time as they in their sole discretion may deem fit, all costs to incurred to be costs in the liquidation. The costs referred to herein being subject to the same conditions and on the same scales as are set out above.

6. That the liquidators be and are hereby authorized to sequestrate the estate of any person or liquidate any Company in order to recover any monies due to the Company where they consider/s it necessary and that the costs in relation thereto be costs in the liquidation. The costs referred to herein being subject to the same conditions and on the same scale as are set out above.

7. That the liquidators be and are hereby authorized to engage the services of bookkeepers, accountants and auditors, consultants, document managers, IT consultants and any other advisers to investigate and write up the books of the Company as may be required, and if necessary, to produce an audited balance sheet as at the date of liquidation, either for the purpose of investigating the affairs of the Company, establishing the claims of creditors, or any other purpose as they in their sole discretion may deem fit, all costs incurred in relation thereto to be costs in the liquidation. The liquidators, in their sole discretion, may agree the costs with the relevant service providers and advisers on behalf of the Company. The liquidators be and are hereby authorized and instructed to pay the costs for and relating to preparing creditor claims and representing creditors, and preparing for same, at meetings and assisting in regard to the payment of their dividends, as a cost of administration from the assets of the estate. All costs incurred in connection with any such services and service providers to be treated as costs of the administration of the estate. The costs referred to herein being subject to the same conditions and on the same scale as are set out in 2.g above.

8. That the liquidators be and are hereby authorized to sell or in any other way dispose of any immovable or movable assets of the Company, whether as going concerns, or otherwise, or whether separately or jointly with any other person or corporate entity, and on such terms and conditions as the liquidators in their sole discretion may decide on and particularly in their sole discretion, should they decide to sell or otherwise dispose of any such asset, jointly with any other person or corporate entity; on the method and quantum of division, of the total consideration, by public auction, tender or private treaty and on such terms and conditions as the liquidators in their sole discretion may deem fit and any other costs thereof which they, in their sole discretion may deem fit and any other costs thereof which they, in their sole discretion cannot pass over, to be costs of liquidation.

9. That the Liquidators be and is/are hereby authorized to sell any immovable property as per the instructions given by the secured creditor at any given time. This includes the proceeding to public auction by the auctioneers nominated by the secured creditor. In such an event the secured creditor will have the opportunity to assess the offer and decide to buy the property in or instruct the liquidator to further market the property and / or proceed with a second auction at a later stage,

10. That the liquidators, in the case of the sale of any immovable property by the estate, and where the liquidators contract that they as sellers shall be entitled to nominate the conveyancers to do the conveyancing of the property to be purchaser, shall be entitled to instruct attorneys, to effect such registration of transfer on condition that the purchaser pays all cost or transfer and that the seller estate has no liability for such costs of transfer or any part thereof,

11. That the liquidators are furthermore authorized in their sole discretion to abandon any asset for which they can find no purchaser, or which is not practical to sell, the costs of which are the costs of the liquidation.

12. That in the event of any asset which is subject of a mortgage bond, pledge or any other form of security not realizing sufficient to pay the claim of the secured creditors, plus the pro rata share of the costs of administration in full, that the liquidators be and are hereby authorized in their discretion to sell such asset to the creditor concerned at an agreed valuation, subject to the payment by such creditor of pro rata of the costs of administration in terms of Section 89 of the Insolvency Act, as amended.

13. That the said liquidators be and are hereby authorized and empowered in their sole discretion to compromise or admit any claim against the Company, whether liquidated or unliquidated arising from any guarantee, damages claim or any other cause whatsoever, as a liquidated claim in terms of Section 78 (3) of the Insolvency Act, as amended, at such amount as may be agreed upon by both the creditor concerned and the liquidators, and to accept payment of any claims, due to the Company by way of delivery or issue of shares and to appoint any directors to any subsidiary companies, as the liquidators may deem necessary and to sell any subsidiaries on such terms and conditions as they in their sole discretion, on behalf of the Company, deem fit. In view of the large number of MTI members and the fact that back-office data is available, the liquidators be and are herby authorized and empowered to use the following procedure for proof of claims against the estate, instead of any other method or in addition thereto as they may decide namely:

    a) Appoint a suitable data service provider with knowledge of insolvency claims to be provided with a copy the back-office database and to use that data for further analysis of what the claim of every MTI member should be, and which person received dispositions that may be set aside, with instructions to prepare for every MTI member a statement of transactions in a format that is easy to follow.

    b) The data service provider to compare all existing claims to the result of the said statement of transactions and to provide a report with recommendations of which claims may be admitted at which amounts.

    c) If the MTI member has already submitted a claim for an amount that agrees with the amount so recommended the liquidators may admit such claim at that amount.

    d) If the MTI member has already submitted a claim for an amount that does not agree with the amount recommended, the liquidators must advise the MTI member accordingly and provide a copy of the aforesaid statement of transactions and invite the member to provide further information and debate the correct amount of the claim according to such suitable procedure as may be determined by the liquidators on a case-by-case basis. Such advice should also be digital only without paper, to be produced by the data service provider in such format as directed by the liquidators.

    e) For those members that have not yet submitted claims, the liquidators must send to each such member a copy for the aforesaid statement of transactions and invite the member to indicate whether the member agrees with the statement and whether the member wishes his or her claim to be admitted against the estate.

    f) Such statements or claims will be kept in digital format only and need not be printed. They must however all be saved in an archive PDF format and retained as part of the records of the estate.

14. That the liquidators are authorized to take all such other steps and to do such other acts as they in their sole discretion on behalf of the Company, may deem fit, and at the cost of the Company.

15. That the Liquidators be and are hereby authorized to make application for the destruction of the books and records of the Company, six months after confirmation of the Final Account;

16. That any excess in premiums and stamp duty on Security Bonds or Asset Insurance, which is more than that provided for in Rule 31, laid down by the Master of the High Court, be and are hereby authorized as an administration expense of the estate.

17. That the actions of the liquidators in employing nightwatchmen/security guards to protect the premises and assets of the Company, be and are hereby approved and ratified, all costs relating thereto, to be the costs in the liquidation.

18. That the actions of the Liquidator in advertising, calling for tenders for the purchase of the business and/or assets of the Company, be and are hereby approved and ratified, all costs so incurred to be costs in the liquidation.

19. That the actions of the provisional liquidators and/or liquidators in having disposed of assets, shares and loan accounts, prior to the date of this meeting, be and are hereby approved and ratified, all costs incurred in relation thereto to be costs of the liquidation.

20. That the actions of the provisional liquidators and/or liquidators in continuing the business of the Company and retaining staff be and are hereby approved and ratified, all costs so incurred to be the costs of liquidation.

21. That the actions of the provisional liquidators and/or liquidators in employing salesmen and administration personnel and generally to protect the interests of creditors be and are hereby approved and ratified and the fees of such personnel to be costs in the liquidation.

22. That the liquidators be and are hereby authorized and empowered to continue such the business of the Company from the date of liquidation until such time as creditors instruct them to the contrary or until such time as the assets are realized and to do all things which they in their sole discretion may deem necessary for the successful continuation of the business (all costs incurred to be costs in the liquidation) and without restricting the generalities of their powers, he/they are hereby specifically authorized;

   22.1   To discharge and engage employees and to fix their remuneration;

   22.2   To continue the lease of the Company's premises until such time as it is decided to determine the lease.

   22.3   The employ persons to undertake the physical count and valuation of stock in trade at the beginning and end of any trading period subsequent to the date of liquidation of the Company.

   22.4   To employ persons to prepare an inventory or inventories of all movable assets of the Company.

   22.5   Generally, to do all things which they in their discretion may deem necessary to determine the lease.

23. That the liquidators and/or liquidators are hereby indemnified against any losses and/or claims for damages resulting from the continuation of the Company's business, all such losses and damages to be costs in the liquidation.

24. That the liquidator/s are hereby authorized to submit for determination and/or arbitration any dispute concerning the estate or any claim or demand by or upon the estate and that any costs so incurred to be costs of administration and paid for by the estate.

25. That the further administration of the affairs of the Company be left entirely in the hands and at the discretion of the liquidators.

26. That the liquidators are hereby authorized to appoint a representative on behalf of creditors to attend creditors meetings and tender the cost.

27. It is resolved that the Liquidators "out of pocket" expenses be regarded as items of expenditure and may be charged as administration costs that would include: –

The costs of agents to obtain: –

27.1    ITC searches and documents

27.2    Credit Inform searches

27.3    Cipro searches

27.4    Deeds Office searches

27.5    Natis document searches

28. The costs of the use of couriers for the delivering and acceptance of any document or parcel on behalf estate when the local postal service is not used;

29. Travelling expenses which include time, fuel, kilometers, toll fees, airfares and accommodation.

30. Interest be charged on all funds and monies advanced by any person or company at prime rate till payment thereof.

The liquidator's Resolutions for adoption by creditors were presented and approved of.

