UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

MIRROR TRADING INTERNATIONAL                         Chapter 15
(PTY) LTD,

                                              Case No.: 23-11046

       Debtor in a Foreign Proceeding.
_____/

## NOTICE OF SUBSEQUENT INFORMATION

       Chavonnes Badenhorst St Clair Cooper, the acknowledged foreign representative of the bankruptcy estate of Mirror Trading International (PTY) Ltd (the "Foreign Representative"), files this Notice of Subsequent Information, under 11 U.S.C. § 1518, and states as follows:

       On May 1, 2023, the Court of King's Bench of Alberta entered an order recognizing the foreign main proceedings of debtor Mirror Trading International (PTY), LTD as a foreign main proceeding.  The Recognition Order is attached hereto as **Exhibit "A"**.

       On April 7, 2023, the Court in Belgium entered an order recognizing a foreign main proceeding. The Recognition Order is attached hereto as **Exhibit "B".**

       May 8, 2023.                      Respectfully submitted,

SEQUOR LAW, P.A.
1111 Brickell Avenue, Suite 1250
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202
Email: ggrossman@sequorlaw.com

By:     */s/ Gregory S. Grossman*
        Gregory S. Grossman
        Florida Bar No. 896667


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via electronic filing using the CM/ECF system with the Clerk of the Court which sent e-mail notification of such filing to all CM/ECF participants in this case and via regular US mail to all participants who are not on the list to receive e-mail notice/service for this case as indicated on the Service List on May 8, 2023.

*/s/ Gregory S. Grossman*
Gregory S. Grossman


## SERVICE LIST

**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- **Office of the US Trustee**   USTPRegion21.MM.ECF@usdoj.gov

**Manual Notice List**

The following is the list of **parties** who receive via US Mail.

**Christopher J Redmond**
13220 Metcalf Ave., Suite 310
Overland Park, KS 66213

*EXHIBIT "A"*

| COURT FILE NUMBER | 2301-05332 |
|---|---|
| COURT | COURT OF KING'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| MATTERS | IN THE MATTER OF THE *BANKRUPTCY AND INSOLVENCY ACT*, RSC 1985, c. B-3, AS AMENDED |
| | IN THE MATTER OF MIRROR TRADING INTERNATIONAL (PTY) LTD |
| APPLICANT | CHAVONNES BADENHORST ST CLAIR COOPER, AS FOREIGN REPRESENTATIVE |
| DOCUMENT | **ORDER** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **STIKEMAN ELLIOTT LLP** 4300 Bankers Hall West 888 – 3rd Street S.W. Calgary, AB  T2P 5C5 Solicitor: Karen Fellowes, K.C. Phone Number: (403) 724-9469 Email: kfellowes@stikeman.com Fax Number: (403) 266-9034 File No.: 153207.1001 |

Clerk's Stamp:

JUDICIAL CENTRE OF CALGARY

**FILED**
**May 02, 2023**
**by Email**
CLERK OF THE COURT

jg

**Counsel for the Applicant**

**DATE ON WHICH ORDER WAS PRONOUNCED:**     May 1, 2023

**NAME OF JUDGE WHO MADE THIS ORDER:**     The Honourable  Justice Romaine

**LOCATION OF HEARING:**     Calgary, Alberta

THIS APPLICATION, by Chavonnes Badenhorst St Clair Cooper, in his capacity as the foreign representative (the "**Foreign Representative**") of Mirror Trading International (Pty) Ltd. (the "**Debtor**") pursuant to sections 269 and 270 of the *Bankruptcy and Insolvency Act*, RSC 1985, C. B-3 (the "*BIA*"), seeks an order recognizing and enforcing the winding-up and liquidation proceeding of the Debtor (the "**Foreign Proceeding**") commenced in the High Court of South Africa (Western Cape Division, Cape Town) (the "**Foreign Court**") (Master's Ref. C000906/2020), as referenced in and appended to the Letter of Request for Judicial Assistance from the Courts of Canada issued by the Foreign Court on December 15, 2022, a certified copy of which is attached as **Schedule "A"** to this Order;

117119992 v3

-2-

ON READING the Notice of Application, the Affidavit of the Foreign Representative, Chavonnes Badenhorst St Clair Cooper, sworn April 20, 2023, and the Affidavit of Service of Zandhrea de Guzman sworn April 28, 2023; AND UPON hearing the submissions of counsel for the Foreign Representative;

**RECOGNITION OF FOREIGN PROCEEDING**

1.      THIS COURT ORDERS that the Foreign Proceeding is hereby recognized as a foreign main proceeding and given full force and effect in all provinces and territories of Canada pursuant to section 269 of the *BIA*, however, that in the event of any conflict between Orders granted in the Foreign Proceeding and the Orders of this Court made in the within proceedings, the Orders of this Court shall govern with respect to Property (as defined below) in Canada.

**RECOGNITION OF LIQUIDATORS**

2.      THIS COURT ORDERS that the court-appointed liquidators in the Foreign Proceeding, namely Chavonnes Badenhorst St. Clair Cooper, Herman Bester, Adriaan Willem Van Rooyen, Christopher James Roos, Jacolien Frieda Barnard, Deidre Basson, Daniel Sandile Ndlovu and Kevin Titus be entrusted with the administration and realization of all the Debtor's Property (as defined below) located in Canada.

**NO PROCEEDINGS AGAINST THE DEBTOR**

3.      THIS COURT ORDERS that until such date as this Court may order (the "**Stay Period**") no proceeding or enforcement process in any court or tribunal in Canada (each, a "**Proceeding**") shall be commenced or continued against or in respect of the Debtor, or affecting the business or the Property of the Debtor (the "**Business**" and the "**Property**", respectively), except with leave of this Court, and any and all Proceedings currently under way against or in respect of the Debtor or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

4.      THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Debtor, the Foreign Representative, or affecting the Business or the Property, are hereby stayed and suspended except with leave of this Court, provided that nothing in this Order shall (i) prevent the assertion of or the exercise of rights and remedies outside of Canada, (ii) empower any of the Debtors to carry on any business in Canada which that Debtor is not lawfully entitled to carry on, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

-3-

**NO INTERFERENCE WITH RIGHTS**

5.      THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Debtor and affecting the Business in Canada, except with leave of this Court.

**EXAMINATION OF INVESTORS**

6.      THIS COURT ORDERS that the commissioners appointed pursuant to subsection 418(1)(a) of the South African *Companies Act, 61 of 1973* (the "***Companies Act***"), namely Adriaan Serfontein Hurter, Lambertus Von Wielligh Bester, Eberhardt Bertelsmann, and Hans-Joachim Fabricius (collectively, the "**Commissioners**"), shall be permitted to examine investors of the Debtor who reside within the jurisdiction of Canada (the "**Investors**") to be examined for the purpose of investigating the estate of the Debtor (the "**Examinations**").

7.      THIS COURT ORDERS that the Examinations shall take place at the offices of the Foreign Representative's Canadian solicitors, Stikeman Elliott LLP, situated at 4300 Bankers Hall West, 888-3rd Street S.W., Calgary, AB, Canada T2P 5C5 or such other location as is determined by the Commissioners.

8.      THIS COURT ORDERS that the Investors attending such examination provide to the Commissioners all books and records relating to the Debtor in their possession, custody or control.

9.      THIS COURT ORDERS that all Examinations shall be recorded either by video or in audio and that the records of the Examinations and copies of any documents produced shall be kept by the commissioner, alternatively Stikeman Elliot LLP, or further alternatively any such person appointed by this Court.

10.      THIS COURT ORDERS that the Foreign Representative and/or Commissioners are authorized to make copies of any record produced by the Investors.

**SERVICE AND NOTICE**

11.      THIS COURT ORDERS that the time for service of this Application together with all supporting materials is hereby declared good and sufficient and no other person is required to have been served with such documents, and this hearing is properly returnable before this Honourable Court today and further service thereof is dispensed with.

117119992 v3

-4-

12.    THIS COURT ORDERS that no other Persons are entitled to be served with a copy of this Order.

**OBLIGATIONS OF FOREIGN REPRESENTATIVE**

13.    THIS COURT ORDERS that, in addition to any other obligations contained herein, the Foreign Representative shall, without delay, inform the court of (i) any substantial change in the status of the Foreign Proceeding, (ii) any substantial change in the status of the Foreign Representative's authority to act in that capacity, and (iii) any other foreign proceeding in respect of the Debtor that becomes known to the Foreign Representative.

14.    THIS COURT ORDERS that the Foreign Representative shall, pursuant to section 276 of the *BIA*, after the granting of this Order publish a copy of this Order in the prescribed form once a week for two consecutive weeks, or as otherwise directed by the Court, in one or more newspapers in Canada.

**GENERAL**

15.    THIS COURT ORDERS that the Foreign Representative may from time to time apply to this Court for advice and directions in the discharge of his powers and duties hereunder.

16.    THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the Court of South Africa to give effect to this Order and to assist the Foreign Representative and his agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Foreign Representative as may be necessary or desirable to give effect to this Order, or to assist the Foreign Representative and his agents in carrying out the terms of this Order.

17.    THIS COURT ORDERS that the Foreign Representative be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

18.    THIS COURT ORDERS that any interested party may apply to this Court to vary or amend this Order or seek other relief on not less than seven (7) days notice to the Debtor, the Foreign Representative, and to any other party or parties likely to be affected by the order sought, or upon such other notice, if any, as this Court may order.

-5-

19.    THIS COURT ORDERS that this Order shall be effective as of December 15, 2022.


_____
Justice of the Alberta Court of King's Bench

**SCHEDULE "A"**

**LETTER OF REQUEST FOR JUDICIAL ASSISTANCE**



**OFFICE OF THE CHIEF JUSTICE**
**REPUBLIC OF SOUTH AFRICA**

# APOSTILLE

### (CONVENTION DE LA HAYE DU 5 OCTOBRE 1961)

1. **COUNTRY: REPUBLIC OF SOUTH AFRICA**

   **THIS PUBLIC DOCUMENTS**

2. **HAS BEEN SIGNED BY:** E L VAN DER VENDEL

3. **ACTING THE CAPACITY:** NOTARY PUBLIC

4. **BEAR THE SEAL/STAMP OF A:** NOTARY PUBLIC

   **CERTIFIED**

5. **AT PRETORIA:**

6. **THE 22ND DAY OF FEBRUARY 2023**

7. **BY G MUKANSI, REGISTRAR**

8. **CERTIFICATE NUMBER:** 3177/2023

9. **SEAL/STAMP**

10. **SIGNATURE**

# APOSTILLE

I, the undersigned

**ELSJE LOVAT VAN DE VENDEL (M23160)**

Notary Public, duly sworn and admitted and practicing as such at Pretoria, Gauteng Province, Republic of South Africa, hereby certify that the attached documents being:

**1. ORDER issued by the High Court of South Africa (Western Cape Division, Cape Town) under Case No 21118/2022 dated 15 December 2022**

**And**

**2. Letter of Request for Judicial Assistance from the Courts of CANADA in relation to the winding-up of MIRROR TRADING INTERNATIONAL (Pty) Ltd (In Liquidation) Master's ref. C000906/2020), dated 15 December 2022**

Are copies of the original documents which I compared.

Thus done and signed at PRETORIA on 20 February 2023

ELSJE LOVAT VAN DE VENDEL

NOTARY PUBLIC

(M23160)



IN THE HIGH COURT OF SOUTH AFRICA

(WESTERN CAPE DIVISION, CAPE TOWN)

Case No: 21118/2022

Before the honourable Mr Justice Francis

Cape Town, ~~Friday~~ 15 December 2022
*Thursday*

In the *ex parte* application of:

| | |
|---|---|
| **HERMAN BESTER N.O** | First Applicant |
| **ADRIAAN WILLEM VAN ROOYEN N.O** | Second Applicant |
| **CHRISTOPHER JAMES ROOS N.O** | Third Applicant |
| **JACOLIEN FRIEDA BARNARD N.O** | Fourth Applicant |
| **DEIDRE BASSON N.O** | Fifth Applicant |
| **CHAVONNES BADENHORST ST CLAIR COOPER N.O** | Sixth Applicant |

---

## DRAFT ORDER

---

**HAVING HEARD COUNSEL AND HAVING READ THE PAPERS FILED OF RECORD IT IS ORDERED:**

1.    That a letter of request be issued in favour of the applicants to any Court of competent

      jurisdiction in Canada in terms of the draft letter annexed to this order marked annexure

      "LOR".

2.    That the costs of this application shall be costs in the administration of the insolvent estate

      of Mirror trading International (Pty) Ltd (in liquidation).

BY ORDER OF THE COURT

2022 -12- 2 9

WCD-003

_____

COURT REGISTRAR

Schabort Potgieter Attorneys Inc.
C/O van der Berg & Associates
2nd Floor, Radio House
Cnr Loop & Longmarket Streets





"LOR

## THE HIGH COURT OF SOUTH AFRICA
## WESTERN CAPE DIVISION, CAPE TOWN

CASE NO.:

In the **urgent** *ex parte* application of:

**HERMAN BESTER N.O.**                                First Applicant

**ADRIAAN WILLEM VAN ROOYEN N.O.**              Second Applicant

**CHRISTOPHER JAMES ROOS N.O**                   Third Applicant

**JACOLIEN FRIEDA BARNARD N.O**                  Fourth Applicant

**DEIDRE BASSON N.O.**                              Fifth Applicant

**CHAVONNES BADENHORST ST CLAIR**               Sixth Applicant
**COOPER N.O**

(In their capacities as the jointly appointed
liquidators of Mirror Trading International (Pty)
Ltd (in liquidation) (Master's Ref:
C000906/2020)

2022 -12- 29
WCD-003

---

**LETTER OF REQUEST FOR JUDICIAL ASSISTANCE FROM THE COURTS
OF CANADA IN RELATION TO THE WINDING-UP OF MIRROR TRADING
INTERNATIONAL (PTY) LTD (IN LIQUIDATION) (MASTER'S REF.
C000906/2020)**

---

1.      To any Court of competent jurisdiction in Canada;

2.      This constitutes a letter of request by the High Court of South Africa
        (Western Cape Division, Cape Town), directed to any Court of competent
        jurisdiction in Canada;

3.      The purpose of this letter of request is to request any Court of competent
        jurisdiction in Canada to:

ELSIE VAN DE VENTER
NOTARY
PUBLIC

- 2 -

3.1    Recognise the liquidation of Mirror Trading International (Pty) Ltd t/a MTI, wound up because it was unable to pay its debts, and that it was just and equitable to do so;

3.2    Recognise the appointment of Adriaan Willem Van Rooyen N.O., Herman Bester N.O., Christopher James Roos N.O, Jacolien Frieda Barnard N.O. Deidre Basson N.O. and Chavonnes Badenhorst St Clair Cooper N.O, as the jointly appointed liquidators concerned with the winding-up of Mirror Trading International (Pty) Ltd t/a MTI, as per their certificate of appointment attached as annexure "A1";

3.3    Recognise the Court order relating to the extension of powers of the jointly appointed liquidators, as well as the institution of an inquiry in terms of the provisions of section 417/418 of the South African Companies Act 61 of 1973 as set out in annexure "A2" hereto, and the adopted resolutions passed at the second creditors' meeting held on 10 December 2021, attached hereto as annexure "A2.1";;

3.4    Recognise the rights, powers and title of the said joint provisional liquidators of Mirror Trading International (Pty) Ltd t/a MTI, as specifically extended in terms of the Court order annexed hereto as annexure "A2" above, and to institute the required legal proceedings in any competent Court in Canada relating to the winding-up of Mirror Trading International (Pty) Ltd t/a as MTI;

3.5    Making such order as any competent Court in Canada may consider just and appropriate in assisting the High Court of South Africa by ensuring the aforesaid in the most effective administration and winding-up of Mirror

- 3 -

Trading International (Pty) Ltd t/a MTI.

4.      This letter of request is granted by the abovementioned Court on application

        made to it by the joint liquidators under the abovementioned case number.

        In the circumstances this letter of request will form an annexure to the

        Court's order in this regard.


5.      **BACKGROUND TO THIS LETTER OF REQUEST**

5.1     The application for the urgent winding-up of Mirror Trading International

        (hereinafter referred to as "MTI") was launched by a Mr Anton Fred Melchior

        Lee (hereinafter referred to as "Lee"), investor/creditor of MTI in the amount

        of US$34,708.77 on 23 December 2020 out of this Court and under case

        number 19201/2020.

5.2     The winding-up application was first heard on 24 December 2020. While the

        application was not opposed by MTI, a postponement was requested on

        behalf of the voluntary group/association comprising a large number of

        investors/creditors of MTI known as the MTI Recovery Action Group

        (hereinafter referred to as "RAG") resulting in the hearing being postponed

        to 29 December 2020.

5.3     After considering the available information, RAG conceded that MTI ought

        to be wound-up and Rogers J of this Court granted an order placing MTI

        under provisional winding-up in the hands of the Master of this Court with a

        return date for the finalisation thereof on 1 March 2021. A copy of this order

        is annexed hereto as annexure "A3".

- 4 -

5.4     MTI was placed under provisional winding-up in terms of section 344 of the Companies Act, 61 of 1973 in that it was unable to pay its debts as described in terms of section 345 of the Companies Act, 61 of 1973 and it further appeared to the Court that it was just and equitable that it be wound-up in the view of the legality of its business model.

5.5     MTI was finally wound up by an order of this court on 30 June 2021, and as per the order granted and attached hereto as annexure "**A4**".

5.6     According to the winding-up application, and consequent investigations conducted by the jointly appointed liquidators in the insolvent estate of MTI, it has been determined that MTI is both factually and commercially insolvent and has been trading illegally in terms of the provisions of the Companies Act, 61 of 1973.