_____
ADOPTED ON BEHALF OF CREDITORS:

For liquidators,
present at 2nd meeting,
not voting
P.O. Sintunger

_____
ADOPTED ON BEHALF OF MEMBERS:

_____
PRESIDING OFFICER:

MASTER OF THE WESTERN CAPE HIGH COURT
CAPE TOWN
2022 -02- 0 4
IN INSOLVENT ESTATES
MEESTER VAN DIE WES KAAP HOE HOF

51

29-12-2020

IN THE HIGH COURT OF SOUTH AFRICA
(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO: 19201/2020

BEFORE THE HONOURABLE MR JUSTICE ROGERS
AT CAPE TOWN: ON TUESDAY, 29 DECEMBER 2020

In the matter between:

ANTON FRED MELCHIOR LEE                                    Applicant

and

MIRROR TRADING INTERNATIONAL (PTY) LIMITED          First Respondent
T/A MTI
(REGISTRATION NUMBER: 2019/205570/07)
Registered office at: 43 Plein Street
                      Unit 1
                      First Floor
                      Stellenbosch
                      Western Cape

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)            Second Respondent
                      Private Bag X9t520, Cape Town 8000

                      2020 -12- 2 8
                      DRAFT ORDER
                      WCD-010

Having read the documents filed of record and having heard Counsel for the
Applicant, it is hereby ordered that:

1. The First Respondent is hereby placed under provisional liquidation in the hands of the Master of the High Court, Cape Town.

2. A rule nisi is hereby issued calling upon all persons interested to show cause, if any, on Monday, 1 March 2024 at 10h00, or as soon thereafter as the application may be heard, why a final order should not be granted in the following terms:

   2.1 That the First Respondent be placed under Final Liquidation; and

   2.2 That the costs of this application shall be costs in the Liquidation.

3. A copy of this provisional order is to be served as follows:

   3.1 On the Respondent at its principal place of business at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape;

   3.2 On the employees of the First Respondent, if any, at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape; and at 341 Beyers Naude Drive, Randburg, Gauteng.

   3.3 By one publication in each of the Sunday Times and Rapport newspapers respectively; and

   3.4 On the South African Revenue Service, Cape Town at 22 Hans Strijdom Avenue, Cape Town.

2

55

4.   The Registrar of this Honourable Court shall transmit a copy of this provisional order to the Sheriff of the province in which the registered office of the First Respondent is situated and to the Sheriff of every province in which it appears the First Respondent owns businesses.

5.   The Sheriff of this Honourable Court shall attach all property that appears to belong to the First Respondent and transmit to the Master an inventory of all property attached by him or her in terms of section 19 of the Insolvency Act 24 of 1936.

BY ORDER OF THE COURT

2020 -12- 2 0

(COURT REGISTRAR

VEZI & DEBEER INC: YASIN ALLI (REF: YALLI) Yasin@vezidebeer.co.za
3RD FLOOR, EQUITY HOUSE, 107 ST GEORGES MALL, CAPE TOWN, TEL:  (012) 361 2746
HC BOX: 763

3

Final Liquidation

IN THE HIGH COURT OF SOUTH AFRICA
WESTERN CAPE DIVISION, CAPE TOWN

Case No: 19201/2020

BEFORE THE HONOURABLE ACTING JUSTICE DE WET
CAPE TOWN: WEDNESDAY, 30 JUNE 2021

In the matter between:

ANTON FRED MELCHIOR LEE                                     Applicant

and

MIRROR TRADING INTERNATIONAL (PTY) LTD t/a MTI      First Respondent
(Registration Number: 2019/205570/07)
Registered Office at      43 Plein Street, Unit 1
                          1st Floor, Stellenbosch
                          Western Cape

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)      Second Respondent
CLYNTON HUGH MARKS                              Third Respondent

and

ADRIAAN WILLEM VAN ROOYEN N.O.        First Proposed Intervening Party
HERMAN BESTER N.O.                    Second Proposed Intervening Party
CHRISTOPHER JAMES ROOS N.O.           Third Proposed Intervening Party
JACOLIEN FRIEDA BARNARD N.O.          Fourth Proposed Intervening Party
DEIDRE BASSON N.O.                    Fifth Proposed Intervening Party

ORDER





1022

2

Having heard Counsel for Applicant, First and Third Respondents as well as First to Fifth Proposed Intervening Parties;

IT IS ORDERED THAT:

1. The application for the reconsideration of the provisional order in terms of Rule 6(12)(c) is dismissed;

2. The *rule nisi* granted on 29 December 2020, is made absolute and First Respondent is placed under Final Liquidation;

3. The costs of this application, are costs in the administration of First Respondent;

4. The costs occasioned by the intervention of Third Respondent, as taxed on an attorney and client scale, be paid by Third Respondent;

5. The application for intervention by First to Fifth Proposed Intervening Parties as well as their counter application is postponed in terms of an order issued separately from this order for sake of convenience.

BY ORDER OF THE COURT

2021 -06- 3 0

COURT REGISTRAR

763  Coombe Commercial
     c/o Vezi & De Beer Inc
     CAPE TOWN





**Financial Sector
Conduct Authority**

**FSCA Press Release**                                    **18 August 2020**

**Mirror Trading International**

The FSCA is investigating the activities of Mirror Trading International. The FSCA is of the view that the current business model of Mirror Trading International requires it to be in possession of a financial service provider licence. MTI has informed us that they accept clients' funds in the form of Bitcoin, pool the funds into one trading account on a forex derivative trading platform, and conduct high frequency trading through the utilisation of a Bot. If this is being done as described, then this amounts to financial services, hence the licence requirement.

However, the FSCA has a much greater concern about the activities of the company. MTI claims to have more than R2.9 billion (at current conversion rates) in clients' funds in trading accounts, but we have not been able to conclusively confirm that the funds exist.

Moreover, the returns on the investments claimed by MTI seem far-fetched and unrealistic. According to MTI its Bot-trading is able to generate consistent profits of an average of 10% per month. The FSCA warns the public that MTI is not licensed to conduct the proclaimed business that they are conducting and that they are aware of the need for a FSP licence. The FSCA also draws attention to the fact that FX Choice, the previous platform broker for MTI seems to have made public statements that gainsay the version of MTI in terms of trading volumes and Bot trading. FX Choice has blocked the account of MTI due to compliance concerns. We are in the process of obtaining confirmation from FX Choice of the correctness of the statements attributed to them.

Transitional Management Committee:
DP Tshidi (Commissioner)    CD de Silva    JA Boyd    MM du Toit    LP Kekana    K Gibson    OB Mokhubela    P Mogase

The investigation is ongoing, and MTI has partially co-operated with the FSCA. We are reviewing the information as it becomes available and will involve the South African Police Service if the discrepancies are confirmed. MTI has undertaken to inform all of its clients of the investigation and to provide the opportunity to all its clients to withdraw their assets that are with MTI. We recommend that clients request refunds into their own accounts as soon as possible.

<div align="center">ENDS</div>

Enquiries:                    Brandon Topham
                              Email address: brandon.topham@fsca.co.za
                              Telephone: 012 367 7856

**Transitional Management Committee:**
DP Tshidi (Commissioner)    OD da Silva    JA Boyd    MM du Toit    LP Kekana    K Gibson    OB Makhubela    P Mogase



**Financial Sector
Conduct Authority**

P.O. Box 35655
Menlo Park
0102

Tel: +27 12 428 8000
Toll free: 0800 20 3722
Fax: +27 12 346 6941
Email: info@fsca.co.za
Website: www.fsca.co.za

**FSCA Press Release**                                    28 October 2020

### FSCA conducts search operations at premises of Mirror Trading International

On 26 October 2020, the Financial Conduct Authority (FSCA) executed three search and seizure warrants, which were issued by three separate high courts in Limpopo, Kwazulu-Natal and Western Cape, on application by the FSCA, at the home of the Chief Executive Officer of Mirror Trading International (MTI), Mr. Johan Steynberg, the home of the Marketing Director of MTI, Mrs. Cheri Marks, and the MTI offices in Stellenbosch.

The FSCA does not conduct criminal investigations. Our investigations are carried out in terms of the Financial Sector Regulations Act, 9 of 2017, which is aimed at protecting the South African investing public and to ensure a secure financial sector. Investigations may lead to referrals of evidence to other authorities or to the South African Police Service (SAPS).

Following the execution of the warrants against MTI, the next step is for the FSCA investigators to examine the evidence and compare it with other information obtained. On conclusion of the investigation, the FSCA will make decisions which may include taking regulatory or administrative action where necessary, and or referring the evidence obtained to other bodies.

The regulator strongly refutes allegations that the FSCA lied to the Courts. While demonstrations have been made by MTI to FSCA investigators, with the view to convince them that live trading was taking place and that bitcoin balances existed, the FSCA has not been able to independently confirm the accuracy of the demonstrations. The FSCA has also received contradictory information about these trades. Obtaining independent evidence to support certain statements made to the investigators (including existence of the trading and balance of investor funds), is part of the reason why applications were made to the Courts to allow the investigators to gather further evidence.

MTI previously indicated that they were trading in foreign exchange, and that they now trade in Crypto assets. The information at the disposal of the investigation team indicates that both these trading operations were and are implemented by means of derivative financial instruments. The FSCA has jurisdiction over all derivative instruments regardless of what asset or commodity forms the basis for the trades. The Authority therefore, rejects the statement that it does not have jurisdiction to investigate the matter.

---

**Transitional Management Committee:**

DP Tshidi (Commissioner)    CD da Silva    JA Boyd    MM du Toit    LP Kekana    K Gibson    OB Makhubela    P Mogase

The FSCA's investigation will continue without fear, favour or prejudice and the regulator and its investigators are not threatened or deterred by unfounded defamatory remarks. Our earlier warning to the public to exercise extreme caution when "investing" with any person or organisation not registered as a Financial Service Provider or in terms of a properly executed Prospectus registered with the CIPC or registered as a financial institution with the Prudential Authority, remains in place.