5.7     MTI was registered and incorporated in April 2019 purportedly in order to conduct the business of a fund manager trading in Crypto currency particularly Bitcoin. The sole director and chief executive, Mr Cornelius Johannes Steynberg (hereinafter referred to as "Steynberg"), purportedly the only person of full control over the funds invested through it by its investors/creditors who is strongly suspected of being the mastermind behind what appears to be a Ponzi-type investment scheme utilising MTI as the vehicle. Steynberg was assisted by MTI's so-called senior management team which included Mrs. Nerina Steynberg, Mr. Clynton Hugh Marks, Mrs Cheri Marks, Mr. Charlie Ward, Ms. Monica Coetzee, Ms. Liz Malton, Mr. Leonard Gray, Mr. Romana Samuels and others.

- 5 -

5.8     MTI operated by soliciting members of the public to invest their funds in the form of Bitcoin on online derivative trading platforms through MTI on the promise of unrealistically high returns, in other words up to 10% per month. MTI's business model made use of a referral structure in terms of which existing investors received referral bonuses over and above their exorbitant returns on investment for the recruitment of new members to invest their Bitcoin through MTI.

5.9     From available information it appears that more than 3500 Bitcoin were paid to approximately 180 individuals as so-called referral bonuses. At the current value of one bitcoin (at approximately R285 985.75), this equates to more than R1 billion. Importantly most members of the MTI senior management team benefited from these payments. These persons also constituted what can be described as the "*winners*" of the Ponzi-type scheme and at the expense of other investors at the lower end of the scheme termed as the "*losers*".

5.10    After suspicion arose of the business of MTI being conducted in contravention of South African statutory provisions regulating local and foreign investments schemes, the South African Financial Sector Conduct Authority (hereinafter referred to as the "FSCA") being the statutory created financial sector regulatory body established in terms of section 56 of the Financial Sector Regulation Act, 9 of 2017 initiated investigations into MTI's business activities.

5.11    No less than three press releases were issued by the FSCA, the last of

- 6 -

which was issued on 17 December 2020 and which press releases are annexed hereto as annexure "**A5**" in terms of which the FSCA advised the general public that *inter alia*:

5.11.1    MTI was conducting business which required of it to be in possession of a financial service provider licence, for which it had not applied;

5.11.2    it had found evidence contradicting MTI's claim to have funds in trading accounts of a substantial value, as the total value of frozen Bitcoin invested through FXChoice was negligible;

5.11.3    it had found evidence contradicting MTI's alleged returns on investments and that from 29 January 2020 until 3 June 2020 MTI had in fact suffered a capital loss on investment of approximately 30% as opposed to its alleged returns of up to 10% per month;

5.11.4    it had found evidence contradicting MTI's alleged utilisation of bot trading;

5.11.5    after being informed by the FSCA that it was conducting an illegal unregistered financial services business, MTI claimed to have:

5.11.5.1    changed its business to that of a fund manager trading in derivative instruments based on Crypto currency (still Bitcoin);

5.11.5.2    accordingly changed its online derivative training platform from FXChoice to "*Trade300*" (still utilising a bot);

5.11.5.3    transferred all its investors' funds to Trade300;

- 7 -

*10*

5.11.6   it had found evidence to believe that Trade300 was not a legitimate derivative trading platform but instead linked to Steynberg himself;

5.11.7   it had found that the alleged transfer of investor funds from FXChoice to the so-called Trade 300 had not occurred during the period alleged by Steynberg, despite MTI providing it with purported proof of the transfer in this regard;

5.11.8   it had found no evidence of any significant store of funds on any trading platform and that most of the Crypto currency balances were held in the name and under the control of Steynberg personally, which funds did not equate to that which MTI claimed to have in investor funds and in its trading account;

5.11.9   It is believed that MTI and its senior management were conducting an illegal operation, were misleading investors/creditors and were contravening several laws.

5.12   In addition to the above:

5.12.1   the Texas State Securities Board has issued an emergency order in terms of which MTI and Steynberg were to immediately cease and desist from offering for sale any security, acting as a securities dealer or agent and engaging in any fraud in connection with the offer for sale of any security in Texas. A copy of this order is annexed hereto as annexure "A6"

- 8 -

5.13    The Canadian *Autorité Des Marchés Financiers,* an independent administrative authority which regulates the French financial market, has placed MTI on its warning list of websites and companies that solicit investors illegally. A copy of the relevant extract of the warning list is attached hereto as annexure "**A7**".

5.14    From the website of RAG and from their nominations for the appointment of provisional liquidators it appears that tens of thousands of investors are foreign citizens from more than 140 countries.

5.15    The above is an indication of the magnitude of the scheme and the existence of its international presence which supports the necessity of the issuing of this letter of request.

5.16    From the above it is concluded that:

5.16.1    MTI is a company unable to pay its debts as and when they become due;

5.16.2    the liabilities of MTI by far exceed the assets of MTI;

5.16.3    certain individuals benefited handsomely at the expense of others;

5.16.4    MTI received and accepted funds in the form of Bitcoins from members of the public without being registered to do so in terms of the relevant South African legislation including but not limited to the Financial Service Regulation Act and the Banks Act, 94, 1990;

5.16.5    MTI utilised the funds invested through by its investors/creditors to

- 9 -

cover its operational costs and the returns on investments and referral bonusses to its investors and creditors;

5.16.6    MTI accordingly utilised and invested the funds in contravention of the investment mandate provided to it by its investors/creditors.

5.17    From preliminary investigations it appears that MTI ought to hold a minimum of 23 000 Bitcoin being the number of Bitcoin it owes to its investors. To date, the jointly appointed liquidators have only been able to recover approximately 1300 Bitcoin and to the benefit of the insolvent estate.

6.    **THE COURT'S REQUESTS IN RELATION TO THE CONDUCTING OF THE EXAMINATION**

6.1    An enquiry has been instituted into the affairs of MTI and in terms of the provisions of section 417 and 418 of the Companies Act, 61 of 1973, a copy of the order is attached above as annexure "A2".

6.2    The Court accordingly requests for the reasons stated above and so as to best assist it in the winding-up of MTI that:

6.2.1    an examination of investors who benefited at the expense of others and who reside within the jurisdiction of Canada be examined in terms of the provisions of section 417 and 418 of the South African Companies Act, 61 of 1973;

6.2.2    that these investors who unjustly benefited be ordered to attend to be examined at such time as you shall appoint and at the offices of the joint

- 10 -

*15*

liquidators' Canadian solicitors, Stikeman Elliott LLP, situated at 4300 Bankers Hall West, 888-3rd Street S.W. Calgary, AB Canada T2P 5C5, alternatively such place as you shall appoint, alternatively that such order to attend may be issued by the appointed commissioners being any of the following:

6.2.2.1        Mr Adriaan Serfontein Hurter;

6.2.2.2        Mr Lambertus Von Wielligh Bester;

6.2.2.3        Retired Justice Eberhardt Bertelsmann;

6.2.2.4        Retired Justice Hans-Joachim Fabricius

6.2.3        appointed as commissioners in terms of section 418(1)(a) of the Companies Act, 61 of 1973;

6.2.4        that you order that those attending such examination provide to the duly appointed commissioner(s), and in attendance, all books and records relating to MTI in their possession;

6.2.5        the examination be presided over and taken by the aforementioned commissioner(s), alternatively any appropriate judicial officer whom you shall appoint for this purpose;

6.2.6        the examination shall be private and confidential (or held in private) as contemplated in section 417(7) of the Companies Act, 61 of 1973;

6.2.7        that the persons who may participate in the examination shall include Advocate Johann Hershensohn, Advocate Ruan de Leeuw, Mr Jacobus Hendrik Schabort and Mr Chavon Hendrik St Clair Cooper;

- 11 -

*14*

6.2.8    that the examination of all such witnesses examined shall be recorded either by video or in audio and that the records of the examination and copies of any documents produced shall be kept by the commissioner, alternatively Stikeman Elliott, further alternatively any such person you shall appoint.

6.3    A true copy of the current wording of the provisions of section 417 and 418 of the South African Companies Act is attached hereto as annexure "**A8**".

7.    **THE NEED FOR OTHER REQUESTS MENTIONED ABOVE**

7.1    In addition to the above requests, the Court requests that you:

7.1.1    recognise the jointly appointed liquidators as the duly appointed liquidators of the company in liquidation for the purposes of the judicial assistance in or pursuant to this letter of request;

7.1.2    if and to the extent necessary, permit the jointly appointed liquidators in their said capacity to seek, obtain and maintain in Canada appropriate relief in relation to claims the company in liquidation has brought or intends to bring against any investors who have benefited at the expense of others and in the unlawful scheme;

7.1.3    make any order that appears to any Court of competent jurisdiction in Canada to be convenient and appropriate in relation to the liquidation of the company in liquidation to assist the High Court of South Africa (Western Cape Division, Cape Town) including where the need for such

- 12 -

order becomes apparent after the date of this letter of request.

7.2    Orders to this effect will assist the jointly appointed liquidators in preserving and recovering the assets of the company in liquidation and otherwise in carrying out their duties in relation to the winding-up, in particular in achieving the most effective administration of the company in liquidation's winding-up for the benefit of its creditors.

8.    **CONCLUSION**

In the circumstances the presiding Judge is kindly and respectfully requested to accept this letter of request and to agree to the requests contained herein and to assist the jointly appointed liquidators to conduct their examination into the affairs of the company in liquidation in the manner stated above and within the jurisdiction of Canada.

DATED AND SIGNED AT CAPE TOWN ON THIS ___15___ DAY OF _December_ 2022

_____

**HIS LORDSHIP MR JUSTICE**







1b

A1



REPUBLIC OF SOUTH AFRICA

SERTIFIKAAT VAN AANSTELLING VAN LIKWIDATEUR

[Maatskappywet, No 61 van 1973 (soos gewysig)]

CERTIFICATE OF APPOINTMENT OF LIQUIDATOR

[Companies Act, No 61 of 1973 (as amended)]



NO:   C000906/2020

Hierby word gesertifiseer dat:
This is to certify that:

| | | |
|---|---|---|
| 1. BARNARD, JACOLIEN FRIEDA | ID. | 8210030014085 |
| 2. BASSON, DEIDRE | ID. | 7009290090087 |
| 3. BESTER, HERMAN | ID. | 7009235139080 |
| 4. COOPER, CHAVONNES BADENHORST ST CLAIR | ID. | 6905045153081 |
| 5. ROOS, CHRISTOPHER JAMES | ID. | 8409215014080 |
| 6. VAN ROOYEN , ADRIAAN WILLEM | ID. | 6911185280080 |
| 7. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX | ID. | XXXXXXXXXXXXXXXXXX |

aangestel is as Likwidateur met die magte soos uiteengesit in Artikel 386(1) van Wet No 61 van 1973
saamgelees met item 9 van Skedule 5 van Wet 71 van 2008 van die Maatskappy bekend as:

appointed as Liquidator with the powers as set out in Section 386(1) of Act 61 of 1973 read together with item
9 of Schedule 5 of Act 71 of 2008 of the Company known as:

**MIRROR TRADING INTERNATIONAL (PTY) LIMITED T/A MTI   2019/205570/07**

wat onder Likwidasie geplaas is
which has been placed under Liquidation    30-6-2021    

van die Hoë Hof van Suid-Afrika,                                                                Afdeling
by Order of the High Court of South Africa,    WESTERN CAPE HIGH COURT (CAPE TOWN)    Division

Geteken te                                                    op
Signed at    CAPE TOWN                              on    11 NOVEMBER 2021

MASTER OF THE WESTERN CAPE HIGH COURT

CAPE TOWN

2021 -11- 11

A.M. INSOLVENT ESTATES 2
11 NOVEMBER 2021
DATE STAMP / DATUMSTEMPEL    MEESTERS KANTOOR WES KAAP HOË HOF

DOJCD\HBOUWER
MEESTER VAN DIE HOË HOF VAN SUID-AFRIKA
MASTER OF THE HIGH COURT OF SOUTH AFRICA

URN: 8992020\NS000906



ELSIE VAN DE VENDEL
NOTARY PUBLIC
SOUTH AFRICA

Extension of Powers

IN THE HIGH COURT OF SOUTH AFRICA

[WESTERN CAPE DIVISION, CAPE TOWN]

Case No. 935/2020

CAPE TOWN, On Friday the 22ⁿᵈ of January 2021

Before his Honourable Justice De Villiers (Acting)

In the *ex parte* application of :

| | |
|---|---|
| **HERMAN BESTER N.O.** | First Applicant |
| **ADRIAAN WILLEM VAN ROOYEN N.O.** WCD-004 | Second Applicant |
| **CHRISTOPHER JAMES ROOS N.O.** | Third Applicant |
| **JACOLIEN FRIEDA BARNARD N.O.** | Fourth Applicant |
| **DEIDRE BASSON N.O.** | Fifth Applicant |

*(in their capacities as the duly appointed joint provisional liquidators of*

*Mirror Trading International (Pty) Ltd (in provisional liquidation))*

*(for an order extending the powers of the Applicants in terms of Section*

*366(5) and 387(3) of the Companies Act, 61 of 1973 (as amended) ("the 1973*

*Companies Act") read with Item 9 of Schedule 5 of the Companies Act, 71*

*of 2008 (as amended) ("the 2008 Companies Act") and for the convening of*

*a Commission of Enquiry in terms of the provisions of Section 417 and 418*

*of the 1973 Companies Act and the appointment of a Commissioner in*

*terms of Section 418 of the 1973 Companies Act read with Item 9 of*

*Schedule 5 of the 2008 Companies Act)*



14

2

## ORDER

**HAVING READ THE PAPERS FILED OF RECORD** and having heard counsel for the Applicants an order is made in the following terms:

1. Authorising the applicants to bring this application in terms of the provisions of section 386(5) and 387(3) of the Companies Act, 61 of 1973, as amended ("the 1973 Companies Act") read with Item 9 of Schedule 5 to the Companies Act 71 of 2008, as amended ("the 2008 Companies Act").

2. Authorising the applicants in terms of section 386(5) and 387(3) of the 1973 Companies Act read with section 386(4) to:

    2.1 Institute or defend actions or other legal proceedings in terms of section 386(4)(a);

    2.2 Obtain legal advice on any question of law affecting the administration of Mirror Trading International (Pty) Ltd ("MTI") and to engage the services of attorneys and counsel in connection with any matter arising out of or relating to MTI;

    2.3 Agree with such attorneys and counsel on the tariff or scale of fees to be charged by and paid to such attorneys and/or counsel for the rendering of services to MTI and to conclude written agreements with the attorneys and/or counsel in the form contemplated in and by section 73(2) of the



3

Insolvency Act, 24 of 1936 read with section 339 of the 1973 Companies Act;

2.4    Pay the attorneys and/or counsel the agreed costs and the disbursements incurred by the attorneys and counsel out of the funds of MTI as costs in the administration of MTI as and when such services are rendered and disbursements are made;

2.5    Agree to any reasonable offer of composition made to MTI by any debtor and to accept payment of any part of a debt due to MTI in settlement thereof or to grant an extension of time for the payment of any such debt in terms of section 386(4)(b);

2.6    Open an on-line cryptocurrency trading account in the name of, alternatively on behalf of MTI and to receive cryptocurrency to be recovered on behalf of MTI, in such account;

2.7    Sell any movable property of MTI, including any Bitcoin or other form of cryptocurrency, by public auction, public tender, private treaty or relevant platform, as the case may be, and to give delivery thereof in terms of section 386(4)(h)

2.    Engage the services of bookkeepers, accountants, auditors, forensic accountants, forensic digital experts, investigators, key staff or any other person for any purpose for which they may be required in relation to the



*20*

4

affairs of MTI and to treat the costs so incurred as costs in the administration in terms of section 386(4)(i).

3.  Ratifying and confirming all such actions already taken by the applicants as fall under section 386(4)(a) of the 1973 Companies Act, including the engagement by the applicants of attorneys and counsel to bring this application.

4.  That a commission of enquiry into the affairs of MTI be held in terms of the provisions of section 417 read with section 418 of the 1973 Companies Act read with item 9, Schedule 5 of the 2008 Companies Act ("the enquiry").

5.  That Mr Adriaan Serfontein Hurter, Mr Lambertus Von Wielligh Bester, retired Judge Eberhard Bertelsmann and, conditional upon his acceptance of this appointment pursuant to the granting of this order, retired Judge Hans-Joachim Fabricius, be appointed as commissioners in terms of section 418(1)(a) of the 1973 Companies Act and that they be authorised to fix the time(s) and place(s) for the holding of the enquiry as they in their sole direction deem fit.

6.  That the Master of the High Court, Cape Town be authorised to appoint commissioners in addition to the court appointed commissioners, upon the Applicants' duly motivated request to do so ("the additional appointed commissioners").

7.  That the enquiry be referred to the court appointed commissioners and, if applicable, to the additional appointed commissioners and to the duly designated magistrate in any one of the following magistrate courts:



NOTARY
PUBLIC

21

5

(i)     Magistrate Court, Stellenbosch;

(ii)    Magistrate Court, Cullinan;

(iii)   Magistrate Court, Durban.

        ("the designated magistrates")

8.   That the applicants are authorised to proceed with the whole or any part of the enquiry before any one of the court appointed commissioners and/or the additional appointed commissioners and or any of the designated magistrates (collectively referred to as "the commissioners").