<center>ENDS</center>

Enquiries:

Financial Sector Conduct Authority

Email address: FSCACommunications@fsca.co.za

Telephone: 0800 203 722



Financial Sector
Conduct Authority

FSCA Press Release                                    17 December 2020

**The FSCA's investigation on Mirror Trading International nears completion**

The Financial Sector Conduct Authority (FSCA) has previously warned the public against trading with MTI (Mirror Trading International (Pty) Limited) and makes this information available, because it believes it is in the public interest to warn financial customers and to protect the public.

The FSCA now reports that its investigation into this entity is near completion as MTI is not licensed to conduct financial services and has not applied for such a licence. The Authority believes that MTI and its senior management are conducting an illegal operation, misleading clients and have contravened several laws.

Mr Cornelius Johannes Steynberg, CEO of MTI has actively assisted in the operations by Mr Clynton Hugh Marks and Mrs Cheri Marks ("Marks").

**The evidence and statements of MTI, Steynberg and Marks**

MTI first started trading in April 2019. Members of the public were invited to register on the MTI website (www.mirrortradinginternational.co.za and www.mymticlub.com) and move their Bitcoin from their Bitcoin wallet to MTI Bitcoin wallets. Steynberg was in full control of these MTI Bitcoin wallets. From the MTI Bitcoin wallet, the Bitcoin were transferred to MTI's forex platform "broker of choice" by the name of FXChoice Ltd ("FXChoice").

Steynberg testified under oath, that from April 2019 to July 2019, member trading accounts were linked to a professional trader appointed by MTI through a multi account manager arrangement linked to Meta Trader 4. Trading was conducted in derivative instruments based on forex pairs.



41

However, according to Steynberg MTI experienced substantial losses (of up to 80%), and as a result, MTI requested its members to delink their respective FXChoice accounts from the multi account manager account and move their bitcoin to a pooled account.

As a result, from August 2019 Steynberg claimed that MTI employed a bot (high frequency artificial intelligence trading) together with a head trader and trading team to make all its trading decisions, with great success. The Authority found evidence contradicting this assertion.

During October 2020, after the FSCA informed MTI that it was an conducting illegal unregistered financial services business, MTI claimed that it changed its trading activities to trade in derivative instruments based on crypto currency (Bitcoin), so that it no longer fell within the jurisdiction of the FSCA, and that it no longer required an FSP licence (financial services provider licence). This is also incorrect as the submissions received from Steynberg revealed that the crypto was alleged to be traded in the form of a derivative product, which would have required registration with the FSCA as well. We have found no evidence that any crypto trading is being conducted as communicated with members of MTI.

MTI, Steynberg, and Cheri Marks claim that the trading activities of MTI were from FXChoice to Trade300, transferring all the clients' crypto assets from FXChoice to Trade300.

According to Steynberg, Trade300 is another on-line trading platform. At Trade300 MTI experienced the same extraordinary profits utilising the bot – but at this stage trading in crypto derivatives.

Steynberg stated under oath and repeatedly in the press that the bot trading averaged a return of 10% per month, and that MTI has never had a negative profit trading day, but for one exception. Marks also repeatedly confirmed the trading successes on social media.

42

**The evidence uncovered by the investigation**

The FSCA obtained evidence from FXChoice, a Belize registered on-line trading platform, that is in complete contradiction with the claims of Steynberg and Merks. According to FXChoice they received queries from clients of MTI and in the process the clients provided FXChoice with trading statements. The source of the trading statements was MTI. These trading statements were based on demo trading accounts and not actual trades. As a result, FXChoice froze the balance of the crypto assets linked to MTI on the FXChoice platform.

However, the total frozen crypto assets on FXChoice is a negligible amount, taking into account the total assets that MTI claimed it invested on behalf of its clients. FXChoice confirmed that MTI put in 1846.72 Bitcoin from 29 January 2020 until 3 June 2020 and made a loss of 566.68 Bitcoin, an approximate capital loss of 30%.

The FSCA attempted to track down Trade300 to obtain a statement and trading details from it, to verify the version of MTI. MTI did not provide any useful details that assisted the FSCA.

The FSCA followed all possible links on the internet to establish whether Trade300 existed. It could only find one reference to Trade300; i.e. the website of Trade300. However, the website was and still is "under maintenance", and the only reference linked to the website is the name of "Joe Steyn", a known alias of Steynberg.

The FSCA obtained search and seizure warrants and executed them at the homes of Steynberg and Marks, and the offices of MTI. On the desktop computer of Steynberg the investigation team found evidence relating to Trade300. It would therefore appear that Trade 300 is linked to Steynberg.

As a further effort to verify the evidence of MTI, Steynberg and Marks, the FSCA requested information from MTI about the transfer of clients' assets from FXChoice to Trade300. MTI, in support of its assertion purported to provide proof of the transfer in the form of Bitcoin wallets, stating that MTI transferred 16 444 Bitcoin from FXChoice to Trade300 in 4 instalments on 21 July 2020; 22 July 2020 and 24 July 2020 respectively.

43

The FSCA found that no withdrawal of bitcoin by MTI from FXChoice occurred in July 2020. The last withdrawal of bitcoin by MTI from FXChoice was conducted in August 2019. Further, FX Choice confirmed that none of the eight sending wallets are related to FX Choice and that FX Choice had neither received deposits from nor sent any payments to any of the eight bitcoin wallets.

The transfers were made from wallets with transaction activities which bear no resemblance to the purported activities of MTI.

We have found no evidence of any significant store of Crypto assets on any trading platform and that most crypto balances appear in the name and under control of Steynberg. The amount of such balances is well below the advertised balance on the MTI trading platform as being due to investors of MTI.

In the last few days, we received complaints that investors were unable to redeem their investments.

The investigation is on-going, and a criminal case has been opened by the FSCA with the South African Police Services.

**ENDS**

Enquiries:        Financial Sector Conduct Authority

Email address: fscacommunications@fsca.co.za

Telephone: 0800 203 722

Transitional Management Committee:
OB Makhubela (Commissioner)    DP Tshidi    JA Boyd    MM du Toit    LP Kekana    K Gibson





TRAVIS J. ILEY
DEPUTIES COMMISSIONER

CLINTON EDGAR
DEPUTY SECURITIES COMMISSIONER

MAIL P.O. BOX 13167
AUSTIN, TEXAS 78711-3167

Phone (512) 305-8300
Facsimile (512) 305-8310

**Texas State Securities Board**

200 E. 10th Street, 5th Floor
Austin, Texas 78701-2407
www.ssb.texas.gov

E. WALLY KINNEY
MEMBER

MIGUEL ROMANO, JR.
MEMBER

ROBERT BELFOR
MEMBER

ROBERT REEL
MEMBER

MELISSA TYROCH
SECRETARY

IN THE MATTER OF
MIRROR TRADING INTERNATIONAL PTY LTD;
CORNELIUS JOHANNES "JOHANN" STEYNBERG;
FOREXANDBITCOIN.COM; MICHAEL AARON
CULLISON; STEVE HEROSE AND BRIAN D. KNOTT

Order No. ENF-20-CDO-1911

**Mirror Trading International PTY LTD**
Service by certified mail, return receipt requested, addressed to (1) 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600; and (2) P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

**Cornelius Johannes "Johann" Steynberg**
Service by certified mail, return receipt requested, addressed to (1) 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600; and (2) P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

**Forexandbitcoin.com**
Service by certified mail, return receipt requested, addressed to (1) 9550 South Maryland, Parkway, Suite A5, #446, Las Vegas, Nevada 89123; (2) 122 Coney Island Avenue, Las Vegas, Nevada 89123; (3) 1650 Autumn Gold Avenue, Last Vegas, Nevada 89123; (4) 3480 Moon Dance Cellars Court, Las Vegas, Nevada 89126; (5) 10352 Gwynne Falls South, Las Vegas, Nevada 89123; and (6) 1371 Pedro Street, San Jose, California 35126.

**Michael Aaron Cullison**
Service by certified mail, return receipt requested, addressed to (1) 9550 South Maryland, Parkway, Suite A5, #446, Las Vegas, Nevada 89123; (2) 122 Coney Island Avenue, Las Vegas, Nevada 89123; (3) 1650 Autumn Gold Avenue, Last Vegas, Nevada 89123; (4) 3480 Moon Dance Cellars Court, Las Vegas, Nevada 89126; (5) 10352 Gwynne Falls South, Las Vegas, Nevada 89123; and (6) 1371 Pedro Street, San Jose, California 55126.

**Steve Herosy**
Service by certified mail, return receipt requested, addressed to (1) 2218 West Olive Avenue, #322, Burbank, California 91506; and (2) 102 Kenneth Road, Glendale, California 91201.

Brian D. Knott
Service by certified mail, return receipt requested, addressed to (1) 10405 Long-Leaf
Place, Las Vegas, Nevada 89134; and (2) and 2209 Latitudes Court, Las Vegas, Nevada
89135.

## EMERGENCY CEASE AND DESIST ORDER

This is your OFFICIAL NOTICE of the issuance by the Securities Commissioner
of the State of Texas (the "Securities Commissioner") of an EMERGENCY CEASE AND
DESIST ORDER pursuant to Section 23-2 of The Securities Act, Tex. Rev. Civ. Stat. Ann.
arts. 581-1-581-45 (the "Securities Act").

The Enforcement Division of the Texas State Securities Board (the "Enforcement
Division") has presented evidence sufficient for the Securities Commissioner to find

## FINDINGS OF FACT

1.  Mirror Trading International PTY LTD ("Respondent Mirror Trading") can be
    served at 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South
    Africa 7600, and P.O. Box 7140, Droeity Centre, Stellenbosch, Western Cape,
    South Africa 7599.