9.   That the commissioners are authorised and empowered to summon or cause to be summoned before them any person to be examined at the enquiry by counsel or any attorney on behalf of the applicants or by any other competent party as is provided for in section 418(1)(c) of the 1973 Companies Act. Such persons may include, but are not limited to:

| **NAME** | **CAPACITY** |
|----------|--------------|
| 1.   Cornelius Johannes Steynberg | Director of MTI |
| 2.   Nerina Steynberg | Second in command of MTI |
| 3.   Coenie Rademan | Past Director of MTI |
| 4.   Clynton Hugh Marks | Head of Referral Program and |

NOTARY
PUBLIC

22

6

|   |   | Members of MTI |
|---|---|---|
| 5. | Cheri Marks | Head of Communications and Marketing of MTI |
| 6. | Liz Malton | Management Team member and Training and Presenting Team member of MTI |
| 7. | Charles Ward | COO of MTI |
| 8. | Monica Coetzee | Head of Corporate Services and Training and Presenting Team member of MTI |
| 9. | Romana Samuels | Head of Member Support of MTI and staff member at MTI's Stellenbosch office |
| 10. | Vincent Ward | Head of International Expansion of MTI |
| 11. | Leonard Gray | Head of Legal of MTI |
| 12. | Jaco Eckley | Management Team member and staff member at MTI's Stellenbosch office |
| 13. | Tom Fraser | Management Team member of MTI |
| 14. | Gerald Lassen | Member of MTI and Manager of MTI's Strand office |
| 15. | Duly authorised representative(s) of FXChoice | |
| 16. | A certain Ms Camila | Senior Account Manager of Trade300 |
| 17. | Duly authorised representatives of Standard Bank (being the bank of MTI) | |
| 18. | Duly authorised representatives of ABSA, FNB and Standard Bank | |



23

7

(being the banks of Steynberg)

19.    Duly authorised representative(s) of any other bank in respect of
       bank statements of any party that may be identified as being
       relevant for purpose of investigation the affairs of MTI

20.    Individuals already identified, and still to be identified, who received
       referral commission in the form of bonus and who made "profits" on
       their purported investments with MTI

10.  That the commissioners are authorised and empowered to summons further
     persons before them who, as a result of the evidence led before them or
     representations made to them, appear to them to be capable of giving
     information concerning their knowledge of or dealings and associations with the
     business, trade, property and affairs of MTI.

11.  That all persons summoned before the commissioners may be examined
     concerning the trade, dealings, affairs and property of MTI.

12.  That all persons summoned by the commissioner be ordered to produce at the
     enquiry inter alia all books, record and documents, whether in printed form or
     sorted in digital form (including documents stored through the utilisation of
     computer hardware or software), in their possession, custody, power or under
     their control or in possession, custody, power or under control of the firm,
     company, or any entity by which they are employed or which they represent in
     respect of all matters concerning the trade, dealings, affairs or property of MTI.





8

13. That the signature of the relevant commissioner or the Master of the Western Cape High Court, Cape Town on the summons (subpoenas) to be issued, shall be sufficient for the validity thereof.

14. That the record of this application and all proceedings before the commissioners shall be kept private and confidential and shall not be disclosed without the prior leave of the court or the relevant commissioner having been obtained.

15. That the applicants and commissioners are authorised and empowered to conduct any part of the enquiry, as identified by the applicants, via an appropriate virtual platform in a format to be determined by the relevant commissioner.

16. That the commissioner(s) be directed and instructed to report to the Master of the High Court, Cape Town, in respect of the following, although not limited thereto:

    (i)     The identity of the witnesses who gave evidence before the commissioner(s);

    (ii)    Which assets and/or monies were discovered, if any, through the inquiry and which advantage was derived to the creditors of MTI as a result thereof; and

    (iii)   Whether any unlawful acts, transgressions and/or any other irregularities were discovered by means of the evidence before the commissioners(s)



9

and whether such matters should be referred to the relevant authority for consideration.

17.  That the costs and expenses of this application and the enquiry on an attorney own client scale, be costs in the administration of MTI.

18.  That the applicants be granted such further and/or alternative relief as the court may deem necessary.



BY THE ORDER OF THE COURT

COURT REGISTRAR

Box 97
Mostert and Bosman
Fourth Floor
Madison Square
c/o Carl Cronje & Tygerfalls Boulevard
Bellville
Refr: PDT/AE7WI7098



A2.1

**MIRROR TRADING INTERNATIONAL (PTY) LTD - (IN LIQUIDATION)**
**MASTER'S REFERENCE NUMBER:   C806/2020**

RESOLUTIONS SUBMITTED AT THE SECOND MEETING OF CREDITORS AND MEMBERS, IN TERMS OF SECTION 402 OF THE COMPANIES ACT, ACT 71 OF 1973, AS AMENDED, TO BE HELD BEFORE THE MASTER OF THE HIGH COURT CAPE TOWN, ON FRIDAY, THE 10TH OF DECEMBER 2021 AT 09H00.

**RESOLVED:**

1.  That all actions of whatsoever nature heretofore taken by the liquidators and also as set out in the report, to which these Resolutions are attached, be and are hereby confirmed, ratified and approved of.

2.  That the liquidators be and are hereby granted the authority and shall be vested with all the powers mentioned in the Companies Act 61 of 1973, as amended.

3.  That the liquidators be and are hereby authorized to engage the services of Attorneys, Accountants and/or Counsel and/or Recording Agents, as they may deem necessary the purpose of:

    a.  taking any legal opinion that may be considered necessary in the interest of the estate;

    b.  instituting or defending on behalf of the Company any action or other legal proceedings of a civil nature, and subject to the provisions of any law relating to criminal procedure, any criminal proceedings;

    c.  holding enquiries and examinations in terms of Sections 415, 416, 417 and 418 of the Companies Act, 61 of 1973, as amended, or as read in conjunction with the Insolvency Act nr. 24 of 1936, as amended and to appoint attorneys and counsel and also accountants and any other advisers, to act on their behalf in regard to such enquiries and at the cost of the Company to assist them in regard to such enquiries, and particularly to hold an enquiry as envisaged in the report to creditors, to which these resolutions are attached;

    d.  to draw any contracts and sign any documents as may be necessary;

    e.  for any purpose, in doing searches at the Deeds Offices, Registrar of Companies and other registry, as they in his/their sole and absolute discretion may deem necessary, all costs so incurred to be costs in the liquidation;

    f.  for any other purpose whatsoever, as they, in their sole discretion, may deem fit;

    g.  that the liquidators be duly authorized to agree any tariff and/or scale of rates to be used in determination of any legal or other fees, and in their sole discretion to agree the quantum of such fees, which legal fees shall be on an attorney and own client basis;

    h.  all costs incurred to be treated as administration costs of the estate;

4.  That the liquidators be and are hereby authorized and empowered to investigate any apparent voidable and/or undue preference and/or any disposition of property, and to take any steps which they in their absolute discretion may deem necessary, including the institution of legal actions and the employment of attorneys and/or counsel to have these set aside, and to proceed to the final end or determination of any such legal actions or abandon the same at any time as they in their sole discretion may deem fit, all costs so incurred to be costs in the liquidation. The costs referred to herein being subject to the same conditions and/or he same scales as are set out above.



27

5. That the liquidators be and are hereby authorized to collect any outstanding debts due to the Company in liquidation, and for the purpose thereof, to sell or compound any of these debts for such sum, and on such terms and conditions, as they in their sole discretion may deem fit, or to abandon any claims which they in their sole discretion may deem to be irrecoverable, and to appoint debt collectors in their sole discretion to assist them in the recovery of outstanding debts, and to take all necessary steps on the terms and provisions as they in their sole discretion as liquidators may deem fit, to ensure the maximum debt collections, or to institute Legal Action and/or employ attorneys and/or counsel in connection with the recovery of the debts, and to proceed to the final end or determination of any such legal action instituted or to abandon the same at any time as they in their sole discretion may deem fit, all costs so incurred to be costs in the liquidation. The costs referred to herein being subject to the same conditions and on the same scales as are set out above.

6. That the liquidators be and are hereby authorized to sequestrate the estate of any person or liquidate any Company in order to recover any monies due to the Company where they consider/s it necessary and that the costs in relation thereto be costs in the liquidation. The costs referred to herein being subject to the same conditions and on the same scale as are set out above.

7. That the liquidators be and are hereby authorized to engage the services of bookkeepers, accountants and auditors, consultants, document managers, IT consultants and any other advisers to investigate and write up the books of the Company as may be required, and if necessary, to produce an audited balance sheet as at the date of liquidation, either for the purpose of investigating the affairs of the Company, establishing the claims of creditors, or any other purpose as they in their sole discretion may deem fit, all costs incurred in relation thereto to be costs in the liquidation. The liquidators, in their sole discretion, may agree the costs with the relevant service providers and advisers on behalf of the Company. The Liquidators be and are hereby authorized and instructed to pay the costs for and relating to preparing creditor claims and representing creditors, and preparing for same, at meetings and assisting in regard to the payment of their dividends, as a cost of administration from the assets of the estate. All costs incurred in connection with any such services and service providers to be treated as costs of the administration of the estate. The costs referred to herein being subject to the same conditions and on the same scale as are set out in 3.g above.

8. That the liquidators be and are hereby authorized to sell or in any other way dispose of any immovable or movable assets of the Company, whether as going concerns, or otherwise, or whether separately or jointly with any other person or corporate entity, and on such terms and conditions as the liquidators in their sole discretion may decide on and particularly in their sole discretion, should they decide to sell or otherwise dispose of any such asset, jointly with any other person or corporate entity, on the method and quantum of division, of the total consideration, by public auction, tender or private treaty and on such terms and conditions as the liquidators in their sole discretion may deem fit and any other costs thereof which they, in their sole discretion may deem fit and any other costs thereof which they, in their sole discretion cannot pass over, to be costs of liquidation.

9. That the Liquidators be and is/are hereby authorized to sell any immovable property as per the instructions given by the secured creditor at any given time. This includes the proceeding to public auction by the auctioneers nominated by the secured creditor. In such an event the secured creditor will have the opportunity to assess the offer and decide to buy the property in or instruct the liquidator to further market the property and / or proceed with a second auction at a later stage.

10. That the liquidators, in the case of the sale of any immovable property by the estate, and where the liquidators contract that they as sellers shall be entitled to nominate the conveyancers to do the conveyancing of the property to the purchaser, shall be entitled to instruct attorneys, to effect such registration of transfer on condition that the purchaser pays all cost or transfer and that the seller estate has no liability for such costs of transfer or any part thereof.

ELSJE VAN DEVENDEL
NOTARY PUBLIC

11. That the liquidators are furthermore authorized in their sole discretion to abandon any asset for which they can find no purchaser, or which is not practical to sell, the costs of which are the costs of the liquidation.

12. That in the event of any asset which is subject of a mortgage bond, pledge or any other form of security not realizing sufficient to pay the claim of the secured creditors, plus the pro rata share of the costs of administration in full, that the liquidators be and are hereby authorized in their discretion to sell such asset to the creditor concerned at an agreed valuation, subject to the payment by such creditor of pro rata of the costs of administration in terms of Section B9 of the Insolvency Act, as amended.

13. That the said liquidators be and are hereby authorized and empowered in their sole discretion to compromise or admit any claim against the Company, whether liquidated or unliquidated arising from any guarantee, damages claim or any other cause whatsoever, as a liquidated claim in terms of Section 78 (3) of the Insolvency Act, as amended, at such amount as may be agreed upon by both the creditor concerned and the liquidators, and to accept payment of any claims, due to the Company by way of delivery or issue of shares and to appoint any directors to any subsidiary companies, as the liquidators may deem necessary and to sell any subsidiaries on such terms and conditions as they in their sole discretion, on behalf of the Company, deem fit. In view of the large number of MTI members and the fact that back-office data is available, the liquidators be and are herby authorized and empowered to use the following procedure for proof of claims against the estate, instead of any other method or in addition thereto as they may decide namely:

    a) Appoint a suitable data service provider with knowledge of insolvency claims to be provided with a copy the back-office database and to use that data for further analysis of what the claim of every MTI member should be, and which person received dispositions that may be set aside, with instructions to prepare for every MTI member a statement of transactions in a format that is easy to follow.

    b) The data service provider to compare all existing claims to the result of the said statement of transactions and to provide a report with recommendations of which claims may be admitted at which amounts.

    c) If the MTI member has already submitted a claim for an amount that agrees with the amount so recommended the liquidators may admit such claim at that amount.

    d) If the MTI member has already submitted a claim for an amount that does not agree with the amount recommended, the liquidators must advise the MTI member accordingly and provide a copy of the aforesaid statement of transactions and invite the member to provide further information and debate the correct amount of the claim according to such suitable procedure as may be determined by the liquidators on a case-by-case basis. Such advice should also be digital only without paper, to be produced by the data service provider in such format as directed by the liquidators.

    e) For those members that have not yet submitted claims, the liquidators must send to each such member a copy for the aforesaid statement of transactions and invite the member to indicate whether the member agrees with the statement and whether the member wishes his or her claim to be admitted against the estate.

    f) Such statements or claims will be kept in digital format only and need not be printed. They must however all be saved in an archive PDF format and retained as part of the records of the estate.

14. That the liquidators are authorized to take all such other steps and to do such other acts as they in their sole discretion on behalf of the Company, may deem fit, and at the cost of the Company.

WCD-003

NOTARY PUBLIC

15. That the Liquidators be and are hereby authorized to make application for the destruction of the books and records of the Company, six months after confirmation of the Final Account;

16. That any excess in premiums and stamp duty on Security Bonds or Asset Insurance, which is more than that provided for in Rule 31, laid down by the Master of the High Court, be and are hereby authorized as an administration expense of the estate.

17. That the actions of the liquidators in employing nightwatchmen/security guards to protect the premises and assets of the Company, be and are hereby approved and ratified, all costs relating thereto, to be the costs in the liquidation.

18. That the actions of the Liquidator in advertising, calling for tenders for the purchase of the business and/or assets of the Company, be and are hereby approved and ratified, all costs so incurred to be costs in the liquidation.

19. That the actions of the provisional liquidators and/or liquidators in having disposed of assets, shares and loan accounts, prior to the date of this meeting, be and are hereby approved and ratified, all costs incurred in relation thereto to be costs of the liquidation.

20. That the actions of the provisional liquidators and/or liquidators in continuing the business of the Company and retaining staff be and are hereby approved and ratified, all costs so incurred to be the costs of liquidation.

21. That the actions of the provisional liquidators and/or liquidators in employing salesmen and administration personnel and generally to protect the interests of creditors be and are hereby approved and ratified and the fees of such personnel to be costs in the liquidation.

22. That the liquidators be and are hereby authorized and empowered to continue such the business of the Company from the date of liquidation until such time as creditors instruct them to the contrary or until such time as the assets are realized and to do all things which they in their sole discretion may deem necessary for the successful continuation of the business (all costs incurred to be costs in the liquidation) and without restricting the generalities of their powers, he/they are hereby specifically authorized;

22.1 To discharge and engage employees and to fix their remuneration;

22.2 To continue the lease of the Company's premises until such time as it is decided to determine the lease.

22.3 The employ persons to undertake the physical count and valuation of stock in trade at the beginning and end of any trading period subsequent to the date of liquidation of the Company.

22.4 To employ persons to prepare an inventory or inventories of all movable assets of the Company.

22.5 Generally, to do all things which they in their discretion may deem necessary to determine the lease.

23. That the liquidators and/or liquidators are hereby indemnified against any losses and/or claims for damages resulting from the continuation of the Company's business, all such losses and damages to be costs in the liquidation.

30

24.  That the liquidator/s are hereby authorized to submit for determination and/or arbitration any dispute concerning the estate or any claim or demand by or upon the estate and that any costs so incurred to be paid for by the estate.

25.  That the further administration of the affairs of the Company be left entirely in the hands and at the discretion of the liquidators.

26.  That the liquidators are hereby authorized to appoint a representative on behalf of creditors to attend creditors meetings and tender the cost.

27.  It is resolved that the Liquidators "out of pocket" expenses be regarded as items of expenditure and may be charged as administration costs that would include: –

The costs of agents to obtain: –

27.1      ITC searches and documents

27.2      Credit Inform searches

27.3      Cipro searches

27.4      Deeds Office searches

27.5      Natis document searches

28.  The costs of the use of couriers for the delivering and acceptance of any document or parcel on behalf Estate when the local postal service is not used.

29.  Travelling expenses which include time, fuel, kilometers, toll fees, airfares and accommodation.

30.  Interest be charged on all funds and monies advanced by any person or company at prime rate till payment thereof.

The liquidator's Resolutions for adoption by creditors were presented and approved of.

ADOPTED ON BEHALF OF CREDITORS:

For liquidators, present at 2nd meeting, not notary S.O. Sintenje

ADOPTED ON BEHALF OF MEMBERS:

PRESIDING OFFICER:



MASTER OF THE WESTERN CAPE HIGH COURT
CAPE TOWN
2022 -02- 0 4
A M: INSOLVENT ESTATES 3
MEESTER VAN DIE WES KAAP HOË HOF

ELSJE VAN DE VENDEL
NOTARY PUBLIC

51

A3

29-12-2020

IN THE HIGH COURT OF SOUTH AFRICA
(WESTERN CAPE DIVISION, CAPE TOWN)

CASE NO: 19201/2020

BEFORE THE HONOURABLE MR JUSTICE ROGERS
AT CAPE TOWN: ON TUESDAY, 29 DECEMBER 2020

In the matter between:

ANTON FRED MELCHIOR LEE                                   Applicant

and

MIRROR TRADING INTERNATIONAL (PTY) LIMITED          First Respondent
T/A MTI
(REGISTRATION NUMBER: 2019/205570/07)
Registered office at: 43 Plein Street
                      Unit 1
                      First Floor
                      Stellenbosch
                      Western Cape.

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)           Second Respondent

Private Bag X9020, Cape Town 8000

2020 -12- 2 8
DRAFT ORDER
WCD-010

Having read the documents filed of record and having heard Counsel for the
Applicant, it is hereby ordered that:



1.  The First Respondent is hereby placed under provisional liquidation in the hands of the Master of the High Court, Cape Town.