2.  Cornelius Johannes "Johann" Steynberg ("Respondent Steynberg") is the
    Founder, Director, and Chief Executive Officer of Respondent Mirror Trading. He
    can be served at 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western
    Cape, South Africa 7600, and P.O. Box 7140, Droeity Centre, Stellenbosch,
    Western Cape, South Africa 7599.

3.  ForexAndBitcoin.com ("Respondent ForexAndBitcoin") is a multilevel marketer
    for Respondent Mirror Trading.  It can be served at 9550 South Maryland,
    Parkway, Suite A5, #443, Las Vegas, Nevada 89183; 422 Coney Island Avenue,
    Las Vegas, Nevada 89123; 1950 Autumn Gold Avenue, Last Vegas, Nevada
    89123; 6423 Moon Dance Cellars Court, Las Vegas, Nevada 89130; 10352
    Gwynne Falls South, Las Vegas, Nevada 89123; and 1371 Pedro Street, San
    Jose, California 95125.

4.  Michael Aaron Cullison ("Respondent Cullison") is the owner of Respondent
    ForexAndBitcoin and a multilevel marketer for Respondent Mirror Trading. He can
    be served at 9550 South Maryland, Parkway, Suite A5, #443, Las Vegas, Nevada
    89183; 422 Coney Island Avenue, Las Vegas, Nevada 89123; 1950 Autumn Gold
    Avenue, Last Vegas, Nevada 89123; 6423 Moon Dance Cellars Court, Las Vegas,
    Nevada 89130; 10352 Gwynne Falls South, Las Vegas, Nevada 89123; and 1371
    Pedro Street, San Jose, California 95125.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 2






41

5.  Steve Herzog ("Respondent Herzog") is a multilevel marketer for Respondent Mirror Trading. He can be served at 221D West Olive Avenue, #322, Burbank, California 91505, and 182 Kenneth Road, Glendale, California 91201.

6.  Brian D. Knott ("Respondent Knott") is a multilevel marketer for Respondent Mirror Trading. He can be served at 10408 Long Leaf Place, Las Vegas, Nevada 89134, and 2208 Latitude Court, Las Vegas, Nevada 89103.

### RESPONDENT MIRROR TRADING IS RECRUITING MULTILEVEL MARKETERS TO PERPETRATE AN INTERNATIONAL CRYPTOCURRENCY AND FOREX INVESTMENT SCHEME

7.  Respondent Mirror Trading purports to operate as a private company in The Western Cape, a province of South Africa located off the south-western coast of the country.

8.  Respondent Mirror Trading is perpetrating an international multilevel marketing scheme tied to investments in a cryptocurrency and forex trading pool.

9.  Respondent Mirror Trading is promising to pay lucrative commissions to multilevel marketers for promoting its investments and recruiting other multilevel marketers.

10.  Respondent Mirror Trading is touting the success of its multilevel marketers in recruiting new members. It claims to have recruited almost 78,000 members from more than 170 countries, including more than 22,500 members since March 1, 2020.

11.  Its multilevel marketers are now illegally soliciting Texans to purchase fraudulent investments in the cryptocurrency and forex trading pool.

### RESPONDENTS FOREXANDBITCOIN, CULLISON, KNOTT AND HERZOG ARE PUBLICLY SOLICITING TEXAS RESIDENTS

12.  Respondents ForexAndBitcoin, Cullison, Knott and Herzog are multilevel marketers for Respondent Mirror Trading.

13.  Respondents ForexAndBitcoin, Cullison, Knott and Herzog are advertising the investments in the cryptocurrency and forex trading pool through forums in craigslist.org for Texas residents.

14.  Respondents ForexAndBitcoin, Cullison, Knott and Herzog are touting the profitability of the investments in the cryptocurrency and forex trading pool variously claiming as follows:

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 3





47

A.    Investors deposit as little as $105 and make an average of 10% per month;

B.    Investors simply need to "[j]ust sit back and watch [their] MONEY grow;"

C.    The investments pay "daily trade income," the daily trade income is "automatically compounded" and "compound interest is the 8th Wonder of the World;"

D.    The investment "grows your bitcoin compounding daily earning an average of 10% per month;"

E.    The investments have more than 200+ days straight with positive gains; and

F.    The investments close 600 to 800 trades each day and have not lost a trade in almost a year.

15.    In addition to touting the profitability of the investments in the cryptocurrency and forex trading pool, Respondent Herzog is targeting Texans impacted by changes to the economy, in part by encouraging them to put their governmental assistance "stimulus/covid check to work" by purchasing the investments.

16.    In addition to touting the profitability of the investments, Respondents ForexAndBitcoin, Cullison, Knott and Herzog are also touting the profitability of the multilevel marketing program.

### THE QUALIFICATIONS AND PRIOR FINANCIAL EXPERIENCE OF THE MULTILEVEL MARKETERS PROMOTING THE PRODUCT IN TEXAS

17.    Although Respondents ForexAndBitcoin, Cullison, Knott and Herzog are touting the profitability of both the investments in the bitcoin and forex trading pool and the multilevel marketing program, they are not providing investors with information relating to their qualifications and their prior financial experience, including the following information:

A.    Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about June 17, 1997, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, California Northern Bankruptcy Court, Case No. 89-54197;

B.    Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about August 28, 2008, Respondent Cullison filed a

Emergency Cease and Desist Order/Intertrac Trading International PTY LTD et al/Page 4




Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy
Court, District of Nevada, Case No. 05-12244-bam;

C.    Respondents FormAndBitcoin and Cullison are not telling potential
investors that on or about September 23, 2011, Respondent Cullison,
formerly doing business as Empower, Nutrition Inc., LLC, and doing
business as Fusion Nutrition Inc., filed a Voluntary Petition for Chapter 7
Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case
No. 16-10113-leb;

D.    Respondents FormAndBitcoin and Cullison are not telling potential
investors that on or about August 4, 2016, Respondent Cullison filed a
Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy
Court, District of Nevada, Case No. 05-12244-bam;

E.    Respondent Knott is not telling potential investors that on or about June
16, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the
United States Bankruptcy Court, District of Nevada, Case No. 10-21128-
bam;

F.    Respondent Knott is not telling potential investors that on or about August
9, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United
States Bankruptcy Court, District of Nevada, Case No. 19-18134-abl; and

G.    Respondent Herceg is not telling potential investors that on or about
October 4, 2017, he filed a Voluntary Petition for Chapter 7 Bankruptcy in
the United States Bankruptcy Court for the Central District of California,
Case No. 2:17-bk-22208-BR.

**RESPONDENT MIRROR TRADING MAINTAINS INTERNET
WEBSITES THAT SERVE AS PLATFORMS FOR PURCHASING
THE INVESTMENTS IN THE CRYPTOCURRENCY AND FOREX POOL**

18.   Respondent     Mirror     Trading     maintains     internet     websites     at
www.mirrortradinginternational.com (the "MTI Website") and www.mymticlub.com
(the "MTI Club Website").

19.   The MTI Website and the MTI Club Website advertise the investments in the
cryptocurrency and forex trading pool.

20.   The MTI Club Website serves as a platform for purchasing the investments in the
cryptocurrency and forex trading pool.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 6




49

## THE INVESTMENTS IN THE
## CRYPTOCURRENCY AND FOREX TRADING POOL

21.  Respondent Mirror Trading is having investments in a cryptocurrency and forex trading pool whereby it purports to pool cryptocurrencies and somehow use the cryptocurrencies to trade forex for a profit.

22.  Respondent Mirror Trading is describing the investments in the cryptocurrency and forex trading pool in greater detail as follows:

A.  Potential investors purchase the investments in the cryptocurrency and forex trading pool by registering as members through the MTI Club Website and funding their accounts with bitcoin;

B.  Respondent Mirror Trading then pools the deposit and invests the bitcoin in a "trading pool" with various "registered and regulated" forex brokers;

C.  Respondent Mirror Trading employs advanced "digital software" and "artificial intelligence" to trade the bitcoin on the forex markets through the brokers' platforms;

D.  The forex trading generates income, and Respondent Mirror Trading retains a portion of the income to cover costs and pay salaries and commissions; and

E.  Respondent Mirror Trading also uses income generated through forex trading to pay returns to investors equal to their pro rata share of the percent of daily trading profits.

23.  Respondent Mirror Trading is publishing historical information that purports to show it has earned considerable returns for investors. For example, it claims the average daily profit for investors was 0.5384 percent from September 2019 through April 2020, and it claims investors received compounded returns of 141.79 percent during this eight-month period of time.

24.  Respondent Mirror Trading is also publishing current information that purports to reflect it continues to provide lucrative income for investors. For example, it is representing as follows:

A.  On June 25, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.1884 percent;

B.    On June 25, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.2598 percent;

C.    On June 24, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.6218 percent;

D.    On June 23, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.5384 percent; and

E.    On June 22, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.1198 percent.

25.    Respondent Mirror Trading is also projecting future returns will continue to generate profits of around 10 percent per month, it projecting these future returns as follows:

A.    An investment of 1 bitcoin, valued at around $9,168.64 at the time of investment, will generate an ending balance of around 3.73112534 bitcoin worth around $34,209.02 at the end of a 12 month term, assuming the price of bitcoin remains constant through the term.

B.    An investment of 1 bitcoin, valued at around $9,138.74 at the time of investment, will generate an ending balance of around 723.10028452 bitcoin worth around $6,609,973.07 at the end of a 60 month term, assuming the price of bitcoin remains constant through the term.