2.  A rule *nisi* is hereby issued calling upon all persons interested to show cause, if any, on Monday, 1 March 2021 at 10h00, or as soon thereafter as the application may be heard, why a final order should not be granted in the following terms: 

    2.1    That the First Respondent be placed under Final Liquidation; and

    2.2    That the costs of this application shall be costs in the Liquidation.

3.  A copy of this provisional order is to be served as follows:

    3.1    On the Respondent at its principal place of business at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape;

    3.2    On the employees of the First Respondent, if any, at 43 Plein Street, Unit 1, First Floor, Stellenbosch, Western Cape; and at 341 Begeos Nande Drive, Randburg, Gauteng.

    3.3    By one publication in each of the *Sunday Times* and *Rapport* newspapers respectively; and

    3.4    On the South African Revenue Service, Cape Town at 22 Hans Strijdom Avenue, Cape Town.

2



33

4.   The Registrar of this Honourable Court shall transmit a copy of this provisional
order to the Sheriff of the province in which the registered office of the First
Respondent is situated and to the Sheriff of every province in which it appears
the First Respondent owns businesses.

5.   The Sheriff of this Honourable Court shall attach all property that appears to
belong to the First Respondent and transmit to the Master an inventory of all
property attached by him or her in terms of section 19 of the Insolvency Act 24
of 1936.

BY ORDER OF THE COURT

Private Bag X9000, Cape Town

2020 -12- 2

WCD-003

WCD-018

COURT REGISTRAR

VEZI & DEBEER INC: YASIN ALLI (REF: YALLI) Yasin@vezidebeer.co.za
3RD FLOOR, EQUITY HOUSE, 107 ST GEORGES MALL, CAPE TOWN, TEL: (012) 361 2746
HC BOX: 763

3



**Final Liquidation**

*IN THE HIGH COURT OF SOUTH AFRICA*
*WESTERN CAPE DIVISION, CAPE TOWN*

Case No: 19201/2020

*BEFORE THE HONOURABLE ACTING JUSTICE DE WET*
*CAPE TOWN:  WEDNESDAY, 30 JUNE 2021*

In the matter between:

ANTON FRED MELCHIOR LEE                                    Applicant

and                              2021 -06- 3 0

MIRROR TRADING INTERNATIONAL (PTY) LTD t/a MTI    First Respondent
(Registration Number: 2019/205570/07)
Registered Office at          43 Plein Street, Unit 1
                              1st Floor, Stellenbosch
                              Western Cape

FINANCIAL SECTOR CONDUCT AUTHORITY (FSCA)      Second Respondent

CLYNTON HUGH MARKS                                   Third Respondent

and

ADRIAAN WILLEM VAN ROOYEN N.O.         First Proposed Intervening Party
HERMAN BESTER N.O.                   Second Proposed Intervening Party
CHRISTOPHER JAMES ROOS N.O.           Third Proposed Intervening Party
JACOLIEN FRIEDA BARNARD N.O.         Fourth Proposed Intervening Party
DEIDRE BASSON N.O.                    Fifth Proposed Intervening Party

ORDER




56

1022

2

Having heard Counsel for Applicant, First and Third Respondents as well as First to Fifth Proposed Intervening Parties;

**IT IS ORDERED THAT:**

1.  The application for the reconsideration of the provisional order in terms of Rule 6(12)(c) is dismissed;

2.  The *rule nisi* granted on 29 December 2020, is made absolute and First Respondent is placed under Final Liquidation;

3.  The costs of this application, are costs in the administration of First Respondent;

4.  The costs occasioned by the intervention of Third Respondent, as taxed on an attorney and client scale, be paid by Third Respondent;

5.  The application for intervention by First to Fifth Proposed Intervening Parties as well as their counter application is postponed in terms of an order issued separately from this order for sake of convenience.

**BY ORDER OF THE COURT**

Cape Town High

**2021 -06- 3 0**

_____
**COURT REGISTRAR**

763  Coombe Commercial
     c/o Vezi & De Beer Inc
     CAPE TOWN



A5    56



Financial Sector
Conduct Authority

**FSCA Press Release**                                    **18 August 2020**

**Mirror Trading International**

The FSCA is investigating the activities of Mirror Trading International. The FSCA is of the view that the current business model of Mirror Trading International requires it to be in possession of a financial service provider licence. MTI has informed us that they accept clients' funds in the form of Bitcoin, pool the funds into one trading account on a forex derivative trading platform, and conduct high frequency trading through the utilisation of a Bot. If this is being done as described, then this amounts to financial services, hence the licence requirement.

However, the FSCA has a much greater concern about the activities of the company. MTI claims to have more than R2.9 billion (at current conversion rates) in clients' funds in trading accounts, but we have not been able to conclusively confirm that the funds exist.

Moreover, the returns on the investments claimed by MTI seem far-fetched and unrealistic. According to MTI its Bot-trading is able to generate consistent profits of an average of 10% per month. The FSCA warns the public that MTI is not licensed to conduct the proclaimed business that they are conducting and that they are aware of the need for a FSP licence. The FSCA also draws attention to the fact that FX Choice, the previous platform broker for MTI seems to have made public statements that gainsay the version of MTI in terms of trading volumes and Bot trading. FX Choice has blocked the account of MTI due to compliance concerns. We are in the process of obtaining confirmation from FX Choice of the correctness of the statements attributed to them.

Transitional Management Committee

DP Tshidi (Commissioner)   CD da Silva   JA Boyd   MM du Toit   LP Kekana   SK Gibson   OD Makhubela   P Mogase

NOTARY PUBLIC

The investigation is ongoing, and MTI has partially co-operated with the FSCA. We are reviewing the information as it becomes available and will involve the South African Police Service if the discrepancies are confirmed. MTI has undertaken to inform all of its clients of the investigation and to provide the opportunity to all its clients to withdraw their assets that are with MTI. We recommend that clients request refunds into their own accounts as soon as possible.

**ENDS**

Enquiries:           Brandon Topham

Email address: brandon.topham@fsca.co.za

Telephone: 012 367 7856



54



**FSCA**

Financial Sector
Conduct Authority

P.O. Box 35655
Menlo Park
0102

Tel +27 12 428 6000
Toll free, 0800 20 3722
Fax, +27 12 346 6941
Email. info@fsca.co.za
Website. www.fsca.co.za

**FSCA Press Release**                                    **28 October 2020**

### FSCA conducts search operations at premises of Mirror Trading International

On 26 October 2020, the Financial Conduct Authority (FSCA) executed three search and seizure warrants, which were issued by three separate high courts in Limpopo, Kwazulu-Natal and Western Cape, on application by the FSCA, at the home of the Chief Executive Officer of Mirror Trading International (MTI), Mr. Johan Steynberg, the home of the Marketing Director of MTI, Mrs. Cheri Marks, and the MTI offices in Stellenbosch.

The FSCA does not conduct criminal investigations. Our investigations are carried out in terms of the Financial Sector Regulations Act, 9 of 2017, which is aimed at protecting the South African investing public and to ensure a secure financial sector. Investigations may lead to referrals of evidence to other authorities or to the South African Police Service (SAPS).

Following the execution of the warrants against MTI, the next step is for the FSCA investigators to examine the evidence and compare it with other information obtained, On conclusion of the investigation, the FSCA will make decisions which may include taking regulatory or administrative action where necessary, and or referring the evidence obtained to other bodies.

The regulator strongly refutes allegations that the FSCA lied to the Courts. While demonstrations have been made by MTI to FSCA investigators, with the view to convince them that live trading was taking place and that bitcoin balances existed, the FSCA has not been able to independently confirm the accuracy of the demonstrations. The FSCA has also received contradictory information about these trades. Obtaining independent evidence to support certain statements made to the investigators (including existence of the trading and balance of investor funds), is part of the reason why applications were made to the Courts to allow the investigators to gather further evidence.

MTI previously indicated that they were trading in foreign exchange, and that they now trade in Crypto assets. The information at the disposal of the investigation team indicates that both these trading operations were and are implemented by means of derivative financial instruments. The FSCA has jurisdiction over all derivative instruments regardless of what asset or commodity forms the basis for the trades, The Authority therefore, rejects the statement that it does not have jurisdiction to investigate the matter.

Transitional Management Committee

DP Tshidi (Commissioner)    CD da Silva    JA Boyd    MM du Toit    LP Kekana    K Gibson    OB Makhubela    P Mogase

ELSJE VAN DE VEN
NOTARY
PUBLIC
SOUTH AFRICA

39

The FSCA's investigation will continue without fear, favour or prejudice and the regulator and its investigators are not threatened or deterred by unfounded defamatory remarks. Our earlier warning to the public to exercise extreme caution when "investing" with any person or organisation not registered as a Financial Service Provider or in terms of a properly executed Prospectus registered with the CIPC or registered as a financial institution with the Prudential Authority, remains in place.

**ENDS**

Enquiries: 2022-12- 2 9

WCD-003

Financial Sector Conduct Authority

Email address: FSCACommunications@fsca.co.za

Telephone: 0800 203 722



2

40



**Financial Sector
Conduct Authority**

**FSCA Press Release**                                    **17 December 2020**

### The FSCA's investigation on Mirror Trading International nears completion

The Financial Sector Conduct Authority (FSCA) has previously warned the public against trading with MTI (Mirror Trading International (Pty) Limited) and makes this information available, because it believes it is in the public interest to warn financial customers and to protect the public.

The FSCA now reports that its investigation into this entity is near completion as MTI is not licensed to conduct financial services and has not applied for such a licence. The Authority believes that MTI and its senior management are conducting an illegal operation, misleading clients and have contravened several laws.

Mr Cornelius Johannes Steynberg, CEO of MTI has actively assisted in the operations by Mr Clynton Hugh Marks and Mrs Cheri Marks ("Marks").

### The evidence and statements of MTI, Steynberg and Marks

MTI first started trading in April 2019. Members of the public were invited to register on the MTI website (www.mirrortradinginternational.co.za and www.mymticlub.com) and move their Bitcoin from their Bitcoin wallet to MTI Bitcoin wallets. Steynberg was in full control of these MTI Bitcoin wallets. From the MTI Bitcoin wallet, the Bitcoin were transferred to MTI's forex platform "broker of choice" by the name of FXChoice Ltd ("FXChoice").

Steynberg testified under oath, that from April 2019 to July 2019, member trading accounts were linked to a professional trader appointed by MTI through a multi account manager arrangement linked to Meta Trader 4. Trading was conducted in derivative instruments based on forex pairs.

ELSJE VAN DE VENDEL
NOTARY
PUBLIC
SOUTH AFRICA
GAUTENG

41

However, according to Steynberg MTI experienced substantial losses (of up to 80%), and as a result, MTI requested its members to delink their respective FXChoice accounts from the multi account manager account and move their bitcoin to a pooled account.

As a result, from August 2019 Steynberg claimed that MTI employed a bot (high frequency artificial intelligence trading) together with a head trader and trading team to make all its trading decisions, with great success. The Authority found evidence contradicting this assertion.

During October 2020, after the FSCA informed MTI that it was an conducting illegal unregistered financial services business, MTI claimed that it changed its trading activities to trade in derivative instruments based on crypto currency (Bitcoin), so that it no longer fell within the jurisdiction of the FSCA, and that it no longer required an FSP licence (financial services provider licence). This is also incorrect as the submissions received from Steynberg revealed that the crypto was alleged to be traded in the form of a derivative product, which would have required registration with the FSCA as well. We have found no evidence that any crypto trading is being conducted as communicated with members of MTI.

MTI, Steynberg, and Cheri Marks claim that the trading activities of MTI were from FXChoice to Trade300, transferring all the clients' crypto assets from FXChoice to Trade300.

According to Steynberg, Trade300 is another on-line trading platform. At Trade300 MTI experienced the same extraordinary profits utilising the bot – but at this stage trading in crypto derivatives.

Steynberg stated under oath and repeatedly in the press that the bot trading averaged a return of 10% per month, and that MTI has never had a negative profit trading day, but for one exception. Marks also repeatedly confirmed the trading successes on social media.



42

### The evidence uncovered by the investigation

The FSCA obtained evidence from FXChoice, a Belize registered on-line trading platform, that is in complete contradiction with the claims of Steynberg and Marks. According to FXChoice they received queries from clients of MTI and in the process the clients provided FXChoice with trading statements. The source of the trading statements was MTI. These trading statements were based on demo trading accounts and not actual trades. As a result, FXChoice froze the balance of the crypto assets linked to MTI on the FXChoice platform.

However, the total frozen crypto assets on FXChoice is a negligible amount, taking into account the total assets that MTI claimed it invested on behalf of its clients. FXChoice confirmed that MTI put in 1846.72 Bitcoin from 29 January 2020 until 3 June 2020 and made a loss of 566.68 Bitcoin, an approximate capital loss of 30%.

The FSCA attempted to track down Trade300 to obtain a statement and trading details from it, to verify the version of MTI. MTI did not provide any useful details that assisted the FSCA.

The FSCA followed all possible links on the internet to establish whether Trade300 existed. It could only find one reference to Trade300; i.e. the website of Trade300. However, the website was and still is "under maintenance", and the only reference linked to the website is the name of "Joe Steyn", a known alias of Steynberg.

The FSCA obtained search and seizure warrants and executed them at the homes of Steynberg and Marks, and the offices of MTI. On the desktop computer of Steynberg the investigation team found evidence relating to Trade300. It would therefore appear that Trade 300 is linked to Steynberg.

As a further effort to verify the evidence of MTI, Steynberg and Marks, the FSCA requested information from MTI about the transfer of clients' assets from FXChoice to Trade300. MTI, in support of its assertion purported to provide proof of the transfer in the form of Bitcoin wallets, stating that MTI transferred 16 444 Bitcoin from FXChoice to Trade300 in 4 instalments on 21 July 2020; 22 July 2020 and 24 July 2020 respectively.



43

The FSCA found that no withdrawal of bitcoin by MTI from FXChoice occurred in July 2020. The last withdrawal of bitcoin by MTI from FXChoice was conducted in August 2019. Further, FX Choice confirmed that none of the eight sending wallets are related to FX Choice and that FX Choice had neither received deposits from nor sent any payments to any of the eight bitcoin wallets.

The transfers were made from wallets with transaction activities which bear no resemblance to the purported activities of MTI.

We have found no evidence of any significant store of Crypto assets on any trading platform and that most crypto balances appear in the name and under control of Steynberg. The amount of such balances is well below the advertised balance on the MTI trading platform as being due to investors of MTI.

In the last few days, we received complaints that investors were unable to redeem their investments.

The investigation is on-going, and a criminal case has been opened by the FSCA with the South African Police Services.

**ENDS**

Enquiries:          Financial Sector Conduct Authority
                    Email address: fscacommunications@fsca.co.za
                    Telephone: 0800 203 722



Transitional Management Committee:
OB Makhubela (Commissioner)    DP Tshidi    JA Boyd    MM du Toit    LP Kekana    K Gibson

A6 44

TRAVIS J. ILES
SECURITIES COMMISSIONER

CLINTON EDGAR
DEPUTY SECURITIES COMMISSIONER

Mail: P.O. BOX 13167
AUSTIN, TEXAS 78711-3167

Phone: (512) 305-8300
Fax/Mailer (512) 305-8310

## Texas State Securities Board

208 E. 10th Street, 5th Floor
Austin, Texas 78701-2407
www.ssb.texas.gov

E. WALLY KINNEY
CHAIR

MIGUEL ROMANO, JR.
MEMBER

KENNY KONCABA
MEMBER

ROBERT BELT
MEMBER

MELISSA TYROCH
MEMBER

WCD-003

2022-12-29

IN THE MATTER OF  §
MIRROR TRADING INTERNATIONAL PTY LTD;  §
CORNELIUS JOHANNES "JOHANN" STEYNBERG;  §  Order No. ENF-20-CDO-1811
FOREXANDBITCOIN.COM;  MICHAEL  AARON  §
CULLISON; STEVE HERCEG AND BRIAN D. KNOTT  §

**Mirror Trading International PTY LTD**
Service by certified mail, return receipt requested, addressed to (1) 43 Plein Street, Unit
1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600; and (2) P.O. Box 7149,
Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

**Cornelius Johannes "Johann" Steynberg**
Service by certified mail, return receipt requested, addressed to (1) 43 Plein Street, Unit
1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600; and (2) P.O. Box 7149,
Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

**ForexandBitcoin.com**
Service by certified mail, return receipt requested, addressed to (1) 9650 South Maryland,
Parkway, Suite A5, #446, Las Vegas, Nevada 89183; (2) 122 Coney Island Avenue, Las
Vegas, Nevada 89123; (3) 1850 Autumn Gold Avenue, Las Vegas, Nevada 89123; (4)
8493 Moon Dance Cellars Court, Las Vegas, Nevada 89139; (5) 10352 Gwynns Falls
South, Las Vegas, Nevada 89123; and (6) 1371 Pedro Street, San Jose, California 95126.

**Michael Aaron Cullison**
Service by certified mail, return receipt requested, addressed to (1) 9650 South Maryland,
Parkway, Suite A5, #446, Las Vegas, Nevada 89183; (2) 122 Coney Island Avenue, Las
Vegas, Nevada 89123; (3) 1850 Autumn Gold Avenue, Las Vegas, Nevada 89123; (4)
8493 Moon Dance Cellars Court, Las Vegas, Nevada 89139; (5) 10352 Gwynns Falls
South, Las Vegas, Nevada 89123; and (6) 1371 Pedro Street, San Jose, California 95126.

**Steve Herceg**
Service by certified mail, return receipt requested, addressed to (1) 2219 West Olive
Avenue, #322, Burbank, California 91506; and (2) 162 Kenneth Road, Glendale, California
91201.







ELSJE VAN DE VENDEL
NOTARY
PUBLIC

45

Brian D. Knott
Service by certified mail, return receipt requested, addressed to (1) 10409 Long Leaf Place, Las Vegas, Nevada 89134; and (2) and 2209 Latitudes Court, Las Vegas, Nevada 89108.