26.    Respondent Mirror Trading also claims the projection of future returns of around 10 percent per month constitutes a "conservative quota" and "in reality the profits may be higher."

## THE MULTI-LEVEL MARKETING SCHEME

27.    Respondent Mirror Trading is recruiting members to participate in a multilevel marketing scheme.

28.    Respondent Mirror Trading is providing multilevel marketers with tools for recruiting new investors. In addition to providing access to information published in a Telegram group and YouTube channel, Respondent Mirror Trading is providing its multilevel marketers with referral links that can be embedded in websites or sent via electronic mail or text message.

29.    Respondent Mirror Trading is promising to pay four streams of commissions to multilevel marketers.

30.    Respondent Mirror Trading refers to the four streams of commissions as direct once-off referral bonuses, weekly profit-sharing bonuses, P1 leadership bonuses and P2 leadership bonuses. It describes them as follows:

    A.    The direct once-off referral bonuses generally refer to the payment of commissions equal to 10 percent of the principal deposited by recruited investors.

    B.    The weekly profit-sharing bonuses are predicated on recruiting new investors. An agent generally qualifies for weekly profit-sharing bonuses when he or she recruits at least two new members. He or she may then share in a pool of 20 percent of the weekly gross profits derived from trading, with the maximum payout capped at $75,000.

    C.    The P1 leadership bonus is predicated on recruiting new investors and earning shares in a pool. An agent generally earns shares in this pool when he or she refers at least two members with accounts valued at least at $200. Respondent Mirror Trading pays P1 leadership bonuses to the agent based, at least in part, on the number of shares earned by the agent.

    D.    The P2 leadership bonus is also predicated on recruiting new investors and earning shares in a pool. An agent generally earns shares in this pool when he or she refers at least two members with accounts valued at least at $200 and at least one such member refers at least two members with accounts valued at least at $200. Respondent Mirror Trading pays P2 leadership bonuses to the agent based, at least in part, on the number of shares earned by the agent.

31.    Respondent Mirror Trading also purports to prohibit illegal activity among membership, requires all members to adhere to all laws and accepted business practices within the countries they transact business and prohibits members from engaging in fraudulent commercial practices.

## THE DISCLAIMERS

32.    Respondent Mirror Trading is disclaiming any and all liability associated with its sale of investments in the cryptocurrency and forex trading pool. It also requires investors to agree to the following provisions:

    A.    Investors must agree "[n]either MTI nor its business partners is responsible for any loss or damage of whatever nature" and

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 8

B.      Investors must agree "MT will not and cannot be held liable for any losses
        of whatsoever nature due to unfulfilled promises to prospective members or
        third parties by any other existing members."

## REGISTRATION VIOLATIONS

33.     Respondents Mirror Trading, ForexAndBitcoin, Steynberg, Cutfson, Knott and
        Honey (collectively the "Respondents") have not been registered with the
        Securities Commissioner as dealers or agents at any time material hereto.

34.     The investments in the cryptocurrency and forex trading pool have not been
        registered by qualification, notification or coordination and no permit has been
        granted for their sale in Texas at any time material hereto.

## FRAUD AND THE CONCEALMENT OF MATERIAL BUSINESS INFORMATION

35.     In connection with the offer of investments in the cryptocurrency and forex trading
        pool, Respondents Mirror Trading and Steynberg are intentionally failing to
        disclose Respondent Steynberg's business repute, qualifications and experience,
        and this information constitutes a material fact.

## FRAUD AND THE DIGITAL SOFTWARE AND ARTIFICIAL INTELLIGENCE

36.     In connection with the offer of investments in the cryptocurrency and forex trading
        pool, Respondents Mirror Trading and Steynberg are intentionally failing to
        disclose material facts relating to the administration of the "digital software" and
        "artificial intelligence" used to trade forex, including the following material facts:

A.      The identity of the programmers and developers of the "digital software" and
        "artificial intelligence," including the identity of the party that coded the
        software, as well as its business repute, qualifications and experience;

B.      The identity of the servicers of the "digital software" and "artificial
        intelligence," including the identity of the party responsible for maintaining
        and updating the software, as well as its business repute, qualifications and
        experience;

C.      The costs associated with the "digital software" and "artificial intelligence,"
        including any ongoing costs for licensing the software, maintaining the
        software and updating the software; and

D.      The security of the "digital software" and "artificial intelligence," including the
        security of internet connections used to access the software, the use of

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 9

53

security systems to prevent or deter cyberattacks, and the use of encryption to prevent unauthorized access by third-parties.

37.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose material facts relating to the implementation of the "digital software" and "artificial intelligence" used to trade forex, including the following material facts:

A.    The strategy or strategies used to buy and sell forex for a profit;

B.    Information relating to defects, glitches, bugs or malfunctions, including information explaining these events may negatively impact the ability to trade forex for a profit; and

C.    The strategies or procedures for overcoming hardware and software failures, power outages or network disconnections.

## FRAUD AND THE "REGISTERED AND REGULATED" FOREX BROKERS

38.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts about the forex brokers:

A.    The identity of the forex brokers, as well as the address of their principal places of business and their business repute, qualifications and experience of the forex brokers;

B.    Any information that reflects or relates to their registration and regulation by a government agency; and

C.    Any information that reflects the scope of their authority to trade forex, their procedures for trading forex, or their role in receiving, maintaining and using cryptocurrencies.

## FRAUD AND THE SAFEGUARDING OF BITCOIN

39.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts relating to the safeguarding and protecting of bitcoin, including the following material facts:

A.    The types of wallet or software it uses to receive, access and transfer bitcoin, including information that reflects whether Respondent Mirror Trading is

using a custodial wallet that affords access to a custodian or other party with the authority of a non-custodial wallet that is not affiliated with a custodian or other party;

B.    The connectivity of the wallet or software it uses to receive, access and transfer bitcoin, including information that reflects whether Respondent Mirror Trading is using a "hot" wallet, such as a mobile or desktop wallet or a "cold" wallet that is typically not connected to the internet;

C.    The procedures or protocols for securing access to the wallet or software it uses to receive, access and transfer bitcoin, including its policies for safeguarding private keys, and any other means of authentication and access of the wallets or software;

D.    The security of the wallet or software it uses to receive, access and transfer bitcoin, including the security of internet connections used to access the wallet, the use of security systems to prevent or deter cyberattacks, and the use of encryption to prevent unauthorized access by third-parties; and

E.    The risk that attackers may use viruses, malware or other techniques to hack systems or otherwise gain access to bitcoin.

## FRAUD AND THE CONCEALMENT OF
## RISKS ASSOCIATED WITH TRADING FOREX

49.    In connection with the offer of the investment in the forex trading pool, Respondents are intentionally failing to disclose the following material facts relating to the risks associated with trading foreign currencies:

A.    Fluctuations in a country's interest rates may lead to fluctuations in its currency's value, thereby negatively impacting the ability to close a trade for a profit;

B.    Macroeconomic statistics, such as inflation, can have a significant impact on forex markets;

C.    Other capital markets, including stocks, bonds, and commodities markets have strong influences on exchange rates between foreign currencies;

D.    International trade numbers, such as trade deficits and surpluses, play a vital role in forex markets;

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 41





55

E.    Fluctuations in the foreign exchange rate between the time of placing a trade and the time of closing a trade may negatively impact the price of forex;

F.    Leveraging transactions on margin, once called, may lead to substantial losses in excess of initial investments; and

G.    Political news can be important for forex traders, and unexpected news can negatively impact forex trading.

## FRAUD AND THE CONCEALMENT OF THE RISKS ASSOCIATED WITH BITCOIN AND BITCOIN POOLS

41.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg intentionally failing to disclose the following material facts relating to the risks associated with bitcoin and bitcoin pools:

A.    Governments may adopt legislation or regulation that may negatively impact the use, transfer, exchange or price of bitcoin;

B.    A system or technical failure, or deficient source code, may negatively impact the ability to exchange cryptocurrencies for fiat currencies, as well as the price of cryptocurrencies;

C.    A hacking incident or malicious attack may negatively impact the price of cryptocurrencies;

D.    Bitcoin competes with other cryptocurrencies, and this competition may negatively impact the price of bitcoin; and

E.    Investors will need to monetize their bitcoin, and cryptocurrency exchanges or other parties may charge considerable fees when exchanging bitcoin for fiat currency.

## DECEPTION AND THE MULTILEVEL MARKETING PROGRAM

42.    As described herein, Respondent Mirror Trading is recruiting multilevel marketers to offer the investments in the bitcoin and forex trading pool and promising to pay four tiers of commissions for selling the product.

43.    As described herein, Respondent Mirror Trading also purports to prohibit illegal activity among membership, requires all members to adhere to all laws and

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 12

56

accepted business practices within the countries they transact business and
prohibits members from engaging in fraudulent commercial practices.

44.    These statements are materially misleading or otherwise likely to deceive the
public because:

    A.    Any party offering securities in Texas must generally be registered as a
dealer or agent with the Securities Commissioner; and

    B.    Parties may generally only offer securities in Texas when the securities are
registered or permitted for sale.

### DECEPTION AND THE DISCLAIMER OF LIABILITY

45.    As described herein, Respondent Mirror Trading is disclaiming any and all liability
associated with its sale of investments in the cryptocurrency and forex trading pool.
It also requires investors to agree to the following provisions:

    A.    Investors must agree "[n]either MTI nor the business partners is responsible
for any loss or damage of whatever nature;" and

    B.    Investors must agree "MTI will not and cannot be held liable for any losses
of whatsoever nature due to unfulfilled promises to prospective members or
third parties by any other existing members."