## EMERGENCY CEASE AND DESIST ORDER

This is your OFFICIAL NOTICE of the issuance by the Securities Commissioner of the State of Texas (the "Securities Commissioner") of an EMERGENCY CEASE AND DESIST ORDER pursuant to Section 23-2 of The Securities Act, Tex. Rev. Civ. Stat. Ann. arts. 581-1-581-45 (the "Securities Act").

The Enforcement Division of the Texas State Securities Board (the "Enforcement Division") has presented evidence sufficient for the Securities Commissioner to find:

## FINDINGS OF FACT

1. Mirror Trading International PTY LTD ("Respondent Mirror Trading") can be served at 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600, and P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

2. Cornelius Johannes "Johann" Steynberg ("Respondent Steynberg") is the Founder, Director, and Chief Executive Officer of Respondent Mirror Trading. He can be served at 43 Plein Street, Unit 1 Ground Floor, Stellenbosch, Western Cape, South Africa 7600, and P.O. Box 7149, Drostdy Centre, Stellenbosch, Western Cape, South Africa 7599.

3. ForexandBitcoin.com ("Respondent ForexAndBitcoin") is a multilevel marketer for Respondent Mirror Trading. It can be served at 9850 South Maryland, Parkway, Suite A5, #448, Las Vegas, Nevada 89183; 122 Coney Island Avenue, Las Vegas, Nevada 89123; 1860 Autumn Gold Avenue, Last Vegas, Nevada 89123; 8493 Moon Dance Cellars Court, Las Vegas, Nevada 89139; 10332 Gwynne Falls South, Las Vegas, Nevada 89123; and 1371 Pedro Street, San Jose, California 96126.

4. Michael Aaron Cullison ("Respondent Cullison") is the owner of Respondent ForexAndBitcoin and a multilevel marketer for Respondent Mirror Trading. He can be served at 9850 South Maryland, Parkway, Suite A5, #448, Las Vegas, Nevada 89183; 122 Coney Island Avenue, Las Vegas, Nevada 89123; 1860 Autumn Gold Avenue, Last Vegas, Nevada 89123; 8493 Moon Dance Cellars Court, Las Vegas, Nevada 89139; 10332 Gwynne Falls South, Las Vegas, Nevada 89123; and 1371 Pedro Street, San Jose, California 96126.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 2



46

5.  Steve Herceg ("Respondent Herceg") is a multilevel marketer for Respondent Mirror Trading. He can be served at 2219 West Olive Avenue, #322, Burbank, California 91506, and 152 Kenneth Road, Glendale, California 91201.

6.  Brian D. Knott ("Respondent Knott") is a multilevel marketer for Respondent Mirror Trading. He can be served at 10409 Long Leaf Place, Las Vegas, Nevada 89134, and 2209 Latitudes Court, Las Vegas, Nevada 89106.

## RESPONDENT MIRROR TRADING IS
## RECRUITING MULTILEVEL MARKETERS TO PERPETRATE AN
## INTERNATIONAL CRYPTOCURRENCY AND FOREX INVESTMENT SCHEME

7.  Respondent Mirror Trading purports to operate as a private company in The Western Cape, a province of South Africa located off the south-western coast of the country.

8.  Respondent Mirror Trading is perpetrating an international multilevel marketing scheme tied to investments in a cryptocurrency and forex trading pool.

9.  Respondent Mirror Trading is promising to pay lucrative commissions to multilevel marketers for promoting its investments and recruiting other multilevel marketers.

10. Respondent Mirror Trading is touting the success of its multilevel marketers in recruiting new members. It claims to have recruited almost 78,000 members from more than 170 countries, including more than 22,500 members since March 1, 2020.

11. Its multilevel marketers are now illegally soliciting Texans to purchase fraudulent investments in the cryptocurrency and forex trading pool.

## RESPONDENTS FOREXANDBITCOIN, CULLISON,
## KNOTT AND HERCEG ARE PUBLICLY SOLICITING TEXAS RESIDENTS

12. Respondents ForexAndBitcoin, Cullison, Knott and Herceg are multilevel marketers for Respondent Mirror Trading.

13. Respondents ForexAndBitcoin, Cullison, Knott and Herceg are advertising the investments in the cryptocurrency and forex trading pool through forums in craigslist.org for Texas residents.

14. Respondents ForexAndBitcoin, Cullison, Knott and Herceg are touting the profitability of the investments in the cryptocurrency and forex trading pool, variously claiming as follows:

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 3





ELSIE VAN DE VENDEL
NOTARY PUBLIC



47

A.    Investors deposit as little as $100 and make an average of 10% per month;

B.    Investors simply need to "[j]ust sit back and watch [their] MONEY grow;"

C.    The investments pay "daily trade income," the daily trade income is "automatically compounded" and "compound interest is the 8th Wonder of the World;"

D.    The investment "grows your bitcoin compounding daily earning an average of 10% per month;"

E.    The investments have more then 200+ days straight with positive gains; and

F.    The investments close 600 to 800 trades each day and have not lost a trade in almost a year.

15.    In addition to touting the profitability of the investments in the cryptocurrency and forex trading pool, Respondent Herceg is targeting Texans impacted by changes to the economy, in part by encouraging them to put their governmental assistance "stimulus/covid check to work" by purchasing the investments.

16.    In addition to touting the profitability of the investments, Respondents ForexAndBitcoin, Cullison, Knott and Herceg are also touting the profitability of the multilevel marketing program.

## THE QUALIFICATIONS AND PRIOR FINANCIAL EXPERIENCE
## OF THE MULTILEVEL MARKETERS PROMOTING THE PRODUCT IN TEXAS

17.    Although Respondents ForexAndBitcoin, Cullison, Knott and Herceg are touting the profitability of both the investments in the bitcoin and forex trading pool and the multilevel marketing program, they are not providing investors with information relating to their qualifications and their prior financial experience, including the following information:

A.    Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about June 17, 1999, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, California Northern Bankruptcy Court, Case No. 99-54197;

B.    Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about August 25, 2006, Respondent Cullison filed a

Emergency Cease and Desist Order/Minor Trading International PTY LTD et al./Page 4





ELSIE VAN DE VENDEL
NOTARY
PUBLIC

48

Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 08-12244-bam;

C.   Respondents ForexAndBitcoin and Culfson are not telling potential investors that on or about September 23, 2011, Respondent Culfson, formerly doing business as Empower Nutrition Inc., LLC, and doing business as Fusion Nutrition Inc., filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 15-15113-leb;

D.   Respondents ForexAndBitcoin and Culfson are not telling potential investors that on or about August 4, 2015, Respondent Culfson filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 08-12244-bam;

E.   Respondent Knott is not telling potential investors that on or around June 15, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 10-21128-bam;

F.   Respondent Knott is not telling potential investors that on or about August 9, 2019, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 19-15134-abl; and

G.   Respondent Heroed is not telling potential investors that on or about October 4, 2017, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. 2:17-bk-22208-BR.

RESPONDENT MIRROR TRADING MAINTAINS INTERNET
WEBSITES THAT SERVE AS PLATFORMS FOR PURCHASING
THE INVESTMENTS IN THE CRYPTOCURRENCY AND FOREX POOL

18.   Respondent    Mirror    Trading    maintains    internet    websites    at www.mirrortradinginternational.com (the "MTI Website") and www.mymticlub.com (the "MTI Club Website").

19.   The MTI Website and the MTI Club Website advertise the investments in the cryptocurrency and forex trading pool.

20.   The MTI Club Website serves as a platform for purchasing the investments in the cryptocurrency and forex trading pool.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 8

49

## THE INVESTMENTS IN THE
## CRYPTOCURRENCY AND FOREX TRADING POOL

21. Respondent Mirror Trading is issuing investments in a cryptocurrency and forex trading pool whereby it purports to pool cryptocurrencies and somehow use the cryptocurrencies to trade forex for a profit.

22. Respondent Mirror Trading is describing the investments in the cryptocurrency and forex trading pool in greater detail as follows:

    A.    Potential investors purchase the investments in the cryptocurrency and forex trading pool by registering as members through the MTI Club Website and funding their accounts with bitcoin;

    B.    Respondent Mirror Trading thereafter verifies the deposit and transfers the bitcoin to a "trading pool" with various "registered and regulated" forex brokers;

    C.    Respondent Mirror Trading employs advanced "digital software" and "artificial intelligence" to trade the bitcoin on the forex markets through the brokers' platforms;

    D.    The forex trading generates income, and Respondent Mirror Trading retains a portion of the income to cover costs and pay salaries and commissions; and

    E.    Respondent Mirror Trading also uses income generated through forex trading to pay returns to investors equal to their a pro rata share of 40 percent of daily trading profits.

23. Respondent Mirror Trading is publishing historical information that purports to show it has earned considerable returns for investors. For example, it claims that average daily profit for investors was 0.5334 percent from September 2019 through April 2020, and it claims investors received compounded returns of 141.76 percent during this eight-month period of time.

24. Respondent Mirror Trading is also publishing current information that purports to reflect it continues to provide lucrative income for investors. For example, it is representing as follows:

    A.    On June 25, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.1684 percent;





50

B.   On June 25, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.2598 percent;

C.   On June 24, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.6218 percent;

D.   On June 23, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.5394 percent; and

E.   On June 22, 2020, the daily trading income derived from the cryptocurrency and forex trading investment was 0.1198 percent.

25.   Respondent Mirror Trading is also projecting future returns will continue to generate profits of around 10 percent per month. It projecting these future returns as follows:

A.   An investment of 1 bitcoin, valued at around $9,168.84 at the time of investment, will generate an ending balance of around 3.73112834 bitcoin worth around $34,209.02 at the end of a 12 month term, assuming the price of bitcoin remains constant through the term.

B.   An investment of 1 bitcoin, valued at around $9,130.71 at the time of investment, will generate an ending balance of around 723.10825652 bitcoin worth around $6,606,873.07 at the end of a 60 month term, assuming the price of bitcoin remains constant through the term.

26.   Respondent Mirror Trading also claims the projection of future returns of around 10 percent per month constitutes a "conservative quote" and "in reality the profits may be higher."

## THE MULTI-LEVEL MARKETING SCHEME

27.   Respondent Mirror Trading is recruiting members to participate in a multilevel marketing scheme.

28.   Respondent Mirror Trading is providing multilevel marketers with tools for recruiting new investors. In addition to providing access to information published in a Telegram group and YouTube channel, Respondent Mirror Trading is providing its multilevel marketers with referral links that can be embedded in websites or sent via electronic mail or text message.

29.   Respondent Mirror Trading is promising to pay four streams of commissions to multilevel marketers.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 7

5)

30.   Respondent Mirror Trading refers to the four streams of commissions as direct once-off referral bonuses, weekly profit-sharing bonuses, P1 leadership bonuses and P2 leadership bonuses. It describes them as follows:

A.   The direct once-off referral bonuses generally refer to the payment of commissions equal to 10 percent of the principal deposited by recruited investors.

B.   The weekly profit-sharing bonuses are predicated on recruiting new investors. An agent generally qualifies for weekly profit-sharing bonuses when he or she recruits at least two new members. He or she may then share in a pool of 20 percent of the weekly gross profits derived from trading, with the maximum payout capped at $75,000.

C.   The P1 leadership bonus is predicated on recruiting new investors and earning shares in a pool. An agent generally earns shares in this pool when he or she refers at least two members with accounts valued at least at $200. Respondent Mirror Trading pays P1 leadership bonuses to the agent based, at least in part, on the number of shares earned by the agent.

D.   The P2 leadership bonus is also predicated on recruiting new investors and earning shares in a pool. An agent generally earns shares in this pool when he or she refers at least two members with accounts valued at least at $200 and at least one such member refers at least two members with accounts valued at least at $200. Respondent Mirror Trading pays P2 leadership bonuses to the agent based, at least in part, on the number of shares earned by the agent.

31.   Respondent Mirror Trading also purports to prohibit illegal activity among membership, requires all members to adhere to all laws and accepted business practices within the countries they transact business and prohibits members from engaging in fraudulent commercial practices.

### THE DISCLAIMERS

32.   Respondent Mirror Trading is disclaiming any and all liability associated with its sale of investments in the cryptocurrency and forex trading pool. It also requires investors to agree to the following provisions:

A.   Investors must agree "[n]either MTI nor its business partners is responsible for any loss or damage of whatever nature," and

52

B.    Investors must agree "MTI will not and cannot be held liable for any losses of whatsoever nature due to unfulfilled promises to prospective members or third parties by any other existing members."

## REGISTRATION VIOLATIONS

33.    Respondents Mirror Trading, ForexAndBitcoin, Steynberg, Cullison, Knott and Herceg (collectively the "Respondents") have not been registered with the Securities Commissioner as dealers or agents at any time material hereto.

34.    The investments in the cryptocurrency and forex trading pool have not been registered by qualification, notification or coordination and no permit has been granted for their sale in Texas at any time material hereto.

## FRAUD AND THE CONCEALMENT OF MATERIAL BUSINESS INFORMATION

35.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose Respondent Steynberg's business repute, qualifications and experience, and this information constitutes a material fact.

## FRAUD AND THE DIGITAL SOFTWARE AND ARTIFICIAL INTELLIGENCE

36.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose material facts relating to the administration of the "digital software" and "artificial intelligence" used to trade forex, including the following material facts:

A.    The identity of the programmers and developers of the "digital software" and "artificial intelligence," including the identity of the party that coded the software, as well as its business repute, qualifications and experience;

B.    The identity of the servicers of the "digital software" and "artificial intelligence," including the identity of the party responsible for maintaining and updating the software, as well as its business repute, qualifications and experience;

C.    The costs associated with the "digital software" and "artificial intelligence," including any ongoing costs for licensing the software, maintaining the software and updating the software; and

D.    The security of the "digital software" and "artificial intelligence," including the security of internet connections used to access the software, the use of

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 8









53

security systems to prevent or deter cyberattacks, and the use of encryption to prevent unauthorized access by third-parties.

37. In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose material facts relating to the implementation of the "digital software" and "artificial intelligence" used to trade forex, including the following material facts:

A. The strategy or strategies used to buy and sell forex for a profit;

B. Information relating to defects, glitches, bugs or malfunctions, including information explaining these events may negatively impact the ability to trade forex for a profit; and

C. The strategies or procedures for overcoming hardware and software failures, power outages or network disconnections.

## FRAUD AND THE "REGISTERED AND REGULATED" FOREX BROKERS

38. In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts about the forex brokers:

A. The identity of the forex brokers, as well as the address of their principal places of business and their business repute, qualifications and experience of the forex brokers;

B. Any information that reflects or relates to their registration and regulation by a government agency; and

C. Any information that reflects the scope of their authority to trade forex, their procedures for trading forex, or their role in receiving, maintaining and using cryptocurrencies.

## FRAUD AND THE SAFEGUARDING OF BITCOIN

39. In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts relating to the safeguarding and protecting of bitcoin, including the following material facts:

A. The type of wallet or software it uses to receive, access and transfer bitcoin, including information that reflects whether Respondent Mirror Trading is

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al/Page 10

  

ELSIE VAN DE VENDEL
NOTARY PUBLIC

64

using a custodial wallet that affords access to a custodian or other party with the authority of a non-custodial wallet that is not affiliated with a custodian or other party;

B. The connectivity of the wallet or software it uses to receive, access and transfer bitcoin, including information that reflects whether Respondent Mirror Trading is using a "hot" wallet such as a mobile or desktop wallet or a "cold" wallet that is typically not connected to the internet;

C. The procedures or protocols for securing access to the wallet or software it uses to receive, access and transfer bitcoin, including its policies for safeguarding private keys and any other means of authentication and access of the wallets or software;

D. The security of the wallet or software it uses to receive, access and transfer bitcoin, including the security of internet connections used to access the wallet, the use of security systems to prevent or deter cyberattacks, and the use of encryption to prevent unauthorized access by third-parties; and

E. The risk that attackers may use viruses, malware or other techniques to hack systems or otherwise gain access to bitcoin.

## FRAUD AND THE CONCEALMENT OF RISKS ASSOCIATED WITH TRADING FOREX

40. In connection with the offer of the investment in the forex trading pool, Respondents are intentionally failing to disclose the following material facts relating to the risks associated with trading foreign currencies:

A. Fluctuations in a country's interest rates may lead to fluctuations in a currency's value, thereby negatively impacting the ability to close a trade for a profit;

B. Macroeconomic statistics, such as inflation, can have a significant impact on forex markets;

C. Other capital markets, including stocks, bonds, and commodities markets have strong influences on exchange rates between foreign currencies;

D. International trade numbers, such as trade deficits and surpluses, play a vital role in forex markets;



NOTARY
PUBLIC
ELSJE VAN DE VENDEL

55

E.    Fluctuations in the foreign exchange rate between the time of placing a trade and the time of closing a trade may negatively impact the price of forex;

F.    Leveraging transactions on margin, once called, may lead to substantial losses in excess of initial investments; and

G.    Political news can be important for forex traders, and unexpected news can negatively impact forex trading.

## FRAUD AND THE CONCEALMENT OF THE RISKS
## ASSOCIATED WITH BITCOIN AND BITCOIN POOLS

41.    In connection with the offer of investments in the cryptocurrency and forex trading pool, Respondents Mirror Trading and Steynberg are intentionally failing to disclose the following material facts relating to the risks associated with bitcoin and bitcoin pools:

A.    Governments may adopt legislation or regulation that may negatively impact the use, transfer, exchange or price of bitcoin;

B.    A system or technical failure, or deficient source code, may negatively impact the ability to exchange cryptocurrencies for fiat currencies, as well as the price of cryptocurrencies;

C.    A hacking incident or malicious attack may negatively impact the price of cryptocurrencies;

D.    Bitcoin competes with other cryptocurrencies, and this competition may negatively impact the price of bitcoins; and

E.    Investors will need to monetize their bitcoin, and cryptocurrency exchanges or other parties may charge considerable fees when exchanging bitcoin for fiat currency.