46.    These statements are materially misleading or otherwise likely to deceive the
public because:

    A.    The Securities Act provides Texans with important rights, including potential
civil causes of action against Respondent Mirror Trading; and

    B.    As a matter of law, Respondent Mirror Trading may not escape potential
liability by requiring members to disclaim these important rights.

### DECEIT AND OFFERS BY MULTI-LEVEL MARKETERS IN TEXAS

47.    As described herein, Respondents Forex-And-Bitcoin, Cullison, Knott and Harvey
are offering the investments in the cryptocurrency and forex trading pool to Texans,
variously representing as follows:

    A.    Investors deposit as little as $100 and make an average of 10% per month;

    B.    Investors simply need to "[j]ust sit back and watch [their] MONEY grow"

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 42

C. The investment pays "daily trade income," the daily trade income is "automatically compounded" and "compound interest is the 8th Wonder of the World;"

D. The investment "grows your bitcoin compounding daily earning an average of 10% per month;"

E. The investments have more than 200+ days straight with positive gains; and

F. The investment closes 600 to 800 trades each day and has not lost a trade in almost a year.

49. These statements are materially misleading or otherwise likely to deceive the public because they tout the profitability of investing in the cryptocurrency and forex trading pool but do not disclose the following information:

A. The business repute, qualifications or experience of Respondent Mirror Trading and Steynberg;

B. The information relating to the administration of the "digital software" and "artificial intelligence" used to trade forex described herein;

C. The information relating to the implementation of the "digital software" and "artificial intelligence" used to trade forex described herein;

D. The information about the forex brokers described herein;

E. The information relating to the safeguarding and protecting of bitcoin described herein;

F. The information about the forex brokers described herein;

G. The information relating to the risks associated with bitcoin and bitcoin pools described herein;

H. The information relating to the registration of multilevel marketers who offer Texans the investments in the cryptocurrency and forex trading pool described herein;

I. The information relating to the registration of cryptocurrency and forex trading pools offered or sold to Texans described herein; and

$\zeta 6$

    J.    The information relating to the disclaimer of liability as described herein.

49.    These statements are also materially misleading or otherwise likely to deceive the public because Respondents ForexAndBitcoin, Cullison, Knoll and Harcog are touting the safety and profitability of investing in the cryptocurrency and forex trading pool and participating in the multilevel marketing program, but they are not disclosing their qualifications and their prior financial experience, including the following information:

    A.    Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about June 17, 1998, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, California Northern Bankruptcy Court, Case No. 98-54107;

    B.    Respondents ForexAndBitcoin and Cullison are not telling potential investors on or about August 26, 2008, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 08-12244-ham;

    C.    Respondents ForexAndBitcoin and Cullison are not telling potential investors on or about September 23, 2011, Respondent Cullison filed a Voluntary Petition for Chapter 13 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 11-25078-lab;

    D.    Respondents ForexAndBitcoin and Cullison are not telling potential investors on or about September 4, 2015, Respondent Cullison, formerly doing business as Empower Nutrition Inc., LLC, and doing business as Fusion Nutrition Inc., filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 15-15113-leb;

    E.    Respondent Knoll is not telling potential investors that on or around June 15, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 10-21123-bam;

    F.    Respondent Knoll is not telling potential investors that on or about August 9, 2019, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 19-15134-abl; and

    G.    Respondent Harcog is not telling potential investors that on on about October 4, 2017, he filed a Voluntary Petition for Chapter 7 Bankruptcy in

4.    It is further ORDERED that Respondents immediately CEASE AND DESIST from offering securities in Texas through an offer containing a statement that is materially misleading or otherwise likely to deceive the public.

## NOTICE

Pursuant to Section 23-2 of the Securities Act, you may request a hearing before the 31st day after the date you were served with this Order. The request for a hearing must be in writing, directed to the Securities Commissioner, and state the grounds for the request to set aside or modify the Order. Failure to request a hearing will result in the Order becoming final and non-appealable.

You are advised under Section 29.D of the Securities Act that any knowing violation of an order issued by the Securities Commissioner under the authority of Section 23-2 of the Securities Act is a criminal offense punishable by a fine of not more than $10,000, or imprisonment in the penitentiary for two to ten years, or by both such fine and imprisonment.

SIGNED AND ENTERED by the Securities Commissioner this 7th day of July, 2020.

TRAVIS J. ILES
Securities Commissioner

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 17

**AUTORITÉ
DES MARCHÉS
FINANCIERS**

General public    Fraud prevention    Illegal on-line trading platforms
Warning list of websites and companies that solicit investors illegally

# Warning list of websites and companies that solicit investors illegally

**This list is not exhaustive**

It contains only the names of websites that we have received complaints about. Some fraudulent websites are not included in this list either because they have not yet been brought to our attention or their names have been modified. Stay informed!

## Complet list of the active platforms in Québec today

| NOM D'ENTREPRISE | AUTRE NOM D'AFFAIRE | SITE WEB |
|---|---|---|
| 1st Trade options | | www.1sttradeoptions.com |
| AAAFx | | www.aaafx.com |

 

| HQ Broker | Capazone Invest Ltd. | www.hqbroker.com |
|---|---|---|
| ICC Intercertus Capital Ltd, ICC Intercertus Capital (Cayman) Limited et Fiscus Capital Seychelles Limited | | everfx.com |
| iforex group | Formula Investments House Ltd | www.iforex.com |
| Impero Solutions Limited | | impero.solutions |
| International Capital Markets PTY Ltd | | ICMarkets.com |
| IQ Option | Best Binary Options Brokers | wwwbulkforex.com |
| Libertex International Company Limited | | libertex.org |
| Markets.com Global | Playtech PLC | www.markets.com |
| Mirror Trading International | | mymticlub.com |
| My Beverly Dreams LLC/ My Beverly Dreams Inc. | | beverlydream.net |



*magistrate's court.*

(8) *Any director or other officer of a company who is called upon to attend any meeting of creditors held after the second meeting or an adjourned second meeting, shall be entitled to an allowance out of the funds of the company to defray his necessary expenses in connection with such attendance.*

**416. Application of provisions of Insolvency Act, 1936.-**(1) The provisions of sections 66, 67 and 68 of the Insolvency Act, 1936 (Act No. 24 of 1936), shall, in so far as they can be applied and are not inconsistent with the provisions of this Act, *mutatis mutandis* apply in relation to-

(a)  any person who is in terms of section 414 (1) of this Act required to attend any meeting of a company being wound up and which is unable to pay its debts, as if such person were an insolvent required to attend any meeting referred to in section 64 of the Insolvency Act, 1936; and

(b)  any person subpoenaed in terms of section 414 (2) of this Act to attend any meeting of the creditors of such a company or to produce any book or document at any such meeting,

and the provisions of section 65 of the Insolvency Act, 1936, shall, in so far as they can be applied and are not inconsistent with the provisions of this Act, *mutatis mutandis* apply in relation to the production of any book or document or the interrogation of any person under section 415 of this Act, as if such person had been subpoenaed to produce any book or document or were being interrogated under the said section 65 of the Insolvency Act, 1936.

(2) In applying the said sections 66, 67 and 68 of the Insolvency Act, 1936, in terms of subsection (1) of this section, any reference in any of the said sections or in section 64 or 65 of that Act-

(a)  to the estate of an insolvent, shall be construed as a reference to the estate of the company concerned;

(b)  to the trustee of an insolvent estate, shall be construed as a reference to the liquidator of such company;

(c)  to a meeting of the creditors of an insolvent, shall be construed as a reference to a meeting of the creditors of such company;

(d)  to a creditor who has proved a claim against an insolvent estate, shall be construed as a reference to a person who has proved a claim against such company;

(e)  to the business or affairs or property of an insolvent, shall be construed as a reference to the business or affairs or property of such company;

(f)  to any person indebted to an insolvent estate, shall be construed as a reference to a person indebted to such company;

(g)  to the sequestration of an insolvent estate, shall be construed as a reference to the commencement of the winding-up of such company.

*Examination of Persons in Winding-up*

**417. Summoning and examination of persons as to affairs of company.-**(1) In any winding-up of a company unable to pay its debts, the Master or the Court may, at any time after a winding-up order has been made, summon before him or it any director or officer of the company or person known or suspected to have in his possession any property of the company or believed to be indebted to the company, or any person whom the Master or the Court deems capable of giving information concerning the trade, dealings, affairs or property of the company.
*[Sub-s. (1) substituted by s. 9 (a) of Act No. 29 of 1985.]*

Wording of Sections

(1A) Any person summoned under subsection (1) may be represented at his attendance before the Master or the Court by an attorney with or without counsel.
*[Sub-s. (1A) inserted by s. 9 (b) of Act No. 29 of 1985.]*

(2) (a) The Master or the Court may examine any person summoned under subsection (1) on oath or affirmation concerning any matter referred to in that subsection, either orally or on written interrogatories, and may reduce his answers to writing and require him to sign them.
*[Para. (a) substituted by s. 9 (c) of Act No. 29 of 1985.]*

Wording of Sections

(b) Any such person may be required to answer any question put to him or her at the examination, notwithstanding that the answer might tend to incriminate him or her and shall, if he or she does so refuse on that ground, be obliged to so answer at the instance of the Master or the Court: Provided that the Master or the Court

may only oblige the person in question to so answer after the Master or the Court has consulted with the Director of Public Prosecutions who has jurisdiction.