## DECEPTION AND THE MULTILEVEL MARKETING PROGRAM

42.    As described herein, Respondent Mirror Trading is recruiting multilevel marketers to offer the investments in the bitcoin and forex trading pool and promising to pay four tiers of commissions for selling the product.

43.    As described herein, Respondent Mirror Trading also purports to prohibit illegal activity among membership, requires all members to adhere to all laws and

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 12

56

accepted business practices within the countries they transact business and prohibits members from engaging in fraudulent commercial practices.

44.    These statements are materially misleading or otherwise likely to deceive the public because:

    A.    Any party offering securities in Texas must generally be registered as a dealer or agent with the Securities Commissioner; and

    B.    Parties may generally only offer securities in Texas when the securities are registered or permitted for sale.

### DECEPTION AND THE DISCLAIMER OF LIABILITY

45.    As described herein, Respondent Mirror Trading is disclaiming any and all liability associated with its sale of investments in the cryptocurrency and forex trading pool. It also requires investors to agree to the following provisions:

    A.    Investors must agree "[n]either MTI nor its business partners is responsible for any loss or damage of whatever nature;" and

    B.    Investors must agree "MTI will not and cannot be held liable for any losses of whatsoever nature due to unfulfilled promises to prospective members or third parties by any other existing members."

46.    These statements are materially misleading or otherwise likely to deceive the public because:

    A.    The Securities Act provides Texans with important rights, including potential civil causes of action against Respondent Mirror Trading; and

    B.    As a matter of law, Respondent Mirror Trading may not escape potential liability by requiring members to disclaim these important rights.

### DECEIT AND OFFERS BY MULTILEVEL MARKETERS IN TEXAS

47.    As described herein, Respondents ForexAndBitcoin, Cullison, Knott and Herceg are offering the investments in the cryptocurrency and forex trading pool to Texans, variously representing as follows:

    A.    Investors deposit as little as $100 and make an average of 10% per month;

    B.    Investors simply need to "[j]ust sit back and watch [their] MONEY grow;"

51

C.   The investment pays "daily trade income," the daily trade income is "automatically compounded" and "compound interest is the 8th Wonder of the World;"

D.   The investment "grows your bitcoin compounding daily earning an average of 10% per month;"

E.   The investments have more than 200+ days straight with positive gains; and

F.   The investment closes 600 to 800 trades each day and has not lost a trade in almost a year.

48.   These statements are materially misleading or otherwise likely to deceive the public because they tout the profitability of investing in the cryptocurrency and forex trading pool but do not disclose the following information:

A.   The business repute, qualifications or experience of Respondent Mirror Trading and Steynberg;

B.   The information relating to the administration of the "digital software" and "artificial intelligence" used to trade forex described herein;

C.   The information relating to the implementation of the "digital software" and "artificial intelligence" used to trade forex described herein;

D.   The information about the forex brokers described herein;

E.   The information relating to the safeguarding and protecting of bitcoin described herein;

F.   The information about the forex brokers described herein;

G.   The information relating to the risks associated with bitcoin and bitcoin pools described herein;

H.   The information relating to the registration of multilevel marketers who offer Texans the investments in the cryptocurrency and forex trading pool described herein;

I.   The information relating to the registration of cryptocurrency and forex trading pools offered or sold to Texans described herein; and

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al.Page 14

56

J.    The information relating to the disclaimer of liability as described herein.

48.    These statements are also materially misleading or otherwise likely to deceive the public because Respondents ForexAndBitcoin, Cullison, Knott and Herceg are touting the safety and profitability of investing in the cryptocurrency and forex trading pool and participating in the multilevel marketing program, but they are not disclosing their qualifications and their prior financial experience, including the following information:

A.    Respondents ForexAndBitcoin and Cullison are not telling potential investors that on or about June 17, 1999, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, California Northern Bankruptcy Court, Case No. 99-54197;

B.    Respondents ForexAndBitcoin and Cullison are not telling potential investors on or about August 28, 2006, Respondent Cullison filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 06-12244-bam;

C.    Respondents ForexAndBitcoin and Cullison are not telling potential investors on or about September 23, 2011, Respondent Cullison filed a Voluntary Petition for Chapter 13 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 11-25075-leb;

D.    Respondents ForexAndBitcoin and Cullison are not telling potential investors on or about September 4, 2015, Respondent Cullison, formerly doing business as Empower Nutrition Inc., LLC, and doing business as Fusion Nutrition Inc., filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 15-15113-leb;

E.    Respondent Knott is not telling potential investors that on or around June 15, 2010, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 10-21128-bam;

F.    Respondent Knott is not telling potential investors that on or about August 6, 2019, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court, District of Nevada, Case No. 19-15134-abl; and

G.    Respondent Herceg is not telling potential investors that on or about October 4, 2017, he filed a Voluntary Petition for Chapter 7 Bankruptcy in

59

the United States Bankruptcy Court for the Central District of California, Case No. 2:17-bk-22205-BR.

## CONCLUSIONS OF LAW

1. The investments in the cryptocurrency and forex trading pool are "securities" as that term is defined in Section 4.A of the Securities Act.

2. Respondents are violating Section 7 of the Securities Act by offering securities for sale in Texas at a time when the securities are not registered with or permitted by the Securities Commissioner.

3. Respondents are violating Section 12 of the Securities Act by offering securities for sale in Texas without being registered pursuant to the provisions of Section 12 of the Securities Act.

4. Respondents Mirror Trading and Steynberg are engaging in fraud in connection with the offer for sale of securities.

5. Respondents are making an offer containing statements that are materially misleading or otherwise likely to deceive the public.

6. Respondents' conduct, acts, and practices threaten immediate and irreparable harm.

7. The foregoing violations constitute bases for the issuance of an Emergency Cease and Desist Order pursuant to Section 23-2 of the Securities Act.

## ORDER

1. It is therefore ORDERED that Respondents immediately CEASE AND DESIST from offering for sale any security in Texas until the security is registered with the Securities Commissioner or is offered for sale pursuant to an exemption from registration under the Texas Securities Act.

2. It is further ORDERED that Respondents immediately CEASE AND DESIST from acting as a securities dealer or agent in Texas until they are registered with the Securities Commissioner or is acting pursuant to an exemption from registration under the Texas Securities Act.

3. It is further ORDERED that Respondents Mirror Trading and Steynberg immediately CEASE AND DESIST from engaging in any fraud in connection with the offer for sale of any security in Texas.

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 18.

60

4.    It is further ORDERED that Respondents immediately CEASE AND DESIST from offering securities in Texas through an offer containing a statement that is materially misleading or otherwise likely to deceive the public.

## NOTICE

Pursuant to Section 23-2 of the Securities Act, you may request a hearing before the 31st day after the date you were served with this Order. The request for a hearing must be in writing, directed to the Securities Commissioner, and state the grounds for the request to set aside or modify the Order. Failure to request a hearing will result in the Order becoming final and non-appealable.

You are advised under Section 29.D of the Securities Act that any knowing violation of an order issued by the Securities Commissioner under the authority of Section 23-2 of the Securities Act is a criminal offense punishable by a fine of not more than $10,000, or imprisonment in the penitentiary for two to ten years, or by both such fine and imprisonment.

SIGNED AND ENTERED by the Securities Commissioner this 7th day of July, 2020.

TRAVIS J. ILES
Securities Commissioner

Emergency Cease and Desist Order/Mirror Trading International PTY LTD et al./Page 17





ELSJE VAN DE VENDEL
NOTARY
PUBLIC

A-1



**AUTORITÉ
DES MARCHÉS
FINANCIERS**

General public    Fraud prevention    Illegal on-line trading platforms
Warning list of websites and companies that solicit investors illegally

# Warning list of websites and companies that solicit investors illegally

## This list is not exhaustive

It contains only the names of websites that we have received complaints about. Some fraudulent websites are not included in this list either because they have not yet been brought to our attention or their names have been modified. Stay informed!

## Complet list of the active platforms in Québec today

| NOM D'ENTREPRISE | AUTRE NOM D'AFFAIRE | SITE WEB |
| --- | --- | --- |
| 1st Trade options | | www.1sttradeoptions.com |
| AAAFx | | www.aaafx.com |







62

| | | |
|---|---|---|
| HQ Broker | Capazone Invest Ltd. | www.hqbroker.com |
| ICC Intercertus Capital Ltd, ICC Intercertus Capital (Cayman) Limited et Fiscus Capital Seychelles Limited | | everfx.com |
| iforex group | Formula Investments House Ltd | www.iforex.com |
| Impero Solutions Limited | | impero.solutions |
| International Capital Markets PTY Ltd | | ICMarkets.com |
| IQ Option | Best Binary Options Brokers | wwwbulkforex.com |
| Libertex International Company Limited | | libertex.org |
| Markets.com Global | Playtech PLC | www.markets.com |
| Mirror Trading International | | mymticlub.com |
| My Beverly Dreams LLC/ My Beverly Dreams Inc. | | beverlydream.net |

magistrate's court.

(8) Any director or other officer of a company who is called upon to attend any meeting of creditors held after the second meeting or an adjourned second meeting, shall be entitled to an allowance out of the funds of the company to defray his necessary expenses in connection with such attendance.

**416. Application of provisions of Insolvency Act, 1936.**-(1) The provisions of <u>sections 66</u>, <u>67</u> and <u>68</u> of the Insolvency Act, 1936 (<u>Act No. 24 of 1936</u>), shall, in so far as they can be applied and are not inconsistent with the provisions of this Act, *mutatis mutandis* apply in relation to—

(a) any person who is in terms of <u>section 414 (1)</u> of this Act required to attend any meeting of a company being wound up and which is unable to pay its debts, as if such person were an insolvent required to attend any meeting referred to in <u>section 64</u> of the Insolvency Act, 1936; and

(b) any person subpoenaed in terms of <u>section 414 (2)</u> of this Act to attend any meeting of the creditors of such a company or to produce any book or document at any such meeting,

and the provisions of <u>section 65</u> of the Insolvency Act, 1936, shall, in so far as they can be applied and are not inconsistent with the provisions of this Act, *mutatis mutandis* apply in relation to the production of any book or document or the interrogation of any person under <u>section 415</u> of this Act, as if such person had been subpoenaed to produce any book or document or were being interrogated under the said <u>section 65</u> of the Insolvency Act, 1936.

(2) In applying the said <u>sections 66</u>, <u>67</u> and <u>68</u> of the Insolvency Act, 1936, in terms of subsection (1) of this section, any reference in any of the said sections or in <u>section 64</u> or <u>65</u> of that Act-

(a) to the estate of an insolvent, shall be construed as a reference to the estate of the company concerned;

(b) to the trustee of an insolvent estate, shall be construed as a reference to the liquidator of such company;

(c) to a meeting of the creditors of an insolvent, shall be construed as a reference to a meeting of the creditors of such company;

(d) to a creditor who has proved a claim against an insolvent estate, shall be construed as a reference to a person who has proved a claim against such company;

(e) to the business or affairs or property of an insolvent, shall be construed as a reference to the business or affairs or property of such company;

(f) to any person indebted to an insolvent estate, shall be construed as a reference to a person indebted to such company;

(g) to the sequestration of an insolvent estate, shall be construed as a reference to the commencement of the winding-up of such company.

*Examination of Persons in Winding-up*

**417. Summoning and examination of persons as to affairs of company.**-(1) In any winding-up of a company unable to pay its debts, the Master or the Court may, at any time after a winding-up order has been made, summon before him or it any director or officer of the company or person known or suspected to have in his possession any property of the company or believed to be indebted to the company, or any person whom the Master or the Court deems capable of giving information concerning the trade, dealings, affairs or property of the company.

[Sub-s. (1) substituted by <u>s. 9 (a)</u> of <u>Act No. 29 of 1985</u>.]

*Wording of Sections*

(1A) Any person summoned under <u>subsection (1)</u> may be represented at his attendance before the Master or the Court by an attorney with or without counsel.

[Sub-s. (1A) inserted by <u>s. 9 (b)</u> of <u>Act No. 29 of 1985</u>.]

(2) (a) The Master or the Court may examine any person summoned under <u>subsection (1)</u> on oath or affirmation concerning any matter referred to in that subsection, either orally or on written interrogatories, and may reduce his answers to writing and require him to sign them.

[Para. (a) substituted by <u>s. 9 (c)</u> of <u>Act No. 29 of 1985</u>.]

*Wording of Sections*

(b) Any such person may be required to answer any question put to him or her at the examination, notwithstanding that the answer might tend to incriminate him or her and shall, if he or she does so refuse on that ground, be obliged to so answer at the instance of the Master or the Court: Provided that the Master or the Court



may only oblige the person in question to so answer after the Master or the Court has consulted with the Director of Public Prosecutions who has jurisdiction.

[Para. (*b*) substituted by s. 11 (*a*) of Act No. 55 of 2002.]

Wording of Sections

(*c*) An incriminating answer or information directly obtained, or incriminating evidence directly derived from, an examination in terms of this section shall not be admissible as evidence in criminal proceedings in a court of law against the person concerned or the body corporate of which he or she is or was an officer, except in criminal proceedings where the person concerned is charged with an offence relating to—

(i) the administering or taking of an oath or the administering or making of an affirmation;

(ii) the giving of false evidence;

(iii) the making of a false statement; or

(iv) a failure to answer lawful questions fully and satisfactorily.

[Para. (*c*) added by s. 11 (*b*) of Act No. 55 of 2002.]

(3) The Master or the Court may require any such person to produce any books or papers in his custody or under his control relating to the company but without prejudice to any lien claimed with regard to any such books or papers, and the Court shall have power to determine all questions relating to any such lien.

[Sub-s. (3) substituted by s. 9 (*d*) of Act No. 29 of 1985.]

Wording of Sections

(4) If any person who has been duly summoned under subsection (1) and to whom a reasonable sum for his expenses has been tendered, fails to attend before the Master or the Court at the time appointed by the summons without lawful excuse made known to the Master or the Court at the time of the sitting and accepted by the Master or the Court, the Master or the Court may cause him to be apprehended and brought before him or it for examination.

[Sub-s. (4) substituted by s. 9 (*d*) of Act No. 29 of 1985.]

Wording of Sections

(5) Any person summoned by the Master under subsection (1) shall be entitled to such witness fees as he would have been entitled to if he were a witness in civil proceedings in a magistrate's court.

[Sub-s. (5) added by s. 9 (*e*) of Act No. 29 of 1985.]

(6) Any person who applies for an examination or enquiry in terms of this section or section 418 shall be liable for the payment of the costs and expenses incidental thereto, unless the Master or the Court directs that the whole or any part of such costs and expenses shall be paid out of the assets of the company concerned.

[Sub-s. (6) added by s. 9 (*e*) of Act No. 29 of 1985.]

(7) Any examination or enquiry under this section or section 418 and any application therefore shall be private and confidential, unless the Master or the Court, either generally or in respect of any particular person, directs otherwise.

[Sub-s. (7) added by s. 9 (*e*) of Act No. 29 of 1985.]

**418. Examination by commissioners.**—(1) (*a*) Every magistrate and every other person appointed for the purpose by the Master or the Court shall be a commissioner for the purpose of taking evidence or holding any enquiry under this Act in connection with the winding-up of any company.

(*b*) The Master or the Court may refer the whole or any part of the examination of any witness or of any enquiry under this Act to any such commissioner, whether or not he is within the jurisdiction of the Court which issued the winding-up order.

(*c*) The Master, if he has not himself been appointed under paragraph (*a*), the liquidator or any creditor, member or contributory of the company may be represented at such an examination or enquiry by an attorney, with or without counsel, who shall be entitled to interrogate any witness: Provided that a commissioner shall disallow any question which is irrelevant or would in his opinion prolong the interrogation unnecessarily.

(*d*) The provisions of section 417 (1A), (2) (*b*) and (5) shall apply *mutatis mutandis* in respect of such an examination or enquiry.

(2) A commissioner shall in any matter referred to him have the same powers of summoning and examining witnesses and of requiring the production of documents, as the Master who or the Court which appointed him, and, if the commissioner is a magistrate, of punishing defaulting or recalcitrant witnesses, or causing defaulting witnesses to be apprehended, and of determining questions relating to any lien with regard to documents, as the Court referred to in section 417.

ELSJE VAN DE VENDEL
NOTARY PUBLIC
SOUTH AFRICA
GAUTENG

66

(3) If a commissioner-

(a)    has been appointed by the Master, he shall, in such manner as the Master may direct, report to the Master; or

(b)    has been appointed by the Court, he shall, in such manner as the Court may direct, report to the Master and the Court,

on any examination or enquiry referred to him.

(4)  Any witness who has given evidence before the Master or the Court under <u>section 417</u> or before a commissioner under this section, shall be entitled, at his cost, to a copy of the record of his evidence.

(5)  Any person who-

(a)    has been duly summoned under this section by a commissioner who is not a magistrate and who fails, without sufficient cause, to attend at the time and place specified in the summons; or

(b)    has been duly summoned under <u>section 417 (1)</u> by the Master or under this section by a commissioner who is not a magistrate and who-

(i) fails, without sufficient cause, to remain in attendance until excused by the Master or such commissioner, as the case may be, from further attendance;

(ii) refuses to be sworn or to affirm as a witness; or

(iii) fails, without sufficient cause-

(aa)    to answer fully and satisfactorily any question lawfully put to him in terms of <u>section 417 (2)</u> or this section; or

(bb)    to produce books or papers in his custody or under his control which he was required to produce in terms of <u>section 417 (3)</u> or this section,

shall be guilty of an offence.

[S. 418 substituted by <u>s. 10</u> of <u>Act No. 29 of 1985</u>.]