[Para. (b) substituted by s. 11 (a) of Act No. 55 of 2002.]

### Wording of Sections

(c) An incriminating answer or information directly obtained, or incriminating evidence directly derived from, an examination in terms of this section shall not be admissible as evidence in criminal proceedings in a court of law against the person concerned or the body corporate of which he or she is or was an officer, except in criminal proceedings where the person concerned is charged with an offence relating to-

(i)  the administering or taking of an oath or the administering or making of an affirmation;

(ii)  the giving of false evidence;

(iii)  the making of a false statement; or

(iv)  a failure to answer lawful questions fully and satisfactorily.

[Para. (c) added by s. 11 (b) of Act No. 55 of 2002.]

(3)  The Master or the Court may require any such person to produce any books or papers in his custody or under his control relating to the company but without prejudice to any lien claimed with regard to any such books or papers, and the Court shall have power to determine all questions relating to any such lien.

[Sub-s. (3) substituted by s. 9 (d) of Act No. 29 of 1985.]

### Wording of Sections

(4)  If any person who has been duly summoned under subsection (1) and to whom a reasonable sum for his expenses has been tendered, fails to attend before the Master or the Court at the time appointed by the summons without lawful excuse made known to the Master or the Court at the time of the sitting and accepted by the Master or the Court, the Master or the Court may cause him to be apprehended and brought before him or it for examination.

[Sub-s. (4) substituted by s. 9 (d) of Act No. 29 of 1985.]

### Wording of Sections

(5)  Any person summoned by the Master under subsection (1) shall be entitled to such witness fees as he would have been entitled to if he were a witness in civil proceedings in a magistrate's court.

[Sub-s. (5) added by s. 9 (e) of Act No. 29 of 1985.]

(6)  Any person who applies for an examination or enquiry in terms of this section or section 418 shall be liable for the payment of the costs and expenses incidental thereto, unless the Master or the Court directs that the whole or any part of such costs and expenses shall be paid out of the assets of the company concerned.

[Sub-s. (6) added by s. 9 (e) of Act No. 29 of 1985.]

(7)  Any examination or enquiry under this section or section 418 and any application therefore shall be private and confidential, unless the Master or the Court, either generally or in respect of any particular person, directs otherwise.

[Sub-s. (7) added by s. 9 (e) of Act No. 29 of 1985.]

418.  Examination by commissioners.-(1) (a)  Every magistrate and every other person appointed for the purpose by the Master or the Court shall be a commissioner for the purpose of taking evidence or holding any enquiry under this Act in connection with the winding-up of any company.

(b)  The Master or the Court may refer the whole or any part of the examination of any witness or of any enquiry under this Act to any such commissioner, whether or not he is within the jurisdiction of the Court which issued the winding-up order.

(c)  The Master, if he has not himself been appointed under paragraph (a), the liquidator or any creditor, member or contributory of the company may be represented at such an examination or enquiry by an attorney, with or without counsel, who shall be entitled to interrogate any witness: Provided that a commissioner shall disallow any question which is irrelevant or would in his opinion prolong the interrogation unnecessarily.

(d)  The provisions of section 417 (2A), (2) (b) and (5) shall apply mutatis mutandis in respect of such an examination or enquiry.

(2)  A commissioner shall in any matter referred to him have the same powers of summoning and examining witnesses and of requiring the production of documents, as the Master who or the Court which appointed him, and, if the commissioner is a magistrate, of punishing defaulting or recalcitrant witnesses, or causing defaulting witnesses to be apprehended, and of determining questions relating to any lien with regard to documents, as the Court referred to in section 417.

(3) If a commissioner-

(a)    has been appointed by the Master, he shall, in such manner as the Master may direct, report to the Master; or

(b)    has been appointed by the Court, he shall, in such manner as the Court may direct, report to the Master and the Court,

on any examination or enquiry referred to him.

(4) Any witness who has given evidence before the Master or the Court under section 417 or before a commissioner under this section, shall be entitled, at his cost, to a copy of the record of his evidence.

(5) Any person who-

(a)    has been duly summoned under this section by a commissioner who is not a magistrate and who fails, without sufficient cause, to attend at the time and place specified in the summons; or

(b)    has been duly summoned under section 417 (1) by the Master or under this section by a commissioner who is not a magistrate and who-

(i)    fails, without sufficient cause, to remain in attendance until excused by the Master or such commissioner, as the case may be, from further attendance;

(ii)   refuses to be sworn or to affirm as a witness; or

(iii)  fails, without sufficient cause-

(aa)   to answer fully and satisfactorily any question lawfully put to him in terms of section 417 (2) or this section; or

(bb)   to produce books or papers in his custody or under his control which he was required to produce in terms of section 417 (3) or this section,

shall be guilty of an offence.

[S. 418 substituted by s. 10 of Act No. 29 of 1985.]

Wording of Sections

*Dissolution of Companies and other Bodies Corporate*

**419. Dissolution of companies and other bodies corporate.**-(1) In any winding-up, when the affairs of a company have been completely wound up, the Master shall transmit to the Registrar a certificate to that effect and send a copy thereof to the liquidator.

(2) The Registrar shall record the dissolution of the company and shall publish notice thereof in the prescribed manner.

[Sub-s. (2) substituted by s. 49 of Act No. 24 of 2006.]

Wording of Sections

(3) The date of dissolution of the company shall be the date of recording referred to in subsection (2).

(4) In the case of any other body corporate the certificate of the Master under subsection (1) shall constitute its dissolution.

**420. Court may declare dissolution void.**- When a company has been dissolved, the Court may at any time on an application by the liquidator of the company, or by any other person who appears to the Court to have an interest, make an order, upon such terms as the Court thinks fit, declaring the dissolution to have been void, and thereupon any proceedings may be taken against the company might have been taken if the company had not been dissolved.

[S. 420 substituted by s. 10 of Act No. 84 of 1980.]

Wording of Sections

**421. Registrar to keep a register of directors of dissolved companies.**-(1) The Registrar shall establish and maintain a register of directors of companies which have been dissolved and were unable to pay their debts, and cause to be entered therein, in respect of each such director-

(a)    his full forenames and surname, and any former forenames and surname, his nationality, if not South African, his occupation, his date of birth and his last known residential and postal addresses;

*EXHIBIT "2"*

SEQUOR LAW, P.A.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:                                                        Case No.:

MIRROR TRADING INTERNATIONAL                                  Chapter 15
(PTY) LTD

        Debtor in a Foreign Proceeding.
_____/

## RULE 7007.1 CORPORATE OWNERSHIP STATEMENT

Chavonnes Badenhorst St Clair Cooper (the "Liquidator"), the liquidator of the bankruptcy estate of Mirror Trading International (PTY) Ltd (the "Debtor") provides the following information in conformity with Fed. R. Bankr. P. 1007(a)(4) and 7007.1:

1.      At the time the Debtor was placed in an involuntary preliminary liquidation, no corporation owned more than 10% of the Debtor's stock.

2.      At the time the Debtor was placed in an involuntary final liquidation, no corporation owned more than 10% of the Debtor's stock.

3.      The Liquidator is one of six joint liquidators authorized to administer foreign proceedings of the Debtor. The Liquidator is authorized to solely administer the foreign proceedings of the Debtor. The Debtor's joint liquidators names and address in that capacity are:

        a.   Chavonnes Badenhorst St Clair Cooper
             CK Trust (Pty) Ltd
             Unit 1, Sir Benjamin Promenade, Oxford Street,
             Durbanville, Western Cape, Republic of South Africa

        b.   Jacolien Frieda Barnard
             Barn Trustees
             310 Soutpansberg Road, Rietondale,
             Pretoria, Gauteng, Republic of South Africa

      c.  Deidre Basson
         Tshwane Trust Co
         1207 Cobham Road, Queenswood,
         Pretoria, Gauteng, Republic of South Africa

      d.  Herman Bester
         Tygerberg Trustees
         First Floor, Cascade Terraces, Tyger Waterfront
         Belville, Western Cape, Republic of South Africa

      e.  Christopher James Roos
         Sebenza Trust
         Unit 2A, 42 Estcourt Avenue, Wierda Park
         Centurion, Gauteng, Republic of South Africa

      f.  Adriaan Willem van Rooyen.
         Investrust
         73 Bond Street, Sunnyside
         Pretoria, Gauteng, Republic of South Africa

4.     As of the date of this statement, the Liquidator is aware of one lawsuit pending in the United States in which the Debtor is a party: Commodity Futures Trading Commission v. Mirror Trading International Proprietary Limited and Cornelius Johannes Steynberg, Case No. 1:22-cv-635, before the United States District Court for the Western District of Texas.

5.     As of the date of this statement, the Judicial Administrator is not seeking provisional relief under § 1519 of the Bankruptcy Code.

## 28 U.S.C. § 1746 VERIFICATION

I verify under penalty of perjury under the laws of the United States of America that the foregoing Corporate Ownership Statement is true and correct.