<u>Wording of Sections</u>

*Dissolution of Companies and other Bodies Corporate*

**419.  Dissolution of companies and other bodies corporate.-**(1)  In any winding-up, when the affairs of a company have been completely wound up, the Master shall transmit to the Registrar a certificate to that effect and send a copy thereof to the liquidator.

(2)  The Registrar shall record the dissolution of the company and shall publish notice thereof in the prescribed manner.

[Sub-s. (2) substituted by <u>s. 49</u> of <u>Act No. 24 of 2006</u>.]

<u>Wording of Sections</u>

(3)  The date of dissolution of the company shall be the date of recording referred to in <u>subsection (2)</u>.

(4)  In the case of any other body corporate the certificate of the Master under <u>subsection (1)</u> shall constitute its dissolution.

**420.  Court may declare dissolution void.-**  When a company has been dissolved, the Court may at any time on an application by the liquidator of the company, or by any other person who appears to the Court to have an interest, make an order, upon such terms as the Court thinks fit, declaring the dissolution to have been void, and thereupon any proceedings may be taken against the company might have been taken if the company had not been dissolved.

[S. 420 substituted by <u>s. 10</u> of <u>Act No. 84 of 1980</u>.]

<u>Wording of Sections</u>

**421.  Registrar to keep a register of directors of dissolved companies.-**(1)  The Registrar shall establish and maintain a register of directors of companies which have been dissolved and were unable to pay their debts, and cause to be entered therein, in respect of each such director-

(a)    his full forenames and surname, and any former forenames and surname, his nationality, if not South African, his occupation, his date of birth and his last known residential and postal addresses;



*EXHIBIT "B"*



01684

| Repertoriumnummer | Uitgifte | | |
|---|---|---|---|
| **2023/** | Uitgereikt aan | Uitgereikt aan | Uitgereikt aan |
| Datum van uitspraak | | | |
| **0 7 APR. 2023** | | | |
| Rolnummer | op | op | op |
| **EV/23/00024** | € | € | € |

☐ Niet aan te bieden aan de ontvanger

# Nederlandstalige ondernemingsrechtbank Brussel

# Beschikking

| Aangeboden op |
|---|
| Niet te registreren |

## Eenzijdig verzoekschrift (art. 121 wetboek IPR)

IN DE ZAAK VAN:

De heer **Herman Bester**, de heer **Adriaan Willem Van Rooyen**, de heer **Christopher James Roos**, mevrouw **Jacolien Frieda Barnard**, mevrouw **Deidre Basson** en de heer **Chavonnes Badenhorst St. Clair Cooper** in hun hoedanigheid van vereffenaars van **Mirror Trading International (Pty) Ltd (in liquidation)**, een vennootschap naar het recht van Zuid-Afrika, met maatschappelijke zetel te 43 Plein Street, Unit 1, eerste verdieping, Stellenbosch, West-Kaap (Zuid-Afrika) en met ondernemingsnummer 2019/205570/07 (hierna "**Mirror Trading**");

*Verzoekers;*

Bijgestaan en vertegenwoordigd door mevrouw Ilse Van de Mierop, advocaat, met kantoor te 1000 Brussel, Wolstraat 70;

Gelet op het hierbij gevoegd verzoekschrift;

1. Verzoekers vorderen dat de vordering van de vereffenaars van Mirror Trading International (Pty) Ltd (in liquidation) ontvankelijk en gegrond zou verklaard worden en de vonnissen van de *High Court of South Africa, Western Cape Division, Cape Town* 28 december 2020, 22 januari 2021 en 30 juni 2021 in de zaak met nummer 192021/2020 erkend en uitvoerbaar verklaard worden.

Het centrum van voornaamste belangen van verzoekers is gelegen in Zuid-Afrika en dus buiten Europa zodat het WIPR van toepassing is.

2. Krachtens artikel 23, §3 WIPR wordt de vordering tot erkenning of uitvoerbaarverklaring van de buitenlandse beslissing ingesteld en behandeld volgens de procedure bedoeld in de artikelen 1025 tot 1034 Ger.W. en dus bij eenzijdig verzoekschrift. Als de buitenlandse beslissing een uitspraak inzake een insolventieprocedure betreft, is de ondernemingsrechtbank bevoegd (artikel 121, §4 WIPR). De behandeling van éénzijdige verzoekschriften is een bevoegdheid van de voorzitter van deze rechtbank.

Dit artikel voorziet ook dat wanneer de verzoeker geen woon- of verblijfplaats in België heeft hij de zaak mag brengen voor de rechtbank van het arrondissement Brussel ( artikel 23§2, 2ᵉ lid WIPR)

3. Onder het WIPR geldt het principe van de automatische erkenning van niet-Europese insolventieprocedures als een beslissing in een hoofdprocedure op voorwaarde dat de beslissing werd genomen door een rechter in de Staat waarin de voornaamste vestiging van de schuldenaar bij de inleiding van de die

procedure gelegen was (art. 121 §1, 1° WIPR), voorwaarde waaraan voldaan lijkt te zijn.

Verzoekers leggen uitgiftes voor van de vonnissen die voldoen aan de voorwaarden nodig voor de echtheid ervan en waaruit blijkt dat het vonnis onmiddellijk uitvoerbaar is, waarmee voldaan is aan artikel 24 WIPR.

Het komt de dd. Voorzitter voor dat er geen grond voorhanden is, zoals opgesomd in artikel 25 WIPR, om de erkenning of uitvoerbaarverklaring van de beslissing in België te weigeren.

De dd. Voorzitter, oordeelt dat de gevraagde erkenning en uitvoerbaarverklaring bijgevolg moet worden toegestaan.

OM DEZE REDENEN,

De dd. Voorzitter,
rechtsprekend op het hierbij gevoegde eenzijdig verzoek;

erkent en verklaart de vonnissen van de *High Court of South Africa, Western Cape Division, Cape Town* 28 december 2020, 22 januari 2021 en 30 juni 2021 in de zaak met nummer 192021/2020 uitvoerbaar bij voorraad niettegenstaande alle verhaal en zonder borgstelling;

legt de bijdrage van 20 euro voor het begrotingsfonds juridische tweedelijnsbijstand ten laste van verzoekende partij en veroordeelt haar tot betaling van het rolrecht van 165,00 euro aan de FOD Financiën, na uitnodiging.

Deze beschikking werd in raadkamer gewezen door mevrouw B. Burm-Herregodts, rechter, in vervanging van de voorzitter, bijgestaan door de heer K. Nevens, Afgevaardigd Griffier, op  0 7 APR. 2023

NEVENS                                                    B. BURM-HERREGODTS



Verzoekschrift neergelegd op

**3 1 MAART 2023**

ter griffie van de Nederlandstalige
ondernemingsrechtbank Brussel

**Nederlandstalige ondernemingsrechtbank Brussel**
Rolnummer: *A/23/00024*

## EENZIJDIG VERZOEKSCHRIFT M.O.O. EXEQUATUR BUITENLANDS VONNIS
### (art. 121, art. 22, §1, eerste lid en art. 23, §3 WIPR en art. 1025 Ger.W.)

**VOOR:**

De heer **Herman Bester**, de heer **Adriaan Willem Van Rooyen**, de heer **Christopher James Roos**, mevrouw **Jacolien Frieda Barnard**, mevrouw **Deidre Basson** en de heer **Chavonnes Badenhorst St. Clair Cooper** in hun hoedanigheid van vereffenaars van **Mirror Trading International (Pty) Ltd (in liquidation)**, een vennootschap naar het recht van Zuid-Afrika, met maatschappelijke zetel te 43 Plein Street, Unit 1, eerste verdieping, Stellenbosch, West-Kaap (Zuid-Afrika) en met ondernemingsnummer 2019/205570/07 (hierna "**Mirror Trading**");

*Verzoekers;*

Bijgestaan en vertegenwoordigd door mevrouw Ilse Van de Mierop, advocaat, met kantoor te 1000 Brussel, Wolstraat 70;

*       *       *

Onder voorbehoud van alle recht en zonder enige nadelige erkenning;

## 2    Feiten

**1.**     Mirror Trading is een in Zuid-Afrika gevestigde vennootschap die op 30 juni 2021 door de rechtbank te Kaapstad (*'High Court of South Africa, Western Cape Division, Cape Town'*[1]) definitief in vereffening werd gesteld (**Stuk 1** en **Stuk 2**). De heer Herman Bester, de heer Adriaan Willem Van Rooyen, de heer Christopher James Roos, mevrouw Jacolien Frieda Barnard, mevrouw Deidre Basson en de heer Chavonnes Badenhorst St. Clair Cooper werden door de rechtbank aangeduid als vereffenaars van Mirror Trading en treden zodoende op in naam en voor rekening van de vennootschap.

De vennootschap, die in april 2019 was opgericht, was het centrale vehikel in een zogenaamde ponzifraudesysteem: kandidaat-investeerders werden overtuigd om bitcoins, een cryptovaluta of digitale munt, te investeren in de vennootschap en in ruil zouden zij een aanzienlijk rendement tot wel 10% per maand ontvangen. Het systeem werd als het ware in stand gehouden door bestaande investeerders een bijkomende vergoeding te beloven wanneer zij nieuwe investeerders zouden aanbrengen. Het gaat om tienduizenden investeerders in meer dan 140 landen. De spilfiguur in dit verhaal was de heer Cornelius Johannes Steynberg, tot aan de vereffening de gedelegeerd bestuurder en enige bestuurder van Mirror Trading.[2]

Volgens de informatie waarover de vereffenaars beschikken, zouden bij wijze van vergoeding om nieuwe investeerders aan te brengen in totaal zo'n 3.500 bitcoins zijn uitgekeerd aan 180 verschillende personen verspreid over de hele wereld (bijvoorbeeld Canada, de Verenigde Staten en Zweden). Ook diverse in België gevestigde personen zouden op die manier bitcoins hebben ontvangen. Het zou meer concreet gaan om zo'n 47 personen, die samen in totaal zo'n 174,25 bitcoins zouden hebben ontvangen. Vermits de waarde van één bitcoin op vandaag ruwweg zo'n 22.000 EUR bedraagt, gaat het enkel voor de Belgische investeerders al over een bedrag van 3.833.500 EUR.

**2.**     De Zuid-Afrikaanse autoriteit voor de financiële sector, de *Financial Sector Conduct Authority*[3], heeft op haar beurt een onderzoek ingesteld naar Mirror Trading. Naar aanleiding van dat onderzoek heeft zij vier persmededelingen uitgebracht, waarvan de laatste dateert van 19 januari 2021 (**Stuk 3**, **Stuk 4**, **Stuk 5** en **Stuk 6**). De *Financial Sector Conduct Authority* deelde mee dat Mirror Trading onder andere gereguleerde activiteiten uitoefende zonder daarvoor over de vereiste vergunning te beschikken en een aanzienlijk verlies ter waarde van

---

[1]     Vrije vertaling: Hooggerechtshof van Zuid-Afrika, afdeling Westkaap, Kaapstad.
[2]     Hij kreeg niettemin de steun van nog enkele andere personen, waaronder mevrouw Nerina Steynberg, de heer Clynton Hugh Marks, mevrouw Cheri Marks, de heer Charlie Ward, mevrouw Monica Coetzee, mevrouw Liz Malton, de heer Leonard Gray en de heer Romana Samuels.
[3]     Vrije vertaling: Zuid-Afrikaanse toezichtautoriteit voor de financiële sector.

30% van de geïnvesteerde gelden had geleden in tegenstelling tot de buitengewoon hoge winsten die de investeerders werden voorgespiegeld.

Ook in andere landen vonden er vergelijkbare onderzoeken plaats. Zo had de Texaanse *State Securities Board*[4] bijvoorbeeld aan Mirror Trading en de heer Cornelius Johannes Steynberg het verbod opgelegd om op enige manier te handelen in effecten (**Stuk 7**). De Canadese *Autorité des marchés financiers*[5], die bevoegd is voor het grondgebied van de provincie Quebec, plaatste Mirror Trading dan weer op haar lijst van websites en ondernemingen die op onrechtmatige wijze investeerders tracht te lokken (**Stuk 8**).

3.      Op 23 december 2020 had de heer Anton Fred Melchior Lee, die een bedrag van 34.708,77 USD had geïnvesteerd in Mirror Trading, een verzoek tot invereffeningstelling aanhangig gemaakt bij de rechtbank van Kaapstad. Volgens de heer Anton Fred Melchior Lee was Mirror Trading niet langer in staat om haar opeisbare schulden te voldoen.

De zaak werd op de zitting daags nadien, 24 december 2020, uitgesteld op verzoek van een belangenorganisatie van gedupeerde investeerders, de '*MTI Recovery Action Group*'[6], die zich in tussentijd had gemanifesteerd. Op 28 december 2020 heeft de rechtbank vervolgens Mirror Trading in voorlopige vereffening geplaatst en de heer Herman Bester, de heer Adriaan Willem Van Rooyen, de heer Christopher James Roos, mevrouw Jacolien Frieda Barnard, mevrouw Deidre Basson en de heer Chavonnes Badenhorst St. Clair Cooper als voorlopige vereffenaars aangeduid (**Stuk 9**). In dat vonnis bepaalde de rechtbank dat (i) eventuele belanghebbenden tot 1 maart 2021 zouden hebben om eventuele redenen aan te voeren waarom de voorlopige vereffening *niet* zou moeten worden omgezet naar een definitieve vereffening (**Stuk 9**, bladzijde 2, nummer 2) en (ii) dat het vonnis betekend zou worden aan Mirror Trading op haar maatschappelijke zetel en aan haar werknemers, in een krant bekendgemaakt zou moeten worden en tevens betekend zou worden aan de Zuid-Afrikaanse belastingdienst (*South African Revenu Service*)( **Stuk 9**, bladzijde 2, nummer 3).

Nadat de rechtbank op 22 januari 2021 de voorlopige vereffenaars op basis van de toepasselijke wetgeving had gemachtigd om alle nodige stappen te zetten (**Stuk 10**), heeft zij bij vonnis van 30 juni 2021 de vereffening bevestigd (**Stuk 1**). Met dat vonnis werd de voorlopige vereffening omgezet in een definitieve vereffening. Mirror Trading werd in essentie

---

[4]      Vrije vertaling: Statelijk effectenorgaan.
[5]      Vrije vertaling: Autoriteit voor financiële markten.
[6]      Vrije vertaling: MTI actiegroep tot terugvordering.

in vereffening gesteld omdat zij niet langer in staat was om haar schulden te betalen en is naar het recht van Zuid-Afrika nog steeds niet in staat haar schulden te voldoen.

4.    Waar Mirror Trading in totaal tenminste 23.000 bitcoins in handen zou moeten hebben, zijnde het aantal bitcoins dat zij verschuldigd is aan de verschillende investeerders, zijn de vereffenaars er tot dusver in geslaagd slechts zo'n 1.300 bitcoins te lokaliseren en te innen.

## 3    Middelen

### 3.1    Eerste en enige middel – In hoofdorde: Erkenning en uitvoerbaarverklaring vonnissen 28 december 2020, 22 januari 2021 en 30 juni 2021

**5.**    Art. 121 van het Wetboek van internationaal privaatrecht (WIPR) leest als volgt (onderlijning toegevoegd):

"*§ 1 Een buitenlandse rechterlijke beslissing die de opening, het verloop of de sluiting van een insolventieprocedure betreft en die niet is uitgesproken op grond van de insolventieverordening, wordt in België, overeenkomstig artikel 22 erkend of uitvoerbaar verklaard:*

*1° als een beslissing in een hoofdprocedure, indien de beslissing werd genomen door een rechter in de Staat waar de voornaamste vestiging van de schuldenaar bij de inleiding van die procedure gelegen was;*

*2° als een beslissing in een territoriale procedure, indien de beslissing werd genomen door een rechter in de Staat waar de schuldenaar bij de inleiding van die procedure een andere vestiging dan zijn voornaamste vestiging bezat; in dit geval mag de erkenning of de uitvoering van de beslissing slechts goederen betreffen die waren gelegen op het grondgebied van de Staat waar de procedure werd geopend.*

*§ 2 Een buitenlandse rechterlijke beslissing bedoeld in § 1, mag in België geen gevolg krijgen dat in strijd is met de rechten van partijen volgens de regels gesteld in artikel 119, § 2 tot § 4.*

*§ 3 De erkenning brengt met zich dat de beheerder de bevoegdheden mag uitoefenen die hem werden opgedragen in de buitenlandse beslissing, met name om als beheerder van een hoofdprocedure in België een territoriale procedure of voorlopige en bewarende maatregelen aan te vragen in zijn hoedanigheid van beheerder van een buitenlandse hoofdprocedure.*

*§ 4 In afwijking van artikel 23 is de ondernemingsrechtbank bevoegd om kennis te nemen van vorderingen bedoeld in § 1.*

*De ondernemingsrechtbank is eveneens bevoegd om kennis te nemen van vorderingen tot erkenning of uitvoerbaarverklaring van de buitenlandse rechterlijke beslissingen die genomen werden op grond van de insolventieverordening.*

*Die afwijkingen gelden echter niet voor beslissingen inzake de collectieve schuldenregeling van de persoon die geen handelaar is in de zin van het Belgisch recht."*

Art. 22 WIPR, waarnaar art. 121, §1, eerste lid teruggrijpt, legt de procedure vast voor de erkenning en uitvoerbaarverklaring van buitenlandse vonnissen. Een dergelijke vordering wordt bij eenzijdig verzoekschrift voorgelegd aan de rechtbank van de plaats van de verweerder of deze van de plaats van uitvoering indien de verweerder geen woon- of verblijfplaats heeft in België (art. 23, §2, eerste lid en art. 23, §3 WIPR). Wanneer de vordering tot erkenning niet voor één van deze rechtbanken ingeleid kan worden, mag de verzoeker de zaak brengen voor de rechtbank van zijn woonplaats of zijn gewone verblijfplaats en bij gebreke van woonplaats of verblijfplaats in België mag hij de zaak brengen voor de rechtbank van het arrondissement Brussel (art. 23, §2, tweede lid WIPR).