Executed in ____Bloemfontein____, the Republic of South Africa on 31 January, 2023

_____

CHAVONNES BADENHORST ST CLAIR COOPER
for and on behalf of the Debtor – as Liquidator in the South African Proceeding

Dated: January 31, 2023

Respectfully submitted,

**SEQUOR LAW, P.A.**
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

By: */s/ Raul Torrao*
Gregory S. Grossman, FBN 896667
ggrossman@sequorlaw.com
Raul Torrao, FBN 1018991
rtorrao@sequorlaw.com

**REDMOND LAW FIRM, LLC**
Christopher J. Redmond
Kansas Bar No. 7307
13220 Metcalf, Suite 310
Overland Park, Kansas 66213
Tel: (913) 379-1100
Christopher.Redmond@christopherredmondlawfirm.com

*"Pro Hac Vice Application Forthcoming"*

*Signature Page to Corporate Ownership Statement In*
*Chapter 15 Petition for Recognition of Foreign Proceeding*

3

*EXHIBIT "3"*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov


In re:


MIRROR TRADING INTERNATIONAL                          Chapter 15
(PTY) LTD,

                                                      Case No.:

         Debtor in a Foreign Proceeding.
_____/

**ORDER GRANTING RECOGNITION OF FOREIGN**
**MAIN PROCEEDING PURSUANT TO §§ 1515 AND 1517 OF**
**THE BANKRUPTCY CODE AND GRANTING RELATED RELIEF**

    This matter came on for hearing on _____, 202_ ("Hearing"), upon the *Verified Motion*

*for Order of Recognition of Foreign Main Proceeding Pursuant to §§1515 and 1517 and Request*

*for Hearing* ("Verified Motion") [ECF No. 2] of Chavonnes Badenhorst St Clair Cooper (the

"Liquidator"), one of the liquidators of the bankruptcy estate of Mirror Trading International

(PTY) Ltd (the "Debtor") in the Debtor's involuntary liquidation proceeding (the "South African

Proceeding") under the control or supervision of the High Court of South Africa, Western Cape Division, Cape Town, Republic of South Africa (the "South African Court"), seeking recognition and related relief pursuant to Chapter 15 of the U.S. Bankruptcy Code. The Court has considered the Petition ("Petition") [ECF No. 1], the Verified Motion, the Declaration of the Liquidator and its respective attachments, and the arguments of counsel at the Hearing.  The Court finds that:

A.      Due and timely notice of the filing of the Chapter 15 Petition, Verified Motion, and the Hearing was given by the Liquidator.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

C.      Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410.

D.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

E.      The Liquidator qualifies as a "foreign representative" as defined in 11 U.S.C. §101(24).

F.      This Chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1515, 1517.

G.      The Liquidator has met the requirements of 11 U.S.C. §§ 1515(b), 1515(c), 1515(d), and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

H.      The South African Proceeding is a foreign proceeding under 11 U.S.C. §§ 101(23) and 1502(4).

I.      The South African Proceeding is entitled to recognition by this Court under 11 U.S.C. § 1517.

J.      The South African Proceeding is pending in the Republic of South Africa. The Debtor has its center of main interests in the Republic of South Africa, and, accordingly, the South African Proceeding is a foreign main proceeding under 11 U.S.C. § 1502(4) entitled to recognition as a foreign main proceeding under 11 U.S.C. § 1517(b)(1).

K.      The Liquidator is entitled to all relief provided under 11 U.S.C. § 1520(a).

L.      The Liquidator is further entitled to the relief expressly set forth in 11 U.S.C. § 1521(a)(1)(2)(3)(4)(5).

M.      The relief granted by this Order is necessary and appropriate, in the interests of public and international comity, consistent with the public policy of the United States, warranted pursuant to 11 U.S.C. § 1521, and will not cause any hardship to the creditors of the Debtor or other parties that is not outweighed by the benefits of the relief being granted.

N.      The Court finds that the interests of the creditors, interested entities, the Debtor, and the Debtor' estate are sufficiently protected by the rights and obligations under the Federal Rules of Bankruptcy Procedure and/or Federal Rules of Civil Procedure governing the taking of discovery.

Accordingly, it is ORDERED AND ADJUDGED that:

1.      The South African Proceeding is granted recognition as a "foreign main proceeding" under 11 U.S.C. § 1517.

2.      The South African Proceeding and the Orders of the South African Court shall be given full force and effect and be binding on and enforceable in the United States against all persons and entities. This includes without limitation the Orders of the South African Court (1) placing the Debtor into an involuntary provisional liquidation, (2) placing the Debtor into an

involuntary final liquidation, and (3) appointing the Liquidator and certifying that he is a liquidator of the Debtor, all of which are attached to the Verified Motion.

3.      The Liquidator shall have the authority to act independently to carry out any of the duties and powers granted by this Order.

4.      The provisions of 11 U.S.C. § 1520(a) apply to this proceeding, including without limitation, the application of the automatic stay of 11 U.S.C. § 362 with respect to the Debtor and the property of the Debtor that is within the territorial jurisdiction of the United States.

5.      Under 11 U.S.C §1521(a)(1), all persons and entities are stayed from commencing or continuing any action or proceeding concerning the assets, rights, obligations, or liabilities of any Debtor or the Debtor's bankruptcy estate located in the United States.

6.      Under 11 U.S.C § 1521(a)(2), all persons and entities are stayed from executing against the assets of the Debtor or the Debtor's bankruptcy estate located in the United States.

7.      Under 11 U.S.C § 1521(a)(3), all persons and entities are prohibited from transferring, encumbering, or otherwise disposing of any assets of the Debtor or the Debtor's bankruptcy estate located in the United States.

8.      All persons and entities provided notice of this Order who are in possession, custody, or control of property, or the proceeds thereof, of the Debtor or the Debtor's bankruptcy estate, located within the territorial jurisdiction of the United States, shall immediately advise Liquidator by written notice sent to the following addresses:

> Attn: Chavonnes Badenhorst St Clair Cooper
> CK Trust (Pty) Ltd
> Unit 1, Sir Benjamin Promenade, Oxford Street,
> Durbanville, Western Cape, Republic of South Africa

With copies to:

      Attn: Gregory Grossman and Raul Torrao
      Sequor Law, P.A.
      1111 Brickell Avenue, Suite 1250
      Miami, Florida 33131

      and

      Christopher J. Redmond, Esq.
      Redmond Law Firm, LLC
      13220 Metcalf, Suite 310
      Overland Park, Kansas 66213

which written notice shall set forth: (i) the nature of such property or proceeds; (ii) when and how such property or proceeds came into the custody, possession, or control of such person or entity; and (iii) the full identity and contact information for such person or entity. The Liquidator shall file with the Court, from time to time, information demonstrating those persons or entities to whom he has provided notice of this Order.

      9.     The Liquidator is authorized to examine witnesses, take evidence, or seek the delivery of information concerning the assets, affairs, rights, obligations, or liabilities of the Debtor or the Debtor's bankruptcy estate pursuant to §1521(a)(4), the Federal Rules of Bankruptcy Procedure, including without limitation the procedure of Fed. R. Bankr. P. 2004 and Local Rule 2004-1, without further order of this Court.

      10.    The Liquidator is authorized to take discovery in connection with an asset, affair, right, obligation, or liability of the Debtor or the Debtor's bankruptcy estate that consists of a claim or chose in action, whether or not filed, or other proceeding in which the Debtor or the Debtor's bankruptcy estate is a party, notwithstanding pending proceeding doctrines, so long as the Liquidator's Notice of Rule 2004 Examination and a Subpoena under Fed. R. Civ. P. 45 identifies the claim, chose in action, or proceeding to which such discovery relates. The Court may consider

the framework provided by 28 U.S.C. § 1782 and authorities decided thereunder regarding discovery under this paragraph.

11.    Under 11 U.S.C § 1521(a)(5), the Liquidator is entrusted with the full administration and realization of all or a part of the Debtor's bankruptcy estate and assets within the territorial jurisdiction of the United States.

12.    Other than a counterclaim to a suit brought by the Liquidator, no person or entity may commence suit against the Liquidator in any court, including this Court, in the United States without first obtaining leave of this Court.

13.    The Liquidator is further authorized to operate and may exercise the powers of a trustee under, and to the extent provided by 11 U.S.C. §§ 363 and 552.

14.    Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) this Order shall be effective immediately and enforceable upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a); (ii) the Liquidator is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the Liquidator is authorized and empowered and may in its discretion and without further delay take any action and perform any act necessary to implement and effectuate the terms of this Order.

15.    No action taken by the Liquidator in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the South African Proceeding or any order entered in or in respect of the Chapter 15 Case (including any adversary proceedings or contested matters) will be deemed to constitute a waiver of immunity afforded the Liquidator, including pursuant to 11 U.S.C. §§ 306 and 1510.

16.    A copy of this Order, confirmed to be true and correct, shall be served electronically on any person or entity that has appeared in this case to date.

17.     This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this Chapter 15 case subject to the limitations set forth in 11 U.S.C. §1521(a)(7), and any request by any person or entity for relief from the provisions of this Order.

18.     This Court shall retain jurisdiction with respect to the administration, realization, and distribution of the assets of the Debtor or the Debtor's estate within the territorial jurisdiction of the United States.

19.     The Liquidator is directed to serve a true and correct copy of this Order by mail in accordance with Rule 2002(q) of the Federal Rules of Bankruptcy Procedure.

# # #

Submitted by:
Gregory S. Grossman, Esq.
Raul Torrao, Esq.
SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
ggrossman@sequorlaw.com
rtorrao@sequorlaw.com
Telephone:     (305) 372-8282
Facsimile:     (305) 372-8202

Christopher J. Redmond, Esq.
REDMOND LAW FIRM, LLC
13220 Metcalf, Suite 310
Overland Park, Kansas 66213
Christopher.Redmond@christopherredmondlawfirm.com
Telephone:  (913) 379-1100

*(Attorney Gregory S. Grossman shall serve a conformed copy of the foregoing order upon all interested parties and file a Certificate of Service with this Court)*