Het verzoekschrift gaat vergezeld van (i) een uitgifte van de beslissing die voldoet aan de voorwaarden nodig voor de echtheid ervan, (ii) in geval van een verstekbeslissing, het origineel of een voor eensluidend verklaard afschrift van het document waaruit blijkt dat het stuk dat het geding heeft ingeleid of een gelijkwaardig stuk volgens het recht van de Staat waar de beslissing is gewezen aan de niet verschenen partij is betekend of ter kennis gebracht, en (iii) enig document op grond waarvan kan worden vastgesteld dat de beslissing volgens het recht van de Staat waar zij is gewezen uitvoerbaar is en betekend of ter kennis gebracht is (art. 24, §1 WIPR). Indien dergelijke documenten niet voorhanden zouden zijn, kan de rechtbank de verzoeker een termijn geven om ze alsnog neer te leggen, gelijkwaardige documenten aanvaarden of de verzoeker vrijstellen van de verplichting deze voor te leggen (art. 24, §2 WIPR).

Op grond van art. XX.216, §1, eerste lid Wetboek economisch recht (WER) kan "[d]e *insolventiefunctionaris in een op grond van artikel 121 van het Wetboek van internationaal privaatrecht erkende buitenlandse hoofdinsolventie [...] alle bevoegdheden uitoefenen die hem toekomen naar het recht van de staat waar de buitenlandse insolventie is uitgesproken, tenzij op grond van artikel 118, § 1, tweede lid, 2°, van het Wetboek van internationaal privaatrecht een procedure geopend is".* Art. XX.216, §2 WER voegt daaraan toe dat die insolventiefunctionaris "*al zijn bevoegdheden* [kan] *uitoefenen op de goederen van de schuldenaar die zich in België bevinden met inbegrip van deze om ze te verplaatsen, onverminderd artikel 119, § 2 van het Wetboek van internationaal privaatrecht".*

6.     Verzoekers streven met deze procedure de erkenning van het vonnis van 28 december 2020, het vonnis van 22 januari 2021 en het latere vonnis van 30 juni 2021 na. Vervolgens

beogen zij de ten onrechte uitgekeerde bitcoins terug te vorderen van in het bijzonder in België wonende personen, zoals zij ook in andere landen hebben gedaan en doen. Op die manier trachten zij de activa van de vennootschap weder samen te stellen om de opbrengsten uit te keren aan de schuldeisers (overeenkomstig hun rechtmatige aanspraken en rangorde) en dus vergelijkbaar zoals een Belgische curator te werk zou gaan.

7.    De vereffenaars leggen hiervoor de door art. 24, §1 WIPR vereiste documenten voor:

–    Een uitgifte van de beslissing die voldoet aan de voorwaarden nodig voor de echtheid ervan.

De vonnissen van de *High Court of South Africa, Western Cape Division, Cape Town* in de zaak met nummer 192021/2020 van 28 december 2020, 22 januari 2021 en 30 juni 2021 maken deel uit van de stukken van verzoekers (respectievelijk **Stuk 9, Stuk 10 en Stuk 1**). Deze vonnissen zijn, nu zowel België als Zuid-Afrika partij zijn bij het Appstilleverdrag[7], voorzien van een apostille (**Stuk 11**). Dat geldt eveneens voor het door de rechtbank uitgereikt certificaat van aanstelling van de vereffenaars (**Stuk 11**).

–    In geval van een verstekbeslissing, het origineel of een voor eensluidend verklaard afschrift van het document waaruit blijkt dat het stuk dat het geding heeft ingeleid of een gelijkwaardig stuk volgens het recht van de Staat waar de beslissing is gewezen aan de niet verschenen partij is betekend of ter kennis gebracht.

Art. 346(4A)(a) van de Zuid-Afrikaanse *Companies Act 61 of 1973*[8] schrijft voor hoe een verzoekschrift betekend moet worden (**Stuk 12**):[9]

---

[7]    Verdrag van 5 oktober 1961 tot afschaffing van het vereiste van legalisatie van buitenlandse openbare akten, *BS* 7 februari 1976, *err. BS* 10 maart 1976.
[8]    Vrije vertaling: Vennootschapswet 61 van 1973.
[9]    Vrije vertaling: "*Wanneer een verzoek overeenkomstig dit artikelbij de rechtbank wordt ingediend, moet de verzoeker een kopie van het verzoek betekenen-*
*(i) aan elke geregistreerde vakbond die, voor zover de verzoeker redelijkerwijs kan nagaan, werknemers van het bedrijf vertegenwoordigt; en*
*(ii) aan de werknemers zelf*
*(aa) door een kopie van de aanvraag aan te brengen op een mededelingenbord waartoe de aanvrager en de werknemers toegang hebben in de lokalen van de vennootschap; of*
*(bb) indien de verzoeker en de werknemers geen toegang hebben tot de lokalen, door een kopie van de aanvraag aan te brengen op de voordeur van de bedrijfsruimten, indien van toepassing, en anders op de voordeur van de bedrijfsruimten van waaruit de vennootschap ten tijde van het verzoekzaken deed;*
*(iii) aan de Zuid-Afrikaanse Belastingdienst; en*
*(iv) aan de vennootschap, tenzij het verzoek door de vennootschap is ingediend, of de rechtbank, naar eigen goeddunken, ontheffing verleent van het verstrekken van een afschrift wanneer de rechtbank ervan overtuigd is dat het in het belang van de vennootschap of van de schuldeisers zou zijn daarvan af te zien.*"

---

> "When an application is presented to the court in terms of this section, the applicant must furnish a copy of the application-

> (i)     to every registered trade union that, as far as the applicant can reasonably ascertain, represents any of the employees of the company; and

> (ii)    to the employees themselves-

>> (aa)    by affixing a copy of the application to any notice board to which the applicant and the employees have access inside the premises of the company; or

>> (bb)    if there is no access to the premises by the applicant and the employees, by affixing a copy of the application to the front gate of the premises, where applicable, failing which to the front door of the premises from which the company conducted any business at the time of the application;

> (iii)   to the South African Revenue Service; and

> (iv)    to the company, unless the application is made by the company, or the court, at its discretion, dispenses with the furnishing of a copy where the court is satisfied that it would be in the interests of the company or of the creditors to dispense with it."

Noch het vonnis van 28 december 2020 noch dat van 30 juni 2021 is een verstekvonnis, zodat het bewijs van betekening op basis van art. 24, §1 WIPR in principe niet nodig is. Niettemin werd het oorspronkelijk verzoekschrift van 23 december 2020 als volgt betekend:

- Er vond geen betekening aan een geregistreerde vakorganisatie (art. 346(4A)(a)(i)) of aan de werknemers (art. 346(4A)(a)(ii)) plaats, omdat er geen werknemers waren. Dat is naar het recht van Zuid-Afrika voldoende.

- Op 23 december 2020 geschiedde de betekening aan de Mirror Trading (art. 346(4A)(a)(iv)), zoals de heer Yasin Alli in zijn verklaring ('affidavit') van 24 december 2020 bevestigt (**Stuk 13**, bladzijde 2, nummer 2.1 en 2.2 en bijlage YA1 daarbij). De heer Yasin Alli is een Zuid-Afrikaanse advocaat en trad op voor de verzoeker, de heer Anton Fred Melchior Lee.

- Er vond tevens betekening plaats aan de Zuid-Afrikaanse belastingdienst, zoals blijkt uit het feit dat de rechtbank het verzoek heeft ingewilligd.

– Enig document op grond waarvan kan worden vastgesteld dat de beslissing volgens het recht van de Staat waar zij is gewezen uitvoerbaar is en betekend of ter kennis gebracht is.

Een vennootschap kan in Zuid-Afrika onder meer ontbonden worden en bijgevolg in vereffening (*"liquidation"*) worden gesteld wanneer zij niet langer in staat is haar opeisbare schulden te voldoen, aldus art. 344 van de *Companies Act 61 of 1973*. Art. 345 van diezelfde *Companies Act 61 of 1973* verduidelijkt wanneer een vennootschap geacht wordt haar opeisbare schulden niet meer te kunnen betalen, bijvoorbeeld wanneer een schuldeiser een betalingsbevel heeft laten betekenen aan de vennootschap en de vennootschap daar binnen drie weken geen gevolg aan heeft gegeven. De vereffening is zodoende het Zuid-Afrikaanse equivalent van het faillissement zoals we dat in België kennen. Mirror Trading is in vereffening gesteld omdat zij niet in staat is haar schulden te betalen en is nog steeds niet in staat haar schulden te voldoen.

Wanneer een belanghebbende de rechtbank verzoekt om een vennootschap in vereffening te stellen, heeft de rechtbank de mogelijkheid om ofwel meteen een volwaardige vereffening uit te spreken ofwel eerst de voorlopige vereffening (*'provisional liquidation'*) uit te spreken en voorlopige vereffenaars (*'provisional liquidators'*) aan te stellen (art. 368 van de *Companies Act 61 of 1973*). Indien er vervolgens niemand tegen de vereffening met succes bezwaar heeft aangetekend, zet de rechtbank de voorlopig vereffening om in een definitieve vereffening (*'final liquidation'*). In de praktijk verzoekt een belanghebbende die de vereffening vordert eenvoudig dat de rechtbank de betrokken vennootschap in vereffening plaatst. Het behoort dan tot de beoordelingsvrijheid waarover de rechtbank beschikt om eerst de voorlopige vereffening dan wel meteen de definitieve vereffening uit te spreken.

Luidens art. 346A(1) van de *Companies Act 61 of 1973* geschiedt de betekening van het vonnis dat de vereffening uitspreekt op vier manieren (onderlijning toegevoegd) (**Stuk 12**):[10]

---

[10]  Vrije vertaling: *"(1) Een kopie van het vereffeningsvonnis moet betekend worden aan-
(a)    iedere vakorganisatie waarnaar verwezen in lid (2);*

"(1)    A copy of a winding-up order must be served on-

(a) every _trade union_ referred to in subsection (2);

(b) the _employees_ of the company by affixing a copy of the application to any notice board to which the employees have access inside the debtor's premises, or if there is no access to the premises by the employees, by affixing a copy to the front gate, where applicable, failing which to the front door of the premises from which the debtor conducted any business at the time of the presentation of the application;

(c) the _South African Revenue Service;_ and

(d) the _company,_ unless the application was made by the company.

(2)    For the purposes of serving the winding-up order in terms of subsection (1), the sheriff must establish whether the employees of the company are represented by a registered trade union and determine whether there is a notice board inside the premises of the company to which the employees have access."

Het vonnis van 28 december 2020, waarbij de rechtbank de voorlopige vereffening uitsprak en voorlopige vereffenaars aanstelde, voegde daaraan toe dat het vonnis ook in twee kranten moest verschijnen, meer bepaald de _Sunday Times_ en _Rapport_ (**Stuk 9**). Zo geschiedde ook:

• Zoals ook met het initieel verzoekschrift het geval was, vond er geen betekening aan een geregistreerde vakorganisatie (art. 346A(1)(a)) of aan de werknemers (art. 346A(1)(b)) plaats, omdat er geen werknemers waren. Dit bevestigde de

---

(b)      de werknemers van de vennootschap door een kopie van het verzoek aan te brengen op een mededelingenbord waartoe de werknemers toegang hebben in de lokalen van de schuldenaar, of indien de werknemers geen toegang hebben tot de lokalen, door een kopie aan te brengen op het voorportaal, indien van toepassing, en anders op de voordeur van de lokalen van waaruit de schuldenaar zaken deed op het ogenblik van de indiening van het verzoek

(c)      de Zuid-Afrikaanse Belastingdienst; en

(d)      de vennootschap, tenzij het verzoek door de vennootschap was ingediend.

(2)      Voor de betekening van het vereffeningsvonnis krachtens lid 1 moet de sheriff vaststellen of de werknemers van de vennootschap worden vertegenwoordigd door een geregistreerde vakorganisatie en bepalen of er in de lokalen van de vennootschap een mededelingenbord aanwezig is waartoe de werknemers toegang hebben."

onder de arm genomen 'sheriff', het Zuid-Afrikaanse equivalent van een Belgische gerechtsdeurwaarder, ook (**Stuk 14**, bijlage YA7[11] en YA9[12]).

- De betekening aan de Zuid-Afrikaanse Belastingdienst (art. 346A(1)(c)) gebeurde, zoals de heer Yasin Alli bevestigt, op 21 januari 2021 per e-mail (**Stuk 14**, bladzijde 2, nummer 5.2 en bijlage YA3 daarbij).

- Aan Mirror Trading (art. 346A(1)(d)) gebeurde de betekening zowel op haar geregistreerde zetel als op een ander bekend adres, namelijk 341 Beyers Naude Drive, Gauteng (Zuid-Afrika)( **Stuk 14**, bladzijde 3, nummers 8.1 en 9 en bijlagen YA7 en YA9 daarbij).

- Op 31 januari 2021 verscheen het vonnis tot slot in beide kranten, zoals het vonnis had voorgeschreven (**Stuk 14**, bladzijde 3, nummer 6 en bijlagen YA4 en YA5 daarbij).

Noch de wet noch het vonnis zelf schrijft voor dat ook het vonnis van 22 januari 2021 en het vonnis van 30 juni 2021 betekend zou moeten worden. Dat is ook niet gebeurd.

8.     Verzoekers vorderen om die redenen dat de rechtbank hun vordering ontvankelijk en gegrond zou verklaren en de vonnissen van 28 december 2020, 22 januari 2021 en 30 juni 2021 zou erkennen.

---

[11]     *"Kindly note: the offices were found unoccupied therefore I was unable to confirm whether there are any employees nor whether there are members of a registered trade union."* Vrije vertaling: *"Wil noteren dat de kantoren als niet bezet werd aangetroffen, waardoor ik niet in de mogelijkheid was om te bevestigen of er werknemers waren en evenmin of er leden van een geregistreerde vakorganisatie zijn."*

[12]     "Attached a copy as the respondent no longer trades from given address and I was unable to ascertain if the respondent has any employees." Vrije vertaling: *"Als bijlage een kopie nu de verweerder niet langer vanop het opgegeven adres handeldrijft en ik was niet in de mogelijkheid om na te gaan of de werknemers werknemers heeft."*

**OM DEZE REDENEN,**

**Onder alle voorbehoud en zonder enige nadelige erkenning,**

**BEHAGE HET DE NEDERLANDSTALIGE ONDERNEMINGSRECHTBANK BRUSSEL,**

De vordering van de vereffenaars van Mirror Trading International (Pty) Ltd (in liquidation) ontvankelijk en gegrond te verklaren.

De vonnissen van de *High Court of South Africa, Western Cape Division, Cape Town* 28 december 2020, 22 januari 2021 en 30 juni 2021 in de zaak met nummer 192021/2020 te erkennen en uitvoerbaar te verklaren.

Brussel, 31 maart 2023

Ilse Van de Mierop, advocaat



| | |
|---|---|
| **DLA Piper UK LLP** | **Nederlandstalige ondernemings-** |
| **1000 Brussel** | **rechtbank Brussel** |
| **Wolstraat 70** | |

**VOOR:**

De heer **Herman Bester**, de heer **Adriaan Willem Van Rooyen**, de heer **Christopher James Roos**, mevrouw **Jacolien Frieda Barnard**, mevrouw **Deidre Basson** en de heer **Chavonnes Badenhorst St. Clair Cooper** in hun hoedanigheid van vereffenaars van **Mirror Trading International (Pty) Ltd (in liquidation)**, een vennootschap naar het recht van Zuid-Afrika, met maatschappelijke zetel te 43 Plein Street, Unit 1, eerste verdieping, Stellenbosch, West-Kaap (Zuid-Afrika) en met ondernemingsnummer 2019/205570/07;

*Verzoekers;*

Bijgestaan en vertegenwoordigd door mevrouw Ilse Van de Mierop, advocaat, met kantoor te 1000 Brussel, Wolstraat 70;

## Inventaris van de stukken

1. Vonnis van de *High Court of South Africa, Western Cape Division, Cape Town* van 30 juni 2021 in de zaak met nummer 192021/2020.

2. Certificaat van aanstelling van de vereffenaars van 11 november 2021.

3. Persbericht van de *Financial Sector Conduct Authority* van 18 augustus 2020.

4. Persbericht van de *Financial Sector Conduct Authority* van 28 oktober 2020.

5. Persbericht van de *Financial Sector Conduct Authority* van 17 december 2020.

6. Persbericht van de *Financial Sector Conduct Authority* van 19 januari 2021.

7. Persbericht van de *Texas State Securities Board* van 7 juli 2020.

8. Uittreksel uit de website van de *Autorité des marchés financiers* van Québec.

9. Vonnis van de *High Court of South Africa, Western Cape Division, Cape Town* van 28 december 2020 in de zaak met nummer 192021/2020.

10. Vonnis van de *High Court of South Africa, Western Cape Division, Cape Town* van 22 januari 2021 in de zaak met nummer 192021/2020.

11. Genotariseerde versies van de vonnissen van 22 januari 2021 en 30 juni 2021 evenals van het certificaat van aanstelling van 11 november 2021 vergezeld van een apostille.

12. Uittreksel uit de Zuid-Afrikaanse *Companies Act 61 of 1973* (art. 344 tot en met art. 348 en art. 368).[13]

13. Verklaring ('*affidavit*') van de heer Yasin Alli van 24 december 2020.

14. Verklaring ('*affidavit*') van de heer Yasin Alli van 23 februari 2021.

---

[13] Te    raadplegen    op:    http://10.184.192.196/NXT/gateway.dll/Provincial%20Government%2 (westerncape.gov.za).